76e0mona

1

```
76e0mona
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   MIDDLESEX COUNTY RETIREMENT
 3   SYSTEM,
 4
 4              Plaintiff,
 5
 5         v.                              07 CV 2237
 6
 6   MONSTER WORLDWIDE, et al,
 7
 7              Defendants.
 8
 8   ------------------------------x
 9                                         New York, N.Y.
 9                                         June 14, 2007
10                                         5:18 p.m.
10
11   Before:
11
12                  HON. JED S. RAKOFF,
12
13                                    District Judge
13
14                       APPEARANCES
14
15   LABATON SUCHAROW & RUDOFF, LLP
15        Attorneys for Plaintiff
16   BY:  CHRISTOPHER KELLER, ESQ.
16
17   MANATT, PHELPS & PHILLIPS, LLP
17        Attorneys for Defendant Andrew McEelvey
18   BY:  ANDREW DeVORE, ESQ.
18
19   DECHERT, LLP
19   DAVID S. HOFFNER,  ESQ.
20      Attorneys for Defendant, Worldwide, Inc.
21   JONATHAN GARDENER, ESQ.
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐                                                                    2

```
 1            (Case called)
 2            THE COURT:  Good afternoon.
 3            Thank you very much.  We have two motions.
 4            The first is a motion of Defendant McEelvey to
 5   dismiss.
 6            I guess my first question for counsel for
 7   Mr. McEelvey, is could a reasonable juror infer for these
 8   limited purposes, intent from the alleged refusal of
 9   Mr. McEelvey to submit to an interview with the special
10   committee of the board.
11            MR. DeVORE:  No, your Honor, I don't think they could.
12            THE COURT:  Why not?
13            MR. DeVORE:  Plaintiff's papers refer to a letter
```

76e0mona

14    submitted by counsel in connection with Mr. McEelvey's decision
15    not to appear for that interview.  That letter states, because
16    it is, I believe, part of the record, that new counsel had just
17    come in on behalf of Mr. McEelvey, sought time to review the
18    record, got comfortable with the facts, and I would submit your
19    Honor that it was a prudent exercise of their judgement on
20    behalf of Mr. McEelvey.
21              THE COURT:  Well, since I dismissed, one of the
22    questions is going to be -- one of the questions, whether it is
23    going to seek leave to replead.  Has he submitted such an
24    interview since then?
25              MR. DeVORE:  He has not, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    3

 1              THE COURT:  So, why is it that -- why, assuming that
 2    were to be alleged in a replead, complaint, why isn't that a
 3    basis for a negative inference?
 4              MR. DeVORE:  Your Honor, I don't -- I don't believe
 5    that even the absolute refusal to submit to an interview would
 6    be sufficient to provide for that inference.  I don't believe,
 7    given where we are, in these NB and 28 claims and the
 8    heightened pleading requirement for strong inference of
 9    fraudulent intent here, that whatever inference one might draw,
10    a reasonable juror might draw from the refusal to appear in an
11    interview, is enough, in fact far from enough, to satisfy that
12    standard.
13              THE COURT:  That may not be enough in and of itself,
14    but you're not saying, are you, that it couldn't be the basis
15    of a negative inference of -- you know, before lawful intent,
16    are you?
17              THE WITNESS:  Well, your Honor, clearly it is
18    something short of exercising one's Fifth Amendment rights.
19              THE COURT:  And if he did exercise his Fifth Amendment
20    rights, then in a civil litigation you can infer negative
21    intent from that?
22              MR. DeVORE:  That's certainly true, your Honor.
23    Although that is not what happened here.  As a matter of fact,
24    what their letter said, is that --
25              THE COURT:  I know.  You told me what the letter said.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    4

 1    But when was that letter dated?
 2              MR. DeVORE:  It was the middle of November of 2006.
 3              THE COURT:  And are you saying, are you representing
 4    that the special committee has not sought his appearance since
 5    then?
 6              MR. DeVORE:  Your Honor, I would -- before I make any
 7    representations to the Court, I would like to be able to
 8    reconstruct the course of events.  I don't think we have
 9    revisited that issue with the special committee, but I'm not
10    saying that they have asked and that he has refused, or -- I --
11    I just don't -- I would like to be able to look back on the
12    course of communications on that issue.
13              THE COURT:  All right.  Well, let's assume, for sake
14    of argument, that plaintiffs would be in a position to allege
15    that the special committee, after waiting some time for counsel
16    to get up to speed, made a renewed request or reasonably
17    expected counsel to, on their own, get back to them saying
18    we're ready now.  And that they were then put off once again.

76e0mona
19  Why shouldn't -- I mean this is really, in some cases -- and
20  I'm now taking most favorably the plaintiff, of course, as I'm
21  required to do for purposes of these motions -- of this
22  motion -- you know, why couldn't a reasonable factfinder say,
23  gee, the Chairman and founder of the company of the -- the
24  centerpiece of the company, if ever there was one, is ducking
25  talking to the special audit committee about the very matter
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

1  that was the subject of, not just this lawsuit, but numerous
2  inquiries by various authorities.  Why else would he be doing
3  that if he were not possessed of guilty knowledge or intent.
4  Why isn't that a perfectly reasonable inference for a jury to
5  draw?
6       MR. DeVORE:  Your Honor, I -- I would submit that --
7  that acting on the advice of counsel, there could well be other
8  reasons to counsel an individual not to appear in those
9  circumstances.  Particularly --
10      THE COURT:  No.  If you want to waive attorney/client
11  privilege and have a discussion about that, I suppose I could
12  look at that.  But that is what you would have to do if -- if
13  you were raising that claim at trial.  And the -- you can't --
14  you can't have it both ways.  You can't say, ladies and
15  gentlemen of the jury, although this looks awfully strange, we
16  represent to you that there could be, theoretically, some
17  neutral reasons why counsel might be advising him not to submit
18  to an interview by the special committee, but we just want you
19  to speculate about that, we're not going to actually waive
20  attorney/client privilege and tell you what the advice was and
21  what he said in soliciting that advice.
22      That is not a permissible approach.  And I'm not
23  saying that it is any more permissible at this stage.
24      MR. DeVORE:  No, your Honor, I don't -- that
25  approach -- the point I'm trying to make is what we have here,
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

1  based on the allegations, and I think based even on potential
2  allegations that plaintiffs could make based on the facts, is
3  that, at that time, Mr. McEelvey did not submit to be
4  interviewed.  That is not the same thing, obviously, as the
5  invocation of his Fifth Amendment Privilege in that context,
6  and that, given the context, that we're in the heightened
7  pleading requirements.
8       THE COURT:  I agree with you.  That it is less than
9  the invocation of the Fifth Amendment in terms of the inference
10  that it gives rise to.  And I agree with you that the inference
11  that it does give rise to, by itself, is not sufficient to
12  carry plaintiff's burden.
13      But I am not yet convinced that such an inference
14  won't be warranted and, therefore, would be part of the mix.
15      Now, there well may be, but they don't have enough in
16  addition to meet the burden that they have to meet.
17      MR. DeVORE:  Your Honor, I would submit that they
18  don't.  And if I could take a step back and look at that issue
19  for a minute, I think what we have here is really an absence of
20  any specific allegations as to Mr. McEelvey that could possibly
21  satisfy the heightened pleading requirement here.
22      And the -- the -- what -- instead, what we have is --
23  is a theory built on these series of pieces, including Mr.
Page 3

```
                         76e0mona
24   Olsnyckyj, the former general counsel's, guilty plea, and some
25   statements by the company in connection with the statement, the
                   SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                    7

```
 1   size of the statement itself, and the fact that there are GAP
 2   violations, the fact that Mr. McEelvey signed certain
 3   documents.  And the fact that he was a CEO of the company.  And
 4   what is happening, the plaintiffs are trying to take those
 5   pieces and substitute that for some particularized allegations
 6   as to this individual defendant, which they have not pled in
 7   their papers, and have that satisfy the standard.  And I think
 8   the law is pretty clear that that is not enough.
 9              THE COURT:  Well, let me --
10              MR. DeVORE:  One thing --
11              THE COURT:  Let's find out.  Let's talk to your
12   adversary, and we'll come back to you in a minute.
13              MR. DeVORE:  If I may, a hypothetical, your Honor.
14              THE COURT:  We'll come back to you in a minute.
15              MR. DeVORE:  Thanks very much.
16              THE COURT:  So what do we have in the way of --
17   putting aside whatever weight might be given to that inference
18   that I just mentioned, the -- Mr. McEelvey, as I understand it,
19   didn't have any options that were implicated by this scheme,
20   the -- what -- you know, you seem to be asserting in your
21   complaint, in effect, well, he was the top dog, so he must be
22   guilty.  That clearly is not the law.
23              MR. GARDENER:  It is more than just being a top dog,
24   although that is part of the process.
25              THE COURT:  Why?  Why is it relevant at all?
                   SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                    8

```
 1              MR. GARDENER:  Because it puts him, as the founder and
 2   long time CEO and Chairman of the Board, in a position to have
 3   access and to, in fact, have information that would lead him to
 4   know or be reckless in not knowing that his public statements
 5   were inaccurate.
 6              THE COURT:  Oh, that -- that is -- that sounds to
 7   me -- forgive me for putting it this way, totally unrealistic.
 8              MR. GARDENER:  Well, I have specifics, your Honor.
 9              THE COURT:  Well I'm hoping you will give me some,
10   because what you just said, which is, in effect, because
11   someone is the CEO, you can infer that they know every kind of
12   substantial misconduct that others are perpetrating because
13   they, in theory, would have access to it, is just so totally
14   contrary to common sense that it defies, that it boggles the
15   mind.  Precisely because he is the CEO, he has a million things
16   going on at any given time.  And he is not a guarantor of his
17   subordinate's conduct.  Not if you want individual liability,
18   so --
19              MR. GARDENER:  Let me provide you with the specifics.
20              The complaint alleges, among other things, that Mr.
21   McEelvey was intimately involved in the stock option process.
22   He was involved in determining who got stock options.  And when
23   the stock options were granted, his --
24              THE COURT:  Yeah, but that -- that would be -- that --
25   that would be perfectly innocent, unless he knew or had reason
                   SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                    9

76e0mona

1   to know to a reckless disregard level, of the backdating.
2           MR. GARDENER:  Yes, I -- I agree with that.
3           THE COURT:  Yeah.
4           MR. GARDENER:  And I think if you follow through the
5   facts as we know them and we allege them, that that strong
6   inference can be made against him in this case.
7           THE COURT:  Right.  So he is involved in the -- as far
8   as -- as far as you have said so far, he is involved in the
9   determination that the stock options will be granted and other
10  aspects of that.  Not exactly anything that would differentiate
11  him from a CEO, and a completely honest stock option plan.  So
12  what else do you have?
13          MR. GARDENER:  He has admitted in a Wall Street
14  Journal article that we quote that he, in fact, created a list
15  of executives that would receive stock options.  And he would
16  send that to the compensation committee for approval.
17          THE COURT:  Yeah.
18          MR. GARDENER:   In this case --
19          THE COURT:  Like any other CEO, he plays a big role in
20  determining compensation.  And stock options are a classic form
21  of compensation.
22          MR. GARDENER:  But the difference is, in this case
23  because there was backdating, because the date that the stock
24  options were in fact granted comes much later than the date
25  that the compensation committee is alleged to have approved
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                10

1   them, he would have all of that information in his possession.
2   He would --
3           THE COURT:  No, that's what I -- that what I -- what
4   do you mean by that.  Do you mean that --
5           MR. GARDENER:  I mean --
6           THE COURT:  Do you mean that there is any evidence
7   that he actually looked at that?
8           MR. GARDENER:  Well, there is.
9           THE COURT:  Because again any CEO is going to have a
10  thousand documents passing through, not to mention e-mails,
11  passing, you know, through his desk, and through his office,
12  you know, on any given day.  What is the evidence that he
13  focused on this?
14          MR. GARDENER:  The best piece of evidence we have is
15  not in the complaint at the moment, your Honor.  And I
16  mentioned this in the context of if we were to get to the end
17  of this discussion, and we would be asking -- and it doesn't --
18  you are not convinced we have, at this point, a strong
19  inference of scienter against Mr. McEelvey, we would be asking
20  for the right to amend the complaint.
21          THE COURT:  All right.  So tell me about it.
22          MR. GARDENER:  We have gotten, now, possession of the
23  documents that the company has provided to the SEC.  And among
24  those documents -- and I can hand up a copy of the one document
25  that I have pulled out to -- to demonstrate his involvement --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                11

1   is a document in which Mr. McEelvey signed a unanimous written
2   consent for a stock option that was, in fact, alleged to be
3   backdated.  And I would say that Monster has now admitted the
4   fact --

```
                               76e0mona
 5            THE COURT:  Do you have a copy for your adversary?
 6            MR. GARDENER:  Yes.
 7            If I may, your Honor.
 8            THE COURT:  Yes.  Just hand it to my clerk.
 9            Hang on a minute.  I want to take a quick look at
10   this.
11            And what date do you say this was -- this unanimous
12   written consent was actually executed?
13            MR. GARDENER:  We believe that this unanimous written
14   consent was actually executed in or about April of 2000.
15            THE COURT:  And what would be your evidence on that?
16            MR. DeVORE:  The evidence, among other things, is
17   contained in the criminal information against the former
18   general counsel which is attached, which is cited in the
19   complaint and attached to the Posa affidavit as exhibit 3.
20            THE COURT:  So let me go back to your adversary.
21            Assuming that a there is a basis upon which a
22   reasonable factfinder could infer that this document was
23   executed in April of 2000, why isn't it, on its face, not an
24   example of the very backdating that was at the heart of the
25   underlying misconduct, and why isn't your client's signature on
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                              12

```
 1   this rather short and fairly self-evident document not evidence
 2   of his intent.
 3            MR. DeVORE:  Your Honor, there are a number of
 4   reasons.  But I think the most important is the plaintiffs have
 5   made a lot of Mr. Olsnyckyj's --
 6            THE COURT:  Before you get to that, just let me -- let
 7   me assume for the moment, and then we'll get to see whether
 8   they have an adequate proof on it.  Assume for the moment that
 9   this document was executed in April of 2000.  If that
10   assumption were true and could be adequately pled, assume that,
11   is not then -- does it not follow that this document, by
12   itself, is a smoking gun?
13            MR. DeVORE:  No, your Honor, it doesn't.
14            THE COURT:  Why not?
15            MR. DeVORE:  For two reasons:
16            First, if I might with regard to information, what the
17   information makes clear, although the plaintiffs have not
18   focused on it, is that this -- the alleged deception, the
19   deception to which Mr. Olsnyckyj pled guilty was maintained by
20   what -- what is said in the information and in his allocution,
21   by persons.  But what it also says is that the board of
22   directors of the company, of which Mr. McEelvey was the share
23   were deceived by Mr. Olsnyckyj and whoever else was included
24   within the persons, he was deceived.
25            THE COURT:  That is different from the CEO.  I mean
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                              13

```
 1   the -- just so the record is clear, what we have here is about
 2   as classic a case of backdating as one could imagine, assuming
 3   again for sake of argument that this was actually executed in
 4   April of 2000.  And it gives, even on its face, a suggestion of
 5   backdating.  Because no -- it, nowhere, contains the actual
 6   date on which it was executed.  But it is careful to state
 7   everywhere that the various members of the board have set forth
 8   their signatures "as of the first day December, 1999."  A
 9   suspicious wording in and of itself.  It is the wording that
```

76e0mona
```
10  classically is used from time and memorial for backdating the
11  cases under the securities laws in the very district in which
12  that kind of wording is, itself, a red flag of backdating are
13  legion.
14          Then, you know, then you say, well, why were they
15  backdating it.  It is because in the very first paragraph it
16  says:  Resolved that in accordance with the 1999 long-term
17  incentive plan, the Committee, which is the compensation
18  committee of the board, has determined the fair market value of
19  each share of common stock of the corporation on the date
20  hereof, to be $95 per share.  The closing price per share of
21  the common stock of the corporation on the Nasdaq national
22  market to date hereof.
23          In other words, if we backdate it to then, we know
24  what the share price was on that date, and it is going to
25  provide a purchase price for the misconduct we wish to
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

14

```
 1  implement through this backdating.
 2          I mean if, in fact, this document was executed in
 3  April 2000, it is hard to imagine a document that, taken most
 4  favorably to plaintiff, would be any better at giving rise to a
 5  strong inference of fraud.
 6          MR. DeVORE:  Your Honor, a couple of points.
 7          THE COURT:  Uh-huh.
 8          MR. DeVORE:  I recognize what the cases say about the
 9  "as of" language.  Although, I would submit that that is, is
10  something that has developed more recently than 1999.  As the
11  backdating cases have come to light, people have --
12          THE COURT:  I think -- I bring to your attention, the
13  largest securities fraud prosecuted in the 1970s, which is the
14  National Student Marketing, a fairly famous case that led to
15  both criminal and civil cases.  That was a case with Justice
16  Compact.
17          MR. DeVORE:  Secondly, the information makes clear
18  that the board of directors were deceived, that the outside
19  auditors, Seideman, were deceived, and that the lawyers were
20  deceived.  In fact, as is clear in the various signature pages
21  here, it is not just Mr. McEelvey who signed, but other members
22  of the board, as well.
23          THE COURT:  What do you think they were deceived
24  about?
25          MR. DeVORE:  Well --
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

15

```
 1          THE COURT:  They had to know when they signed it that
 2  they were not signing it on December 1, 1999.
 3          MR. DeVORE:  Your Honor, I would submit, based on the
 4  allegations in the complaint, they were deceived with regard to
 5  whether there was any intentional misconduct at issue in
 6  connection with this grant of options or their signing of this
 7  unanimous written consent.  And that that is critically
 8  important for purposes of whether the plaintiffs --
 9          THE COURT:  Well, that sounds like a classic jury
10  issue, not a complaint issue.
11          In other words, what you are saying is, for all we
12  know, the general counsel, the company, said to them, oh, this
13  is fine, I have checked it out, the law allows this.  And,
14  therefore, arguably, there couldn't be any fraudulent intent on
```

76e0mona

15  their part.  You might have an especially good argument there
16  with respect to someone who, himself, didn't hold any options.
17  Although, as CEO, he had an obvious motive to incentivize his
18  high-level employees.  But maybe something like that was said.
19  All we know, assuming the complaint were it amended to include
20  this and assuming it said it was actually executed in April, is
21  that, on its face, it is extraordinarily problematic.
22          MR. DeVORE:  Your Honor, what I'm saying is that even
23  amended to include this, the allegations in the complaint, in
24  my analysis, doesn't satisfy the standard that -- the
25  heightened pleadings standard here, that what the allegations
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

16

1   consist of, even with this, is that Mr. Olsnyckyj pled guilty,
2   and that the board was deceived, that the outside auditors were
3   deceived, that the lawyers were deceived, and there is no
4   allegation, even with this document, that suggests that Mr.
5   McEelvey was within the group doing the deceiving, as opposed
6   to member of the board or others there who were deceived.  And
7   I --
8           THE COURT:  Your adversary has already made mention
9   that Mr. McEelvey was involved in determining stock options,
10  yes?
11          MR. DeVORE:  Yes.
12          THE COURT:  So, he is, as near as I can tell from the
13  allegations in the complaint, the honcho of this company.  He
14  wants to increase the compensation of the executives that he
15  thinks are doing a good job.  He plays a role as any CEO,
16  perfectly legitimately, would in making that determination.
17  And -- but, then, say your adversary, he goes the further step
18  and goes along with a backdating scheme.  I think that
19  distinguishes him clearly from the other members of the board.
20  Moreover, I don't know that plaintiff is in any way, shape, or
21  form bound by what is alleged in some other instrument.  They
22  are relying on it, solely -- as near as I can tell from
23  purposes of discussion -- for date, not for loss.
24          MR. DeVORE:  Your Honor, I don't mean to suggest they
25  are bound.  I mean to say that that is among the allegations
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

17

1   that are in the complaint.  And it suggests, pretty clearly,
2   that this significant group of people, including the
3   professionals charged with administering what would -- one
4   would think for a significant public company would be a program
5   of options that complies with the laws and program of
6   accounting for those options that -- in a way that complies
7   with accounting and legal obligations were deceived.
8   And there is nothing in this document that I can see, your
9   Honor, that suggests that it -- the CEO of the company wasn't
10  in a position to rely, reasonably, on the work of those
11  professionals in assuring that the program satisfied all of
12  those obligations.
13          THE COURT:  Let me cut this short.  I have doubts --
14  though I'm making no conclusions at this point but I have
15  serious doubt -- as to whether the complaint as presently pled
16  meets the legal requirements.  But it would be normal, even if
17  I were to dismiss the complaint, to give leave to replead if
18  there was even the reasonable suggestion that plaintiffs could
19  come forward with other information that would change the

76e0mona

20   equation.
21           In effect, even under the Reform Act, plaintiffs,
22   absent failure to show that they have come up with anything
23   more that is material, are given two bites at the apple.  More
24   than two.  So what I suggest, is the following:
25           I think rather than my deciding this motion now, it
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                        18

1    ought to be postponed for or withdrawn without prejudice.
2            Plaintiffs should draft a new complaint, amended
3    complaint.  Because I'm not dismissing anything.  But with the
4    understanding that if the new complaint doesn't meet the
5    standards, they are not going to get another shot.
6            So, this is the -- this amended complaint will be
7    their second bite at the apple, in effect.  And, then, we would
8    then -- then you could renew your motion.  Or, if you want to
9    withdraw it and put in new papers -- whichever is easier for
10   you, I don't care -- you would have to address whatever the new
11   allegations are, in any event.
12           I think that is the way to proceed, because the -- I
13   mean it would be, at best, a close call to sustain the
14   complaint in its present form.
15           But this does, at first blush, look like a very
16   powerful piece of additional evidence.  So, the suggestion
17   as -- that's all it is at this point, until I hear from counsel
18   as to whether they consent or not -- the suggestion is that
19   defense counsel either withdraw its motions without prejudice
20   or hold it in abeyance -- I don't care which way you want to
21   characterize it -- that plaintiffs then amend their complaint
22   to reflect this document and anything else that they think will
23   add to and address the issues that have now been briefed, and
24   that they do so, however, on the understanding that any motion
25   that is then -- any motion to dismiss that is then directed at
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                        19

1    that amended pleading, will, if granted, be a dismissal with
2    prejudice.
3            So that is -- that is my suggestion.
4            Does plaintiff's counsel consent?
5            MR. GARDENER:  We would.
6            THE COURT:  Or would you prefer me to dismiss your
7    claims now.
8            MR. GARDENER:  Hobson's choice.
9            THE COURT:  I'm throwing that out.  I am not saying I
10   would do that, but I might do that.
11           MR. GARDENER:  Let me preface my comments with --
12           THE COURT:  I might do it in the next five minutes,
13   but I don't know.
14           MR. DeVORE:  I do think there are a multitude of other
15   allegations in the present complaint that we have not spoken
16   about --
17           THE COURT:  And I would certainly hear you.
18           MR. GARDENER:  -- having --
19           THE COURT:  -- tonight, but I'm not going to waste my
20   time doing that unless you are going do live and die by that
21   result.
22           MR. GARDENER:  Having said that, we would consent to
23   preparing and filing amended complaint with respect to
24   McEelvey, your Honor, only, since --
                              Page 9

```
                            76e0mona
25            THE COURT:  That's all we're concerned about is
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    20

```
1    McEelvey.
2            MR. GARDENER:  The only other caveat, or comments, I
3    would just like to put on the record --
4            THE COURT:  Uh-huh.
5            MR. GARDENER:  -- is that I understand your Honor's
6    admonition about this being our second bite at the apple with
7    respect to McEelvey.  I would just say that this -- this
8    amended complaint, since it is directed to McEelvey, would not
9    prejudice our rights to --
10           THE COURT:  Totally correct.  Totally correct.  All my
11   prior comments are limited to the McEelvey aspect.
12           MR. GARDENER:  with that understanding, your Honor, we
13   would consent to that procedure.
14           THE COURT:  Very good.
15           How quick -- before I turn to defense counsel -- how
16   quickly can you get that?
17           MR. GARDENER:  Well, given my -- I was sitting in the
18   audience while you went through the process of gauging time for
19   counsel on trial.  I would -- let me just say we -- we do
20   have --
21           THE COURT:  You want to prepare this by 9:05 tomorrow?
22           MR. GARDENER:  No, your Honor.  We started looking, a
23   week ago, at the production we got from Monster, which involves
24   a million, 200,000 pages of documents.  This one piece is one
25   thing that we happened to find in a week's time.  We would like
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    21

```
1    to amend once with respect to McEelvey.  In fact, we have won
2    right to amend, as your Honor indicated.  So we would like to
3    incorporate everything that we possibly can in there that we
4    might find in the production.
5            THE COURT:  That's fair enough.  But how long do you
6    want?
7            MR. GARDENER:  I would say we would -- I think 30 days
8    would be more than enough time.
9            MR. KELLER:  I agree.
10           THE COURT:  More than enough.  But how about three
11   weeks.
12           MR. GARDENER:  Three weeks, your Honor.
13           THE COURT:  All right, very good.  So that would be --
14   today is the 14th, so that would be -- oh, you are in luck.
15   That would be July 5.  I'm not going to do that to you.  Say
16   July 9?
17           MR. GARDENER:  Thank you, your Honor.
18           THE COURT:  All right.
19           Now, let me make sure that the other side is in
20   agreement to this procedure.  And let me find out whether you
21   would prefer -- doesn't matter to me -- whether you want to
22   just treat your motion in abeyance and file supplemental
23   papers, or you treat your -- you withdraw your motion without
24   prejudice and just file a new motion; either one is fine.
25           MR. DeVORE:  Your Honor, if I had any reasonable hope
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    22

76e0mona

1  of convincing the Court that it should rule on the motion in
2  this complaint and dismiss with prejudice, I would try.  I
3  don't think I do, so I'm not going to do that.
4          THE COURT:  You're a very prudent man.
5          MR. DeVORE:  So I would consent, notwithstanding my
6  view that even with this document the plaintiffs cannot make a
7  standard here --
8          THE COURT:  Very good.  All right.  Which way do you
9  want to go in terms of --
10         MR. DeVORE:  I think if it doesn't make a difference
11 to the Court, probably I would ask for leave to file a new
12 motion.
13         THE COURT:  I think that, frankly, makes it simpler.
14         Okay, so the new amended -- the new, and as to
15 McEelvey, finally amended, complaint will be on July 9.
16         And how long does defense counsel want for any motion
17 you intend to bring?
18         MR. DeVORE:  Two weeks, your Honor.
19         THE COURT:  Two weeks is fine.  That is July 23rd.
20         Answering papers, two weeks?
21         MR. GARDENER:  Two weeks.
22         THE COURT:  August 6.  Reply papers, August 13.  And
23 we'll hear argument on August 20th at 4:00 p.m.
24         All right.  Very good.
25         Now, let's turn to the motion to appoint lead counsel.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              23

1  What -- I didn't get a chance to really go through all of the
2  stuff here.  Was proper notice given and all like that?
3          MR. KELLER:  Your Honor, it was.  All of the -- the
4  requirements of the PSR were met.  The notice was given over
5  the news wires, was picked up on Bloomberg and the internet.
6          THE COURT:  Did you receive, or do you have knowledge
7  of anyone who is seeking to be lead counsel, other than your
8  own firm?
9          MR. KELLER:  I do not, your Honor.
10         THE COURT:  Okay.  What is -- what are your financial
11 arrangements?
12         MR. KELLER:  In terms of?
13         THE COURT:  In terms of the present.  Have you -- do
14 you have a contingent fee arrangement with the Middlesex County
15 Retirement System?
16         MR. KELLER:  Your Honor, we have written fee
17 agreements with both of our clients which require that prior to
18 submission to your Honor, that we may review what has gone on
19 in the case, the results achieved, and their approval -- prior
20 to submission -- of any fee request.
21         THE COURT:  Does it set any goals or any limits?
22         MR. KELLER:  I believe the limit is no more than
23 25 percent.
24         THE COURT:  And does it say anything about things as
25 travel, like coach fair versus first class; that kind of stuff?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              24

1          MR. KELLER:  It does not at that sort of gradual
2  level, but --
3          THE COURT:  Be apprised that this Court will look at
4  that stuff, whether your client does or not.  I have had the
5  most extraordinary situation in a class action about six months
                        Page 11

76e0mona

6   ago, where one of the lead counsel there, where several lead
7   counsel, but one of the lead counsel put in, by way of
8   expenses, not only first class air fare, but he stayed only at
9   the Four Seasons Hotel, wherever.  And there were numerous Four
10  Seasons Hotels spread out throughout the country, the cheapest
11  of which, at least for the room that he wanted, was $600.  In
12  one case, went up to $1,400 when he felt that someone of his
13  significance on the case had to have a full suite.
14          Regretfully, I had to, as a sanction part, eliminate
15  his recovery of any expenses whatsoever.  It wasn't a question
16  of cutting it down, it was a question of having him pay for
17  those expenses a hundred percent.
18          I know I'll never have that kind of problem with your
19  distinguished firm, but I thought I would flag it for its in
20  terrorem effect.
21          MR. KELLER:  Thank you, your Honor.
22          Luckily, Monster is based in New York.  We're in New
23  York and travel should be limited.
24          THE COURT:  There you go.  There you go.
25          Well, the Labaton firm is very well known to its
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

25

1   courts for the excellence of its representation.  It seems to
2   be clear that they, the plaintiffs here, as we need to focus on
3   plaintiff's people, we focus on the lawyer, are precisely the
4   type of plaintiffs that the Reform Act contemplates to be lead
5   plaintiffs and they are represented by very able counsel.  And
6   it does not appear to be absolutely sure that you have received
7   any objections or claims for inquiries as to how many
8   co-counsel or anything like that?
9           MR. KELLER:  That's correct.
10          THE COURT:  That's correct.
11          MR. KELLER:  That is correct.
12          THE COURT:  All right.  So that motion is granted.
13          The Middlesex County Retirement System and Steamship
14  Trade Association International Longshoremen's Association
15  Pension Fund plaintiffs' -- appointed as plaintiffs and Labaton
16  firm is appointed as lead counsel.
17          Anything else that we need to take up today?
18          MR. KELLER:  Nothing else.
19          MR. DeVORE:  I think it is clear, but I want to make
20  it clearer, that is the company may not answer -- need not
21  answer the amended complaint.
22          THE COURT:  Need not answer the --
23          MR. HOFFNER:  The new complaint.
24          THE COURT:  Under the Reform Act, not until the motion
25  is heard.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

26

1           MR. HOFFNER:  The company has already answered.
2           THE COURT:  The company has already answered the --
3   I'm sorry.  But they are not going to change it in any way.
4           But I think what you probably should do is -- I think
5   you -- you probably -- after they file the amended complaint,
6   you -- even though it won't change anything as to McEelvey -- I
7   think you still have to file an answer to that amended
8   complaint, yes.
9           MR. HOFFNER:  Okay.
10          THE COURT:  But you don't have to do that until
                        Page 12

76e0mona

11    after -- even though the motion is only McEelvey's motion, you
12    would have leave of this Court to wait until that motion is
13    decided if you want to file your amended answer.
14                MR. HOFFNER:  Thank you, your Honor.
15                THE COURT:  All right.
16          Anything else?
17                MR. KELLER:  Your Honor?
18                THE COURT:  I'm sorry.  Yes.
19                MR. KELLER:  I just wanted to address that last point
20    and make sure there is clarification and -- that the -- that
21    there will be an answer.
22                THE COURT:  Basically -- I mean I think we need to put
23    the case on hold, Is my real point, until we have the amended
24    complaint and the motion practice.
25                MR. KELLER:  Okay.

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

27

1                THE COURT:  I think that even -- as I interpret the
2     intent of the Reform Act, that would be true even if it's only
3     McEelvey that's involved now.  But if you want to argue about
4     that.
5                MR. KELLER:  Well, we would have -- at the very least,
6     we would have the option of making motion for summary relief
7     from that provision, I think, if what we're referencing is --
8                THE COURT:  Sure.  Absolutely.  And if you have a good
9     reason -- for example, I can well imagine that you might think
10    that the document deserves -- with respect to the company --
11    should go forward, even while that other issue -- depositions,
12    I think you have a much harder road to hoe -- but maybe
13    document, you might even be able to arrange that informally
14    with your adversary, for all I know.  But, sure, whenever you
15    want to bring -- what we'll do, is we'll put the -- we'll stay
16    the case in all respects other than the filing of the amended
17    complaint and the motion practice that follows it without
18    prejudice to your applying -- telephonically, I don't need to
19    have a formal motion, just get your adversary on the phone,
20    call my chambers to move forward in any particular respect that
21    you think makes sense as to any party other than McEelvey.  And
22    my instinct is that on the document side, that probably makes
23    sense.  And on the deposition side, probably doesn't make
24    sense.  But just, you know, every situation is different.
25          Okay?

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

28

1                MR. KELLER:  Okay.  Thank you, your Honor.
2                THE COURT:  All right, very good.  Thanks very much.
3                ALL:  Thank you, your Honor.
4          (Adjourned)
5
6
7
8
9
10
11
12
13
14
15

76e0mona

16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300