UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
BRIARWOOD INVESTMENTS, INC.,           : Civil Action No. 1:07-cv-08159-LLS
Individually and On Behalf of All Others :
Similarly Situated,                    :
                                       :
                  Plaintiff,           : AMENDED CLASS ACTION COMPLAINT
                                       : FOR VIOLATIONS OF
        vs.                            : FEDERAL SECURITIES LAWS
                                       :
CARE INVESTMENT TRUST INC.,            :
F. SCOTT KELLMAN, ROBERT O'NEILL       :
and FLINT D. BESECKER,                 :
                                       :
                  Defendants.          :
———————————————————— x

Lead Plaintiffs Alaska Hotel & Restaurant Employees Pension Trust Fund and Norfolk County Retirement System ("Plaintiffs" or "Lead Plaintiffs") make the following allegations, except as to allegations specifically pertaining to them and their counsel, based upon the investigation undertaken by Lead Counsel, which included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories regarding Defendant Care Investment Trust Inc. ("Care Investment" or the "Company"), press releases and other public statements issued by the Company, media reports about the Company and interviews with certain witnesses relating to the facts alleged herein, and believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a federal securities class action on behalf of a class consisting of all those who purchased Care Investment common stock pursuant and/or traceable to the Company's initial public offering on or about June 22, 2007 (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

2.  The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

3.  This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

4.  Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District.

5. In connection with the acts and conduct alleged herein, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## PARTIES

6. Lead Plaintiffs purchased Care Investment common stock pursuant and/or traceable to the Company's IPO and were damaged thereby.

7. Defendant Care Investment, a real estate investment trust (REIT), is a real estate investment and finance company formed principally to invest in healthcare-related commercial mortgage debt and real estate. The Company provides financing to companies operating a full range of healthcare-related facilities and invests in healthcare-related real estate assets. Care Investment is externally managed by an affiliated entity, CIT Healthcare LLC ("CIT Healthcare"), which is a wholly-owned subsidiary of CIT Group Inc. Care Investment's common stock is publicly traded on the NYSE under the symbol "CRE."

8. Defendant F. Scott Kellman ("Kellman") has served as the Chief Executive Officer and President of the Company since May and March 2007, respectively. He has also served as a managing director and head of real estate at CIT Healthcare since January 2007. Kellman signed the Form S-11/A Registration Statement that Care Investment filed with the Securities and Exchange Commission on or about June 21, 2007 (the "Registration Statement"), as well as certain other pre-effective amendments thereto, in connection with the IPO.

9. Defendant Robert O'Neill ("O'Neill") has served as the Company's Chief Financial Officer, Treasurer and Secretary since May 2007. He has served as Senior Vice President, Finance and Accounting, at CIT Group since June 2003. O'Neill signed the Registration Statement.

10.  Flint D. Besecker ("Besecker") has served as a member of the Company's Board of Directors since the Company's inception and, upon consummation of the IPO, became Vice Chairman of the Board of Directors. He has also served as President of CIT Healthcare since its inception. Besecker signed the Registration Statement.

11.  Kellman, O'Neill and Besecker are referred to herein collectively as the "Individual Defendants," and, together with Care Investment, collectively as the "Defendants."

## CLASS ACTION ALLEGATIONS

12.  Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all persons who purchased the Company's common stock pursuant and/or traceable to the IPO (the "Class"). Excluded from the Class are Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded parties.

13.  The members of the Class are so numerous that joinder of all members is impracticable. Care Investment sold more than 15 million shares of common stock in the IPO. The precise number of Class members is unknown to Lead Plaintiffs at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Care Investment or its transfer agent or the underwriters to the IPO. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

14.  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

15.  Plaintiffs' claims are typical of the claims of the other members of the Class because all of their damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

16.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

17.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  Whether the federal securities laws were violated by Defendants' acts as alleged herein, including Sections 11, 12(a)(2) and 15 of the Securities Act;

(b)  Whether the Registration Statement and Prospectus (collectively, the "Offering Documents"), issued by Defendants to the investing public in connection with the IPO, negligently omitted and/or misrepresented material facts about Care Investment and its business;

(c) Whether the Individual Defendants were control persons of Care Investment pursuant to Section 15 of the Securities Act; and

(d) The extent of the injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

18. Defendant Care Investment is a real estate investment and finance company formed principally to invest in healthcare-related commercial mortgage debt and real estate. It provides financing to companies operating in the healthcare industry. Care Investment is externally managed by CIT Healthcare.

19. On or about June 21, 2007, Care Investment filed the Registration Statement.

20. On or about June 22, 2007, the Prospectus (the "Prospectus") with respect to the IPO, which forms part of the Registration Statement, became effective and, including the exercise of the over-allotment, more than 15 million shares of Care Investment's common stock were sold to the public at $15.00 per share, thereby raising more than $225 million. The IPO closed on June 27, 2007, and Care Investment received approximately $210.3 million in proceeds (after underwriting discounts and other expenses related to the IPO).

21. In connection with the IPO, CIT Healthcare sold a portfolio of healthcare-related mortgage assets (the "Contributed Portfolio") to Care Investment[1] in exchange for $204.3 million in

---

[1] As a technical matter, CIT Healthcare first transferred the Contributed Portfolio to an affiliated entity, CIT Real Estate Holding Corporation ("CIT Holding") (also a wholly-owned subsidiary of CIT Group), which then transferred the Contributed Portfolio to Care Investment pursuant to a Contribution Agreement, dated as of June 27, 2007, between CIT Holding and Care Investment (the "Contribution Agreement").

cash and 5,256,250 shares of Care Investment common stock valued at $78.8 million, representing $283.1 million in aggregate consideration.

22. The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

23. The Offering Documents described Care Investment's business and highlighted the positive attributes of the Company's relationship with CIT Healthcare, stating in pertinent part as follows:

> We intend to capitalize on the expertise of our external manager, CIT Healthcare LLC, which we refer to as our Manager, a wholly-owned subsidiary of CIT Group Inc., which we refer to as CIT Group. We believe that our Manager's experience and reputation in the healthcare finance industry, market knowledge and relationships with companies in the healthcare industry will benefit us by enabling our Manager to originate, manage and create value from attractive investment opportunities for us. While many of our competitors rely on financial institutions or other third party originators to provide them with investment opportunities, we believe that one of our business strengths will be our access to investment opportunities originated directly by our Manager. Our Manager also has business relationships with many financial institutions and may originate investment opportunities for us through these firms as well.

24. This statement was an inaccurate statement of material fact because it portrayed Care Investment and its relationship with CIT Healthcare in a positive fashion but failed to disclose that prior to the IPO, CIT Healthcare had engaged in questionable loan practices which exposed the Company to a heightened risk of default in the Contributed Portfolio. As detailed further herein, CIT Healthcare's questionable loan practices, and their potential impact on the Contributed Portfolio (and the Company), were not disclosed in the Registration Statement in a meaningful fashion.

25. The Offering Documents also described the Company's Contributed Portfolio in positive terms, stating in pertinent part as follows:

Upon consummation of this offering, our Manager will transfer to CIT Holding, which will then immediately contribute to us, a portfolio of real estate mortgage assets secured by several different types of healthcare facilities with diverse operations and tenants in a variety of geographic locations. We believe the diversity in this portfolio will be a strength to our business, in particular in the event of a downturn or unforeseen event, including regulatory changes, in any particular business or geographic sector.

26. Furthermore, the Prospectus represented that CIT Healthcare had purportedly ascribed a "fair market value" of $283.1 million to the Contributed Portfolio as of June 22, 2007.

27. The statements referenced above in ¶¶25 and 26 were each inaccurate statements of material fact because they failed to disclose that at the time of the IPO, the Contributed Portfolio contained a material number of extremely high credit risk loans which had been materially over-valued by Care Investment. Furthermore, given the true credit risk of the investments in the Contributed Portfolio, it was materially misleading to describe the Contributed Portfolio as having a "fair market value" of $283.1 million when its "fair market value" was materially less than that amount.

28. The Contributed Portfolio was materially overvalued and impaired for the following reasons:

(a) **Poor Loan Underwriting Practices and Questionable Loan Practices**: Prior to selling the Contributed Portfolio to Care Investment, CIT Healthcare engaged in questionable loan practices to healthcare entities, as detailed herein. First, CIT Healthcare would issue a loan to a healthcare company based on and collateralized by a portion of the outstanding accounts receivable balance reported by the healthcare company to CIT Healthcare. CIT Healthcare, however, had a pattern and practice of not properly verifying the accounts receivable information. This heightened the risk that CIT Healthcare would not have sufficient collateral supporting the loan should the borrower be unable to make the necessary payments. Second, CIT Healthcare also

frequently made "airball" or "term" loans, as they were internally known at CIT Healthcare. CIT Healthcare would issue a large uncollateralized loan to a company that had previously obtained a smaller, collateralized loan. The second larger loan was referred to as an airball loan because it was not secured with any collateral, leaving CIT Healthcare without recourse (and thus thin air) in the event that the company to whom the loan was issued could not repay it – a distinct possibility, in the event that the company failed to service the first loan. In addition, these questionable loan practices were not mutually exclusive. Indeed, CIT Healthcare would sometimes issue a loan secured by an accounts receivable balance which was then followed by an airball loan to the same company, thereby materially increasing the risk of non-payment.

(b) **Inclusion of Premium Paid to CIT Healthcare**: The "fair market value" of the Contributed Portfolio was inflated by the inclusion of a $4.6 million premium paid by Care Investment to CIT Healthcare in connection with Care Investment's acquisition of the Contributed Portfolio. Months after the IPO, Care Investment disclosed for the first time in its Form 10-Q, dated August 14, 2007, that CIT Healthcare had received a premium of $4.6 million in connection with the sale of the Contributed Portfolio: "Our Manager determined that the fair value of the assets contributed was approximately $283.1 million on June 22, 2007 inclusive of approximately $4.6 million in premium." This overstated the value of the Contributed Portfolio by approximately 1.6%.

29. Although the Offering Documents purported to advise investors that the valuation of the Contributed Portfolio was not independently verified, this boilerplate disclosure was not sufficient to warn investors of the true risks inherent in the Contributed Portfolio that were known to Defendants or capable of becoming known by them at the time of the IPO, as set forth above.

30. In addition, the Offering Documents represented that "[a]s of March 31, 2007, none of the[] loans [in the Contributed Portfolio] were delinquent or in default." In the Contribution

Agreement (a copy of which was attached to a pre-effective amendment to the Offering Documents), CIT Holding represented, in Section 7(j), that "there is no material default, breach, violation or event of acceleration existing under any Initial Asset . . . ." In turn, Section 6(b)(i) of the Contribution Agreement provided that a condition to the closing of the transactions contemplated therein was "that at the time of the Closing [*i.e.*, the "date of the closing of the IPO," *see* Section 3], each of the representations and warranties of CIT Holding made in this Agreement shall be true and correct."

31.  The statements referenced above in ¶30 were each inaccurate statements of material fact because at the time of the IPO, there was a $26 million loan from the Contributed Portfolio that was in dispute and not being paid. In its Form 10-Q, dated November 14, 2007, Care Investment disclosed that "one loan [in the Contributed Portfolio] with a carrying value of approximately $26 million was technically past due 90 days with respect to interest payments as a result of a billing dispute." As such, this loan – which represented nearly 10% of the Contributed Portfolio's assets, as valued by CIT Healthcare – was in default at least as of the end of June 2007, when the IPO was completed.

32.  The Offering Documents also described the Company's efforts to implement means of providing financing to companies within the healthcare industry – the purpose for which Care Investment was formed. Specifically, with respect to Care Investment's efforts to secure warehouse financing facilities, the Registration Statement provided, in pertinent part, as follows:

> We will use short-term financing, in the form of warehouse facilities. Warehouse lines are typically collateralized loans made to borrowers who invest in securities and loans and, in turn, pledge the resulting securities and loans to the warehouse lender. ***We are currently negotiating a warehouse facility with Column Financial Inc., an affiliate of Credit Suisse Securities, LLC, an affiliate of one of our underwriters, which we expect to be in place shortly after consummation of this offering. We are also currently negotiating a warehouse facility with UBS Real Estate Securities Inc., an affiliate of one of our underwriters, which we expect to be in place soon after consummation of this offering.*** There is no assurance, however, that we will be able to close these facilities on terms favorable to us, if at all. [Emphasis added.]

- 9 -

33.     The statements referenced above in ¶32 were inaccurate statements of material fact because they failed to disclose that the Company was experiencing significant difficulties securing warehouse lines on acceptable terms, and that – at the time of the IPO – it had only one lender to negotiate with as opposed to two lenders as represented in the Offering Documents. In the Offering Documents, Care Investment disclosed that it was separately negotiating a warehouse facility with Column Financial Inc. ("Column Financial") and UBS Real Estate Securities Inc. ("UBS Real Estate"), both of which are affiliates of certain underwriters of the IPO. At the time of the IPO, however, UBS Real Estate's commercial real estate securities group was nothing more than a shell and the group was virtually non-existent. Thus, the Company did not have two lenders lined up to provide warehouse facilities, but rather was struggling to convince a single lender to extend it a warehouse facility on favorable terms. This information was material because any delay in obtaining the financing would have a direct and adverse material impact on the Company's ability to provide financing to other companies in the healthcare industry, thereby delaying the Company's ability to leverage the capital raised in the IPO and hindering the Company's growth rate as a result. And, with only one potential lender available to the Company, the Company's ability to obtain a warehouse facility on favorable terms was drastically reduced.

34.     The Company's difficulties in securing warehouse facilities and other sources of funding were first disclosed to the public after the IPO in its Form 10-Q for the period ending June 30, 2007, dated August 14, 2007. In the Form 10-Q (at Note 4), the Company disclosed, in pertinent part, the following:

As of June 30, 2007, Care had no debt obligations or facilities in place to provide financing for the acquisition of future investments. We will use short-term financing, in the form of warehouse facilities, secured bank lines and repurchase agreements. ***Due to continuing disruption in the credit markets along with a material reduction in liquidity, efforts to finalize negotiations on these debt facilities are taking longer than originally anticipated*** (see Note 11). If we are unable to obtain financing on terms acceptable to us, we may be unable to grow the Company in accordance with our business plan. [Emphasis added.]

35.   In Note 11, referenced in the prior paragraph, Care Investment revealed that adverse conditions in the credit markets were also affecting its ability to secure warehouse facilities:

Since June 30, 2007, investor concerns surrounding sub-prime mortgage credit risk, hedge fund losses, a large volume of unsuccessful leveraged loan syndications and related impact on the overall credit markets, including widening of credit spreads, have materially impacted liquidity in the debt markets, making financing terms for borrowers less attractive. ***Consequently, our efforts to negotiate our warehouse facilities on terms favorable to us are taking longer than expected.*** Should the current market conditions continue, our ability to grow may be impeded. We are in discussions with several financial institutions relating to other short-term financings. [Emphasis added.]

Moreover, the Company noted that "the terms of the facilities under negotiation are likely to be more restrictive with respect to advance rates and possibly more expensive than we originally planned." In addition, although the Company indicated in the Form 10-Q that it was still in negotiations with Column Financial to secure a warehouse facility, the Company made no mention of UBS Real Estate.

36.   When the Company eventually secured a warehouse facility on October 1, 2007, the Company was only partially successful. In its October 2, 2007 Form 8-K, Care Investment revealed that it had finally obtained a warehouse facility, but only from Column Financial; the Company again made no mention of UBS Real Estate. Moreover, even after the Company had finally secured a warehouse facility from Column Financial, it was still experiencing problems. In its November 14, 2007 Form 10-Q for the period ending September 30, 2007, the Company disclosed that the advance

rates under the warehouse facility were "less than the levels expected at the inception of negotiations for the facility."

37. The Offering Documents also described Care Investment's intention to use collateralized debt obligations (CDOs) to provide longer-term funding, stating in pertinent part as follows:

> For longer-term funding, we may utilize, among other financings, securitization structures, such as collateralized debt obligations (CDOs) or commercial mortgage-backed securities (CMBS), as well as other match-funded secured financing structures. We believe match-funded secured financing structures are an appropriate financing vehicle for our investments because they will enable us to obtain long-term, cost of funds and minimize the risk that we have to refinance our liabilities prior to the maturities of our investments while giving us the flexibility to manage credit risk and, subject to certain limitations, to take advantage of profit opportunities.

38. The statement referenced above in ¶37 was materially false and misleading because the credit markets were beginning to dry up as a result of widespread and far reaching problems in the sub-prime market. These problems necessarily impaired the Company's ability to use CDOs as a viable means of providing longer-term funding, because the tightening in the credit markets was having a corresponding effect on the debt markets. As a result, the Company's inability to use CDOs as part of its long-term funding strategy caused a corresponding impairment of its ability to grow.

39. Indeed, as the Company disclosed in its November 14, 2007 Form 10-Q, problems in the credit market continued to preclude the Company from issuing CDOs as part of its long-term funding strategy as of September 30, 2007. Moreover, as the Company further disclosed in the Form 10-Q, these problems were developing as of the second quarter of 2007 and thus should have been apparent as of the time of the final Registration Statement, which was filed toward the end of the second quarter. The Form 10-Q provided in pertinent part as follows:

Investor concerns surrounding sub-prime mortgage credit risk, hedge fund losses, a large volume of unsuccessful leveraged loan syndications and related impact on the overall credit markets, including widening of credit spreads, arose in the second quarter of 2007. Disruption in the credit markets persists beyond September 30, 2007. These factors have materially impacted the availability of liquidity in the debt markets, making financing terms for borrowers less attractive. Consequently, the advance rates of our warehouse facility are less than the levels expected at inception of negotiations for the facility. In addition, *plans to issue collateralized debt obligations (CDO) for more stable longer-term financing are uncertain given continuing turmoil in the CDO market. We can not foresee when the CDO market may stabilize and do not believe that we will he able to successfully enter into a CDO on terms acceptable to us in the short term*. Should the current market conditions continue for an extended period of time, our ability to grow may be impeded and Care may be required to further adjust its business plan. [Emphasis added.]

40. At the time of the filing of this complaint, Care Investment stock traded in a range of $10.00 to $10.50 per share, approximately 33% less than the IPO price.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

41. Plaintiffs repeat and reallege each and every allegation set forth above.

42. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class.

43. In contravention of the SEC rules and regulations governing their preparation, the Registration Statement was negligently prepared because it contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

44. Care Investment was the registrant for the IPO. As issuer of the shares, Care Investment is strictly liable to Plaintiffs and the Class for the misstatements and omissions contained in Registration Statement.

45.     None of the Defendants named herein made a reasonable investigation or had a reasonable basis to believe that the statements contained in the Offering Documents, including the Registration Statement, were true, complete, accurate and non-misleading with respect to all material facts.

46.     By reason of the conduct alleged herein, Defendants violated Section 11 of the Securities Act.

47.     Plaintiffs acquired Care Investment shares pursuant and/or traceable to the IPO.

48.     Plaintiffs and the Class have sustained damages. The value of Care Investment common stock has declined substantially subsequent to and due to Defendants' violations.

49.     At the time they purchased Care Investment stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein. Less than one year had elapsed since the time Lead Plaintiffs discovered, or reasonably could have discovered, the facts upon which this Complaint is based and the time that the initial Complaint was filed. Less than three years had elapsed since the time that the securities upon which this Count is brought were offered to the public and the time that the initial Complaint was filed.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

50.     Plaintiffs repeat and reallege each and every allegation set forth above.

51.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class.

52.     Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Prospectus.

53.     As set forth above, the Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein. Defendants' actions of solicitation included preparing the inaccurate and misleading Prospectus and participating in efforts to market the IPO to investors.

54.     Defendants owed to the purchasers of Care Investment common stock, including Plaintiffs and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, including the Prospectus contained therein, to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact. Defendants, in the exercise of reasonable care, should have known that the Offering Documents contained misstatements and omissions of material fact.

55.     Plaintiffs and the other members of the Class purchased or otherwise acquired Care Investment common stock pursuant and/or traceable to the Prospectus, and neither Plaintiffs nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Prospectus.

56.     Plaintiffs, on behalf of themselves and the Class, hereby offer to tender to Defendants those shares of common stock that Plaintiffs and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon. Class members who have sold their shares are entitled to rescissory damages.

## COUNT III

### Violations of Section 15 of the Securities Act
### Against the Individual Defendants

57.     Plaintiffs repeat and reallege each and every allegation set forth above.

58.     This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class.

59.     Each of the Individual Defendants was a control person of Care Investment by virtue of his position as a director and/or senior officer of the Company.

60.     The Individual Defendants were participants in the violation of Section 11 of the Securities Act alleged in Count I above, because they were signatories to the Registration Statement and they otherwise participated in the preparation of the Offering Documents and the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.      declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.      awarding Plaintiffs and the other members of the Class damages together with interest thereon;

C.      with respect to Count II, ordering Defendants to accept and pay for the shares held by the members of the Class along with interest thereon, and ordering an award of rescissory damages payable to those Class members that have sold their shares;

D.      awarding Plaintiffs and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.      awarding Plaintiffs and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: February 19, 2008
          COUGHLIN STOIA GELLER RUDMAN &
            ROBBINS LLP
          SAMUEL H. RUDMAN
          DAVID A. ROSENFELD
          JOSEPH RUSSELLO

*/s/ David Rosenfeld*
          DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LABATON SUCHAROW LLP
JOEL H. BERNSTEIN
MICHAEL W. STOCKER
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

*Lead Counsel for Lead Plaintiffs and the Class*

ABRAHAM FRUCHTER & TWERSKY LLP
JACK G. FRUCHTER
One Pennsylvania Plaza, Suite 1910
New York, NY 10119
Telephone: 212/279-5050
212/279-3655 (fax)

*Additional Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2008, a copy of the foregoing Amended Class Action Complaint for Violations of Federal Securities Laws was sent, via U.S. Mail, postage prepaid to the following parties on the attached service list.

_____
Joseph Russello

CARE INVESTMENT
Service List - 2/19/2008   (07-0193)
Page 1 of 1

**Counsel For Defendant(s)**

Andrew David Kaizer
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY  10017
   212/547-5400
   212/547-5444(Fax)

Joel G. Chefitz
Myriam Pierre Warren
McDermott Will & Emery LLP
227 W. Monroe Street, Suite 3100
Chicago, IL  60606-5096
   312/372-2000
   312/984-3689(Fax)

**Counsel For Plaintiff(s)**

Jack G. Fruchter
Abraham, Fruchter & Twersky
One Pennsylvania Plaza, Suite 2805
New York, NY  10119
   212/279-5050
   212/279-3655(Fax)

Samuel H. Rudman
David A. Rosenfeld
Joseph F. Russello
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
   631/367-7100
   631/367-1173(Fax)

Joel H. Bernstein
Michael W. Stocker
Labaton Sucharow LLP
140 Broadway, 34th Floor
New York, NY  10005
   212/907-0700
   212/818-0477(Fax)