# EXHIBIT 1 –

# Part 2

our portfolio and not for the purpose of speculating on changes in interest rates. Our financing strategy focuses on the use of match-funded financing structures. Accordingly, we will seek to match the maturities and/or repricing schedules of our financial obligations with those of our investments to minimize the risk that we will have to refinance our liabilities prior to the maturities of our investments and to reduce the impact of changing interest rates on earnings.

*Warehouse Facilities.*    We will use short-term financing, in the form of warehouse facilities. Warehouse lines are typically collateralized loans made to borrowers who invest in securities and loans and, in turn, pledge the resulting securities and loans to the warehouse lender. We are currently negotiating a warehouse facility with Column Financial Inc., an affiliate of Credit Suisse Securities, LLC, an affiliate of one of our underwriters, which we expect to be in place shortly after consummation of this offering. We are also currently negotiating a warehouse facility with UBS Real Estate Securities Inc., an affiliate of one of our underwriters, which we expect to be in place soon after consummation of this offering. There is no assurance, however, that we will be able to close these facilities on terms favorable to us, if at all.

*Long-term Funding.*    For longer-term funding, we may utilize, among other financings, securitization structures, such as collateralized debt obligations (CDOs) or commercial mortgage-backed securities (CMBS), as well as other match-funded secured financing structures. We believe match-funded secured financing structures are an appropriate financing vehicle for our investments because they will enable us to obtain long-term, cost of funds and minimize the risk that we have to refinance our liabilities prior to the maturities of our investments while giving us the flexibility to manage credit risk and, subject to certain limitations, to take advantage of profit opportunities.

*Permanent Financing for Real Estate.*    We intend to finance a portion of the purchase price of our investments in real estate by borrowing funds from third parties.

## Conflicts of Interest

We, our executive officers, certain of our directors and our Manager will face conflicts of interest because of our relationships with each other. We were formed by our Manager, and the terms of our management agreement, including fees payable, were not negotiated at arms-length, and those terms may not be as favorable to us as if the management agreement had been negotiated with an unaffiliated party. The terms of the contribution agreement relating to the contribution of our initial assets were also not negotiated at arms-length, and those terms, including the consideration paid for our initial assets, may not be as favorable to us as if the contribution agreement had been negotiated with an unaffiliated party. Our Manager also faced conflicts of interest in determining which assets in its portfolio would be contributed to us as part of our initial assets since there were other assets in our Manager's portfolio that met the criteria in the investment guidelines and conflicts of interest policy described below and therefore could have been selected for contribution to us. In addition, none of the employees of our Manager or CIT Group or any of our officers are expected to devote his or her time to us exclusively. Our president's primary focus will be to us and our operations.

The compensation we will pay to our Manager consists of both a base management fee that is not tied to our performance and an incentive fee that is based entirely on our performance. The base management fee is received regardless of performance and it may not provide sufficient incentive to our Manager to seek to achieve attractive risk-adjusted returns to our portfolio. The incentive fee may cause our Manager to place undue emphasis on the short-term maximization of our funds from operations at the expense of other criteria, such as preservation of capital, in order to achieve a higher incentive fee. Investments with higher yield potential are generally riskier or more speculative. This could result in increased risk to the value of our investment portfolio.

Since our investments will be primarily sourced and originated by our Manager and our Manager and its affiliates may invest in many of the same investments that we target, we have developed a conflicts of interest policy with our Manager in an effort to address conflicts with respect to the origination of investments, the allocation of investment opportunities, the terms of investments purchased from our Manager, the terms upon which we may make certain co-investments with our

10

Table of Contents

Manager and the servicing of defaulted or distressed loans in which both we and our Manager have an interest. This conflicts of interest policy gives us the first right to invest in certain investment opportunities originated or otherwise identified by our Manager, directly or in the secondary market, and provides specific guidelines with respect to the terms of co-investments with our Manager, participations in loans in which our Manager holds a participation, including participations that are senior to our participation, and the servicing of distressed loans in which both we and our Manager participate. Specifically, among other things, we will have the first right to invest in any mortgage or real estate asset that constitutes (i) any mortgage loan, for 12 months following the closing of this offering and, thereafter, any mortgage loan with a total principal amount over $75.0 million; (ii) an investment opportunity which constitutes equity or preferred equity; (iii) an investment opportunity which constitutes mezzanine loans or B Notes; and (iv) an investment that our Manager originates and elects to syndicate. In addition, there will be an "independent investment advisor" that will attend or otherwise participate in meetings of our investment committee. The independent investment advisor will be retained by our board of directors (and approved by a majority of our independent directors), and will determine whether any investment decisions made by our investment committee should be separately reviewed by our independent directors. Such independent investment advisor will be unaffiliated with our Manager and CIT Group and will be compensated by us. For a description of these conflicts of interest policies, see "Our Manager and Management Agreement— Conflicts of Interest Policies."

## Our Management Agreement

A management agreement will govern the relationship between us and our Manager and describes the services to be provided by our Manager and its compensation for those services. The management agreement appoints our Manager, subject to the supervision of our board of directors, to manage our investments and day-to-day operations subject to the terms and conditions of the management agreement.

The management agreement has an initial term expiring on June 30, 2010, and will automatically be renewed for one-year terms thereafter unless either we or our Manager gives the other party at least 180 days prior notice of its intention not to renew the agreement. We are not able to terminate the management agreement without cause during the initial term or any renewal term. If we elect to not renew the management agreement upon expiration of the initial term or any renewal term, we will be required to pay our Manager a termination fee.

Our Manager is entitled to receive from us a base management fee, an incentive fee based on certain financial performance criteria, a termination fee if we choose to not renew the management agreement and reimbursement of certain expenses as described in the management agreement. The following table summarizes the fees payable to our Manager pursuant to the management agreement:

| Fee | Summary Description |
| --- | --- |
| Base Management Fee | The base management fee will be payable monthly in arrears in an amount equal to 1/12 of 1.75% of our gross equity (as defined in the management agreement). Our Manager will use the proceeds from its management fee in part to pay compensation to its officers and employees provided to us who, notwithstanding that certain of them also are our officers, will receive no cash compensation directly from us. |
| Incentive Fee | The incentive fee will be payable quarterly in arrears in an amount equal to the product of:<br><br>• 25% of the dollar amount by which |

11

Table of Contents

| Fee | Summary Description |
| --- | --- |

• our funds from operations (after the base management fee and before the incentive fee) (as defined in the management agreement) for such quarter per share of our common stock (based on the weighted average number of shares outstanding for such quarter)

• plus the amount by which any capital gains realized during the quarter exceed any capital losses realized during the quarter

• exceed an amount equal to

• the weighted average of the price per share of our common stock issued in all our offerings (including this offering), in each case at the time of issuance thereof, multiplied by the greater of

• 2.25% and

• 0.75% plus ¼ of the 10-year U.S. treasury rate (as defined in the management agreement) for such quarter

• multiplied by the weighted average number of shares of our common stock outstanding during such quarter.

Termination Fee    The termination fee, payable by us if we choose to not renew the management agreement, is equal to the sum of the average annual base management fee plus the average annual incentive fee, earned during the two years immediately prior to termination, multiplied by three. The termination fee will be calculated as of the end of the most recently completed fiscal quarter prior to the date of termination. No termination fee is payable if we terminate the management agreement for cause.

12

Table of Contents

**Our Structure**

The following chart shows the structure of our organization following the completion of this offering and the related transactions:



\* The remaining 0.7% of our equity represents 148,333 shares of restricted stock granted to our officers and directors and officers of our Manager under our Equity Plan.

**Operating and Regulatory Structure**

We will elect to be taxed and intend to qualify as a REIT for federal income tax purposes commencing with our taxable year ending December 31, 2007. Our qualification as a REIT will depend upon our ability to meet, on a continuing basis, various complex requirements under the Internal Revenue Code relating to, among other things, the sources of our gross income, the composition and values of our assets, our distribution levels and the concentration of ownership of our capital stock. We believe that, commencing with our taxable year ending December 31, 2007, we will be organized in conformity with the requirements for qualification and taxation as a REIT under the Internal Revenue Code, and that our intended manner of operation will enable us to continue to meet the requirements for qualification and taxation as a REIT. See ''Federal Income Tax Considerations — Taxation of Care Investments Trust.''

**Our Distribution Policy**

To maintain our qualification as a REIT, we intend to make regular quarterly distributions to our stockholders of at least 90% of our taxable income, which does not necessarily equal net income as calculated in accordance with U.S. generally accepted accounting principles, or GAAP. Distributions will be authorized by our board of directors and declared by us based upon a variety of factors deemed relevant by our board of directors, and our distribution policy may change in the future. Our ability to make distributions to our stockholders will depend, in part, upon the performance of our investment portfolio and, in turn, upon our Manager's management of our business. Distributions to our stockholders generally will be taxable to our stockholders as ordinary income, although a portion of our distributions may be designated by us as capital gain or may constitute a return of capital. See ''Federal Income Tax Considerations—Taxation of Stockholders.''

**Exemption From Regulation Under the Investment Company Act**

We intend to conduct our operations so that we are not required to register as an investment company. We will rely on the exemption provided by Section 3(c)(5)(C) of the Investment Company Act for companies that invest primarily in mortgages and other liens on and interests in real estate, also known as ''qualifying real estate assets.'' This exemption, as interpreted by the staff of the

13

---

Table of Contents

Securities and Exchange Commission, or SEC, requires us to invest at least 55% of our portfolio in qualifying real estate assets and to invest at least another 25% of our portfolio in additional qualifying real estate assets or in a broader category of assets that we refer to as real estate-related assets. As a result, we will be limited in the types of assets we may acquire. This exemption also prohibits us from issuing redeemable securities. Alternatively, we may not be subject to regulation under the Investment Company Act because we do not come within the definition of an investment company under the Investment Company Act. See ''Business—Exemption From Regulation Under the Investment Company Act.''

**The Offering**

| | |
|---|---|
| Common stock offered | 15,000,000 shares |
| Common stock to be outstanding after this offering | 21,012,373 shares[(1)(2)] |
| Use of proceeds | The net proceeds to us from our sale of shares of common stock in this offering, after deducting the underwriting discounts and commissions and other estimated offering expenses, will be approximately $222.1 million. If the |

underwriters exercise their over-allotment option in full, we estimate that our net proceeds will be approximately $255.8 million.

We plan to use $200.8 million of the net proceeds of this offering to fund a portion of the purchase price for the contribution of the initial assets to us, with the remainder of the net proceeds, if any, used for our targeted investments and general corporate purposes. The total fair market value of the initial assets purchased by us may increase between March 31, 2007 and the closing of this offering as a result of accrued interest earned on the initial assets. Accordingly, the cash portion of the consideration that we will pay in exchange for the initial assets would be increased to reflect any increase in the fair market value of the initial assets. In the event that our Manager receives a prepayment of principal on any of the initial assets prior to the closing of this offering, the total fair market value of the initial assets will decrease and the cash portion of the consideration that we will pay in exchange for the initial assets will be decreased to reflect the amount of any such prepayments.

| | |
|---|---|
| New York Stock Exchange symbol | Our common stock has been approved for listing, subject to official notice of issuance, on the New York Stock Exchange, or NYSE, under the symbol "CRE." |
| Ownership and transfer restrictions | In order to assist us in complying with the limitations on the concentration of ownership of a REIT imposed by the Internal Revenue Code, our charter generally prohibits any stockholder from beneficially or constructively owning more than 9.8% in value or in number of shares, whichever |

14

Table of Contents

is more restrictive, of our common or capital stock. In addition, our charter will generally prohibit beneficial or constructive ownership of shares of our capital stock by any person that owns, actually or constructively, an interest in any of our tenants that would cause us to own, actually or constructively, more than a 9.9% interest in any of our tenants. Our board of directors has granted a limited exemption from the ownership limitation to CIT Holding, our Manager and CIT Group. See "Description of Capital Stock— Restrictions on Ownership and Transfer."

(1)  Assumes the underwriters' option to purchase up to an additional 2,250,000 shares of our common stock solely to cover over-allotments, if any, is not exercised.

(2)  Includes (i) 100 shares of common stock we previously issued to CIT Holding, (ii) 5,256,250 shares of common stock to be issued to CIT Holding as partial consideration for the initial assets to be contributed to us upon consummation of this offering, (iii) 607,690 shares of common stock to be granted to our Manager upon consummation of this offering under the Manager Equity Plan that vest immediately upon grant, (iv) 133,333 shares of restricted stock to be granted to our officers and employees of our Manager upon

consummation of this offering under the Equity Plan that vest on the third anniversary of the closing of this offering and (v) an aggregate of 15,000 shares of restricted stock to be granted to our five independent directors that vest ratably over three years from the date of the grant. Does not include an aggregate of 1,269,612 additional shares of our common stock available for future grants under our equity incentive plans.

## Our Corporate Information

Our principal place for business is at our Manager's office located at 505 Fifth Avenue, 6th Floor, New York, New York, 10017, and our telephone number is (212) 771-0505. Our internet address will be *www.carereit.com*. The information found on, or otherwise accessible through, our website is not incorporated into, and does not form a part of, this prospectus or any other report or document we file with or furnish to the SEC.

15

Table of Contents

## RISK FACTORS

*An investment in our common stock involves a number of risks. Before making an investment decision, you should carefully consider all of the risks described below and the other information contained in this prospectus. If any of the risks discussed in this prospectus actually occur, our business, financial condition, liquidity and results of operations could be materially adversely affected. If this were to occur, the value of our common stock could decline and you may lose all or part of your investment.*

### Risks Related to Conflicts of Interest and Our Relationship With Our Manager

***The management agreement was not negotiated on an arms-length basis. As a result, the terms, including fees payable, may not be as favorable to us as if it was negotiated with an unaffiliated third party.***

The management agreement was negotiated between related parties. As a result, we did not have the benefit of arms-length negotiations of the type normally conducted with an unaffiliated third party and the terms, including fees payable, may not be as favorable to us as if we did engage in negotiations with an unaffiliated third party. We may choose not to enforce, or to enforce less vigorously, our rights under the management agreement because of our desire to maintain our ongoing relationship with our Manager.

***The contribution agreement for the initial assets was not negotiated on an arms-length basis and we did not receive independent appraisals of the initial assets to be contributed upon completion of this offering. As a result, the terms of the contribution agreement, including the consideration paid by us in exchange for the initial assets, may not be as favorable to us as if it was negotiated with an unaffiliated third party.***

The contribution agreement was negotiated between related parties. As a result, we did not have the benefit of arms-length negotiations of the type normally conducted with an unaffiliated third party and the terms, including the terms of the contribution of the initial assets, may not be as favorable to us as if we did engage in negotiations with an unaffiliated third party. We have not obtained any independent third-party appraisals of the initial assets to be contributed to us and the determination of the fair market value of the initial assets upon the closing of this offering will be made by our Manager. These assets will be contributed to us directly by CIT Holding, an affiliate of ours, and, in exchange, we will issue to CIT Holding cash proceeds from this offering and shares of our common stock. As a result, the consideration to be paid by us in exchange for the contribution of the assets upon the completion of this offering may exceed the fair market value of these assets. In addition, we may choose not to enforce, or to enforce less vigorously, our rights under the contribution agreement because of our desire to maintain our ongoing relationship with our Manager and CIT Group.

***Our Manager will source most of our investments, and we may also participate in investments in which our Manager and its affiliates are also participating, which could result in conflicts of interest.***

Our Manager will source most of our investments and we may also participate in investments in which our Manager and its affiliates are also participating. Certain of our investments may be subordinate to investments made by our Manager in the same issuer or project. Transactions originated by, or in which we co-invest or participate with, our Manager are not and will not be the result of arms-length negotiations and involve conflicts between our interests and the interests of our Manager in obtaining favorable terms and conditions. There is no assurance that the conflicts of interest policy that addresses some of the conflicts relating to our investments, which is described under ''Our Manager and Management Agreement—Conflicts of Interest Policies,'' will be adequate to address all of the conflicts that may arise. In each case, some of the same officers will be determining the price and terms for the investments for both us and our Manager and there can be no assurance that the procedural protections, such as obtaining market prices or other reliable indicators of fair market value, appointing a third party servicer in the event of a loan's default, or having the independent investment advisor review all of our investments, will be sufficient to assure that the consideration we pay for these investments will not exceed their fair market value and that we would not receive more advantageous terms for an investment had we negotiated the purchase with an

16

---

Table of Contents

independent third party. In addition, since our Manager's officers and employees are also responsible for providing the same services for our Manager's portfolio of investments, they may not devote sufficient time to the management of our business operations. Our interests in such investments may conflict with the interests of such other vehicles or accounts in related investments in the event of a default or restructuring of the investment.

***We will rely on our Manager to assist us in various aspects of our business, and our Manager, in turn, will rely on CIT Group and its affiliates to assist it in various aspects of its business, including financing, and there is no assurance that CIT Group will continue to allocate the same resources to our Manager to provide services to us.***

The relationship with our Manager will be an important component of our growth strategy and provide us with services essential to our operations. Our Manager represents just one segment of CIT Group, and relies on CIT Group and its affiliates for assistance in various aspects of its business, including financing. Our Manager obtains its financing from public and private securities offerings by CIT Group. We cannot assure you that CIT Group will continue to be able to raise our Manager's financing in the future. We also cannot assure you that CIT Group will continue to allocate the same resources to our Manager's business. An inability or unwillingness on the part of CIT Group to access the capital markets on behalf of our Manager or to continue to provide the same level of support to our Manager could negatively affect our business, financial condition and results of operations.

***We may compete with existing and future investment vehicles for access to our Manager, which may reduce investment opportunities available to us.***

In the future, our Manager may sponsor separate investment vehicles with investment focuses that overlap with our investment focus. Under the management agreement, we have the right to terminate the management agreement for cause if our Manager raises, sponsors, forms or advises any new investment fund, company or vehicle, including any REIT, that invests primarily in healthcare-related commercial mortgage loans or other commercial healthcare-related real estate loans, such as mezzanine loans (but specifically excluding CMBS and other similar pass through securities) in the United States or healthcare-related properties in the United States. However, we may choose to not enforce our right to terminate the management agreement. Accordingly, we may compete for access to the benefits that we expect our relationship with our Manager to provide and for the time of their investment professionals to carry out and facilitate our investment activities. We may make investments that are senior or junior to participations in, or have rights and interests different from or adverse to, the investments made by other vehicles or accounts managed by our Manager. Our interests in such investments may conflict

with the interests of such other vehicles or accounts in related investments at the time of origination or in the event of a default or restructuring of the investment.

*Termination of our management agreement would be difficult and costly.*

Termination of the management agreement with our Manager would be difficult and costly. The management agreement has an initial term expiring on June 30, 2010 and will automatically be renewed for one-year terms thereafter unless we or our Manager gives the other party at least 180 days prior notice of its intention not to renew the agreement. We may not terminate the management agreement without cause during the initial term or any renewal term. If we elect to not renew the agreement upon expiration of the initial term or any renewal term we will be required to pay a termination fee, within 90 days of termination, equal to the sum of the average annual base management fee plus the average annual incentive fee earned during the two years immediately prior to termination, multiplied by three. The termination fee will be calculated as of the end of the most recently completed fiscal quarter prior to the date of termination. In addition, following any termination of the management agreement, we must pay our Manager all compensation accruing to the date of the termination. These provisions increase the effective cost to us of terminating the management agreement with our Manager, even if we believe our Manager's performance is not satisfactory.

17

Table of Contents

*Our Manager's base management fee is payable regardless of our performance.*

Our Manager is entitled to receive a base management fee from us that is based on the amount of our equity (as defined in the management agreement), regardless of the performance of our portfolio. For example, we would pay our Manager a base management fee for a specific period even if we experienced a net loss during the same period. Our Manager's entitlement to substantial nonperformance-based compensation might reduce its incentive to devote its time and effort to seeking investments that provide attractive risk-adjusted returns for our portfolio. This in turn could hurt our ability to make distributions to our stockholders and the market price of our common stock.

*Our Manager's incentive fee may induce it to make more speculative investments.*

Our Manager is entitled to an incentive fee from us that may cause it to invest in high-risk investments. In addition to its base management fee, our Manager is entitled to receive an incentive fee based entirely upon our achievement of targeted levels of funds from operations and net capital gains. In evaluating investments and other management strategies, the opportunity to earn an incentive fee based on funds from operations and net capital gains may lead our Manager to place undue emphasis on the maximization of funds from operations at the expense of other criteria, such as preservation of capital, in order to achieve a higher incentive fee. Investments with higher yield potentials generally are riskier or more speculative. This could result in increased risk to our investment portfolio.

**Risks Related to Our Business**

*We have no operating history and may not be able to successfully operate our business or generate sufficient revenue to make or sustain distributions to our stockholders.*

We were organized in March 2007 and have no operating history. The results of our operations depend on many factors, including the performance of the initial assets, the availability of opportunities for the acquisition of additional assets, the level and volatility of interest rates, readily accessible short- and long-term financing, conditions in the financial markets and economy, and our ability to successfully operate our business and execute our investment strategy. We will face substantial competition in acquiring suitable investments, which could adversely impact the yields that we receive on our new investments.

*We are dependent on our Manager, who has no experience operating a REIT.*

Our Manager has no experience operating a REIT or operating a business in compliance with the numerous technical restrictions and limitations necessary to qualify as a REIT under the Internal Revenue Code or to be exempt from the Investment Company Act. Our Manager's lack of experience in managing a portfolio of assets under such constraints may hinder its ability to achieve our investment objective. In addition, maintaining our REIT qualification and complying with the Investment Company Act exemptions limit the types of investments, particularly with respect to healthcare businesses, that we are able to make. We can offer no assurance that our Manager will be successful at all or as successful as in its previous endeavors. Our board of directors is not expected to review or approve individual investments unless our independent investment advisor determines that such review is appropriate.

*We are dependent upon our Manager for our success and may not find a suitable replacement if the management agreement is terminated or such key personnel are no longer available to us.*

We will not have any employees. Our officers are employees of our Manager through CIT Group. We do not have any separate facilities and are completely reliant on our Manager, which has significant discretion as to the implementation of our operating policies and strategies. We depend on the diligence, skill and network of business contacts of our Manager. Our executive officers and our Manager will source, evaluate, negotiate, structure, close, service and monitor our investments. The

18

---

Table of Contents

management agreement does not require our Manager to dedicate specific personnel to fulfilling its obligations to us under the management agreement, or require personnel to dedicate a specific amount of time. The departure of a significant number of the professionals of our Manager could have a material adverse effect on our performance. We are also subject to the risk that our Manager will not renew the management agreement and that no suitable replacement will be found to manage us. After June 30, 2010, the expiration of the initial term of the management agreement, or upon the expiration of any automatic renewal term, our Manager may elect not to renew the management agreement without cause, without penalty, on 180 days' prior written notice to us. We can offer no assurance that our Manager will remain our external manager, that we will be able to find an adequate replacement for our Manager should our Manager elect not to renew the management agreement, or that we will continue to have access to our Manager's principals and professionals or their information or deal flow.

*Our Manager will have broad discretion to invest funds and may make investments that ultimately produce investment returns which are substantially below expectations or that result in losses.*

Our Manager is authorized to follow very broad investment guidelines and has great latitude within those guidelines in determining the types of assets it may decide are proper investments for us. Our board of directors will periodically review our investment guidelines and our investment portfolio. However, our board of directors is not expected to review or approve each proposed investment unless our independent investment advisor determines that such review is appropriate. In addition, the directors and our independent investment advisor will rely primarily on information provided to them by our Manager in reviewing our investments and our portfolio. Furthermore, transactions entered into by our Manager on our behalf may be costly, difficult or impossible to unwind by the time they are reviewed by our board of directors. Our Manager has great latitude within the broad parameters of our investment guidelines in determining the types of assets it may decide are proper investments for us, which could result in investment returns that are substantially below expectations or that result in losses, which would materially and adversely affect our business, operations and results.

*Our failure to manage future growth effectively may have a material negative impact on our business, financial condition and results of operations.*

Our ability to achieve our investment objective depends on our ability to grow, which depends, in turn, on the senior management team of our Manager and its ability to identify and invest in assets that meet our investment criteria. Accomplishing this result on a cost-effective basis is largely a function of our Manager's structuring of our investment process, its ability to provide competent, attentive and efficient services to us and our access to financing on acceptable terms. Our ability to grow is also dependent upon our Manager's ability to successfully hire, train, supervise, manage and retain its employees. We may not be able to manage growth effectively or to achieve growth at all. Any failure to manage our future growth effectively could have a material negative impact on our business, financial condition and results of operations.

***Lenders may require us to enter into restrictive covenants relating to our operations.***

When we obtain financing, lenders could impose restrictions on us that would affect our ability to incur additional debt, our capability to make distributions to stockholders and our flexibility to determine our operating policies. Loan documents we execute will contain negative covenants that may limit, among other things, our ability to repurchase stock, distribute more than a certain amount of our funds from operations, and employ leverage beyond certain amounts.

***If our Manager ceases to be our Manager pursuant to the management agreement, financial institutions providing any credit facilities may not provide future financing to us.***

We are currently negotiating a warehouse facility with Column Financial Inc., an affiliate of Credit Suisse Securities, LLC, an affiliate of one of our underwriters, which we expect to be in place shortly after consummation of this offering. We are also currently negotiating a warehouse facility

19

---

Table of Contents

with UBS Real Estate Securities Inc., an affiliate of one of our underwriters, which we expect to be in place soon after consummation of this offering. There is no assurance, however, that we will be able to close these facilities on terms favorable to us, if at all. Financial institutions that finance our investments pursuant to credit facilities and warehouse agreements may require that our Manager remain our Manager pursuant to the management agreement. If our Manager ceases to be our Manager, it may constitute an event of default and the financial institution providing the warehouse credit facility may have the right to terminate its facility and any obligation to advance funds to us to finance our future investments. If our Manager ceases to be our Manager for any reason and we are unable to obtain financing under these or replacement credit facilities, our growth may be limited.

***If we issue senior securities, we will be subject to restrictive covenants and limitations on our operating flexibility, which could adversely affect our ability to make distributions.***

If we decide to issue senior securities in the future, it is likely that they will be governed by an indenture or other instrument containing covenants restricting our operating flexibility. Holders of senior securities may be granted specific rights, including the right to hold a perfected security interest in certain of our assets, the right to accelerate payments due under the indenture, rights to restrict dividend payments, and rights to require approval to sell assets. Additionally, any convertible or exchangeable securities that we issue in the future may have rights, preferences and privileges more favorable than those of our common stock. We, and indirectly our stockholders, will bear the cost of issuing and servicing such securities.

***The use of securitization financings with over-collateralization requirements may have a negative impact on our cash flow.***

We expect that the terms of securitizations we may issue will generally provide that the principal amount of assets must exceed the principal balance of the related bonds by a certain amount, commonly referred to as "over-collateralization." We anticipate that the securitization terms will provide that, if certain delinquencies

and/or losses exceed specified levels, which we will establish based on the analysis by the rating agencies (or any financial guaranty insurer) of the characteristics of the assets collateralizing the bonds, the required level of over-collateralization may be increased or may be prevented from decreasing as would otherwise be permitted had losses or delinquencies not exceeded those levels. Other tests (based on delinquency levels or other criteria) may restrict our ability to receive net income from assets collateralizing the obligations. We cannot assure you that the performance tests will be satisfied. In advance of completing negotiations with the rating agencies or other key transaction parties on our future securitization financings, we cannot assure you of the actual terms of the securitization delinquency tests, over-collateralization terms, cash flow release mechanisms or other significant factors regarding the calculation of net income to us. Failure to obtain favorable terms with regard to these matters may materially and adversely affect the availability of net income to us. If our assets fail to perform as anticipated, our over-collateralization or other credit enhancement expense associated with our securitization financings will increase.

***We may be required to repurchase loans that we have sold or to indemnify holders of securitization debt.***

If any of the loans we originate or acquire and sell or securitize do not comply with representations and warranties that we make about certain characteristics of the loans, the borrowers and the underlying properties, we may be required to repurchase those loans (including from a trust vehicle used to facilitate a structured financing of the assets through a securitization) or replace them with substitute loans. In addition, in the case of loans that we have sold instead of retained, we may be required to indemnify persons for losses or expenses incurred as a result of a breach of a representation or warranty. Repurchased loans typically require a significant allocation of working capital to be carried on our books, and our ability to borrow against such assets may be limited. Any significant repurchases or indemnification payments could materially and adversely affect our financial condition and operating results.

20

Table of Contents

***Competition in acquiring desirable investments may limit their availability, which could, in turn, negatively affect our ability to make distributions to our stockholders.***

We will compete for investments with numerous public and private investment vehicles, such as other REITs, investment companies, healthcare operators and other institutional investors in identifying investment opportunities. Real estate investment assets are often obtained through a competitive bidding process. Many of our competitors may have advantages over us and our Manager. Competition may result in higher prices for healthcare mortgage loans and real estate related assets, lower yields and a narrower spread of yields over our borrowing costs. In addition, competition for desirable investments could delay the investment of our equity capital in desirable assets, which may, in turn, reduce earnings per share and may negatively affect our ability to maintain our dividend distribution. There can be no assurance that we will achieve investment results that will allow any specified level of cash distribution.

***We may incur borrowing costs related to any warehouse lines of credit and repurchase agreements we may obtain, which could harm our results of operations or financial condition.***

We intend to finance the acquisition of certain investments with warehouse lines of credit and repurchase agreements. In addition, we may engage in various types of securitizations in order to finance our loan originations. The amount of borrowings we intend to employ depends on, among other factors, the amount of our equity capital. Our borrowing costs under any warehouse lines of credit and repurchase agreements we may obtain generally will be adjustable and will correspond to floating interest rates, such as LIBOR or a Treasury index, plus or minus a margin. The margins on these borrowings over or under interest rates may vary depending upon a number of factors, including, without limitation:

- the movement of interest rates;

- the availability of financing in the market; and

- the value and liquidity of our mortgage loans and real estate related assets.

An increase in the interest rates of these borrowings could harm our results of operations and financial condition.

***We may be unable to generate sufficient revenue from operations to pay our operating expenses and to make distributions to our stockholders.***

As a REIT, we generally are required to distribute at least 90% of our taxable income each year to our stockholders and we intend to pay quarterly dividends to our stockholders such that we distribute all or substantially all of our taxable income each year, subject to certain adjustments and sufficient available cash. However we have not established a minimum dividend payment level, and our ability to pay dividends may be adversely affected by the risk factors described in this prospectus. In the event of a downturn in our operating results and financial performance or unanticipated declines in the value of our asset portfolio, we may be unable to pay quarterly dividends to our stockholders. The timing and amount of our dividends are in the sole discretion of our board of directors, and will depend upon, among other factors, our earnings, financial condition, maintenance of our REIT qualification and other tax considerations and capital expenditure requirements, in each case as our board of directors may deem relevant from time to time.

Among the factors that could adversely affect our results of operations and impair our ability to pay dividends to our stockholders are:

- the profitability of the investment of the net proceeds of this offering;

- our ability to make profitable investments;

- defaults in our asset portfolio or decreases in the value of our portfolio; and

- the fact that anticipated operating expense levels may not prove accurate, as actual results may vary from estimates.

21

<hr>

Table of Contents

A change in any one of these factors could affect our ability to pay dividends. If we are not able to comply with the restrictive covenants and financial ratios contained in our credit facilities, our ability to pay dividends to our stockholders and maintain our REIT qualification may also be impaired. We cannot assure you that we will be able to pay dividends to our stockholders in the future or that the level of any dividends we pay will increase over time.

In addition, dividends paid to stockholders are generally taxable to our stockholders as ordinary income, but a portion of our dividends may be designated by us as long-term capital gains to the extent they are attributable to capital gain income recognized by us, or may constitute a return of capital to the extent they exceed our earnings and profits as determined for tax purposes. Such distributions generally will be tax-free to the extent of each stockholder's basis in our common stock and will be treated as capital gain thereafter.

***Our rights and the rights of our stockholders to take action against our directors and officers are limited, which could limit your recourse in the event of actions not in your best interests.***

Our charter limits the liability of our directors and officers to us and our stockholders for money damages, except for liability resulting from:

- actual receipt of an improper benefit or profit in money, property or services; or

- a final judgment based upon a finding of active and deliberate dishonesty by the director or officer that was material to the cause of action adjudicated.

In addition, our charter permits us to agree to indemnify our present and former directors and officers for actions taken by them in those capacities to the maximum extent permitted by Maryland law. Our bylaws require us to indemnify each present or former director or officer, to the maximum extent permitted by Maryland law, in the defense of any proceeding to which he or she is made, or threatened to be made, a party by reason of his or her service to us. In addition, we may be obligated to fund the defense costs incurred by our directors and officers.

***Compliance with our Investment Company Act exemption imposes limits on our operations.***

We intend to conduct our operations so as not to become regulated as an investment company under the Investment Company Act. We intend to qualify for an exemption from registration under Section 3(c)(5)(C) of the Investment Company Act, which generally means that at least 55% of our portfolio must be comprised of qualifying real estate assets and at least another 25% of our portfolio must be comprised of additional qualifying real estate assets and real estate-related assets. To comply with these regulations, we may from time to time acquire direct interests in real estate or buy or originate whole mortgage loans and participations in whole mortgage loans, provided that we control the right to foreclose the mortgage securing the loan in the event of a default, certain B Notes and other qualifying assets. There can be no assurance that we will be able to maintain this exemption from registration. Further, we may not be able to invest in sufficient qualifying real estate assets and/or real estate-related assets and future revisions of the Investment Company Act or further guidance from the staff of the SEC may cause us to lose our exemption or force us to re-evaluate our portfolio and our business strategy. Such changes may prevent us from operating our business successfully.

Our subsidiaries, if any, will be subject to similar restrictions under the Investment Company Act as described in this prospectus so that we do not come within the definition of an investment company under the Investment Company Act. These restrictions also would limit the types of business in which we may engage, as described in this prospectus. A failure to satisfy these requirements could materially and adversely affect our business.

As part of our Manager's obligations under the management agreement, our Manager agreed to use commercially reasonable efforts to cooperate with our efforts to conduct our operations so as not to cause us to become regulated as an investment company under the Investment Company Act and to refrain from any action that, in our Manager's judgment, would adversely affect our status as an

22

---

Table of Contents

entity that is not regulated as an investment company under the Investment Company Act. Failure to maintain this exemption would require us to significantly restructure our business plan. For example, because affiliate transactions generally are prohibited under the Investment Company Act, we would not be able to enter into transactions with any of our affiliates if we fail to maintain our exemption and may be required to terminate our management agreement and any other agreements with affiliates, which could have a material adverse effect on our ability to operate our business. If the management agreement is terminated, it could constitute an event of default under our credit facilities and lenders may then have the right to terminate these facilities and their obligation to advance funds to us to finance our future investments. In addition, we may not be able to identify a replacement manager on favorable terms if at all.

***Rapid changes in the market value or income from our real estate-related investments or non-qualifying assets may make it more difficult for us to maintain our qualification as a REIT or exemption from the Investment Company Act.***

If the market value or income potential of real estate-related investments declines as a result of a change in interest rates, prepayment rates or other factors, we may need to increase our real estate investments and income and/or liquidate our non-qualifying assets in order to maintain our REIT qualification or exemption from the

Investment Company Act. If the decline in real estate asset values and/or income occurs quickly, this may be especially difficult to accomplish. This difficulty may be exacerbated by the illiquid nature of any non-real estate assets that we may own. We may have to make investment decisions that we would not make absent the REIT and Investment Company Act considerations.

*A general economic slowdown could have a material effect on our business.*

Periods of economic slowdown or recession may be accompanied by declines in real estate values. Delinquencies, foreclosures and losses generally increase during economic slowdowns or recessions. Because a portion of the investments we make may be subordinate to other creditors, the rate of delinquencies, foreclosures and losses on our healthcare mortgage loans could be higher than those generally experienced in the mortgage lending industry. If our loans fall into and remain in default, we may have to foreclose and may incur substantial losses. Because real estate investments are relatively illiquid, our ability to promptly sell one or more investments or properties underlying foreclosed investments in our portfolio may be limited. In addition, any material decline in real estate values would increase the loan-to-value ratio of loans that we have previously extended, weaken our collateral coverage and increase the possibility of a loss in the event of a borrower default. Any sustained period of increased delinquencies, foreclosures or losses is likely to materially and adversely affect our ability to finance loans in the future. Furthermore, various international events have caused significant uncertainty in the global financial markets. While the long-term effects of these events and their potential consequences are unknown, they could have a material adverse effect on general economic conditions, consumer confidence and market liquidity.

*Liability relating to environmental matters may decrease the value of the underlying properties.*

Under various federal, state and local laws, an owner or operator of real property may become liable for the costs of removal of certain hazardous substances released on its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect an owner's ability to sell real estate or borrow using real estate as collateral. To the extent that an owner of an underlying property becomes liable for removal costs, the ability of the owner to make debt payments may be reduced, which in turn may adversely affect the value of the relevant mortgage asset held by us.

*We are highly dependent on information systems and systems failures could significantly disrupt our business, which may, in turn, negatively affect the market price of our common stock and our ability to pay dividends.*

Our business is highly dependent on the communications and information systems of our Manager. Any failure or interruption of our Manager's systems could cause delays or other problems

23

Table of Contents

in our securities trading activities, which could have a material adverse effect on our operating results and negatively affect the market price of our common stock and our ability to pay dividends.

*We are exposed to potential risks from legislation requiring companies to evaluate their internal control over financial reporting.*

We will be required to comply with Section 404 of the Sarbanes-Oxley Act of 2002. Section 404 requires us to assess and attest to the effectiveness of our internal control over financial reporting beginning with our fiscal year ending December 31, 2008, and requires our independent registered public accounting firm to opine as to the adequacy of our assessment and effectiveness of our internal control over financial reporting. Our efforts to comply with Section 404 will result in us incurring significant expenses through 2007 and 2008.

Even with those expenditures, we may not receive an unqualified opinion from our independent registered public accounting firm with regard to our internal control over financial reporting.

***Terrorist attacks and other acts of violence or war may affect the real estate industry, our profitability and the market for our common stock.***

The terrorist attacks on September 11, 2001 disrupted the U.S. financial markets, including the real estate capital markets, and negatively impacted the U.S. economy in general. Any future terrorist attacks, the anticipation of any such attacks, the consequences of any military or other response by the U.S. and its allies, and other armed conflicts could cause consumer confidence and spending to decrease or result in increased volatility in the United States and worldwide financial markets and economy. The economic impact of these events could also adversely affect the credit quality of some of our loans and investments and the property underlying our securities.

We may suffer losses as a result of the adverse impact of any future attacks and these losses may adversely impact our performance and revenues and may result in volatility of the value of our securities. A prolonged economic slowdown, a recession or declining real estate values could impair the performance of our investments and harm our financial condition, increase our funding costs, limit our access to the capital markets or result in a decision by lenders not to extend credit to us. We cannot predict the severity of the effect that potential future terrorist attacks would have on our business. Losses resulting from these types of events may not be fully insurable.

In addition, the events of September 11 created significant uncertainty regarding the ability of real estate owners of high profile assets to obtain insurance coverage protecting against terrorist attacks at commercially reasonable rates, if at all. With the enactment of the Terrorism Risk Insurance Act of 2002, or TRIA, and the subsequent enactment of the Terrorism Risk Insurance Extension Act of 2005, which extended TRIA through the end of 2007, insurers must make terrorism insurance available under their property and casualty insurance policies, but this legislation does not regulate the pricing of such insurance. The absence of affordable insurance coverage may adversely affect the general real estate lending market, lending volume and the market's overall liquidity and may reduce the number of suitable investment opportunities available to us and the pace at which we are able to make investments. If the properties in which we invest are unable to obtain affordable insurance coverage, the value of those investments could decline, and in the event of an uninsured loss, we could lose all or a portion of our investment.

## Risks Relating to the Healthcare Industry

***Our investments are expected to be concentrated in healthcare facilities and healthcare-related assets, making us more vulnerable economically than if our investments were more diversified.***

We intend to provide financing for healthcare businesses and may acquire and lease healthcare facilities. A downturn in the healthcare industry could negatively affect our borrowers' or tenants' ability to make payments to us and, consequently, our ability to meet debt service obligations or make distributions to our stockholders. These adverse effects could be more pronounced than if we diversified our investments outside of healthcare facilities.

24

Table of Contents

Furthermore, our borrowers and tenants in the healthcare industry are heavily dependant on reimbursements from the Medicare and Medicaid programs for the bulk of their revenues. Our borrowers and tenants' dependence on reimbursement revenues could cause us to suffer losses in several instances.

- If our borrowers or tenants fail to comply with operational covenants and other regulations imposed by these programs, they may lose their eligibility to continue to receive reimbursements under the program or incur monetary penalties, either of which could result in the borrower's or tenant's inability to make scheduled payments to us.