# EXHIBIT 1 – Part 4

law and on certain representations as to factual matters and covenants made by us and our Manager, including representations relating to the values of our assets and the sources of our income. The opinion will be expressed as of the date issued and will not cover subsequent periods. Skadden, Arps, Slate, Meagher & Flom LLP has no obligation to advise us or the holders of our common stock of any subsequent change in the matters stated, represented or assumed, or of any subsequent change in applicable law. Furthermore, both the validity of the opinion of Skadden, Arps, Slate, Meagher & Flom LLP, and our continued qualification as a REIT will depend on our satisfaction of certain asset, income, organizational, distribution, stockholder ownership and other requirements on a continuing basis, the results of which will not be monitored by Skadden, Arps, Slate, Meagher & Flom LLP. Our ability to satisfy the asset tests depends upon our analysis of the characterization and fair market values of our assets, some of which are not susceptible to a precise determination, and for which we will not obtain independent appraisals. Our compliance with the REIT income and quarterly asset requirements also depends upon our ability to successfully manage the composition of our income and assets on an ongoing basis. Moreover, the proper classification of an instrument as debt or equity for federal income tax purposes and the tax treatment of participation interests that we hold in mortgage loans and mezzanine loans may be uncertain in some circumstances, which could affect the application of the REIT qualification requirements as described below. Accordingly, there can be no assurance that the IRS will not contend that our interests in subsidiaries or other issuers will not cause a violation of the REIT requirements.

If we were to fail to qualify as a REIT in any taxable year, we would be subject to federal income tax, including any applicable alternative minimum tax, on our taxable income at regular corporate rates, and dividends paid to our stockholders would not be deductible by us in computing our taxable income. Further, if we fail to qualify as a REIT, our taxable mortgage pool securitizations will be treated as separate taxable corporations for U.S. federal income tax purposes that could not be included in any consolidated corporate income tax return. Any resulting corporate tax liability could be substantial and would reduce the amount of cash available for distribution to our stockholders, which in turn could have an adverse impact on the value of, and trading prices for, our common stock. Unless we were entitled to relief under certain Internal Revenue Code provisions, we also would be disqualified from taxation as a REIT for the four taxable years following the year in which we failed to qualify as a REIT.

***Dividends payable by REITs do not qualify for the reduced tax rates available for some dividends.***

The maximum tax rate applicable to income from "qualified dividends" payable to domestic stockholders that are individuals, trusts and estates has been reduced by legislation to 15% through the end of 2010. Dividends payable by REITs, however, generally are not eligible for the reduced rates. Although this legislation does not adversely affect the taxation of REITs or dividends payable by REITs, the more favorable rates applicable to regular corporate qualified dividends could cause investors who are individuals, trusts and estates to perceive investments in REITs to be relatively less attractive than investments in the stocks of non-REIT corporations that pay dividends, which could adversely affect the value of the stock of REITs, including our common stock.

***REIT distribution requirements could adversely affect our ability to execute our business plan.***

We generally must distribute annually at least 90% of our taxable income, subject to certain adjustments and excluding any net capital gain, in order for federal corporate income tax not to apply

39

Table of Contents

to earnings that we distribute. To the extent that we satisfy this distribution requirement, but distribute less than 100% of our taxable income, we will be subject to federal corporate income tax on our undistributed taxable income. In addition, we will be subject to a 4% nondeductible excise tax if the actual amount that we pay out to our stockholders in a calendar year is less than a minimum amount specified under federal tax laws. We intend to make distributions to our stockholders to comply with the REIT requirements of the Internal Revenue Code.

From time to time, we may generate taxable income greater than our taxable income for financial reporting purposes, or differences in timing between the recognition of taxable income and the actual receipt of cash may occur (for example, where a borrower defers the payment of interest in cash pursuant to a contractual right, the terms of our CDOs or otherwise). If we do not have other funds available in these situations, we could be required to borrow funds on unfavorable terms, sell investments at disadvantageous prices or distribute amounts that would otherwise be invested in future acquisitions to make distributions sufficient to enable us to pay out enough of our taxable income to satisfy the REIT distribution requirement and to avoid corporate income tax and the 4% excise tax in a particular year. These alternatives could increase our costs or reduce our equity. Thus, compliance with the REIT requirements may hinder our ability to grow, which could adversely affect the value of our common stock.

### *The stock ownership limit imposed by the Internal Revenue Code for REITs and our charter may restrict our business combination opportunities.*

To qualify as a REIT under the Internal Revenue Code, not more than 50% in value of our outstanding stock may be owned, directly or indirectly, by five or fewer individuals (as defined in the Internal Revenue Code to include certain entities) at any time during the last half of each taxable year after our first year in which we qualify as a REIT. Our charter, with certain exceptions, authorizes our board of directors to take the actions that are necessary and desirable to preserve our qualification as a REIT. Unless an exemption is granted by our board of directors, no person (as defined to include entities) may own more than 9.8% in value or in number of shares, whichever is more restrictive, of our common or capital stock following the completion of this offering. In addition, our charter will generally prohibit beneficial or constructive ownership of shares of our capital stock by any person that owns, actually or constructively, an interest in any of our tenants that would cause us to own, actually or constructively, more than a 9.9% interest in any of our tenants. Our board of directors may grant an exemption in its sole discretion, subject to such conditions, representations and undertakings as it may determine. Our board of directors has granted a limited exemption from the ownership limitation to CIT Holding, our Manager and CIT Group, but only to the extent that such affiliate's ownership of our stock could not reasonably be expected to cause us to violate the REIT requirements (in which case such affiliate either would be required to sell some of our stock or would become subject to the excess share provisions of our charter, in each case to the extent necessary to enable us to satisfy the REIT requirements).

These ownership limitations in our charter are common in REIT charters and are intended to assist us in complying with the tax law requirements and to minimize administrative burdens. However, these ownership limits might also delay or prevent a transaction or a change in our control that might involve a premium price for our common stock or otherwise be in the best interest of our stockholders.

### *Even if we remain qualified as a REIT, we may face other tax liabilities that reduce our cash flow.*

Even if we remain qualified for taxation as a REIT, we may be subject to certain federal, state and local taxes on our income and assets, including taxes on any undistributed income, tax on income from some activities conducted as a result of a foreclosure, and state or local income, property and transfer taxes, including mortgage recording taxes. See "Federal Income Tax Considerations— Taxation of Care Investment Trust." In addition, in order to meet the REIT qualification requirements, or to avert the imposition of a 100% tax that applies to certain gains derived by a REIT from that dealer property or inventory, we may hold some of our non-healthcare assets through taxable REIT subsidiaries, or TRSs, or other subsidiary corporations that will be subject to corporate-level income tax at regular rates. We will be subject to a 100% penalty tax on certain

40

---

Table of Contents

amounts if the economic arrangements among our tenants, our TRS and us are not comparable to similar arrangements among unrelated parties. Any of these taxes would decrease cash available for distribution to our stockholders.

*Complying with REIT requirements with respect to our TRS limits our flexibility in operating or managing certain properties through our TRS.*

A TRS may not directly or indirectly operate or manage a healthcare facility. For REIT qualification purposes, the definition of a "healthcare facility" means a hospital, nursing facility, assisted living facility, congregate care facility, qualified continuing care facility, or other licensed facility which extends medical or nursing or ancillary services to patients and which, immediately before the termination, expiration, default, or breach of the lease of or mortgage secured by such facility, was operated by a provider of such services which was eligible for participation in the Medicare program under Title XVIII of the Social Security Act with respect to such facility. If the IRS were to treat a subsidiary corporation of ours as directly or indirectly operating or managing a healthcare facility, such subsidiary would not qualify as a TRS, which could jeopardize our REIT qualification under the REIT gross asset tests. Although we currently do not plan to operate healthcare facilities, proposed legislation would allow TRSs to operate qualified healthcare properties, provided that such properties are operated by an eligible independent contractor. See "Federal Income Tax Considerations—Other Tax Considerations—Legislative or Other Actions Affecting REITs." This legislation is merely proposed and has not been enacted, and no assurances can be provided that it will be enacted as currently proposed or at all.

*Complying with REIT requirements may cause us to forgo otherwise attractive opportunities.*

To qualify as a REIT for federal income tax purposes, we continually must satisfy tests concerning, among other things, the sources of our income, the nature and diversification of our assets, the amounts we distribute to our stockholders and the ownership of our stock. We may be unable to pursue investments that would be otherwise advantageous to us in order to satisfy the source-of-income, asset-diversification or distribution requirements for qualifying as a REIT. Thus, compliance with the REIT requirements may hinder our ability to make certain attractive investments.

*Complying with REIT requirements may force us to liquidate otherwise attractive investments.*

To qualify as a REIT for federal income tax purposes, we must ensure that at the end of each calendar quarter, at least 75% of the value of our assets consists of cash, cash items, government securities and qualified REIT real estate assets, including certain mortgage loans and mortgage backed securities. The remainder of our investment in securities (other than government securities and qualified real estate assets) generally cannot include more than 10% of the outstanding voting securities of any one issuer or more than 10% of the total value of the outstanding securities of any one issuer. In addition, in general, no more than 5% of the value of our assets (other than government securities and qualified real estate assets) can consist of the securities of any one issuer, and no more than 20% of the value of our total securities can be represented by securities of one or more TRSs. See "Federal Income Tax Considerations—Taxation of Care Investment Trust." If we fail to comply with these requirements at the end of any calendar quarter, we must correct the failure within 30 days after the end of the calendar quarter or qualify for certain statutory relief provisions to avoid losing our REIT qualification and suffering adverse tax consequences. As a result, we may be required to liquidate from our portfolio otherwise attractive investments. These actions could have the effect of reducing our income and amounts available for distribution to our stockholders.

*Liquidation of assets may jeopardize our REIT qualification.*

To qualify as a REIT, we must comply with requirements regarding our assets and our sources of income. If we are compelled to liquidate our investments to repay obligations to our lenders, we may be unable to comply with these requirements, ultimately jeopardizing our qualification as a REIT, or we may be subject to a 100% tax on any resultant gain if we sell assets that are treated as dealer property or inventory.

*Complying with REIT requirements may limit our ability to hedge effectively.*

The REIT provisions of the Internal Revenue Code substantially limit our ability to hedge our liabilities. Any income from a hedging transaction we enter into to manage risk of interest rate

41

Table of Contents

changes or currency fluctuations with respect to borrowings made or to be made to acquire or carry real estate assets does not constitute "gross income" for purposes of the 95% gross income test, but would generally constitute non-qualifying income for purposes of the 75% gross income test, provided that certain requirements are met. To the extent that we enter into other types of hedging transactions, the income from those transactions is likely to be treated as non-qualifying income for purposes of both of the gross income tests. See "Federal Income Tax Considerations—Taxation of Care Investment Trust." As a result, we might have to limit our use of advantageous hedging techniques or implement those hedges through one of our domestic TRSs. This could increase the cost of our hedging activities because our domestic TRSs would be subject to tax on gains or expose us to greater risks associated with changes in interest rates than we would otherwise want to bear.

*The "taxable mortgage pool" rules may increase the taxes that we or our stockholders may incur, and may limit the manner in which we effect future securitizations.*

Certain of our securitizations could be considered to result in the creation of taxable mortgage pools for federal income tax purposes. As a REIT, provided that we own 100% of the equity interests in a taxable mortgage pool, we generally would not be adversely affected by the characterization of the securitization as a taxable mortgage pool. Certain categories of stockholders, however, such as foreign stockholders eligible for treaty or other benefits, stockholders with net operating losses, and certain tax-exempt stockholders that are subject to unrelated business income tax, could be subject to increased taxes on a portion of their dividend income from us that is attributable to the taxable mortgage pool. In addition, to the extent that our stock is owned by tax-exempt "disqualified organizations," such as certain government-related entities and charitable remainder trusts that are not subject to tax on unrelated business income, under recently issued IRS guidance, we will incur a corporate-level tax on a portion of our income from the taxable mortgage pool. In that case, we are authorized to reduce and intend to reduce the amount of our distributions to any disqualified organization whose stock ownership gave rise to the tax. See "Federal Income Tax Considerations— Taxation of Care Investment Trust—Taxable Mortgage Pools and Excess Inclusion Income" and "Federal Income Tax Considerations—Taxation of Stockholders—Taxation of Tax—Exempt Stockholders." Moreover, we would be precluded from selling equity interests in these securitizations to outside investors, or selling any debt securities issued in connection with these securitizations that might be considered to be equity interests for federal income tax purposes. These limitations may prevent us from using certain techniques to maximize our returns from securitization transactions.

*The tax on prohibited transactions will limit our ability to engage in transactions, including certain methods of syndicating and securitizing mortgage loans, that would be treated as sales for federal income tax purposes.*

A REIT's net income from prohibited transactions is subject to a 100% tax. In general, prohibited transactions are sales or other dispositions of property, other than foreclosure property, but including mortgage loans that are held primarily for sale to customers in the ordinary course of business. We might be subject to this tax if we were to syndicate, dispose of, or securitize loans in a manner that was treated as a sale of the loans for federal income tax purposes. Therefore, to avoid the prohibited transactions tax, we may choose not to engage in certain sales of loans at the REIT level and may limit the structures we utilize for our securitization transactions, even though the sales or structures otherwise might be beneficial to us.

*We may not be able to find a suitable tenant for our healthcare property, which could reduce our cash flow.*

We may not be able to find another qualified tenant for a property if we have to replace a tenant. Accordingly, if we are unable to find a qualified tenant for one or more of our properties, rental payments could cease which could have a significant impact on our operating results and financial condition, in which case we could be required to sell such properties or terminate our qualification as a REIT. While the REIT rules regarding foreclosure property allow us to acquire certain qualified healthcare property pursuant to foreclosure proceedings or as the result of the termination or

42

Table of Contents

expiration of a lease (including by reason of default, or the imminence of default, on the lease) of such property and, in connection with such acquisition, to operate a qualified healthcare facility through, and in certain circumstances derive income from, an independent contractor for a period of two years (or, depending on the circumstances of the acquisition of such property, three years or up to six years if extensions are granted), once such period ends, the REIT rules prohibit the direct or indirect operation or management of such facility through our TRS. If the IRS were to treat our TRS as directly or indirectly operating or managing a qualified healthcare facility, such subsidiary would not qualify as a TRS, which could jeopardize our REIT qualification under the REIT gross asset tests.

*Our investments in construction loans will require us to make estimates about the fair market value of land improvements that may be challenged by the IRS.*

We may invest in construction loans, the interest from which will be qualifying income for purposes of the REIT income tests, provided that the loan value of the real property securing the construction loan is equal to or greater than the highest outstanding principal amount of the construction loan during any taxable year. For purposes of construction loans, the loan value of the real property is the fair market value of the land plus the reasonably estimated cost of the improvements or developments (other than personal property) which will secure the loan and which are to be constructed from the proceeds of the loan. There can be no assurance that the IRS would not challenge our estimate of the loan value of the real property.

*The failure of a mezzanine loan to qualify as a real estate asset could adversely affect our ability to qualify as a REIT.*

We may acquire mezzanine loans, for which the IRS has provided a safe harbor but not rules of substantive law. Pursuant to the safe harbor, if a mezzanine loan meets certain requirements, it will be treated by the IRS as a real estate asset for purposes of the REIT asset tests, and interest derived from the mezzanine loan will be treated as qualifying mortgage interest for purposes of the REIT 75% income test. We may acquire mezzanine loans that do not meet all of the requirements of this safe harbor. In the event we own a mezzanine loan that does not meet the safe harbor, the IRS could challenge such loan's treatment as a real estate asset for purposes of the REIT asset and income tests and, if such a challenge were sustained, we could fail to qualify as a REIT.

*Qualifying as a REIT involves highly technical and complex provisions of the Internal Revenue Code.*

Qualification as a REIT involves the application of highly technical and complex Internal Revenue Code provisions for which only limited judicial and administrative authorities exist. Even a technical or inadvertent violation could jeopardize our REIT qualification. Our continued qualification as a REIT will depend on our satisfaction of certain asset, income, organizational, distribution, stockholder ownership and other requirements on a continuing basis. In addition, our ability to satisfy the requirements to qualify as a REIT depends in part on the actions of third parties over which we have no control or only limited influence, including in cases where we own an equity interest in an entity that is classified as a partnership for U.S. federal income tax purposes.

*New legislation or administrative or judicial action, in each instance potentially with retroactive effect, could make it more difficult or impossible for us to qualify as a REIT.*

You should recognize that the present federal income tax treatment of REITs may be modified, possibly with retroactive effect, by legislative, judicial or administrative action at any time, which could affect the federal income tax treatment of an investment in us. The federal income tax rules that affect REITs constantly are under review by persons involved in the legislative process, the IRS and the U.S. Treasury Department, which results in statutory changes as well as frequent revisions to regulations and interpretations. Revisions in federal tax laws and interpretations thereof could cause us to change our investments and commitments and affect the tax considerations of an investment in us.

43

Table of Contents

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

We make forward looking statements in this prospectus that are subject to risks and uncertainties. These forward looking statements include information about possible or assumed future results of our business and our financial condition, liquidity, results of operations, plans and objectives. They also include, among other things, statements concerning anticipated revenues, income or loss, capital expenditures, dividends, capital structure, or other financial terms, as well as statements regarding subjects that are forward looking by their nature, such as:

- our business and financing strategy;
- our ability to obtain future financing arrangements;
- our ability to acquire investments on attractive terms;
- our understanding of our competition;
- our projected operating results;
- market trends;
- estimates relating to our future dividends;
- completion of any pending transactions;
- projected capital expenditures; and
- the impact of technology on our operations and business.

The forward looking statements are based on our beliefs, assumptions, and expectations of our future performance, taking into account the information currently available to us. These beliefs, assumptions, and expectations can change as a result of many possible events or factors, not all of which are known to us. If a change occurs, our business, financial condition, liquidity, and results of operations may vary materially from those expressed in our forward looking statements. You should carefully consider this risk when you make a decision concerning an investment in our securities, along with the following factors, among others, that could cause actual results to vary from our forward looking statements:

- the factors referenced in this prospectus, including those set forth under the section captioned "Risk Factors";
- general volatility of the securities markets in which we invest and the market price of our common stock;
- changes in our business or investment strategy;
- changes in healthcare laws and regulations;
- availability, terms and deployment of capital;
- availability of qualified personnel;
- changes in our industry, interest rates, the debt securities markets, the general economy or the commercial finance and real estate markets specifically;
- the degree and nature of our competition;
- the performance and financial condition of borrowers, operators and corporate customers;
- increased rates of default and/or decreased recovery rates on our investments;
- increased prepayments of the mortgage and other loans underlying our mortgage-backed or other asset-backed securities;
- changes in governmental regulations, tax rates and similar matters;

- legislative and regulatory changes (including changes to laws governing the taxation of REITs or the exemptions from registration as an investment company);

44

Table of Contents

- availability of investment opportunities in real estate-related and other securities;
- the adequacy of our cash reserves and working capital; and
- the timing of cash flows, if any, from our investments.

When we use words such as "will likely result," "may," "shall," "believe," "expect," "anticipate," "project," "intend," "estimate," "goal," "objective," or similar expressions, we intend to identify forward looking statements. You should not place undue reliance on these forward looking statements. We are not obligated to publicly update or revise any forward looking statements, whether as a result of new information, future events, or otherwise.

45

Table of Contents

## USE OF PROCEEDS

We estimate that the net proceeds we will receive from the sale of 15,000,000 shares of our common stock in this offering will be approximately $222.1 million (or approximately $255.8 million if the underwriters fully exercise their over-allotment option), in each case assuming an initial public offering price of $16.00 per share, which is the mid-point of the price range set forth on the cover of this prospectus, after deducting underwriting discounts and commissions of approximately $15.6 million (or approximately $17.9 million if the underwriters fully exercise their over-allotment option) and estimated offering expenses of approximately $2.3 million payable by us. A $1.00 increase (decrease) in the assumed initial public offering price of $16.00 per share would increase (decrease) net proceeds to us from this offering by approximately $14.0 million, assuming the number of shares offered by us as set forth on the cover page of this prospectus remains the same, after deducting underwriting discounts and commissions and estimated offering expenses payable by us.

We plan to use approximately $200.8 million of the net proceeds of this offering to fund a portion of the purchase price for the contribution of the initial assets to us, with the remainder of the net proceeds, if any, used for our targeted investments and general corporate purposes. The total fair market value of the initial assets purchased by us may increase between March 31, 2007 and the closing of this offering as a result of accrued interest earned on the initial assets. Accordingly, the cash portion of the consideration that we will pay in exchange for the initial assets would be increased to reflect any increase in the fair market value of the initial assets. In the event that our Manager receives a prepayment of principal on any of the initial assets prior to the closing of this offering, the total fair market value of the initial assets will decrease and the cash portion of the consideration that we will pay in exchange for the initial assets will be decreased to reflect the amount of any such prepayments. Further, to the extent that the shares of common stock are priced above or below $16.00 per share, the mid-point of the price range set forth on the cover page of this prospectus, the cash portion of the consideration that we will pay to CIT Holding in exchange for the initial assets will also be adjusted accordingly. A $1.00 increase in the assumed initial public offering price of $16.00 would decrease the cash portion of the consideration paid by us to CIT Holding by approximately $5.3 million, assuming the number of shares offered by us remains the same. Alternatively, a $1.00 decrease in the assumed initial public offering price of $16.00

would increase the cash portion of the consideration paid by us to CIT Holding by approximately $5.3 million, assuming the number of shares offered by us remains the same.

46

Table of Contents

## DISTRIBUTION POLICY

We intend to make regular quarterly distributions to our stockholders. To qualify as a REIT we must distribute to our stockholders an amount at least equal to:

- 90% of our REIT taxable income, determined before the deduction for dividends paid and excluding any net capital gain (which does not necessarily equal net income as calculated in accordance with GAAP); plus

- 90% of the excess of our taxable income from foreclosure property (as defined in the Internal Revenue Code) over the tax imposed on such income by the Internal Revenue Code; less

- Any excess non-cash income (as determined under the Internal Revenue Code). See "Federal Income Tax Considerations."

We will be subject to income tax on our taxable income that is not distributed and to an excise tax to the extent that certain percentages of our taxable income are not distributed by specified dates. See "Federal Income Tax Considerations." Income as computed for purposes of the foregoing tax rules will not necessarily correspond to our income as determined for financial reporting purposes.

Distributions will be authorized by our board of directors and declared by us based upon a number of factors, including actual results of operations, restrictions under Maryland law, the timing of the investment of the net proceeds of this offering, the amount of our funds from operations, our financial condition, capital expenditure requirements, our taxable income, the annual distribution requirements under the REIT provisions of the Internal Revenue Code, our operating expenses and other factors our directors deem relevant. Our ability to make distributions to our stockholders will depend upon the performance of our investment portfolio, and, in turn, upon our Manager's management of our business. Distributions will be made in cash to the extent that cash is available for distribution.

Distributions to stockholders will generally be taxable to our stockholders as ordinary income. However, a portion of such distributions may be designated by us as long-term capital gain to the extent that such portion is attributable to our sale of capital assets held for more than one year. If we pay distributions in excess of our current and accumulated earnings and profits, such distributions will be a treated as a tax-free return of capital to the extent of each stockholder's tax basis in our common stock and as capital gain thereafter. We will furnish annually to each of our stockholders a statement setting forth distributions paid during the preceding year and their federal income tax status. For a discussion of the federal income tax treatment of our distributions, as well as the special rules (including withholding and dividend reduction) applicable to excess inclusion income, see "Federal Income Tax Considerations—Taxation of Care Investment Trust" and "Federal Income Tax Considerations—Taxation of Stockholders."

We may not be able to generate sufficient revenue from operations to pay distributions to our stockholders. In addition, our board of directors may change our distribution policy in the future. See "Risk Factors."

Our charter allows us to issue preferred stock that could have a preference on distributions. We currently have no intention to issue any preferred stock, but if we do, the distribution preference on the preferred stock could limit our ability to make distributions to the holders of our common stock.

To the extent that our cash available for distribution is less than the amount required to be distributed under the REIT provisions of the Internal Revenue Code, we may consider various funding sources to cover any such shortfall, including borrowing under our warehouse facilities, selling certain of our assets or using a portion of

the net proceeds we receive in this offering or future offerings. Our distribution policy enables us to review the alternative funding sources available to us from time to time.

47

---

Table of Contents

## CAPITALIZATION

The following table sets forth our capitalization as of March 26, 2007 and is adjusted to give effect to (1) the contribution of the initial assets to us and the issuance of 5,256,250 shares of our common stock to CIT Holding in partial consideration for such contribution and (2) the sale to the public of 15,000,000 shares of our common stock at an assumed initial public offering price of $16.00 per share, which is the mid-point of the price range set forth on the cover of this prospectus, after deducting underwriting discounts and commissions and estimated offering expenses. You should read this table together with "Use of Proceeds," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and notes thereto included elsewhere in this prospectus.

|  | As of March 26, 2007 | |
|---|---|---|
|  | Actual | As Adjusted(1)(2) |
|  | ($ in thousands) | |
| **Stockholders' equity:** | | |
| Common Stock, par value $0.001 per share; 1,000 shares authorized, 100 shares issued and outstanding on an actual basis; and 250,000,000 shares authorized and 21,012,373 shares issued and outstanding, on an as adjusted basis(3) | $   * | $   21.0 |
| Preferred Stock, par value $0.001 per share; no shares authorized, no shares outstanding on an actual basis; and 100,000,000 shares authorized and no shares outstanding on an as adjusted basis | — | — |
| Additional paid-in capital | * | 306,179.8 |
| Total stockholders' equity(2) | * | 306,200.8 |
| Total capitalization(2) | $   * | $ 306,200.8 |

* Less than $1,000.

(1) Does not include 1,269,612 additional shares available for future grants under the equity incentive plans. Also assumes that the underwriters' option to purchase up to an additional 2,250,000 shares of our common stock to cover over-allotments, if any, is not exercised.

(2) A $1.00 increase (decrease) in the assumed initial public offering price of $16.00 per share (the mid-point of the price range set forth on the cover page of this prospectus) would increase (decrease) net proceeds to us from this offering by approximately $14.0 million, assuming the number of shares offered by us as set forth on the cover page of this prospectus remains the same, after deducting underwriting discounts and commissions and estimated offering expenses payable by us.

(3) The 21,012,373 shares issued and outstanding on an as adjusted basis includes 607,690 shares of common stock granted to our Manager pursuant to the Manager Equity Plan and 148,333 shares of restricted stock granted to our officers, two employees of our Manager and our independent directors pursuant to the Equity Plan.

48

Table of Contents

# SELECTED FINANCIAL INFORMATION

The following table presents selected financial information as of March 26, 2007, that has been derived from our historical audited financial statements.

The information provided below is only a summary and does not provide all of the information contained in our historical financial statements. It should be read in conjunction with the "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical financial statements, including the related notes, included elsewhere in this prospectus.

| | As of March 26, 2007 |
|---|---|
| **ASSETS** | |
| Cash and cash equivalents | $ 100 |
| **STOCKHOLDER'S EQUITY** | |
| Stockholder's equity | $ 100 |

49

Table of Contents

# MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read the following discussion in conjunction with the sections of this prospectus entitled "Risk Factors," "Special Note Regarding Forward-Looking Statements," "Selected Financial Information" and "Business" and other sections included elsewhere in this prospectus.*

**Overview**

We are a newly-organized, real estate investment and finance company formed principally to invest in healthcare-related commercial mortgage debt and real estate. We plan to provide financing to companies operating a full range of healthcare-related properties, including skilled nursing facilities, hospitals, outpatient centers, surgery centers, senior housing, assisted living facilities, independent living facilities, continuing care retirement communities, medical office buildings, laboratories and other healthcare facilities. We primarily intend to provide mortgage financing secured by these healthcare facilities, including first lien mortgage loans, mezzanine loans, B Notes and construction loans. In addition, we intend to make investments in healthcare real estate assets that are consistent with our investment guidelines, such as acquisitions of healthcare facilities. We intend to qualify as a real estate investment trust, or REIT, for federal income tax purposes and will elect to be taxed as a REIT under the Internal Revenue Code of 1986, as amended, or the Internal Revenue Code, commencing with our taxable year ending December 31, 2007. We generally will not be subject to federal taxes on our taxable income to the extent that we distribute our taxable income to stockholders and maintain our qualification as a REIT.

We are externally managed and advised by CIT Healthcare LLC, or our Manager, a healthcare finance company offering a full spectrum of financing solutions and related strategic advisory services to companies across the healthcare industry throughout the United States. Our Manager is a subsidiary of CIT Group Inc., or CIT Group, a publicly-traded commercial and consumer finance company providing financing and leasing

products and services to clients in a wide variety of industries around the world.

Upon consummation of this offering, our Manager will contribute to CIT Holding, a wholly-owned subsidiary of CIT Group, and CIT Holding will then immediately contribute to us, the initial assets in exchange for approximately $200.8 million in cash from the net proceeds of this offering and 5,256,250 shares of our common stock. The initial assets will consist of healthcare-related real estate assets. The initial assets consist of a representative cross-section of the types of investments in our Manager's real estate portfolio in terms of yield and asset type and were selected from among the portfolio because we believe they are appropriate investments within our investment guidelines that reflect our needs as a dividend paying company.

**Outlook and Market Opportunity**

Our business is affected by general U.S. real estate fundamentals and the overall U.S. economic environment. Further, our strategy is influenced by the specific characteristics of the underlying real estate assets that serve as collateral for our investments. We have designed our strategy to be flexible so that we can adjust our investment activities and portfolio weightings given changes in the U.S. commercial real estate capital and property markets and the U.S. economy.

We believe that the commercial real estate business is influenced by a number of general economic and specific real estate factors. Those factors include, among other things, the level and direction of interest rates, capital flows and job growth. We believe most of these are moving in a positive direction. We believe the supply of space is being constrained by a variety of factors, including increased costs of new construction. While interest rates rose in 2005 and through much of 2006, they are still at historically low levels. Although rising interest rates can have a negative effect on the broad economy and the real estate markets, we do not believe that we will experience a sizeable and swift increase in interest rates over the next few years. We note that even though interest rates have increased recently, our view is that the commercial real estate debt market has experienced

50

Table of Contents

historically low default rates and we expect this trend to continue and we believe most commercial real estate asset classes should continue to perform well given the current economic environment and general real estate fundamentals.

Capital flows to commercial real estate increased in 2006 and remain strong in 2007. As an asset class, we believe commercial real estate continues to appeal to a broad mix of investors having a diverse set of investment objectives including current yield, capital appreciation and currency valuations. We believe that commercial real estate continues to look attractive to investors on both an absolute basis and relative to alternative investments. The increased capital flows have resulted in increased competition and lower spreads on debt instruments. The capital flows have driven values higher as capitalization rates have declined. These capital flows will likely continue even as interest rates stabilize. Over time, we expect that capitalization rates will likely follow but lag the increase in long-term interest rates. However, the capital flows may dampen the increase in capitalization rates.

The overall success of our business depends on our ability to leverage our investments. We believe the overall low default rate in the commercial real estate sector has resulted in historically low capitalization rates on real estate investments, increasingly low subordination levels and interest rate margins on securitization transactions, both CMBS and CDOs, and, in general, a high degree of liquidity for longer term financing. As long as the economy continues at a moderate level of growth, we anticipate that commercial real estate default levels will remain low, which will help maintain a high level of liquidity in the market and stable and attractive interest rate margins for financing our investments both on a short-term and long-term basis.

We may originate loans for CMBS execution and increased volatility in this sector may negatively impact our business. While we do not currently foresee any apparent reason or factor for an increase in volatility in

CMBS, there can be no assurance that we will not encounter such increase in the future. Regardless of whether such increase in volatility is the result of a change in the commercial real estate market or some external factor, increased volatility in CMBS will most likely result in higher interest rate margins for CMBS, as well as potentially higher required subordination levels. Such changes in the CMBS market will most likely also be reflected in the CDO market, thereby potentially increasing our long-term cost of funding and reducing the proceeds of such funding. Commercial real estate CDO investors and CMBS investors typically have similar risk and return profiles with regards to the real estate collateral securing both investments. Therefore, changes in the pricing and value of real estate collateral should have a similar effect on the pricing of both commercial real estate CDOs and CMBS securities. In addition, changes and general market shifts in interest and capitalization rates are likely to affect the valuation of securities of both CDO and CMBS markets. To the extent that CMBS and CDO execution become less attractive, the cost of short-term financing such as warehouse facilities, bank credit facilities and repurchase agreements will likely become more expensive and the overall availability of such financing may decrease.

If such events occur, the negative impact to our business will be mitigated to the extent we are able to pass some or all of these increased costs onto our borrowers in the form of higher spreads and originations fees. Recently, borrowers have been the primary beneficiaries of low default rates, stable security pricing and high liquidity in the form of spread compression on their mortgage loan borrowings. To the extent the current market environment changes, we expect that interest rate margins on mortgage loans will widen to reflect such changes.

Further, we believe that the combined expertise and experience of our senior management and our Manager will allow us to foresee potential increases in our funding costs and to adjust our mortgage loan pricing accordingly. In addition, by securitizing or entering into other long-term financing transactions on a regular basis, we will minimize our exposure to fluctuations in short-term borrowing costs.

We are particularly affected by changes in the healthcare industry. Healthcare represents the single largest industry in the United States, accounting for approximately 16.5% of U.S. gross domestic product, and has been growing at a rate faster than the overall economy. Since the 1960s, healthcare spending in the United States has grown at an average rate of 10% a year, according to Centers for

51

---

Table of Contents

Medicare and Medicaid Services (CMS), with total U.S. healthcare expenditures projected to increase from $2.17 trillion in 2006 to $2.88 trillion in 2010.

Medicare, the U.S. federal government's health care program for Americans 65 years or older, provided coverage to 42.9 million seniors in 2006. By 2030, the number of people covered will increase to 78.3 million due to the large number of people entering retirement age. Medicare expenditures totaled about $396.9 billion in 2006 and are expected to grow to $455.0 billion in 2007. Medicaid, the U.S. federal government's healthcare program for certain groups of seniors in nursing homes as well as low-income and disabled persons, incurred expenditures totaling $192.3 billion in 2006. Together, costs for Medicare and Medicaid totaled $589.2 billion in 2006, representing about 20% of the entire 2006 federal budget of approximately $2.7 trillion.

The delivery of healthcare services requires real estate and, consequently, healthcare providers to depend on real estate to maintain and grow their businesses. The healthcare real estate market opportunity is growing in part as a result of an aging population that is driving the demand for healthcare services. Senior citizens are the largest consumers of healthcare services. According to CMS, on a per capita basis, the 75 years and older segment of the population spends 75% more on healthcare than the 65 to 74-year-old segment and nearly 300% more than the population average. The increase in healthcare spending by the U.S. federal government will largely be due to the growing number of elderly who will be eligible for Medicare.

To satisfy this growing demand for healthcare services, a significant amount of new construction of healthcare facilities has been undertaken, and we expect significant construction of additional healthcare facilities

in the future. Much of the new construction will be for the types of facilities that we intend to target.

We believe healthcare deal activity likely will continue to remain strong as the healthcare real estate sector becomes more institutionalized. The volume of acquisitions in 2006 was approximately $22.0 billion, more than triple the 2005 total of approximately $6.5 billion. In addition, public healthcare REITs own just 2% of the $750.0 billion healthcare property market, which we believe provides significant penetration opportunities.

We anticipate overall healthcare real estate fundamentals to remain strong, supported by the following factors:

- generally strong fundamentals at the operator level;
- recently passed legislation favorable to healthcare operators; and
- continued strong capital flows into healthcare real estate, which should result in continued strength in acquisitions, and potentially lower capitalization rates for certain healthcare property types.

We believe healthcare service providers are generally in better financial condition today than in the past few years, as evidenced by stronger balance sheets and lower debt levels. Legislation supportive of Medicare, including the Balanced Budget Refinement Act (BBRA) of 1999 and the Benefits Improvement and Protection Act (BIPA) of 2000, have increased Medicare payments to service operators after the Balanced Budget Act (BBA) of 1997 reduced Medicare payments significantly more than the U.S. government expected.

We intend to rely on the expertise of our senior management and our Manager to identify and source opportunities in the healthcare real estate market and to determine the financing products that best meet the needs of our clients and offer to them appropriate financing solutions.

**Critical Accounting Policies**

Our most critical accounting policies relate to acquisition of investments, related party transactions, loan loss reserves, investment consolidation, revenue recognition, securities valuation, derivative accounting and income taxes. Each of these items involves estimates that will require management to make judgments that are subjective in nature. We will rely on our Manager and its

52

Table of Contents

affiliates' experience and analysis of historical and current market data in order to arrive at what we believe to be reasonable estimates. Under different conditions, we could report materially different amounts using these critical accounting policies.

*Loan Impairment*

We will evaluate the collectibility of loans and other amounts receivable from third parties based on a number of factors, including (i) corporate and facility-level financial and operations reports, (ii) compliance with the financial covenants set forth in the borrowing or lease agreement, (iii) the financial stability of the applicable borrower or tenant and any guarantor and (iv) the payment history of the borrower or tenant. Our level of reserves, if any, for loans and other amounts receivable from third parties will fluctuate depending upon all of the factors previously mentioned.

When our management identifies potential loan impairment indicators, such as non-payment under the loan documents, impairment of the underlying collateral, financial difficulty of the operator or other circumstances that may impair our loan, and our management believes these indicators are permanent, then the loan will be written down to the present value of the expected future cash flows. In cases where expected future cash flows cannot be estimated, the loan will be written down to the fair value of the collateral. The fair value of the loan will be determined by market research, which includes valuing the property as other alternative uses.

*Loans and Investments*

Statement of Financial Accounting Standards No. 115 requires that at the time of purchase, we designate a debt security as held to maturity, available for sale, or trading depending on our ability and intent. Securities classified as trading and available for sale will be reported at fair value, while securities and investments held to maturity will be reported at amortized cost. We do not have any securities at this time.

Loans held for investment are intended to be held to maturity and, accordingly, will be carried at cost, net of unamortized loan origination costs and fees, unless such loan or investment is deemed to be impaired. We intend to invest in preferred equity interests that allow us to participate in a percentage of the underlying property's cash flows from operations and proceeds from a sale or refinancing. This could potentially lead us to account for the investment as a joint venture.

Loans and investments, including real estate, will be tested for recoverability whenever events or changes in circumstances indicate that carrying amounts may not be recoverable. An impairment loss will be recognized if the carrying amount of an asset is not recoverable and exceeds its fair value. Impairment of assets is determined by comparing the carrying amount of an asset to future undiscounted cash flows expected to be generated by the asset. If an asset is determined to be impaired, the impairment is the amount by which the carrying amount of the asset exceeds the fair value of the asset. Relevant and available market data (including comparable third party sales for similar assets, appraisals, and other marketplace information) is considered, both in determining undiscounted future cash flows when testing for the existence of impairment and in determining estimated fair value in measuring impairment. The fair value of the investment is determined by (i) for operating properties, an evaluation of operating cash flow from the property during the projected holding period, and estimated sales value computed by applying an expected capitalization rate to the stabilized net operating income of the specific property, less selling costs or (ii) for other investments, the projected sales price for the underlying collateral. If upon completion of the valuation, the fair value of the impaired investment is less than the net carrying value of the investment an impairment charge will be taken.

*Rental Income*

Rental income from tenants will be recognized in accordance with GAAP, including SEC Staff Accounting Bulletin No. 104, Revenue Recognition, or SAB 104. For leases with minimum scheduled rent increases, we will recognize income on a straight-line basis over the lease term when collectibility

Table of Contents

is reasonably assured. Recognizing rental income on a straight-line basis for leases results in recognized revenue exceeding amounts contractually due from tenants. In the event we determine that collectibility of straight-line rents is not reasonably assured, we will limit future recognition to amounts contractually owed, and, where appropriate, we will establish an allowance for estimated losses. Certain leases provide for additional rents based upon a percentage of the facility's revenue in excess of specified base periods or other thresholds. Such revenue is deferred until the related thresholds are achieved.

Real estate, consisting of land, buildings, and improvements, is recorded at cost. We will allocate the cost of the acquisition to the acquired tangible and identified intangible assets and liabilities, primarily lease related intangibles, based on their estimated fair values in accordance with Statement of Financial Accounting Standards, or SFAS, No. 141, Business Combinations.

We will assess fair value based on estimated cash flow projections that utilize appropriate discount and/or capitalization rates, third-party appraisals, and available market information. Estimates of future cash flows are based on a number of factors including historical operating results, known and anticipated trends, and market and economic conditions. The fair value of the tangible assets of an acquired property considers the value of the property as if it were vacant.

*Evaluation of Liquidity*

We will monitor the liquidity and creditworthiness of our tenants and borrowers on an ongoing basis. This evaluation considers industry and economic conditions, property performance, security deposits and guarantees, and other matters. We will establish provisions and maintain an allowance for estimated losses resulting from the possible inability of our tenants and borrowers to make payments sufficient to recover recognized assets. For straight-line rent amounts, our assessment will be based on income recoverable over the term of the lease.

*Revenue Recognition*

Interest income will be recognized on the accrual basis as it is earned from loans, investments and available-for-sale securities. In many instances, the borrower may pay an additional amount of interest at the time the loan is closed, an origination fee, and deferred interest upon maturity. In some cases interest income may also include the amortization or accretion of premiums and discounts arising at the purchase or origination. This additional income, net of any direct loan origination costs incurred, will be deferred and accreted into interest income on an effective yield or "interest" method adjusted for actual prepayment activity over the life of the related loan or available-for-sale security as a yield adjustment. Income recognition will be suspended for loans when in the opinion of management a full recovery of income and principal becomes doubtful. Income recognition will be resumed when the loan becomes contractually current and performance is demonstrated to be resumed. Interest income is recorded when earned from equity participation interests, referred to as equity kickers. These equity kickers, which may take many forms, including participating debt or incremental interest upon the repayment of the credit facility, have the potential to generate additional revenues to us as a result of excess cash flows being distributed and/or as appreciated properties are sold or refinanced.

*Reserve for Possible Credit Losses*

We will periodically evaluate each of our loans for possible impairment. Loans and other investments will be considered impaired, for financial reporting purposes, when it is deemed probable that we will be unable to collect all amounts due according to the contractual terms of the original agreement, or, for loans acquired at a discount for credit quality when it is deemed probable that we will be unable to collect as anticipated. Significant judgment will be required both in determining impairment and in estimating the resulting loss allowance. Changes in market conditions, as well as changes in the assumption or methodology used to determine fair value, could result in a significant change in the recorded amount in our investment.

*Manager Compensation*

The management agreement provides for the payment of a base management fee to our Manager and an incentive fee if our financial performance exceeds certain benchmarks. The base management

54

Table of Contents

fee and the incentive fee are accrued and expensed during the period for which they are calculated and earned. For a more detailed discussion on the fees payable under the management agreement, see "Our Manager and Management Agreement—Our Management Agreement."

*Derivatives and Hedging Activities*

We will account for derivative financial instruments in accordance with SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" as amended and interpreted. SFAS 133 requires an entity to recognize all derivatives as either assets or liabilities in the consolidated balance sheets and to measure those instruments at fair value. Additionally, the fair value adjustments will affect either other comprehensive income in stockholders' equity until the hedged item is recognized in earnings or net income depending on whether the