# EXHIBIT 1 – Part 5

derivative instrument qualifies as a hedge for accounting purposes and, if so, the nature of the hedging activity.

In the normal course of business, we may use a variety of derivative financial instruments to manage, or hedge, interest rate risk on our liabilities. These derivative financial instruments must be effective in reducing our interest rate risk exposure in order to qualify for hedge accounting. When the terms of an underlying transaction are modified, or when the underlying hedged item ceases to exist, all changes in the fair value of the instrument are marked-to-market with changes in value included in net income for each period until the derivative instrument matures or is settled. Any derivative instrument used for risk management that does not meet the hedging criteria is marked-to-market with the changes in value included in net income. Derivatives are used for hedging purposes rather than speculation.

*Variable Interest Entities*

Financial Accounting Standards Board, or FASB, Interpretation No. 46R, "Consolidation of Variable Interest Entities as revised," or FIN 46R, requires a variable interest entity, or VIE, to be consolidated by its primary beneficiary, or PB. The PB is the party that absorbs a majority of the VIE's anticipated losses and/or a majority of the expected returns. To the extent that it is determined under this test that we are the primary beneficiary of a VIE, such entity will be consolidated.

*Income Taxes*

We will operate in a manner that we believe will allow us to be taxed as a REIT and, as a result, we do not expect to pay substantial corporate-level income taxes. Many of the requirements for REIT qualification, however, are highly technical and complex. If we were to fail to meet these requirements and do not qualify for certain statutory relief provisions, we would be subject to federal income tax, which could have a material adverse impact on our results of operations and amounts available for distributions to our stockholders.

**Results of Operations**

As of the date of this prospectus, we have not commenced operations.

**Liquidity and Capital Resources**

*Overview*

Liquidity is a measurement of our ability to meet potential cash requirements, including ongoing commitments to pay dividends, fund loans and investments and other general business needs. Our primary sources of funds for liquidity will consist of the net proceeds from this offering, net cash provided by operating activities, cash from our expected warehouse credit facility and other financing arrangements and future issuances of common equity, preferred equity, convertible securities, trust preferred and/or debt securities.

In the future, we intend to finance our acquisition of investments primarily by borrowing against or "leveraging" our existing portfolio and using the proceeds to acquire additional commercial

55

Table of Contents

mortgage assets or other investments. It is anticipated that such financing will include warehouse lines of credit and repurchase agreements, as well as, securitizations and other long-term financing structures. By utilizing a securitization or other long-term financing structure, we will be able to obtain permanent financing on our investments at advantageous terms. Proceeds of each CDO will be used to reduce amounts outstanding under existing warehouse facilities which will then be available to provide financing for additional investments.

We believe these identified sources of funds will be adequate for purposes of meeting our short-term (within

one year) liquidity and long-term liquidity needs. Our short-term and long-term liquidity needs include funding future investments, funding operating costs, funding loan commitments and funding distributions to our stockholders. Our ability to meet our long-term liquidity and capital resource requirements may be subject to additional financing. If we are unable to obtain or renew our sources of financing on favorable terms if at all, it may have an adverse effect on our business and results of operations. We do not receive credit or other financial support from CIT Group.

To maintain our qualification as a REIT, we must distribute annually at least 90% of our taxable income. These distribution requirements limit our ability to retain earnings and thereby replenish or increase capital for operations. However, we believe that our significant capital resources and access to financing will provide us with financial flexibility and market responsiveness at levels sufficient to meet current and anticipated capital requirements, including expected new lending and investment opportunities.

*Warehouse Lines*

We are currently negotiating a warehouse facility with Column Financial Inc., an affiliate of Credit Suisse Securities, LLC, an affiliate of one of our underwriters, which we expect to be in place shortly after consummation of this offering. We are also currently negotiating a warehouse facility with UBS Real Estate Securities Inc., an affiliate of one of our underwriters, which we expect to be in place soon after consummation of this offering. There is no assurance, however, that we will be able to close these facilities on terms favorable to us, if at all.

**Contractual Obligations**

As of March 31, 2007, we had no contractual obligations.

**Off-Balance Sheet Arrangements**

As of March 31, 2007, we had no off-balance sheet arrangements.

**Dividends**

To qualify as a REIT, we must pay annual dividends to our stockholders of at least 90% of our taxable income, determined without regard to the deduction for dividends paid and excluding any net capital gains. We intend to pay regular quarterly dividends to our stockholders. Before we pay any dividend, whether for U.S. federal income tax purposes or otherwise, which would only be paid out of available cash to the extent permitted under our secured credit facilities, we must first meet both our operating requirements and scheduled debt service on our warehouse lines and other debt payable.

**Related Party Transactions**

*Contribution Agreement*

We and CIT Holding will enter into a contribution agreement pursuant to which CIT Holding will contribute the initial assets to us and we will issue to CIT Holding 5,256,250 shares of our common stock and pay to CIT Holding approximately $200.8 million from the net proceeds of this offering. Immediately prior to this contribution, our Manager will transfer the initial assets to CIT Holding and CIT Holding will immediately contribute the assets to us pursuant to the contribution agreement.

56

---

Table of Contents

Our Manager determined that the fair market value of the assets to be contributed was approximately $284.9 million as of March 31, 2007. Such assets will be recorded at fair market value on the date of

contribution. Such calculation will be performed on an asset by asset basis.

*Management Agreement*

We and our Manager will enter into a management agreement pursuant to which our Manager will manage our day-to-day activities. Pursuant to the management agreement, we will pay our Manager a monthly base management fee and a quarterly incentive fee and will reimburse our Manager for certain expenses.

*Base Management Fee.* We will pay our Manager a base management fee monthly in arrears in an amount equal to $1/12$ of 1.75% of our equity (as defined in the management agreement). For purposes of calculating the base management fee, our equity equals the month-end value, computed in accordance with GAAP, of our stockholders' equity, adjusted to exclude the effect of any unrealized gains, losses or other items that do not affect realized net income. Our Manager will use the proceeds from its management fee in part to pay compensation to its officers and employees provided to us who, notwithstanding that certain of them also are our officers, will receive no cash compensation directly from us.

*Incentive Fee.* Our Manager will be entitled to receive a quarterly incentive fee pursuant to the terms of the management agreement. The purpose of the incentive fee is to provide an additional incentive for our Manager to achieve targeted levels of funds from operations (as defined in the management agreement) and net capital gains and to increase our stockholder value. The incentive fee will be calculated and payable quarterly in arrears in an amount equal to the product of: (i) 25% of the dollar amount by which (a) our funds from operations (after the base management fee and before the incentive fee) (as defined in the management agreement) per share of our common stock for such quarter (based on the weighted average number of shares outstanding for such quarter), plus the amount by which any capital gains realized during the quarter exceed any capital losses realized during the quarter, exceed (b) an amount equal to (A) the weighted average price per share of our common stock issued in all our offerings (including this offering), in each case at the time of issuance thereof, multiplied by (B) the greater of (1) 2.25% and (2) 0.75% plus one-fourth of the 10-year U.S. treasury rate (as defined in the management agreement) for such quarter, multiplied by (ii) the weighted average number of shares of our common stock outstanding during such quarter.

*Reimbursement of Expenses.* We pay all our operating expenses, except those specifically required to be borne by our Manager under the management agreement. Our Manager is responsible for employment expenses of our Manager's employees, including our officers and any directors who are also employees of our Manager. The costs and expenses required to be paid by us include, but are not limited to transaction costs incident to the acquisition, disposition and financing of our investments; legal, auditing, accounting, consulting and administrative fees and expenses; the compensation and expenses of our directors (excluding those directors who are officers or employees of our Manager) and the cost of liability insurance to indemnify our directors and officers; the costs associated with our establishment and maintenance of any credit facilities and other indebtedness (including commitment fees, accounting fees, legal fees, closing costs and similar expenses); expenses associated with capital raising, including this offering and other securities offerings by us; expenses relating to the payment of dividends; costs incurred by our directors and officers and employees of our Manager for travel on our behalf; expenses incurred in connection with special servicing; expenses connected with communications to holders of our securities and in complying with the continuous reporting and other requirements of the SEC and other governmental bodies; transfer agent and exchange listing fees; the costs of printing and mailing proxies and reports to our stockholders; costs associated with any computer software, hardware or information technology services that are used primarily for us; the costs and expenses incurred with respect to market information systems and publications, research publications and materials relating solely to us; settlement, clearing, and custodial fees and expenses relating to us; the costs of maintaining compliance with all federal, state and local rules and regulations or any other regulatory agency (as such costs relate to us), all taxes and license fees and all insurance costs incurred on behalf of us; and our pro rata portion of rent

57

Table of Contents

(including disaster recovery facility costs and expenses), telephone, utilities, office furniture, equipment, machinery and other office, internal and overhead expenses of our Manager and its affiliates required for our operations.

*Termination Fee.* If we elect to not renew the management agreement upon expiration of its initial term or any renewal term, we will be required to pay our Manager a termination fee. See "Our Manager and Management Agreement—Our Management Agreement—Term and Termination Rights."

For a more detailed discussion of the terms and commitments of the management agreement, see "Our Manager and Management Agreement—Our Management Agreement."

*Registration Rights Agreement*

We, our Manager and CIT Holding will enter into a registration rights agreement with regard to (i) the shares of common stock issued upon the consummation of this offering to CIT Holding as partial consideration for the contribution of the initial assets to us, (ii) shares of common stock granted to our Manager under the Manager Equity Plan and (iii) any shares of common stock which our Manager may receive from us as a part of its incentive fee under our management agreement or otherwise. Pursuant to such registration rights agreement, we will grant to our Manager and CIT Holding demand registration rights to have their shares registered for sale no more than once in any six month period and the right to "piggy-back" their shares in registration statements we might file in connection with any future public offering so long as our Manager is our manager. Notwithstanding the foregoing, any registration will be subject to cutback provisions and we will be permitted to suspend the use, from time to time, of the prospectus that is part of the registration statement (and therefore suspend sales under the registration statement) for certain periods, referred to as "blackout periods."

**Quantitative and Qualitative Disclosures About Market Risk**

*Market Risk*

Market risk is the exposure to loss resulting from changes in interest rates, foreign currency exchange rates, commodity prices, equity prices and real estate values. The primary market risks that we will be exposed to are real estate risk, interest rate risk, market value risk and prepayment risk.

*Real Estate Risk*

Commercial property values and net operating income derived from such properties are subject to volatility and may be affected adversely by a number of factors, including, but not limited to, national, regional and local economic conditions (which may be adversely affected by industry slowdowns and other factors); local real estate conditions (such as an oversupply of housing, retail, industrial, office or other commercial space); changes or continued weakness in specific industry segments; construction quality, age and design; demographic factors; retroactive changes to building or similar codes; and increases in operating expenses (such as energy costs). In the event net operating income decreases, a borrower may have difficulty repaying our loans, which could result in losses to us. In addition, decreases in property values reduce the value of the collateral and the potential proceeds available to a borrower to repay our loans, which could also cause us to suffer losses. Even when the net operating income is sufficient to cover the related property's debt service, there can be no assurance that this will continue to be the case in the future.

*Interest Rate Risk*

Interest rate risk is highly sensitive to many factors, including governmental monetary and tax policies, domestic and international economic and political considerations and other factors beyond our control.

Our operating results will depend in large part on differences between the income from our loans and our borrowing costs. Most of our loans and borrowings will be variable-rate instruments, based on

58

Table of Contents

LIBOR. The objective of this strategy is to minimize the impact of interest rate changes on our net interest income. In addition, we will have various fixed rate loans in our portfolio, which will be financed with variable rate LIBOR borrowings.

In the event of a significant rising interest rate environment and/or economic downturn, defaults could increase and result in credit losses to us, which could adversely affect our liquidity and operating results. Further, such delinquencies or defaults could have an adverse effect on the spread between interest-earning assets and interest-bearing liabilities.

Most warehouse facilities, bank credit facilities and repurchase agreements provide financing based on a floating rate of interest calculated on a fixed spread over LIBOR as determined by the underlying asset. Most of the initial assets are LIBOR-based floating rate loans and will initially be funded from the net proceeds of this offering. New originations of floating rate loans are also expected to be LIBOR-based. Accordingly, our floating interest rate portfolio will be match-funded utilizing our expected sources of short-term financing as well as any CDO financing which we expect will be on a floating rate basis.

As we originate fixed rate investments for our portfolio, we will enter into appropriate interest hedging transactions. Such transactions may involve one or more hedging instruments, including the cash market, swaps, caps, futures, or other derivative transactions. It is not our intention to use hedging instruments to profit from future interest rate fluctuations, but rather to hedge our short-term and long-term interest rate risk.

Since we generally will retain the equity or the below investment grade portion of any securitization which we enter into, we expect that we will need to maintain the appropriate interest rate hedge on any fixed interest rate investment we include in a securitization as we anticipate that our securitization financings will typically be floating rate. Securitization financing generally provides greater total proceeds at a lower average cost of funds relative to short-term financing vehicles, such as warehouse facilities, bank credit facilities and repurchase agreements. In addition, securitization financing will allow us to receive the benefits of these attractive terms for an extended period of time in contrast to such short-term financing options. Finally, all of our loans, including both floating and fixed rate loans, may have maturity dates that exceed the maturity date of any short-term financing that we may have in place. We anticipate that securitization financing will extend beyond the maturity dates of the investments included in the securitization and will eliminate margin calls and restrictions on the period for which an investment remains eligible for financing that are generally required by providers of short-term financing.

*Market Value Risk*

Our available-for-sale securities will be reflected at their estimated fair value with unrealized gains and losses excluded from earnings and reported in other comprehensive income pursuant to SFAS No. 115 "Accounting for Certain Investments in Debt and Equity Securities." The estimated fair value of these securities fluctuate primarily due to changes in interest rates and other factors. Generally, all other factors being equal, in a rising interest rate environment, the estimated fair value of these securities would be expected to decrease; conversely, in a decreasing interest rate environment, the estimated fair value of these securities would be expected to increase.

*Prepayment Risk*

As we receive repayments of principal on these investments, premiums paid on such investments will be amortized against interest income using the effective yield method through the expected maturity dates of the investments. In general, an increase in prepayment rates will accelerate the amortization of purchase premiums, thereby reducing the interest income earned on the investments. Conversely discounts received on such investments are accreted into interest income using the effective yield method through the expected maturity dates of the investments. In general, an increase in prepayment rates will accelerate the accretion of purchase discounts, thereby increasing the interest income earned on the investments.

Table of Contents

*Inflation*

Virtually all of our assets and liabilities will be interest rate sensitive in nature. As a result, interest rates and other factors influence our performance more so than does inflation. Changes in interest rates do not necessarily correlate with inflation rates or changes in inflation rates. Further, our financial statements are prepared in accordance with GAAP and our distributions are determined by our board of directors based primarily by our net income as calculated for tax purposes, in each case, our activities and balance sheet are measured with reference to historical cost and/or fair market value without directly considering inflation.

Table of Contents

## BUSINESS

**Our Company**

We are a newly-organized, real estate investment and finance company formed principally to invest in healthcare-related commercial mortgage debt and real estate. We were organized as a Maryland corporation in March 2007. We plan to provide financing to companies operating a full range of healthcare-related facilities, including skilled nursing facilities, hospitals, outpatient centers, surgery centers, senior housing, assisted living facilities, independent living facilities, continuing care retirement communities, medical office buildings, laboratories and other healthcare facilities. We primarily intend to provide mortgage financing secured by healthcare facilities, including first lien mortgage loans, mezzanine loans, B Notes and construction loans. In addition, we intend to make investments in healthcare real estate assets that are consistent with our investment guidelines, such as acquisitions of healthcare facilities.

We intend to capitalize on the expertise of our external manager, CIT Healthcare LLC, which we refer to as our Manager, a wholly-owned subsidiary of CIT Group Inc., which we refer to as CIT Group. CIT Group formed our Manager in December 2004. We believe that our Manager's experience and reputation in the healthcare finance industry, market knowledge and relationships with companies in the healthcare industry will benefit us by enabling our Manager to originate, manage and create value from attractive investment opportunities for us. While many of our competitors rely on financial institutions or other third party originators to provide them with investment opportunities, we believe that one of our business strengths will be our access to investment opportunities originated directly by our Manager. Our Manager also has business relationships with many financial institutions and may originate investment opportunities for us through these firms as well. We are currently the only company for which our Manager provides management services.

Our objective is to provide attractive total returns to our stockholders by maximizing the difference between the yield on our investments and the cost of financing these investments. We expect this strategy to generate cash available for distribution to our stockholders and to facilitate capital appreciation.

We were formed to leverage our Manager's expertise and relationships in the healthcare marketplace. Our Manager's origination capabilities extend into areas not traditionally served by CIT Group and generate opportunities that, though attractive, are not ideal fits with CIT Group's business model. We intend to capitalize on those strengths and access the full range of investment opportunities that our Manager originates. Our formation fits within CIT Group's strategy of diversifying and growing revenue streams through pursuing opportunities to build upon CIT Group's platforms by originating, distributing and managing assets for third-party investors. We are structured as an externally managed company to optimize the benefits of our association with our Manager and to provide our stockholders with the benefits of CIT Group's infrastructure immediately

and on a more efficient basis than if we were internally managed. As one of CIT Group's subsidiaries, our Manager will not have a separate services agreement with CIT Group but will have complete access to CIT Group's infrastructure.

We intend to qualify as a real estate investment trust, or REIT, for federal income tax purposes and will elect to be taxed as a REIT under the Internal Revenue Code of 1986, as amended, or the Internal Revenue Code, commencing with our taxable year ending December 31, 2007. We generally will not be subject to federal taxes on our taxable income to the extent that we distribute our taxable income to stockholders and maintain our qualification as a REIT.

**Our Manager**

*CIT Healthcare*

Our Manager is a healthcare finance company that offers a full spectrum of financing solutions and related strategic advisory services to companies across the healthcare industry throughout the United States. We believe that our Manager effectively leverages its extensive knowledge and

61

Table of Contents

understanding of the healthcare industry through its client-centric and industry-focused model. Our Manager meets the diverse commercial financing needs of U.S. healthcare providers, including hospitals and health systems, outpatient centers, skilled nursing facilities, assisted living facilities, physician practices, home care and hospice companies, ambulatory surgery centers, pharmaceutical and medical technology companies, long-term care facilities, and vendors serving healthcare providers. Our Manager's leadership team has extensive experience in addressing the capital requirements and advisory service needs of the healthcare marketplace, allowing it to offer a full suite of customized, flexible healthcare financing solutions and services.

As of the date of this prospectus, our Manager employed approximately 120 professionals with substantial experience and expertise in origination, underwriting, structuring, portfolio management, servicing, securitization, syndication and secondary market transactions. Of these professionals, our Manager has 44 employees originating and sourcing investment opportunities. We believe our Manager is one of the leading healthcare financiers in the country. During 2006, our Manager evaluated approximately $23.8 billion of transactions for its own account, closed approximately $2.7 billion of commitments and funded approximately $2.2 billion of healthcare loans in the United States. As of March 31, 2007, our Manager owned assets of approximately $2.4 billion.

*CIT Group*

CIT Group (NYSE: CIT) is a commercial and consumer finance company providing financing and leasing products and services to clients in a wide variety of industries around the world. Founded in 1908, CIT Group has a premium brand focused on providing clients with customized financial solutions based on a combination of financial, intellectual and relationship capital. CIT Group sources transactions through direct marketing efforts to borrowers, lessees, manufacturers, vendors, distributors and to end-users through referral sources and other intermediaries. As of March 31, 2007, CIT Group managed assets of $79.7 billion comprised of an owned loan and lease portfolio of $73.4 billion and a securitized portfolio of $6.3 billion. CIT Group also serviced over $3.0 billion of third-party assets under fee-based contracts as of March 31, 2007. CIT Group employed approximately 7,500 people as of March 31, 2007.

**Operations**

The following chart shows our Manager's internal organization:



62

---

Table of Contents

We believe our relationship with our Manager and our ability to capitalize on its reputation, relationships, market knowledge, infrastructure and expertise will provide us with substantial benefits in sourcing, underwriting and evaluating investments, executing such investments quickly and effectively, and managing our assets. Under our management agreement, our Manager will be responsible for administering our business activities and day-to-day operations, including sourcing originations, providing underwriting services and processing approvals for all loans and other investments in our portfolio and activities related to real estate acquisition investments in our portfolio. We will have an investment committee that will review all loans, real estate and other investments to determine whether they meet our investment guidelines and conflicts of interest policy and are otherwise appropriate for our portfolio. In addition, there will be an "independent investment advisor" that will attend or otherwise participate in meetings of our investment committee. The independent investment advisor will be retained by our board of directors (and approved by a majority of our independent directors), and will have the authority to bring to our nominating, corporate governance and investment oversight committee for its review and, if appropriate, approval, any investment committee decision that the independent investment advisor determines, in its sole discretion, should be reviewed, including, without limitation, any investment decision that (i) contravenes our investment guidelines or (ii) presents an actual or apparent conflict of interest between our Manager, or any of its affiliates, and us. Such independent investment advisor will be unaffiliated with our Manager and CIT Group and will be compensated by us. Our Manager will also provide certain administrative and servicing functions with respect to our loans, real estate and other investments. We may elect to outsource to third parties certain operational and property management functions relating to our real estate. We believe that we will be able to capitalize on our Manager's well established operations and services in each of these areas as described below.

*Origination*

Our investments will be direct asset originations generally sourced by our Manager. Since our investments will be generally sourced and originated by our Manager, we have developed a conflicts of interest policy with our Manager in an effort to address conflicts with respect to the origination of investments and the allocation of investment opportunities, the terms of investments purchased from our Manager, the terms upon which we make certain co-investments with our Manager and the servicing of defaulted or distressed assets. This conflicts of interest policy gives us a right of first refusal on certain investment opportunities originated by our Manager, directly or in the secondary market, and provides specific guidelines with respect to the terms of co-investments, participations and distressed assets. For a description of these conflicts of interest policies, see "Our Manager

and Management Agreement—Conflicts of Interest Policies."

With 44 employees engaged in the origination process, our Manager solicits healthcare institutions throughout the United States. We believe that each originator is a well versed financier, able to determine which financing products best meet the needs of the client and then offer to them appropriate financing solutions. Additionally, as our Manager services the loans that it directly originates, it consistently monitors its loan portfolio in order to generate new originations from existing assets. We intend to capitalize on our Manager's established platform, reputation, market knowledge and relationships in the healthcare finance industry to develop and maintain our investment portfolio. During 2006, our Manager evaluated approximately $23.8 billion of transactions and originated approximately $2.2 billion of healthcare loans in the United States.

*Underwriting*

Each of our Manager's originators will work in conjunction with a team of our Manager's underwriters. Upon receipt of each new deal submission, an underwriter will analyze it in accordance with our Manager's underwriting investment criteria, which includes, but is not limited to, review of collateral quality including age, location and experience of the management team operating the real estate, analysis of the property cash flow considering occupancy rates, appropriate reserves and management fee percentages. Additional criteria utilized to ensure the creditworthiness of borrowers and lessees include consideration of debt service coverage ratios and loan to value percentages. These

63

Table of Contents

underwriters will perform underwriting due diligence on all proposed transactions prior to investment approval and commitment. We believe that the involvement of our Manager's closely integrated origination and transaction management groups, coupled with our ability to utilize the knowledge and expertise of its servicing and portfolio management group in the underwriting, structuring and servicing of our loans, its credit expertise across asset classes and its extensive due diligence process, will significantly enhance the credit quality and performance of our investments.

Key factors considered in credit decisions will include debt service coverage, loan-to-value, debt yield, cash equity remaining in the deal or level of cash out to the borrower, competitive set relative performance, and historical and projected operating performance. Consideration will also be given to other factors such as additional forms of collateral, borrower concentration, property concentration (both by type and location), identification of repayment strategy and expected changes in market conditions.

*Investment Approval Process*

A proposed loan or investment for us will be analyzed and a written credit memorandum or analysis will be prepared. The memorandum will include a description of the prospective borrower or lessee and any guarantors, the collateral and the proposed use of investment proceeds, comparable properties, consolidated financial statements for the property and borrower or lessee and an analysis and a summary of key factors. In addition, the presentation will provide an analysis of borrower or lessee liquidity, net worth, cash investment, income and operating history and projections. The written credit memorandum or analysis will be presented for approval to our investment committee, which will initially consist of our Manager's president, who is also one of our directors, and our chief executive officer, chief financial officer and chief investment officer. All transactions require the approval of a majority of the members of our investment committee.

The investment committee will be made up of employees of our Manager, but its activities and investment criteria will be established and overseen by an independent committee of our board of directors. In addition, there will be an "independent investment advisor" that will attend or otherwise participate in meetings of our investment committee. The independent investment advisor will be retained by our board of directors (and approved by a majority of our independent directors), and will have the authority to bring to our nominating,

corporate governance and investment oversight committee for its review and, if appropriate, approval, any investment committee decision that the independent investment advisor determines, in its sole discretion, should be reviewed, including, without limitation, any investment decision that (i) contravenes our investment guidelines or (ii) presents an actual or apparent conflict of interest between our Manager, or any of its affiliates, and us. Such independent investment advisor will be unaffiliated with our Manager and CIT Group and will be compensated by us.

### *Servicing and Portfolio Management*

We believe that effective loan management is essential to maximizing the performance and value of a commercial real estate or commercial mortgage investment. Expertise in servicing and portfolio management is one of the many benefits which we expect our Manager will provide to us.

*Servicing.* Our Manager has always serviced its loan portfolios internally, and it is expected to service and/or monitor our loans through its comprehensive internal servicing operations. Our Manager currently services an expanding portfolio of loans with commitments in excess of $2.8 billion through its servicing and portfolio management group. Due to the complex nature of many of the loans in its portfolio, we believe that our Manager has developed expertise which enables it to provide effective and timely internal monitoring and reporting, as well as a high level of service to borrowers from closing through loan maturity. Following the funding of an approved loan, all pertinent data is entered into our Manager's servicing system which tracks payment performance, processes contractual interest rate adjustments on variable rate loans and tracks the operating performance of the asset. This expertise in servicing complex commercial real estate loans cannot be easily replicated, and we believe that it will enable our Manager to originate and successfully manage credit facilities and transactions for our benefit.

64

Table of Contents

*Portfolio Management.* Our Manager's portfolio management group will monitor each of our investments and compare on-going financial data and operating statements to historical data to determine if any significant economic events have or are occurring at the property or in the market in general that may have a negative effect on the property. The portfolio management group will also monitor local economic trends, rental, occupancy and expense rates and property competitiveness within the commercial real estate market.

We believe that the scope and depth of our Manager's servicing and portfolio management operations will distinguish us from many other real estate investment companies and will provide a comprehensive platform for pursuing and maintaining attractive real estate investments.

### Our Business Strengths

We believe our business strengths include the following:

- *Access to Our Manager.* Our relationship with our Manager provides us with access to origination opportunities in the healthcare industry and market insight gained through our Manager's network of dedicated professionals. We expect that our Manager's relationships with participants in the real estate finance and healthcare industries will provide us access to significant investment and financing opportunities. We believe that to replicate the scope and resources this platform will provide to us would be cost prohibitive.

- *Established Origination Platform.* Our investments will be primarily sourced and originated by our Manager. Our Manager's origination team, which consists of 44 members, reviewed approximately $23.8 billion of potential financings in 2006. In soliciting and evaluating these opportunities, our Manager has developed considerable institutional relationships within the healthcare industry. This origination team will also originate acquisitions of real estate utilized by, related to and/or serving the healthcare industry. Additionally, as our Manager services the loans that it directly originates, it consistently monitors its loan portfolio to generate new origination opportunities from existing assets.

We intend to capitalize on our Manager's established platform, reputation, market knowledge and relationships in the healthcare industry to develop and maintain our investment portfolio.

- *Contributed Portfolio.* Upon consummation of this offering, our Manager will transfer to CIT Holding, which will then immediately contribute to us, a portfolio of real estate mortgage assets secured by several different types of healthcare facilities with diverse operations and tenants in a variety of geographic locations. We believe the diversity in this portfolio will be a strength to our business, in particular in the event of a downturn or unforeseen event, including regulatory changes, in any particular business or geographic sector.

- *Experienced Management Team.* Our executive officers and the personnel in our Manager's vertically integrated healthcare finance platform have extensive experience that we intend to use for originating, underwriting, structuring, portfolio management, servicing complex commercial real estate investments, real estate capital markets, securitization, syndication, match funding, hedging and finance. We believe that our Manager's experience will enable us to offer innovative financing solutions that will appeal to a variety of healthcare operators. We further believe that our Manager's depth of knowledge in both traditional real estate investment and healthcare operations positions us favorably to take advantage of the available opportunities in the healthcare commercial real estate market.

- *Long-Term Commitment by Our Manager.* Our management agreement has an initial term of approximately three years. In addition, CIT Group will own approximately 27.9% of our outstanding common stock through CIT Holding and our Manager upon completion of this offering. We believe that the long-term commitment by our Manager to us under our management agreement along with CIT Group's meaningful equity ownership in us will ensure that our interest and the interests of our Manager, CIT Group and our other stockholders are aligned.

65

Table of Contents

- *Comprehensive Underwriting Process.* Our underwriting process focuses on both real estate investments and healthcare operations. In addition, our acquisition and development selection process includes a comprehensive analysis of a targeted healthcare facility's profitability, cash flow, occupancy and patient and payor mix, financial trends in revenues and expenses, barriers to competition, the need in the market for the type of healthcare services provided by the facility, the strength of the location and the underlying value of the facility, as well as the financial strength and experience of the tenant and the tenant's management team. Through our detailed underwriting of healthcare acquisitions, which includes an analysis of both the underlying real estate and ongoing or expected healthcare operations at the property, we expect to deliver attractive risk-adjusted returns to our stockholders.

- *Extensive Internal Servicing and Monitoring Operations.* We believe that the involvement of our Manager's servicing and portfolio management employees in the underwriting, structuring and servicing of our loans, its credit expertise across asset classes and its due diligence procedures, will significantly enhance the credit quality and performance of our investments. We expect that our Manager will service and/or monitor all of our loans through its internal servicing and portfolio management operations, which currently services an expanding portfolio of loans with managed assets of approximately $2.4 billion as of March 31, 2007. Due to the complex nature of many of the loans in its portfolio, we believe that our Manager has developed expertise which enables it to provide effective and timely internal monitoring and reporting, as well as a high level of service to borrowers from closing through loan maturity. We believe that this expertise in servicing and monitoring complex commercial real estate assets cannot be easily replicated and that it will enable our Manager to originate and successfully manage credit facilities and transactions for our benefit.

**Investment Guidelines**

Our board of directors has adopted general guidelines for our investments and borrowings to the effect that:

- no investment will be made that would cause us to fail to qualify as a REIT;

- no investment will be made that would cause us to be regulated as an investment company under the Investment Company Act;

- no more than 20% of our equity, determined as of the date of such investment, will be invested in any single asset (except with respect to the initial assets contributed to us by CIT Holding in connection with this offering) and no more than 40% of our equity, determined as of the date of such investment, will be invested in projects controlled by a single borrower or group of affiliated borrowers that would form a consolidated group under GAAP;

- our leverage will generally not exceed 80% of the total value of our investments;

- we will maintain a portfolio of geographically diverse assets;

- no investment will be made that does not comply with our conflicts of interest policy; and

- our Manager must seek approval of a majority of our independent directors before engaging in any transaction that is in contravention of our investment guidelines.

These investment guidelines may be changed or waived by our board of directors (which must include a majority of our independent directors) without the approval of our stockholders.

**Our Targeted Investments**

Our targeted investments will fall into three main categories, in each case with the primary focus on real estate and companies in the healthcare industry:

- *Real Estate Finance.* We intend to originate a variety of investments secured by real property, in each case serving, related to and/or operated by companies in the healthcare industry.

66

Table of Contents

- *Real Estate Acquisitions.* We intend to make investments in real estate utilized by, related to and/or serving the healthcare industry for long-term investment purposes. Our real estate acquisitions operation will utilize the same originations, underwriting and portfolio management platform and expertise of our Manager as will our real estate finance operation. We may elect to outsource to third parties certain operational and property management functions relating to our real estate.

  Certain of our acquisitions will be structured as sale-leaseback transactions, in which we purchase real estate, typically a single-tenant building, and immediately lease it back to the seller under a long-term, net operating lease.

  Pursuant to triple-net leases, tenants will pay base rent and additional rent to us and pay operating expenses incurred at the property, including utilities, property taxes, insurance, and repairs and maintenance. Leases may contain annual base rent escalations based on a predetermined fixed rate, an inflation index or some other factor. Other leases may require tenants to pay additional rent based upon a percentage of the facility's revenue in excess of the revenue for a specific base period or threshold. Rental rates will vary by lease, taking into consideration many factors, including:

  - creditworthiness of the tenant;
  - operating performance of the facility;
  - cost of capital at the inception of the lease;
  - location, type and physical condition of the facility;
  - barriers to entry, such as certificates of need, competitive development and constraining high land costs; and
  - lease term.

Case 1:07-cv-08159-LLS    Document 29-6    Filed 04/22/2008    Page 14 of 16

Page 73 of 156

- *Commercial Finance.* We intend to originate a range of non-real estate loans to healthcare facilities and operators as an ancillary business to the prior two categories where we can achieve appropriate risk adjusted returns.

Our targeted real estate finance investments include:

- *First Mortgage Loans.* We intend to provide term loans secured by first mortgages in healthcare facilities. We expect our clients will include owners and operators of skilled nursing facilities, hospitals, outpatient centers, surgery centers, senior housing, assisted living facilities, independent living facilities, continuing care retirement communities, medical office buildings, laboratories, and other healthcare facilities.

- *Mezzanine Loans.* We intend to offer mezzanine financing for healthcare facilities in the form of loans that are subordinate to a conventional first mortgage loan and senior to the borrower's equity in the project. We expect our mezzanine loans to generally take the form of loans secured by subordinate mortgages or by pledges of ownership interests in the entity that directly or indirectly controls the property. The maturities of these loans are generally determined by the maturities of the senior debt on the property.

- *Subordinate Interests in Whole Loans (B Notes).* We intend to invest in B Notes, or subordinate interests in whole loans. The subordination of a B Note is generally evidenced by a co-lender or participation agreement between the holders of the related senior interest, or the A Note, and the B Note. Our ownership of a B Note with controlling class rights may, in the event the financing fails to perform according to its terms, cause us to elect to pursue our remedies as owner of the B Note, which may include foreclosure on, or modification of, the loan. In some cases the owner of the A Note, which owner may be our Manager, may be able to foreclose or modify the loan against our wishes as holder of the B Note. As a result, our economic and business interests may diverge from the interests of the holders of the A Note. These divergent interests among holders of each investments may result in conflicts of interest between us and our Manager. The maturities of these loans are generally determined by the maturities of the senior debt on the property.

67

Table of Contents

- *Construction Loans.* We intend to provide construction loans for ground-up projects and major redevelopment opportunities for healthcare facilities. If we commit to development projects, we generally expect to commit when they are at least 50% pre-leased. We expect to use internal and external construction management expertise to evaluate local market conditions, construction costs and other factors to seek appropriate risk adjusted returns.

- *Participating Debt/Preferred Equity.* We intend to provide financing that may take the form of participating debt or a preferred equity investment in an entity that owns a healthcare facility as well as, directly or indirectly, the underlying real property.

There are no limitations on the amount that we may invest in any category of our targeted investments except as would cause us to be regulated as an investment company under the Investment Company Act or cause us to not be qualified as a REIT for federal income tax purposes.

In evaluating potential investments, we will consider such factors as:

- the quality and experience of management and the creditworthiness of the operator of the facility;
- the facility's historical and forecasted cash flow and its ability to meet operational needs, capital expenditure requirements and lease or debt service obligations, providing a competitive return on our investment;
- the construction quality, condition and design of the facility;
- the geographic area of the facility;

- the tax, growth, regulatory and reimbursement environment of the jurisdiction in which the facility is located;

- the impact of such an investment on our ability to maintain our REIT qualification and our exemption from the Investment Company Act;

- the occupancy and demand for similar healthcare facilities in the same or nearby communities; and

- the payor mix of private, Medicare and Medicaid patients.

**Initial Asset Contribution**

Upon consummation of this offering, our Manager will contribute to CIT Holding, which will then immediately contribute to us, the initial assets, in exchange for $200.8 million in cash from the net proceeds of this offering and 5,256,250 shares of our common stock issued to CIT Holding, thereby resulting in a net equity contribution to us of approximately $84.1 million at an assumed initial public offering price of $16.00 per share (which is the mid-point of the price range set forth on the cover page of this prospectus). Both our Manager and CIT Holding are wholly-owned subsidiaries of CIT Group. Our Manager determined that the fair market value of the assets to be contributed was $284.9 million as of March 31, 2007, which represents 101.649% of book value of $280.3 million, the principal balance of the initial assets as of March 31, 2007. The initial assets consist of a representative cross-section of the types of investments in our Manager's real estate portfolio in terms of yield and asset type and were selected from among the portfolio because we believe they are appropriate investments within our investment guidelines that reflect our needs as a dividend paying company. The initial assets represent approximately 51% of our Manager's current portfolio of real estate assets. The total fair market value of the initial assets may increase between March 31, 2007 and the closing of this offering and the contribution of the initial assets to us as a result of accrued interest earned on the initial assets. Accordingly, the cash portion of the consideration that we will pay to CIT Holding in exchange for the initial assets would be increased to reflect any increase in the fair market value of the initial assets. In the event that our Manager receives a prepayment of principal on any of the initial assets prior to the closing of this offering, the total fair market value of the initial assets will decrease and the cash portion of the consideration that we will pay to CIT Holding in exchange for the initial assets will be decreased to reflect the amount of any such prepayments. The determination of the fair market value of the initial assets upon the closing of this offering will be made by our Manager. The following table sets forth information, as of March 31, 2007, regarding the investments that have been identified as initial assets as of the date hereof. As of March 31, 2007, none of these loans were delinquent or in default.

68

Table of Contents

**Our Initial Assets**
**As of March 31, 2007**
**($ in thousands)**

| Property Type | Our Assumed Loan | Total Commitment(1) | CIT Commitment(2) | Our Commitment(3) | Principal Balance | # Properties | Origination Date | Maturity | |
|---|---|---|---|---|---|---|---|---|---|
| Skilled Nursing Facility | First Mortgage | $ 155,000(4) | $ 155,000 | $ 25,000 | $ 22,086 | 17 | 3/26/2007 | 3/26/2012 | LIB( |
| Skilled Nursing Facility | First Mortgage | 28,711 | 28,711 | 28,711 | 24,126 | 6 | 3/2/2007 | 3/1/2012 | LIB( |
| Skilled Nursing Facility | First Mortgage | 28,000 | 28,000 | 28,000 | 27,853 | 2 | 1/27/2006 | 1/31/2011 | LIB( |
| Skilled Nursing Facility | First Mortgage | 21,400 | 21,400 | 11,400 | 10,784 | 2 | 2/9/2006 | 2/9/2011 | LIB( |
| Skilled Nursing Facility | First Mortgage | 10,800 | 10,800 | 9,300 | 9,244 | 1 | 3/31/2006 | 3/31/2011 | LIB( |
| Skilled Nursing Facility | First Mortgage | 6,765 | 6,765 | 6,765 | 6,749 | 3 | 6/30/2006 | 6/30/2011 | LIB( |
| Skilled Nursing Facility | First Mortgage | 5,552 | 5,552 | 5,552 | 5,537 | 1 | 5/30/2006 | 5/30/2011 | LIB( |
| Skilled Nursing Facility/ Assisted Living Facility | First Mortgage | 119,500(10) | 38,648 | 25,000 | 25,000 | 7 | 12/8/2005 | 12/8/2008 (11) | LIB( |
| Skilled Nursing Facility/ Assisted Living Facility | First Mortgage | 9,750 | 9,750 | 9,750 | 9,702 | 2 | 10/2/2006 | 10/2/2011 | LIB( |
| Skilled Nursing Facility/ | Term Loan A | 100,000 | 30,000 | 30,000 | 25,710 | 10 | 10/4/2006 | 10/4/2011 | LIB( |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Assisted Living Facility/ Independent Living Skilled Nursing Facility/ Assisted Living Facility/ Independent Living | First Mortgage | 37,241 | 37,241 | 36,887 | 36,887 | 4 | 6/5/2006 | 4/30/2009 | 8.15 |
| Skilled Nursing Facility/ Senior Apts/Assisted Living Facility | Term Loan A & B | 66,250 | 22,050 | 19,250 | 19,141 | 13 | 1/18/2006 | 2/1/2011 | LIB( |
| Skilled Nursing Facility/ Intermediate Care Facility | First Mortgage | 69,000 | 40,000 | 30,000 | 30,000 | 10 | 10/31/2006 | 10/31/2011 | LIB( |
| Assisted Living Facility | First Mortgage/ Second Mortgage | 3,750(20) | 3,750 | 3,750 | 3,695 | 1 | 8/11/2006 | 8/11/2011 | LIB( |
| Assisted Living Facility/ Independent Living Facility/ Alzheimers Facility/Cottage | First Mortgage | 24,225 | 24,225 | 24,225 | 23,776 | 1 | 8/31/2006 | 8/31/2011 | LIB( |
| Total: | | $ 685,944 | $ 461,892 | $ 293,590 | $ 280,290 | | | | |

69

Table of Contents

(1) "Total Commitment" refers to the total commitment, loan or loan tranche in which we are acquiring an interest, which may be part of a larger credit facility in respect of the referenced borrower. See "Business—Description of Initial Assets."

(2) "CIT Commitment" reflects the face value of such initial asset as held by our Manager as of March 31, 2007.

(3) "Our Commitment" reflects the face amount of such initial asset that will be contributed to us at closing.

(4) This loan consists of a $155.0 million loan that has been bifurcated by our Manager into a $130.0 million first mortgage A facility at LIBOR + 2.25% and a $25.0 million first mortgage B facility at LIBOR + 3.75%. Our $25.0 million commitment will be from the A facility.

(5) The facilities securing this loan are located throughout Michigan.

(6) The facilities securing this loan are located throughout Virginia.

(7) The facilities securing this loan are located in Norwood and Cedar Grove.

(8) This loan has a 7.00% interest rate floor on the A loan and a 7.50% interest rate floor on the B loan.

(9) The facilities securing this loan are located in Corpus Christi and Portland.

(10) This loan carries an interest rate of LIBOR + 3.63%. This loan was syndicated to our Manager at a rate of LIBOR + 3.48%.

(11) The borrower has right to deliver an extension notice allowing maturity to occur December 8, 2010.

(12) The facilities securing this loan are located throughout New Jersey.

(13) The interest rate for this loan is the greater of (i) LIBOR + 3.15% or (ii) 6.00%.

(14) The facilities securing this loan are located throughout Oregon and Washington.

(15) This interest rate on this loan was derived from a fixed rate of 5-year Treasury + 3.25%.

(16) The facilities securing this loan are located throughout Ohio.

(17) The real estate loan carries an interest rate of LIBOR + 4.00%, term loan carries interest rate of LIBOR + 5.60%.

(18) The facilities securing this loan are located in Baton Rouge, Louisiana; Springhill, Louisiana; Jonesboro, Louisiana; Carthage, Texas.

(19) The facilities securing this loan are located throughout Illinois.

(20) This loan consists of a $2.8 million first mortgage at LIBOR + 3.00% and a $0.9 million second mortgage at LIBOR + 4.75%.

70