# EXHIBIT 1 – Part 6

Table of Contents

**Description of Initial Assets**

*Michigan Skilled Nursing /Assisted Living Portfolio*

Our Manager originated a $155.0 million first mortgage loan in March 2007. The first mortgage loan consists of three funding stages, the first of which occurred in March 2007 for $114.8 million, a second stage which will occur in June 2007 for $33.6 million and a third stage which will occur in October 2007 for $6.6 million. Our Manager bifurcated the loan into a $130.0 million, first mortgage A facility, which carries interest at LIBOR plus 225 basis points, and a $25.0 million first mortgage B facility which carries interest at LIBOR plus 375 basis points. We will own a $25.0 million parri passu participation in the first mortgage A facility. The loan is secured by a portfolio of 17 skilled nursing facilities located in Michigan, with a combined total of 1,893 beds.

The 17 facilities in the subject portfolio are located in diverse markets throughout Michigan. Ten of the 17 facilities (63% of the total beds) are located in the Detroit metropolitan area. Two facilities (14% of the total beds) are located in Flint, Michigan, two facilities (8% of the total beds) are located in Escanaba, Michigan and the remaining three facilities (15% of the total beds) are located in other areas in Michigan. The average occupancy rate for the facilities is approximately 88%.

Our commitment accrues interest at an annual rate of LIBOR plus 225 basis points. The first mortgage matures on March 26, 2012.

*Virginia Skilled Nursing Facility Portfolio*

Our Manager originated a $28.7 million first mortgage loan in March 2007. We will be assuming this loan in its entirety from our Manager. The loan is secured by six skilled nursing facilities throughout Virginia with a combined total of 418 beds.

The facilities were built between 1989 and 1991. The average occupancy rate for the facilities is approximately 91%.

Our commitment accrues interest at an annual rate of LIBOR plus 250 basis points. The first mortgage matures on March 1, 2012.

*New Jersey Skilled Nursing Facility Portfolio*

Our Manager originated a $28.0 million first mortgage loan in January 2006. We will be assuming this loan in its entirety from our Manager. The loan is secured by two skilled nursing facilities in Northern New Jersey with a combined total of 420 beds.

The portfolio consists of a skilled nursing facility located in Norwood, New Jersey with 240 beds which was built in 1989, and a skilled nursing facility located in Cedar Grove, New Jersey with 180 beds which was built in 1984. The average occupancy rate for the facilities is approximately 90%.

The first mortgage accrues interest at an annual rate of LIBOR plus 400 basis points. The first mortgage matures on January 31, 2011.

*San Antonio Skilled Nursing Facilities Portfolio*

Our Manager originated this $21.4 million credit facility in February 2006. The facility consists of a $11.4 million first mortgage loan and a $10.0 million revolver. We will own the $11.4 million first mortgage loan, while our Manager will retain the $10.0 million revolver. The loan is secured by two skilled nursing facilities and a parcel of vacant land located in San Antonio, Texas.

The nursing facilities, one of which was built in 1983 and the other in 2006, offer a combined total of 225 beds. The building completed in 2006 is currently in a lease-up stage.

The mortgage accrues interest at an annual rate of LIBOR plus 350 basis points and has an interest floor of 7%. The credit facility matures on February 9, 2011.

*Maryland Skilled Nursing Facility*

Our Manager originated this $10.8 million loan in March 2006. The facility consists of a $9.3 million first mortgage loan and a $1.5 million revolver. We will own 100% of the $9.3 million first

71

Table of Contents

mortgage loan which is secured by one skilled nursing facility located in suburban Baltimore, Maryland. Our Manager will retain the $1.5 million revolver. The skilled nursing facility was built in 1985 and has 130 beds. Major renovations were undertaken in 1989 and 2005. The facility is approximately 90% occupied.

The first mortgage accrues interest at an annual rate of LIBOR plus 375 basis points. The first mortgage matures on March 31, 2011.

*Texas Skilled Nursing Facility Portfolio*

Our Manager originated a $6.8 million first mortgage loan in June 2006. We will assume this loan in its entirety from our Manager. This first mortgage loan is secured by three skilled nursing facilities with a combined total of 311 beds, all located in Texas.

The portfolio consists of three facilities: (i) a skilled nursing facility built in 1994 with 120 beds, (ii) a skilled nursing facility built in 1984 with 94 beds and (iii) a skilled nursing facility built in 1998 with 97 beds. The average occupancy rate for the facilities is approximately 90%.

The first mortgage accrues interest at an annual rate of LIBOR plus 300 basis points. The first mortgage matures on June 30, 2011.

*Texas Skilled Nursing Facility*

Our Manager originated a $5.6 million first mortgage loan in May 2006. We will own 100% of this loan. This first mortgage loan is secured by a skilled nursing facility located in Austin Texas, with 110 beds.

The first mortgage accrues interest at an annual rate of LIBOR plus 300 basis points. The loan matures on May 30, 2011.

*New Jersey Skilled Nursing/Assisted Living Portfolio*

Our Manager purchased a $38.6 million participation in this $119.5 million first mortgage facility. Our Manager purchased a pari passu participation in this facility in two funding stages, the first of which was $25.0 million in December 2005 and the second of which was $13.6 million in December 2006. We will own a $25.0 million parri passu participation in the first mortgage facility. The loan is secured by seven properties located in New Jersey, four of which are skilled nursing facilities, two of which are assisted living facilities and one of which is skilled nursing/assisted living.

The facilities, which were built in 1989, 1998, 1999, and 2000, have a combined 899 skilled beds and 261 assisted units. The facilities' average occupancy rate is approximately 83%.

Our participation accrues interest at an annual rate of LIBOR plus 348 basis points. The loan matures on December 8, 2008.

*Texas Skilled Nursing/Assisted Living Portfolio*

Our Manager originated this $9.8 million first mortgage loan in October 2006. The loan is secured by a skilled nursing facility and an assisted living facility, both located in Texas. We will own 100% of this loan.

The skilled nursing facility, which was built in 1991, is approximately 88% occupied and offers 108 beds.

The assisted living facility offers 40 units, was built in 1996 and had a major renovation/addition in 1999. The properties are approximately 92% occupied.

This first mortgage loan accrues interest at an annual rate of the greater of (i) LIBOR plus 315 basis points or (ii) 6.0%. The loan matures on October 2, 2011.

*Washington and Oregon Skilled Nursing/Assisted Living Portfolio*

Our Manager purchased a $30.0 million term loan participation in this $100.0 million credit facility in October 2006. The facility consists of an $86.0 million Term Loan A and a $14.0 million

72

Table of Contents

capital expenditures tranche. We will own our Manager's $30.0 million participation in the Term Loan A tranche which is pari passu with other investors in the facility. The loan is secured by a portfolio of ten properties all located in Oregon and Washington.

The portfolio of ten properties has 942 skilled beds, 97 assisted units, and 114 independent living units spread across seven skilled nursing facilities and three skilled nursing/assisted living facilities/independent living facilities, which were built between 1964 and 2005, with an average age of 29 years. The average occupancy rate for the facilities is approximately 89%.

Our commitment accrues interest at an annual rate of LIBOR plus 275 basis points. The credit facility matures on October 4, 2011.

*Ohio Skilled Nursing/Assisted Living/Independent Living Portfolio*

Our Manager originated a $37.2 million first mortgage loan in June 2006. The proceeds from the first mortgage were used by the borrower to purchase a portfolio of four senior housing facilities in the state of Ohio. We will own 99% of this loan.

The four senior housing facilities are comprised of 295 skilled nursing beds, 118 assisted living and independent living units and 45 patio home units, and have an average occupancy rate of 89%.

Our commitment accrues interest at a fixed rate of 8.15%. The first mortgage matures on April 30, 2009.

*Texas and Louisiana Skilled Nursing Facilities Portfolio*

Our Manager purchased a $22.1 million participation in a $66.3 million credit facility in January 2006. The facility consists of two tranches: a $53.5 million tranche, consisting of a $37.0 million real estate loan, a $8.0 million Term Loan, and a $8.5 million revolver, and a $12.8 million tranche, consisting of a $7.3 million real estate loan and a $5.5 million Term Loan. We will own a $19.3 million pari passu participation in the credit facility.

The first tranche of this loan is secured by first mortgages on five skilled nursing facilities located in Louisiana and Texas, with a combined total of 655 beds and an average occupancy approximately 72%. It is also secured by a mezzanine interest in four assets with an existing HUD Loan. These assets consist of two assisted living facilities, a skilled nursing facility and a multifamily apartment building, all located in Louisiana. The average occupancy rate for the facilities is approximately 94%.

The second tranche of this loan is secured by leasehold mortgages on four skilled nursing facilities, with a combined total of 606 beds which are approximately 85% occupied, and cash flows from four ancillary businesses.

Our participations earn a blended average rate of LIBOR plus 430 basis points. The credit facility matures on February 1, 2011.

*Illinois Skilled Nursing Facilities Portfolio*

Our Manager originated this $69.0 million first mortgage loan in October 2006. Our Manager syndicated $29.0 million of this loan. We will own a $30.0 million pari passu participation in this first mortgage loan. The loan is secured by a first lien on ten skilled nursing facilities located in Illinois.

The nursing facilities serve a niche market as their focus is care for people with mental retardation. These assets, which offer a combined total of 1,553 beds and were built between 1965 and 1978, have an average occupancy rate of approximately 92%.

The loan accrues interest at an annual rate of LIBOR plus 300 basis points. The loan matures on October 31, 2011.

*Florida Assisted Living Facility*

Our Manager originated this $3.8 million credit facility in August 2006. The credit facility consists of a $2.8 million first mortgage loan that has a guarantee from the parent company, and a $0.9 million

73

Table of Contents

second mortgage that has a personal guarantee from the principal. We will own 100% of both the first and second mortgage in this credit facility. The loan is secured by an assisted living facility in Florida.

The facility was built in 1996 and has 49 units and is approximately 78% occupied.

The first mortgage loan bears interest at LIBOR plus 300 basis points and has a 12 month extension option. The second mortgage bears interest at LIBOR plus 475 basis points with interest only in years one through four. Additionally, 4% of the principal is due in year five with bullet maturity for the remainder on August 11, 2011. Both the first and second mortgage in this credit facility mature on August 11, 2011.

*Florida Assisted Living/Independent Living/Alzheimer's Facility/Cottage*

Our Manager originated this $24.2 million first mortgage loan on a retirement campus in Vero Beach, Florida. We will own 100% of this mortgage.

The campus has 120 independent living apartments, 24 assisted living units, 24 Alzheimer units, 37 independent living cottages and 24 independent living cottages under construction. Construction began on the community in 2002. The average occupancy rate for the faciliters is approximately 77%.

The loan matures on August 31, 2011, with an 18-month lockout provision. The loan bears interest at LIBOR plus 275 basis points with six months interest only.

**Our Targeted Facilities**

The markets for healthcare real estate is extensive and includes real estate owned by a variety of healthcare operators. Healthcare operating properties typically are multi-tenant medical office buildings that are leased to multiple healthcare providers (hospitals and physician practices) under a gross, modified gross or net lease structure. Under a gross or modified gross lease, all or a portion of operating expenses are not reimbursed by tenants. Medical Office Buildings, or MOBs, are managed by third party property management companies and are leased on a net basis or are leased to multiple tenants under gross or modified gross leases pursuant to which we are responsible for certain operating expenses. Regardless of lease structure, most leases at operating properties include annual base rent escalation clauses that are either predetermined fixed increases or are a function of an inflation index, and typically have an initial term ranging from 10 to 15 years. We plan to have investments in senior housing facilities, medical office buildings, hospitals, skilled nursing facilities, outpatient centers and other healthcare facilities. The following describes the nature of the operations of our expected

borrowers and tenants:

*Senior Housing Facilities*

Senior housing properties include independent living facilities, assisted living facilities and continued care retirement communities, which cater to different segments of the elderly population based upon their needs. Services provided by our tenants in these facilities are primarily paid for by the residents directly or through private insurance and are less reliant on government reimbursement programs such as Medicaid and Medicare.

- **Independent Living Facilities, or ILFs.** ILFs are designed to meet the needs of seniors who choose to live in an environment surrounded by their peers with services such as housekeeping, meals and activities. These residents generally do not need assistance with activities of daily living, including bathing, eating and dressing. However, residents have the option to contract for these services.

- **Assisted Living Facilities, or ALFs.** ALFs are licensed care facilities that provide personal care services, support and housing for those who need help with activities of daily living yet require limited medical care. The programs and services may include transportation, social activities, exercise and fitness programs, beauty or barber shop access, hobby and craft activities, community excursions, meals in a dining room setting and other activities sought by residents. These facilities are often in apartment-like buildings with private residences ranging from single rooms to large apartments. Certain ALFs may offer higher levels of personal assistance for residents with Alzheimer's disease or other forms of dementia. Levels of personal assistance are based in part on local regulations.

74

Table of Contents

- **Continuing Care Retirement Communities, or CCRCs.** CCRCs provide housing and health-related services under long-term contracts. This alternative is appealing to residents as it eliminates the need for relocating when health and medical needs change, thus allowing residents to "age in place." Some CCRCs require a substantial entry fee or buy-in fee, and most also charge monthly maintenance fees in exchange for a living unit, meals and some health services. CCRCs typically require the individual to be in relatively good health and independent upon entry.

*Medical Office Buildings*

MOBs typically contain physicians' offices and examination rooms, and may also include pharmacies, hospital ancillary service space and outpatient services such as diagnostic centers, rehabilitation clinics and day-surgery operating rooms. While these facilities are similar to commercial office buildings, they require more plumbing, electrical and mechanical systems to accommodate multiple exam rooms that may require sinks in every room, brighter lights and special equipment such as medical gases.

*Hospitals*

Services provided by our tenants in these facilities are paid for by private sources, third-party payors (e.g., insurance and health management organizations, or HMOs), or through the Medicare and Medicaid programs.

- **Acute Care Hospitals.** Acute care hospitals offer a wide range of services such as fully-equipped operating and recovery rooms, obstetrics, radiology, intensive care, open heart surgery and coronary care, neurosurgery, neonatal intensive care, magnetic resonance imaging, nursing units, oncology, clinical laboratories, respiratory therapy, physical therapy, nuclear medicine, rehabilitation services and outpatient services.

- **Long-Term Acute Care Hospitals.** Long-term acute care hospitals provide care for patients with complex medical conditions that require longer stays and more intensive care, monitoring, or emergency back-up than that available in most skilled nursing-based programs.

- **Specialty Hospitals.** Specialty hospitals are licensed as acute care hospitals but focus on providing care in specific areas such as cardiac, orthopedic and women's conditions or specific procedures such

as surgery and are less likely to provide emergency services.

- **Rehabilitation Hospitals.** Rehabilitation hospitals provide inpatient and outpatient care for patients who have sustained traumatic injuries or illnesses, such as spinal cord injuries, strokes, head injuries, orthopedic problems, work-related disabilities and neurological diseases.

### *Skilled Nursing Facilities*

Skilled Nursing Facilities, or SNFs, offer restorative, rehabilitative and custodial nursing care for people not requiring the more extensive and sophisticated treatment available at hospitals. Ancillary revenues and revenue from sub-acute care services are derived from providing services to residents beyond room and board and include occupational, physical, speech, respiratory and intravenous therapy, wound care, oncology treatment, brain injury care and orthopedic therapy as well as sales of pharmaceutical products and other services. Certain skilled nursing facilities provide some of the foregoing services on an out-patient basis. Skilled nursing services provided by our tenants in these facilities are primarily paid for either by private sources, or through the Medicare and Medicaid programs.

### *Outpatient Centers*

Outpatient centers deliver healthcare services in dedicated settings utilizing specialized staff to provide a more efficient and comfortable experience to the patient than is available in a traditional acute care hospital. Ambulatory surgery centers, dialysis clinics and oncology diagnostic and treatment centers are examples of the type of outpatient facilities we intend to target for investment.

75

Table of Contents

### *Other Healthcare Facilities*

Other healthcare facilities may include physician group practice clinic facilities, health and wellness centers, and facilities used for other healthcare purposes, behavioral health, manufacturing facilities for medical device.

### **Reimbursement**

All of our properties will be used as healthcare facilities; therefore, we will be directly affected by the risk associated with the healthcare industry. Our lessees and mortgagors, as well as any facilities that may be owned and operated for our own account from time to time, will derive a substantial portion of their net operating revenues from third-party payors, including the Medicare and Medicaid programs. These programs are highly regulated by federal, state and local laws, rules and regulations and are subject to frequent and substantial change. There are no assurances that payments from governmental payors will remain at levels comparable to present levels or will, in the future, be sufficient to cover the costs allocable to patients eligible for reimbursement under these programs.

### **Operating Policies and Strategies**

### *Financing and Leverage Policies*

We intend to acquire our initial assets in part with the proceeds of this offering and, thereafter, intend to finance our investments primarily by borrowing against or "leveraging" our investments in accordance with our investment guidelines in order to increase the size of our portfolio and potential return to stockholders. Our investment guidelines state that our leverage will generally not exceed 80% of the total value of our investments. We anticipate our overall leverage will be between 70% and 80% of the total value of our investments, but our actual leverage will depend on our mix of investments and the cost of leverage. Our charter and bylaws do not limit the amount of indebtedness we can incur, and our board of directors has discretion to deviate from or

change our investment guidelines at any time. We will use leverage for the sole purpose of financing our portfolio and not for the purpose of speculating on changes in interest rates. Our financing strategy focuses on the use of match-funded financing structures. Accordingly, we will seek to match the maturities and/or repricing schedules of our financial obligations with those of our investments to minimize the risk that we will have to refinance our liabilities prior to the maturities of our investments and to reduce the impact of changing interest rates on earnings.

*Warehouse Facilities*

We will use short-term financing, in the form of warehouse facilities. We are currently negotiating a warehouse facility with Column Financial Inc., an affiliate of Credit Suisse Securities, LLC, an affiliate of one of our underwriters, which we expect to be in place shortly after consummation of this offering. We are also currently negotiating a warehouse facility with UBS Real Estate Securities Inc., an affiliate of one of our underwriters, which we expect to be in place soon after consummation of this offering. There is no assurance, however, that we will be able to close these facilities on terms favorable to us, if at all. In connection with warehouse facilities that we intend to enter into, lenders may request that we hold assets in special purpose entities. However, we may elect not to put loans with ongoing funding obligations into these special purpose vehicles. Warehouse lines are typically collateralized loans made to borrowers who invest in securities and loans and, in turn, pledge the resulting securities and loans to the warehouse lender. In the event of a default, the warehouse lender would take title to the pledged collateral. The pool of assets in a warehouse facility typically must meet certain requirements, including term, average life, investment rating, agency rating and sector diversity requirements. Typically, there are also certain requirements relating to portfolio performance, including required minimum portfolio yield and limitations on delinquencies and charge-offs. Failure to comply with these requirements could result in either the need to post additional collateral or cancellation of the warehouse financing facility.

*Long Term Funding*

For longer-term funding, we may utilize, among other financings, securitization structures, such as collateralized debt obligations, (CDOs) or commercial mortgage-backed securities (CMBS), as well as

Table of Contents

other match-funded secured financing structures. CDOs are multiple class debt securities, or bonds, secured by pools of assets, such as whole loans, B Notes, mezzanine loans, CMBS and REIT debt. In a CDO the assets are pledged to a trustee for the benefit of the holders of the bonds. The bonds generally are rated by one or more rating agencies. We believe match-funded secured financing structures are an appropriate financing vehicle for our targeted real estate asset classes, because they will enable us to obtain long-term cost of funds and minimize the risk that we have to refinance our liabilities prior to the maturities of our investments while giving us the flexibility to manage credit risk and, subject to certain limitations, to take advantage of profit opportunities. As our Manager continues to originate real estate debt securities subsequent to this offering (taking into account the contribution of the initial assets), we expect to reach critical mass for a securitization or other secured term debt execution. In conjunction with our long-term financing strategy, we plan to retain the equity component, or below investment grade component, of the rated securitization and as a result, will still have exposure to any investments included in such securitizations.

*Permanent Financing for Real Estate*

We intend to finance a portion of the purchase price of our investments in real estate by borrowing funds from third parties.

*Credit Risk Management*

We will be exposed to various levels of credit and special hazard risk depending on the nature of our underlying assets and the nature and level of credit enhancements supporting our assets. Through the services of our Manager, we expect to originate or purchase mortgage loans that meet our investment guidelines as established by our board of directors. Our chief investment officer will monitor credit risk and other risks of loss associated with each investment. In addition, we will seek to maintain a diversified portfolio of assets to avoid undue geographic, issuer, industry and/or property type concentrations. Our board of directors will monitor the overall portfolio.

*Asset/Liability Management*

To the extent consistent with our election to qualify as a REIT, we will follow an interest rate risk management policy intended to mitigate the negative effects of major interest rate changes. We intend to minimize our interest rate risk from borrowings by attempting to structure the key terms of our borrowings to generally correspond to the interest rate term of our assets.

*Hedging Activities*

To the extent we provide floating rate financing to our borrowers, which we expect to consider on a case by case basis, we expect to require our borrowers to purchase and pledge as part of the collateral for the credit facility an interest rate hedge in the form of an interest rate cap. In instances where we provide fixed rate financing, we may utilize an interest rate swap or other interest hedging strategy. We may elect to utilize other hedging strategies. These strategies may include interest rate swaps, the purchase or sale of interest rate collars, caps or floors, options, mortgage derivatives and other hedging instruments. These instruments may be used to hedge as much of the interest rate risk as we determine is in the best interest of our stockholders given the cost of such hedges and the need to maintain our qualification as a REIT. In general, income from hedging transactions does not constitute qualifying income under current law for purposes of the REIT gross income requirements. To the extent, however, that we enter into a hedging contract to reduce interest rate risk on indebtedness incurred to acquire or carry real estate assets, any income that we derive from the contract would be excluded altogether from the REIT 95% gross income test, but would continue to be non-qualifying income for the 75% gross income test. See "Federal Income Tax Considerations—Taxation of Care Investment Trust—Income Tests."

*Disposition Policies*

While there are no current plans to dispose of any investments that will be in our portfolio, with the assistance of our Manager we will evaluate our portfolio on a regular basis to determine if it

77

Table of Contents

continues to satisfy our investment criteria. Subject to certain restrictions applicable to REITs, we may need to sell our investments opportunistically and use the proceeds of any such sale for debt reduction, additional investments or working capital purposes.

*Equity Capital Policies*

Subject to applicable law, our board of directors has the authority, without further stockholder approval, to issue additional authorized common stock and preferred stock or otherwise raise capital, including through the issuance of senior securities, in any manner and on the terms and for the consideration it deems appropriate, including in exchange for property. Stockholders will have no preemptive right to additional shares issued in any offering, and any offering may cause a dilution of investment.

We may, under certain circumstances, repurchase our common stock in private or public transactions with our stockholders, if those purchases are approved by our board of directors. Our board of directors has no present intention of causing us to repurchase any shares, and any action would only be taken in conformity with

applicable federal and state laws and the applicable requirements for qualifying as a REIT for so long as our board of directors concludes that we should remain a REIT.

*Conflicts of Interest Policies*

We, our executive officers, certain of our directors and our Manager will face conflicts of interests because of our relationships with each other. Since our investments will be primarily sourced and originated by our Manager and our Manager and its affiliates will invest in many of the same investments that we target, we have developed a conflicts of interest policy with our Manager in an effort to address conflicts with respect to the origination of investments, the allocation of investment opportunities, the terms of investments purchased from our Manager, the terms upon which we may make certain co-investments with our Manager and the servicing of defaulted or distressed loans in which both we and our Manager have an interest. This conflicts of interest policy gives us the first right to invest in certain investment opportunities originated or otherwise identified by our Manager, directly or in the secondary market, and provides specific guidelines with respect to the terms of co-investments with our Manager, participations in loans in which our Manager holds a participation, including participations that are senior to our participation, and the servicing of distressed loans in which both we and our Manager participate. Specifically, among other things, we will have the first right to invest in any mortgage or real estate asset that constitutes (i) any mortgage loan, for the first 12 months following the closing of this offering, and, thereafter, mortgage loan with a total principal amount over $75.0 million; (ii) an investment opportunity which constitutes equity or preferred equity; (iii) an investment opportunity which constitutes mezzanine loans or B Notes; and (iv) an investment that our Manager originates and elects to syndicate. In addition, there will be an "independent investment advisor" that will attend or otherwise participate in meetings of our investment committee. The independent investment advisor will be retained by our board of directors (and approved by a majority of our independent directors), and will have the authority to bring to our nominating, corporate governance and investment oversight committee for its review and, if appropriate, approval, any investment committee decision that the independent investment advisor determines, in its sole discretion, should be reviewed including, without limitation, any investment decision that (i) contravenes our investment guidelines or (ii) presents an actual or apparent conflict of interest between our Manager, or any of its affiliates, and us. Such independent investment advisor will be unaffiliated with our Manager and CIT Group and will be compensated by us. For a description of these conflicts of interest policies, see "Our Manager and Management Agreement—Conflicts of Interest Policies."

*Interested Director, Officer and Employee Transactions*

We will adopt a policy that, unless the action is approved by a majority of our independent directors and is not otherwise prohibited by law, we will not:

78

Table of Contents

- acquire from or sell to any of our directors, officers or employees, or any entity in which one of our directors, officers or employees has an economic interest of more than five percent or a controlling interest, or acquire from or sell to any affiliate of any of the foregoing, any of our assets or other property;
- make any loan to or borrow from any of the foregoing persons; or
- engage in any other transaction with any of the foregoing persons.

However, our bylaws do not prohibit any of our directors, officers, employees or agents, in their personal capacity or in a capacity as an affiliate, employee or agent of any other person, or otherwise, from having business interests and engaging in business activities similar to or in addition to or in competition with those of or relating to us.

Pursuant to Maryland law, a contract or other transaction between a company and a director or between the

company and any other corporation or other entity in which a director serves as a director or has a material financial interest is not void or voidable solely on the grounds of the common directorship or interest, the presence of that director at the meeting at which the contract or transaction is authorized, approved or ratified or the counting of the director's vote in favor thereof if (1) the material facts relating to the common directorship or interest and as to the transaction are disclosed to the board of directors or a committee of the board, and the board or committee in good faith authorizes the transaction or contract by the affirmative vote of a majority of disinterested directors, even if the disinterested directors constitute less than a quorum, (2) the material facts relating to the common directorship or interest of the transaction are disclosed to the stockholders entitled to vote thereon, and the transaction is approved in good faith by vote of the stockholders, or (3) the transaction or contract is fair and reasonable to the company at the time it is authorized, ratified or approved.

*Policies with Respect to Other Activities*

We have not engaged in trading, underwriting or agency distribution or sale of securities of other issuers and do not intend to do so. We have not in the past, but we may in the future, invest in the securities of other issuers for the purpose of exercising control over such issuers. At all times, we intend to make investments in a manner as to qualify as a REIT, unless because of circumstances or changes in the Internal Revenue Code or the regulations of the U.S. Department of the Treasury, our board of directors determines that it is no longer in our best interest to qualify as a REIT. We intend to make investments in such a way that we will not be treated as an investment company under the Investment Company Act. After this offering, we will become subject to the information reporting requirements of the Securities Exchange Act of 1934, as amended, referred to as the Exchange Act. Pursuant to these requirements, we will file periodic reports, proxy statements and other information, including audited consolidated financial statements, with the SEC. We intend to furnish our stockholders with annual reports containing consolidated financial statements audited by our independent certified public accountants and with quarterly reports containing unaudited consolidated financial statements for each of the first three quarters of each fiscal year.

*Future Revisions in Policies and Strategies*

Our board of directors has the power to modify or waive our operating policies and strategies without the consent of our stockholders to the extent that the board of directors (including a majority of our independent directors) determines that a modification or waiver is in the best interest of our stockholders. Among other factors, developments in the market that either affect the policies and strategies mentioned herein or that change our assessment of the market may cause our board of directors to revise our policies and strategies.

**Exemption From Regulation Under the Investment Company Act**

We intend to conduct our operations so that we are not required to register as an investment company. We may rely on the exemption provided by Section 3(c)(5)(C) of the Investment Company Act for companies that invest primarily in mortgages and other liens on and interests in real estate,

79

Table of Contents

also known as "qualifying real estate assets." This exemption, as interpreted by the staff of the SEC, requires us to invest at least 55% of our portfolio in qualifying real estate assets and to invest at least another 25% of our portfolio in additional qualifying real estate assets or in a broader category of assets that we refer to as real estate-related assets. As a result, we will be limited in the types of assets we may acquire. This exemption also prohibits us from issuing redeemable securities.

Based on no-action letters issued by the staff of the SEC, we will classify our investments in fee interests in real estate and in various types of whole loans as qualifying real estate assets, as long as the loans are "fully secured" by an interest in real estate at the time we originate or acquire the loan. That is, if the loan-to-value ratio

of the loan is equal to or less than 100%, then we will consider the loan a qualifying real estate asset. We will not consider loans with loan-to-value ratios in excess of 100% to be qualifying real estate assets that come within the 55% basket, but only real estate-related assets that come within the 25% basket. We will consider a participation in a whole mortgage loan to be a qualifying real estate asset only if we control the right to foreclose the mortgage securing the loan in the event of a default.

With respect to our investments in B Notes, we will take the position that B Notes are qualifying real estate assets that come within the 55% basket, or Qualifying B Notes, where we have the unilateral right to (i) instruct the servicer to foreclose on a defaulted mortgage loan, (ii) replace the servicer in the event the servicer, in its discretion, elects not to foreclose on such a loan, and (iii) purchase the A Note in the event of a default on the mortgage loan and foreclose on the loan. We note that the staff of the SEC has not provided any guidance on the treatment of B Notes for Section 3(c)(5)(C) purposes and any such guidance may require us to adjust our B Note investment strategy.

Based on a no-action letter issued by the staff of the SEC, we will classify our investments in mezzanine loans as qualifying real estate assets as long as (i) the mezzanine loan is a "Tier 1 mezzanine loan," or a subordinated loan made specifically and exclusively for the financing of real estate, (ii) we exercise ongoing control rights over the management of the underlying property, (iii) we have the right to cure defaults on the loan or purchase the mortgage loan in the event of a default on the mortgage loan and (iv) we have the right to foreclose on the collateral and, through our ownership of the property-owning entity, become the owner of the underlying property. We will treat our other mezzanine loan investments and investments in securities issued by companies primarily engaged in the real estate business as real estate-related assets that come within the 25% basket. The treatment of other investments as qualifying real estate assets and real estate-related assets will be based on the characteristics of the underlying collateral and the particular type of loan (including whether we have foreclosure rights with respect to those securities or loans that have underlying real estate collateral) and will be consistent with guidance of the SEC or its staff.

Our subsidiaries will be subject to similar restrictions under the Investment Company Act as described in this prospectus so that we do not come within the definition of an investment company under the Investment Company Act. When we are primarily engaged in the business of owning mortgages and other liens on and other interests in real estate through wholly-owned or majority-owned subsidiaries that meet the requirements described above, we may be exempted from regulation as an investment company by Section 3(c)(6) of the Investment Company Act. If we are engaged in one or more real estate businesses and one or more non-investment company businesses through wholly-owned or majority-owned subsidiaries, we may rely on the exemption provided by Section 3(c)(6) provided that at least 25% of our gross income during our prior fiscal year was derived from our real estate business.

Alternatively, in the future when we operate our business through one or more subsidiaries, we may not be subject to regulation under the Investment Company Act because we do not come within the definition of an investment company under the Investment Company Act. Under Section 3(a)(1) of the Investment Company Act, a company is not deemed to be an "investment company" if:

- it neither is, nor holds itself out as being, engaged primarily, nor proposes to engage primarily, in the business of investing, reinvesting or trading in securities; or

- it neither is engaged nor proposes to engage in the business of investing, reinvesting, owning, holding or trading in securities and does not own or propose to acquire "investment

80

Table of Contents

securities" having a value exceeding 40% of the value of its total assets on an unconsolidated basis, or the 40% Test. "Investment securities" excludes U.S. government securities and securities of majority-owned subsidiaries that are not themselves investment companies and are not relying on the exception from the definition of investment company for private funds under Section 3(c)(1) or Section 3(c)(7) of

the Investment Company Act.

The 40% Test would limit the types of businesses in which we may engage either directly or through our subsidiaries, if any. We anticipate that some of our wholly-owned or majority-owned subsidiaries will rely on the exemptions provided by Section 3(c)(5)(C) or 3(c)(6) or Rule 3a-7 under the Investment Company Act. Other subsidiaries may not be majority-owned or wholly-owned by us or might rely on the exemption provided by Section 3(c)(1) or 3(c)(7) of the Investment Company Act, in which case we would treat securities that we own and that were issued by these types of subsidiaries as "investment securities" and be required to keep the value of these securities below 40% of our total assets on an unconsolidated basis.

The determination of whether an entity is a majority-owned subsidiary of our company would be made by us. The Investment Company Act defines a majority-owned subsidiary of a person as a company 50% or more of the outstanding voting securities of which are owned by such person, or by another company which is a majority-owned subsidiary of such person. The Investment Company Act further defines voting securities as any security presently entitling the owner or holder thereof to vote for the election of directors of a company. We would treat companies, including CDO subsidiaries, in which we own at least a majority of the outstanding voting securities as majority-owned subsidiaries for purposes of the 40% Test. We have not requested the SEC to approve our treatment of any company as a majority-owned subsidiary and the SEC has not done so. If the SEC were to disagree with our treatment of one or more companies, including any CDO subsidiaries, as majority-owned subsidiaries, we would need to adjust our investment strategy and invest our assets in order to continue to pass the 40% Test. Any such adjustment in our investment strategy could have a material adverse effect on us.

We may seek a no-action letter from the SEC Staff regarding how certain of our investment strategies fit within the exemptions from regulation under the Investment Company Act that we and our subsidiaries, if any, are using. To the extent that the staff of the SEC provides more specific guidance regarding the treatment of assets as qualifying real estate assets or real estate-related assets, we may be required to adjust our investment strategy accordingly. Any additional guidance from the staff of the SEC could provide additional flexibility to us, or it could further inhibit our ability to pursue the investment strategy we have chosen.

If we or our subsidiaries, if any, fail to maintain our exemptions from the Investment Company Act, we would become subject to substantial regulation with respect to our capital structure (including our ability to use leverage), management, operations, transactions with affiliated persons (as defined in the Investment Company Act), and portfolio composition, including restrictions with respect to diversification and industry concentration and other matters. Compliance with the Investment Company Act will, accordingly, limit our ability to make certain investments.

**Competition**

Our income-generating potential will depend, in large part, on our Manager's ability to originate real estate related investment opportunities in healthcare facilities with spreads over costs. In originating these investments, our Manager will face competition from other REITs, investment companies, healthcare operators and other institutional investors when it attempts to identify investment opportunities. Real estate investment assets are often obtained through a competitive bidding process. Many of our competitors may have advantages over us and our Manager. Competition may result in higher prices for healthcare mortgage loans and real estate related assets, lower yields and a narrower spread of yields over our borrowing costs. In addition, competition for desirable investments could delay the investment of our equity capital in desirable assets, which may, in turn, reduce earnings per share and may negatively affect our ability to maintain our dividend distribution.

Table of Contents

**Employees**

We do not have any employees.

**Legal Proceedings**

We are not a party to any legal proceedings.

82

Table of Contents

**OUR MANAGER AND MANAGEMENT AGREEMENT**

**Our Manager**

*CIT Healthcare*

Our Manager is a healthcare finance company that offers a full spectrum of financing solutions and related strategic advisory services to companies across the healthcare industry throughout the United States. We believe that our Manager effectively leverages its extensive knowledge and understanding of the healthcare industry through its client-centric industry-focused model. Our Manager meets the diverse commercial financing needs of U.S. healthcare providers, including hospitals and health systems, outpatient centers, skilled nursing facilities, assisted living facilities, physician practices, home care and hospice companies, ambulatory surgery centers, pharmaceutical and medical technology companies, long-term care facilities, and vendors serving healthcare providers. Our Manager's leadership team has extensive experience in addressing the capital requirements and advisory service needs of the healthcare marketplace, allowing it to offer a full suite of customized, flexible healthcare financing solutions and services.

As of the date of this prospectus, our Manager employed approximately 120 professionals with substantial experience and expertise in origination, underwriting, structuring, portfolio management, servicing, securitization, syndication and secondary market transactions. Of these professionals, our Manager has 44 employees originating and sourcing investment opportunities. We believe our Manager is one of the leading healthcare financiers in the country. During 2006, our Manager evaluated approximately $23.8 billion of transactions for its own account, closed approximately $2.7 billion of commitments and funded approximately $2.2 billion of healthcare loans in the United States. As of March 31, 2007, our Manager owned assets of approximately $2.4 billion.

We believe that our Manager's experience, reputation in the healthcare finance industry, market knowledge and relationships with companies in the healthcare industry will benefit us by enabling our Manager to originate, manage and create value from attractive investment opportunities for us. While many of our competitors rely on financial institutions or other third party originators to provide them with investment opportunities, we believe that one of our key business strengths will be our access to investment opportunities originated directly by our Manager. Our Manager also has strong relationships with many financial institutions and may originate investment opportunities for us through these firms as well.

*CIT Group*

CIT Group (NYSE: CIT) is a commercial and consumer finance company providing financing and leasing products and services to clients in a wide variety of industries around the world. Founded in 1908, CIT Group has a premium brand focused on providing clients with customized financial solutions based on a combination of financial, intellectual and relationship capital. CIT Group sources transactions through direct marketing efforts to borrowers, lessees, manufacturers, vendors, distributors and to end-users through referral sources and other intermediaries. As of March 31, 2007, CIT Group managed assets of $79.7 billion comprised of an owned loan and lease portfolio of $73.4 billion and a securitized portfolio of $6.3 billion. CIT Group also serviced over $3.0 billion of third-party assets under fee-based contracts as of March 31, 2007. CIT Group employed approximately 7,500 people as of March 31, 2007.

**Our Management Agreement**

We will enter into a management agreement with our Manager, pursuant to which our Manager will provide for the day-to-day management of our operations.

***Management Services***

The management agreement appoints our Manager to manage our investments and day-to-day operations subject to the terms and conditions of the management agreement. In performing its duties under the management agreement, our Manager will use its commercially reasonable efforts to comply

83

Table of Contents

with, and to cause the personnel providing services to us to comply with, our conflicts of interest policy, investment guidelines and investment committee charter. Our Manager at all times will be subject to the supervision and direction of our board of directors, the terms and conditions of the management agreement and such further limitations or parameters as may be imposed from time to time by our board of directors. Our Manager is responsible for (i) the selection, purchase, sale and servicing of our commercial real estate investments, (ii) our financing activities and (iii) providing us with investment advisory services. Our Manager is responsible for our day-to-day operations and will perform (or cause to be performed) such services and activities relating to our investments and operations as may be appropriate, including, without limitation:

- serving as our consultant with respect to the periodic review of investment criteria and parameters for investments, borrowings and operations (including, without limitation, the investment guidelines and conflicts of interest policy, any modifications to which must be approved by a majority of our independent directors) and other policies and recommendations with respect thereto for approval by our board of directors;

- making available to us its knowledge and experience with respect to mortgage loans, real estate, real estate securities, other real estate-related assets and non-real estate related assets and real estate operating companies in the healthcare industry and otherwise;

- serving as our consultant with respect to the identification, investigation, evaluation, analysis, selection, purchase, origination, negotiation, structuring, monitoring and disposition of our investments, including the accumulation of assets for securitization;

- serving as our consultant with respect to decisions regarding any financings, securitizations, hedging activities or borrowings undertaken by us or our subsidiaries, including (1) assisting us in developing criteria for debt and equity financing that is specifically tailored to our investment objectives, (2) advising us with respect to obtaining appropriate warehouse or other financings for our investments and (3) advising us with respect to and structuring long-term financing vehicles for our investments, and advising us with respect to offering and selling securities publicly or privately in connection with any such structured financing;

- serving as our consultant with respect to arranging for the issuance of mortgage backed securities from pools of mortgage loans or mortgage backed securities owned by us;

- representing and making recommendations to us in connection with the purchase and finance and commitment to purchase and finance investments;

- with respect to any prospective investment by us and any sale, exchange or other disposition of any investment by us, conducting negotiations on behalf of us with real estate brokers, sellers and purchasers and their respective agents, representatives and investment bankers and owners of privately and publicly held real estate companies;

- providing us with portfolio management, asset servicing and loan servicing, including enforcing rights, exercising remedies, granting consents and taking other actions on our behalf in respect of our investments;

- conducting periodic on-site visits to properties to inspect the physical condition of the properties and to

- evaluate the performance of a tenant or operator of its duties;
- reviewing, analyzing and commenting upon the operating budgets, capital budgets and leasing plans of properties;
- engaging and supervising, on behalf of us and at our expense, independent contractors that provide real estate, investment banking, mortgage brokerage, securities brokerage, appraisal, engineering, environmental, seismic, insurance, legal, accounting, transfer agent, registrar, leasing, master servicing, special servicing, due diligence and such other services as may be required relating to our operations or investments (or potential investments);
- coordinating and managing operations of any joint venture or co-investment interests held by us and conducting all matters with the joint venture or co-investment partners;

84

Table of Contents

- providing executive and administrative personnel, office space and office services required in rendering services to us;
- performing and supervising the performance of administrative functions necessary in our management as may be agreed upon by our Manager and our board of directors, including, without limitation, the services in respect of any of our incentive plans, the collection of revenues and the payment of our debts and obligations and maintenance of appropriate information technology services to perform such administrative functions;
- communicating on behalf of us with the holders of any of our equity or debt securities as required to satisfy the reporting and other requirements of any governmental bodies or agencies or trading exchanges or markets and to maintain effective relations with such holders, including website maintenance, logo design, analyst presentations, investor conferences and annual meeting arrangements;
- counseling us in connection with policy decisions to be made by our board of directors;
- evaluating and recommending to us hedging strategies and engaging in hedging activities on our behalf, consistent with such strategies, as so modified from time to time, with our qualification as a REIT, and with our investment guidelines;
- counseling us regarding the maintenance of our qualification as a REIT and monitoring compliance with the various REIT qualification tests and other rules set out in the Internal Revenue Code and Treasury Regulations promulgated thereunder;
- counseling us regarding the maintenance of our exemption from status as an investment company under the Investment Company Act and monitoring compliance with the requirements for maintaining such exemption;
- furnishing reports and statistical and economic research to us regarding our activities and services performed for us or our subsidiaries by our Manager;
- monitoring the operating performance of our investments and providing periodic reports with respect thereto to our board of directors, including comparative information with respect to such operating performance and budgeted or projected operating results;
- investing and re-investing any of our monies and securities (including in short-term investments, payment of fees, costs and expenses, or payments of dividends or distributions to our stockholders and partners) and advising us as to our capital structure and capital-raising activities;
- causing us to retain qualified accountants and legal counsel, as applicable, to (i) assist in developing appropriate accounting procedures, compliance procedures and testing systems with respect to financial reporting obligations and compliance with the provisions of the Internal Revenue Code applicable to REITs and, if applicable, taxable REIT subsidiaries and (ii) conduct quarterly compliance