# EXHIBIT 1 – Part 7

- reviews with respect thereto;
- causing us to qualify to do business in all jurisdictions in which such qualification is required and to obtain and maintain all appropriate licenses;
- assisting us in complying with all regulatory requirements applicable to us in respect of our business activities, including preparing or causing to be prepared all financial statements required under applicable regulations and contractual undertakings and all reports and documents, if any, required under the Exchange Act and the Securities Act or by the NYSE;
- taking all necessary actions to enable us and our subsidiaries to make required tax filings and reports, including soliciting stockholders for required information to the extent necessary under the Internal Revenue Code and Treasury Regulations applicable to REITs;
- handling and resolving all claims, disputes or controversies (including all litigation, arbitration, settlement or other proceedings or negotiations) in which we may be involved or to which we may be subject arising out of our day-to-day operations other than with our Manager and its affiliates;

85

Table of Contents

- arranging marketing materials, advertising, industry group activities (such as conference participations and industry organization memberships) and other promotional efforts designed to promote our business;
- using commercially reasonable efforts to cause expenses incurred by or on behalf of us to be commercially reasonable or commercially customary and within any budgeted parameters or expense guidelines set by our board of directors from time to time;
- performing such other services as may be required from time to time for the management and other activities relating to our assets as our board of directors reasonably requests or our Manager deems appropriate under the particular circumstances; and
- using commercially reasonable efforts to cause us to comply with all applicable laws.

Pursuant to the terms of the management agreement, our Manager will provide us with a management team, including a chief executive officer, chief financial officer and chief investment officer or similar positions, along with appropriate support personnel to provide the management services to be provided by our Manager to us as described in the management agreement, who are expected to devote their time to our management as necessary and appropriate, commensurate with the level of our activity. Our Manager will provide personnel for service on an investment or similar type of committee.

Our Manager has not assumed any responsibility under the management agreement other than to render the services called for under the management agreement in good faith and is not responsible for any action of our board of directors in following or declining to follow its advice or recommendations, including as set forth in our conflicts of interest policy, investment guidelines and investment committee charter. The management agreement provides that our Manager and its affiliates, and the directors, officers, employees and stockholders of our Manager and its affiliates, will not be liable to us, any of our subsidiaries, our board of directors or our stockholders for any acts or omissions by our Manager, its officers, employees or its affiliates, performed in accordance with and pursuant to the management agreement, except by reason of acts constituting bad faith, willful misconduct, gross negligence, or reckless disregard of their respective duties under the management agreement. We have agreed to indemnify our Manager and its affiliates, and the directors, officers, employees and stockholders of our Manager and its affiliates, with respect to any and all expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorney's fees) in respect of or arising from any acts or omissions of our Manager, its affiliates, and the directors, officers, employees and stockholders of our Manager and its affiliates, performed in good faith under the management agreement and not constituting bad faith, willful misconduct, gross negligence, or reckless disregard of their respective duties. Our Manager has agreed to indemnify us and our directors, officers and stockholders and each person, if any, controlling us, with

respect to all expenses, losses, damages, liabilities, demands, charges and claims in respect of or arising from any acts or omissions of our Manager constituting bad faith, willful misconduct, gross negligence or reckless disregard of its duties under the management agreement or any claims by our Manager's employees relating to the terms and conditions of their employment by our Manager. Our Manager, through CIT Group, will maintain reasonable and customary "errors and omissions" and other customary insurance coverage.

Our Manager is required to refrain from any action that, in its sole judgment made in good faith, (i) would adversely affect our qualification as a REIT under the Internal Revenue Code or our status as an entity exempted from investment company status under the Investment Company Act, or (ii) would violate any law, rule or regulation of any governmental body or agency having jurisdiction over us or of any exchange on which our securities may be listed or that would otherwise not be permitted by our charter or bylaws. If our Manager is ordered to take any action by our board of directors, our Manager will notify our board of directors if it is our Manager's judgment that such action would adversely affect such status or violate any such law, rule or regulation or our charter or bylaws. Our Manager, its directors, officers, stockholders and employees will not be liable to us, our board of directors, or our stockholders for any act or omission by our Manager, its directors, officers, stockholders or employees except as provided in the management agreement.

86

Table of Contents

*Term and Termination Rights*

The management agreement has an initial term expiring on June 30, 2010, and will be automatically renewed for one-year terms thereafter unless we or our Manager elects to not renew the agreement upon the expiration date of the initial term or any renewal term by providing the other party with at least 180 days prior notice of its intention not to renew the agreement. The management agreement does not limit the number of renewal terms. The management agreement may not be terminated without cause during the initial term or any renewal term. We may only elect to not renew the management agreement upon the expiration of the initial term or any renewal term. If we elect to not renew the agreement upon expiration of the initial term or any renewal term we will be required to pay our Manager a termination fee, within 90 days of termination, equal to the sum of the average annual base management fee plus the average annual incentive fee, earned during the two years immediately prior to termination, multiplied by three. The termination fee will be calculated as of the end of the most recently completed fiscal quarter prior to the date of termination. In addition, following any termination of the management agreement, we must pay our Manager all compensation accruing to the date of termination. We also may not assign the management agreement in whole or in part to a third party without the written consent of our Manager.

In addition, if we decide to not renew the management agreement due to fees that a majority of our independent directors have determined to be unfair, our Manager may agree to perform its management services at fees our independent directors determine to be fair, and the management agreement will be renewed on such revised fee terms. In such circumstances, our Manager may give us notice that it wishes to renegotiate the fees, in which case we and our Manager must negotiate in good faith, and if we cannot agree on a revised fee structure at the end of our 180 day notice period, the agreement will not be renewed, and we must pay the termination fees described above.

We may also terminate the management agreement with 60 days' prior written notice for cause, without paying the termination fee, if any of the following events occur, which will be determined by a majority of our board of directors, including a majority of our independent directors:

- our Manager's fraud, misappropriation of funds or embezzlement against us or its gross negligence in the performance of its duties under the management agreement (including such action or inaction by our Manager which materially impairs our ability to conduct our business;

- a material breach of any provision of the management agreement (including the failure of our Manager to use commercially reasonable efforts to comply with our conflicts of interest policy and investment

- guidelines) if such default continues uncured for a period of 60 days after written notice thereof, which notice must contain a request that the same be remedied;

- our Manager raises, sponsors, forms or advises any new investment fund, company or vehicle, including any REIT, that invests primarily in healthcare-related commercial mortgage loans or other commercial healthcare-related real estate loans, such as mezzanine loans (but specifically excluding CMBS and other similar pass through securities) in the United States or healthcare-related properties in the United States;

- our Manager commences any proceeding relating to its bankruptcy, insolvency, reorganization or relief of debtors or there is commenced against our Manager any such proceeding which results in an order for relief or remains undismissed for a period of 90 days;

- upon the conviction (including a plea of *nolo contendere*) of our Manager of a felony or the entry of any order or consent decree by any state or federal regulatory agency or authority, or the settlement by our Manager with any such regulatory agency or authority, whether or not such order, consent decree or settlement involves the admission or denial of liability, with respect to or arising out of any regulatory proceeding where the subject matter of the regulatory proceeding involves conduct of our Manager in the course of conducting its business as contemplated by the management agreement;

- a change in control (as defined in the management agreement) of our Manager (provided that we exercise this right within six months following such change in control); or

87

Table of Contents

- the dissolution of our Manager.

Our Manager may at any time assign certain duties under the management agreement to any affiliate of our Manager provided that our Manager shall remain liable to us for the affiliate's performance.

*Management Fees and Incentive Fee*

We do not intend to employ personnel. As a result, we will rely on the facilities, resources and personnel of our Manager to conduct our operations. The base management fee is payable monthly in arrears in cash, and the incentive fee is payable quarterly in arrears in cash or, at the option of our Manager, all or a portion of such incentive fee may be paid in shares of our common stock, subject to the restrictions described below. The base management fee is intended to reimburse our Manager for providing certain services to us as described above under "—Management Services." Our Manager may also be entitled to certain expense reimbursements as described below. Expense reimbursements to our Manager will be made monthly.

*Base Management Fee.* We will pay our Manager a base management fee monthly in arrears in an amount equal to 1/12 of 1.75% of our equity. For purposes of calculating the base management fee, our equity equals the month-end value, computed in accordance with GAAP, of our stockholders' equity, adjusted to exclude the effect of any unrealized gains, losses or other items that do not affect realized net income. Our Manager will use the proceeds from its management fee in part to pay compensation to its officers and employees provided to us who, notwithstanding that certain of them also are our officers, will receive no cash compensation directly from us.

*Incentive Fee.* Our Manager will be entitled to receive a quarterly incentive fee pursuant to the terms of the management agreement. The purpose of the incentive fee is to provide an additional incentive for our Manager to achieve targeted levels of Funds From Operations and to increase our stockholder value. The quarterly incentive fee will be payable in arrears and will be in an amount equal to the product of:

- 25% of the dollar amount by which

    - our Funds From Operations (after the base management fee and before the incentive fee) (as defined in the management agreement) for such quarter per share of our common stock (based on the weighted average number of shares outstanding for such quarter)

- plus the amount by which any capital gains realized during the quarter exceed any capital losses realized during the quarter
- exceed an amount equal to
  - the weighted average of the price per share of our common stock issued in all our offerings (including this offering), in each case at the time of issuance thereof, multiplied by the greater of
    - 2.25% and
    - 0.75% plus one-fourth of the 10-year U.S. treasury rate (as defined in the management agreement) for such quarter
- multiplied by the weighted average number of shares of our common stock outstanding during such quarter.

"Funds From Operations" is based upon standards established by the National Association of Real Estate Investment Trusts, or NAREIT, on the date hereof and means net income (computed in accordance with GAAP), excluding gains (losses) from debt restructuring and gains (losses) from sales of property, plus depreciation and amortization on real estate assets and non-cash equity compensation expense, and after adjustments for unconsolidated partnerships and joint ventures. However, for purposes of determining the incentive fee, the calculation of Funds From Operations shall be adjusted to exclude one-time events pursuant to changes in GAAP, and may be adjusted to

88

Table of Contents

exclude other non-cash charges after discussion between our Manager and our independent directors and approval by the majority of our independent directors in the case of non-cash charges.

"10-year U.S. treasury rate" means the arithmetic average of the weekly average yield to maturity for actively traded current coupon U.S. Treasury fixed interest rate securities (adjusted to a constant maturity of 10 years) published by the Federal Reserve Board in publication H. 15, or any successor publication, during a calendar quarter, or, if such rate is not published by the Federal Reserve Board, any Federal Reserve Bank or agency or department of the federal government selected by us. If we determine in good faith that the 10-year U.S. treasury rate cannot be calculated as provided above, then the rate shall be the arithmetic average of the per annum average yields to maturities, based upon closing asked prices on each business day during a quarter, for each actively traded marketable U.S. Treasury fixed interest rate security with a final maturity date not less than eight nor more than 12 years from the date of the closing asked prices as chosen and quoted for each business day in each such quarter in New York City by at least three recognized dealers in U.S. government securities selected by us.

The following example illustrates how we would calculate our quarterly incentive fee in accordance with the management agreement.

Assume the following:

- Funds From Operations for the quarter equals $10,000,000;
- Amount by which capital gains exceeds capital losses for the quarter is $1,000,000;
- 25,000,000 shares of common stock are outstanding and the weighted average number of shares of common stock outstanding during the quarter is 25,000,000;
- 10-year U.S. Treasury Rate is 4.5%; and
- weighted average price per share of common stock is $17.00.

Under these assumptions, the quarterly incentive fee payable to our Manager would be $359,375 as calculated below:

| | | |
|---|---|---:|
| 1. | Funds From Operations plus amount by which capital gains exceeds capital losses for the quarter | $ 11,000,000 |
| 2. | Per share amount calculated in 1 above ($11,000,000/25,000,000) | $ 0.44 |
| 3. | Weighted average price per share of common stock ($17.00) multiplied by the greater of (A) 2.25% and (B) 0.75% plus one-fourth of 10-year U.S. Treasury Rate | $ 0.38 |
| 4. | Excess of Funds From Operations per share over amount calculated in 2 above ($0.44-$0.38) | $ 0.06 |
| 5. | Weighted average number of shares outstanding multiplied by the amount calculated in 3 above (25,000,000 x $0.06) | $ 1,437,500 |
| 6. | Incentive Fee equals 25% of amount calculated in 4 above | $ 359,375 |

Pursuant to the calculation formula, if Funds From Operations increases and the weighted average share price and shares of common stock outstanding remain constant, the incentive fee will increase.

We will not incur any incentive fees in connection with this offering.

Our ability to achieve returns in excess of the thresholds noted above in order for our Manager to earn the incentive fee described above is dependent upon the level and volatility of interest rates, our ability to react to changes in interest rates and to utilize successfully the operating strategies described herein, and other factors, many of which are not within our control.

Our Manager will compute the quarterly incentive compensation within 45 days after the end of each calendar quarter, and we will pay the quarterly incentive compensation with respect to each calendar quarter within 10 business days following the delivery to us of our Manager's written

89

Table of Contents

statement setting forth the computation of the incentive fee for such quarter. The management agreement provides that of our Manager may elect to receive all or a portion of the incentive fee in shares of our common stock and the balance would be paid in cash. Under the management agreement, our Manager agrees that it may not elect to receive shares of our common stock as payment of its incentive compensation, except in accordance with all applicable NYSE rules and securities laws (including prohibitions on insider trading).

The number of shares to be received by our Manager, if any, will be based on the closing price of our common stock on the first business day prior to the payment date. Shares of our common stock delivered as payment of the incentive fee to our Manager will be immediately vested.

*Reimbursement of Expenses.*   We pay all our operating expenses, except those specifically required to be borne by our Manager under the management agreement. Our Manager is responsible for employment expenses of our Manager's employees, including our officers and any directors who are also employees of our Manager. The costs and expenses required to be paid by us include, but are not limited to:

- costs incident to the acquisition, disposition, maintenance, administration, ownership and financing of our investments;

- expenses incurred in contracting with third parties;

- external legal, auditing, accounting, consulting, investor relations and administrative fees and expenses;

- the compensation and expenses of our directors (excluding those directors who are officers or

- employees of our Manager) and the cost of liability insurance to indemnify our directors and officers;
- the costs associated with our establishment and maintenance of any credit facilities and other indebtedness (including commitment fees, accounting fees, legal fees, closing costs and similar expenses);
- expenses associated with our formation and capital raising, including this offering and other securities offerings by us;
- expenses relating to the payment of dividends;
- costs incurred by our directors and officers and employees of our Manager for travel on our behalf;
- expenses incurred in connection with servicing problem or delinquent loans, or special servicing;
- expenses connected with communications to holders of our securities and in complying with the continuous reporting and other requirements of the SEC and other governmental bodies;
- transfer agent and exchange listing fees;
- the costs of printing and mailing proxies and reports to our stockholders;
- costs associated with any computer software, hardware or information technology services that are used primarily for us;
- the costs and expenses incurred with respect to market information systems and publications, research publications and materials relating solely to us;
- settlement, clearing, and custodial fees and expenses relating to us;
- the costs of maintaining compliance with all federal, state and local rules and regulations or any other regulatory agency (as such costs relate to us), all taxes and license fees and all insurance costs incurred on our behalf;
- the costs of administering any of our incentive plans; and

90

Table of Contents

- our pro rata portion of rent (including disaster recovery facility costs and expenses), telephone, utilities, office furniture, equipment, machinery and other office, internal and overhead expenses of our Manager and its affiliates required for our operations.

**Conflicts of Interest in Our Relationship with Our Manager**

We, our executive officers, certain of our directors and our Manager will face conflicts of interest because of our relationships with each other. We were formed by our Manager. The terms of our management agreement, including fees payable, were not negotiated at arms-length. As a result, those terms may not be as favorable to us as if the management agreement had been negotiated with an unaffiliated party. The terms of the contribution agreement relating to the contribution of our initial assets were also not negotiated at arms-length. As a result, and those terms, including the consideration paid for our initial assets, may not be as favorable to us as if the contribution agreement had been negotiated with an unaffiliated party. Our Manager also faced conflicts of interest in determining which assets in its portfolio would be contributed to us as part of our initial assets since there were other assets in our Manager's portfolio that met the criteria in our investment guidelines and conflicts of interest policy and therefore could have been selected for contribution to us. In addition, none of the employees of our Manager or CIT Group or any of our officers will devote his or her time to us exclusively. Our president's primary focus will be to us and our operations.

The compensation we will pay to our Manager consists of both a base management fee that is not tied to our performance and an incentive fee that is based entirely on our performance. The risk of the base management fee

component is that it is received regardless of performance and it may not provide sufficient incentive to our Manager to seek to achieve attractive risk-adjusted returns to our portfolio. The risk of the incentive fee component is that it may cause our Manager to place undue emphasis on the short-term maximization of our funds from operations and capital gains at the expense of other criteria, such as preservation of capital, in order to achieve a higher incentive fee. Investments with higher yield potential are generally riskier or more speculative. This could result in increased risk to the value of our investment portfolio.

Our Manager is authorized to follow very broad investment guidelines and has great latitude within those guidelines in determining the types of assets it may decide are proper investments for us. Our board of directors will periodically review our investment guidelines and our investment portfolio. However, our board is not expected to review or approve individual investments unless our independent investment advisor determines that such review is appropriate. In addition, our board of directors and our independent investment advisor will rely primarily on information provided to it by our Manager. Furthermore, transactions entered into by our Manager on our behalf may be costly, difficult or impossible to unwind by the time they are reviewed by our board of directors.

**Conflicts of Interest Policies**

We have adopted certain policies that are designed to eliminate or minimize certain potential conflicts of interest. Our board of directors has established investment guidelines. Unless otherwise approved by the majority of our independent directors, all of our investments must be in accordance with our investment guidelines. We have developed a conflicts of interest policy with our Manager in an effort to address conflicts with respect to the allocation of investment opportunities. However, we cannot make any assurances regarding the success of investments that are allocated to us or to our Manager. This conflicts of interest policy includes the following:

*First Right to Invest.*   Our Manager has agreed to provide us with the first right to invest in investment opportunities which it originates or otherwise identifies meeting certain criteria. Specifically, we will have the first right to invest in any mortgage or real estate asset that our Manager originates or otherwise identifies with one or more of the following characteristics, regardless of how such asset is originated or otherwise identified by our Manager, unless otherwise specified below:

- any mortgage loan, for the first 12 months following the closing of this offering, and thereafter, any mortgage loan with a total principal amount over $75.0 million;

91

Table of Contents

- any investment opportunity which constitutes equity or preferred equity;
- any investment opportunity which constitutes mezzanine loans or B Notes; and
- any investment that our Manager originates and elects to syndicate.

Further, we will have the right to invest in any other mortgage or real estate-related asset that our Manager elects not to invest in for any reason, including failure to satisfy our Manager's investment criteria or concentration issues. Our Manager's executive officers and other personnel may be involved in both the decision of whether an investment opportunity is to be referred to us and the decision of whether we will participate in the investment opportunity.

*Pari-Passu Co-Investments.*   The economic terms of any co-investment with our Manager made on a pari passu basis must be at least as favorable to us as to our Manager.

*Co-Investments with Debt Tranches of Different Priorities.*   We have adopted the following policies with respect to co-investments with our Manager involving debt tranches of different priorities.

- Any co-investment purchased in the secondary market from an unaffiliated third party that results in our Manager and us holding debt tranches of different priorities must be on the same terms as are

offered by the third party.

- Any co-investment that is purchased or part of a co-origination with our Manager and that results in our Manager and us holding debt tranches of different priorities must comply with the following:

  - if there is one or more third party participants in our debt tranche, our investment must be on terms no less favorable than the most favored third party participant in our debt tranche;

  - if there are no other participants in our debt tranche, our investment must be on then current market terms for similar investments purchased in arms-length transactions as reasonably determined by our Manager based upon third party bids received or published market data; and

  - in the event that third party bids or published market data are not available to our Manager, our investment must be approved by a majority of our independent directors.

*Participations.* We have adopted the following policies with respect to our participation in investments in which our Manager and its affiliates are also participating.

- In the event that we (i) invest in a loan, or portion of a loan, that is directly or indirectly secured by the same underlying real estate asset that secures a debt tranche of a different priority held by our Manager or (ii) we or our Manager hold a preferred equity interest in a real estate asset that (directly or indirectly) secures a loan in which the other party has an interest, then, if each of our Manager and us holds a majority of its respective debt tranche, a majority of our independent directors may, upon the occurrence of (i) a material default in respect of the debt tranche in which we hold an interest or (ii) any request to amend, modify or waive any material term of our debt tranche in order to avoid a pending material default, retain a reputable independent third party special servicer or adviser to advise our board of directors with respect to all material rights, remedies, enforcement actions, amendments and requests for waivers or consents in respect of our debt tranche, and the cost of such servicer or adviser will be deducted from any base management fee payable to our Manager in respect of our debt tranche. However, such costs must not exceed the lesser of the special servicer fee and the management fee allocable to our equity allocable to such loan.

- We may not invest (i) in any loan directly or indirectly secured by a real estate asset in which our Manager has an equity interest (other than preferred equity) or (ii) in any equity interest (other than preferred equity) in any real estate asset which directly or indirectly secures any loan held by our Manager.

92

Table of Contents

*Fees.* In connection with any investment purchased from our Manager or any co-investment or participation with our Manager, our Manager will provide us with our pro rata portion of any fees collected from the borrower on such investment.

*Legal Counsel.* The legal department of our Manager and CIT Group will provide legal services to us, and we and our officers and directors will be entitled to all fiduciary obligations owed by attorneys to their clients and attorney-client privileges available under applicable law. In order to mitigate possible conflicts of interest, we will retain separate external counsel with respect to the following:

- any disputes between our Manager and us arising under the management agreement or any other agreement between our Manager and us;

- any co-investments or investments purchased from our Manager where we and our Manager are purchasing tranches of different priorities;

- any investment for which a majority of our independent directors has retained a special servicer or advisor in accordance with the management agreement;

- any matter that a majority of our independent directors identifies as a situation where the dual representation of us and our Manager presents an actual or apparent conflict of interest; and

- at our option or the option of our Manager or any of our independent directors, with respect to any other matter.

This conflicts of interest policy may be changed or waived by us and our Manager (which approval must include a majority of our independent directors) without the approval of our stockholders.

In addition, there will be an "independent investment advisor" that will attend or otherwise participate in meetings of our investment committee. The independent investment advisor will be retained by our board of directors (and approved by a majority of our independent directors), and will have the authority to bring to our nominating, corporate governance and investment oversight committee for its review and, if appropriate, approval, any investment committee decision that the independent investment advisor determines, in its sole discretion, should be reviewed including, without limitation, any investment decision that (i) contravenes our investment guidelines or (ii) presents an actual or apparent conflict of interest between our Manager, or any of its affiliates, and us. Such independent investment advisor will be unaffiliated with our Manager and CIT Group and will be compensated by us.

Table of Contents

## MANAGEMENT

### Directors and Executive Officers

Upon completion of this offering, our board of directors will initially consist of six directors, including the five director nominees named below, each of whom has been nominated for election and has consented to serve as a director upon completion of this offering. We believe that five of the directors will be considered independent in accordance with the general independence standards of the NYSE. Upon the expiration of their current terms at the annual meeting of stockholders in 2008, directors will be elected to serve a term of one year. Our bylaws provide that a majority of the entire board of directors may establish, increase or decrease the number of directors, provided that the number of directors shall never be less than one, which is the minimum number required by the Maryland General Corporation Law, nor more than 15. All of our executive officers serve at the discretion of our board of directors. The following table sets forth certain information about our director, director nominees and executive officers.

| Name | Age | Position with Us |
|---|---|---|
| F. Scott Kellman | 50 | Chief Executive Officer and President |
| Michael P. McDugall | 47 | Chief Investment Officer |
| Robert O'Neill | 53 | Chief Financial Officer, Treasurer and Secretary |
| Flint D. Besecker | 41 | Director; Vice-Chairman of the Board of Directors nominee |
| Kirk E. Gorman | 56 | Independent Director nominee (Chairman of the Board of Directors) |
| Gerald E. Bisbee, Jr. | 64 | Independent Director nominee |
| Alexandra Lebenthal | 43 | Independent Director nominee |
| Karen P. Robards | 57 | Independent Director nominee |
| J. Rainer Twiford | 54 | Independent Director nominee |

*F. Scott Kellman* has been our chief executive officer since May 2007 and our president since March 2007. Mr. Kellman has been a managing director and head of real estate at our Manager since January 2007. Mr. Kellman is a veteran of the healthcare industry and has 22 years of experience deploying capital in healthcare real estate. Prior to joining our Manager, Mr. Kellman was senior vice president business development, at Healthcare Property Investors, Inc. (NYSE: HCP) from June 2005 until January 2007, where he was responsible for directing business development and sourcing investment opportunities. In addition, Mr. Kellman served as

senior vice president, treasurer of Tenet Healthcare Corporation (NYSE: THC) from March 2003 until May 2005 where he managed the financial aspects of Tenet's real estate as well as overseeing the company's corporate finance and cash management functions. Prior to that, Mr. Kellman was an executive officer of Omega Healthcare Investors, Inc. (NYSE: OHI) from August 1993 until February 2002, where he acquired and provided debt financing for healthcare real estate properties. Mr. Kellman served as chief operating officer the last three years he was at Omega. In addition, Mr. Kellman founded and operated Medical REIT, a healthcare REIT, which was merged into Omega Healthcare in August 1993. Mr. Kellman received an AB in political science with high distinction as well as a JD from the University of Michigan.

*Michael P. McDugall* has been our chief investment officer since May 2007. Mr. McDugall has been a managing director and head of risk management for real estate investment at our Manager since March 2007. In this capacity, he has overall credit responsibility for the real estate investment portfolio of our Manager. Prior to joining our Manager, Mr. McDugall held a variety of management roles at GE Commercial Finance Real Estate (NYSE: GE) from December 1987 to March 2007. From April 2002 until March 2007 Mr. McDugall served within GE's North American equity investment division as a territory risk manager and credit officer within the business development and direct investments groups from April 2005 until March 2007 and before that within the strategic joint venture group from April 2002 until April 2005, where his responsibilities included overseeing transaction structuring, underwriting due diligence, credit approvals and closing due diligence. Prior to joining GE, Mr. McDugall was a manager with the accounting firm of PricewaterhouseCoopers (successor firm to Coopers and Lybrand) from January 1984 until December 1987 where he practiced as a certified public accountant. Mr. McDugall received a BS in business administration from LaSalle University.

94

Table of Contents

*Robert O'Neill* has been our chief financial officer, treasurer and secretary since May 2007. Mr. O'Neill has been with CIT Group since June 2003 as senior vice president, finance and accounting, responsible for Sarbanes-Oxley implementation and compliance, as well as for monitoring internal controls globally. Prior to joining CIT Group, he provided consulting services to CIT Group on SEC reporting matters and internal controls. Mr. O'Neill held a variety of financial executive positions at J.P. Morgan Chase (NYSE: JPM) and its predecessor banks, most recently as chief financial officer of its Latin America region from April 1997 until July 2002. Mr. O'Neill received a BA in psychology from Fairfield University and an MBA in accounting from Rutgers University. He is a certified public accountant and a member of the American Institute of Certified Public Accountants and the New York State Society of Certified Public Accountants.

*Flint D. Besecker* has been a member of our board of directors since our formation and will become vice chairman of our board of directors upon consummation of this offering. Mr. Besecker has been president of our Manager since its formation. In his capacity as president, he is responsible for its overall strategy, growth and profitability. Prior to joining CIT Group in December 2004, Mr. Besecker held a variety of executive positions at GE Healthcare Financial Services (NYSE: GE) from October 1999 until November 2004. Mr. Besecker served as a managing director and group head of GE Healthcare Financial Services from October 2002 until November 2004 and, prior to that, as director—strategic marketing from October 2001 until October 2002. In addition, Mr. Besecker served as executive vice president and chief risk officer of Heller Healthcare Finance (NYSE: HF) and was the president and co-founder of Healthcare Analysis Corporation. He has also served as an officer of Healthcare Financial Partners (NYSE: HCFP). Mr. Besecker received a BS in accounting from Canisius College and is a certified public accountant.

*Kirk E. Gorman* will join our board of directors as chairman upon consummation of this offering. Since September 2003, Mr. Gorman has been senior vice president, chief financial officer of Jefferson Health System, Inc. Prior to joining Jefferson Health System, Mr. Gorman was chief financial officer of Universal Health Services, Inc. from 1987 until March 2003. Universal Health Services is a large healthcare management company, operating acute care hospitals, behavioral health facilities and ambulatory centers throughout the United States. Mr. Gorman was also president of Universal Health Realty Income Trust, a REIT specializing in

healthcare and human service related facilities, from 1987 until March 2003. Mr. Gorman is currently a director of VIASYS Healthcare Inc. and IASIS Healthcare Corporation. Mr. Gorman received an AB from Dartmouth College and an MBA from the Tuck School of Business.

*Gerald E. Bisbee, Jr.* will join our board of directors upon consummation of this offering. Since 1998, Mr. Bisbee has been chairman, president and chief executive officer of ReGen Biologics, Inc, an orthopedic medical device developer, manufacturer and distributor. Prior to joining ReGen, Mr. Bisbee was chairman and chief executive officer of APACHE Medical Systems, Inc., which he joined in 1989. Mr. Bisbee is currently a director of Cerner Corporation (NASDAQ: CERN). Mr. Bisbee received a BA in business from North Central College, an MBA from the Wharton School of the University of Pennsylvania and a PhD and M. Phil. from Yale University.

*Alexandra Lebenthal* will join our board of directors upon consummation of this offering. Since October 2006, Ms. Lebenthal has been president and chief executive officer of Alexandra & James, Co., a wealth management company, which she co-founded. Prior to forming Alexandra & James, Ms. Lebenthal was chief executive officer, executive vice president of the Lebenthal Division of Advest Inc. from January 2002 until December 2005. Ms. Lebenthal is currently a director of Broadridge Financial Solutions and The Securities Industry Financial Markets Organization (SIFMA). Ms. Lebenthal received an AB in history from Princeton University.

*Karen P. Robards* will join our board of directors upon consummation of this offering. Since 1987, Ms. Robards has been a partner of Robards & Company, LLC, a financial advisory, consulting and private investment firm. From 1976 to 1987, Ms. Robards was an investment banker at Morgan Stanley & Co., where she headed its healthcare investment banking activities. Ms. Robards serves as the independent chair of the board of several open-end and closed-end BlackRock mutual funds and is a director of AtriCure (NASDAQ: ATRC), Inc. Ms. Robards is a co-founder and director of the

95

Table of Contents

Cooke Center for Learning and Development. Ms. Robards received an AB in economics from Smith College and an MBA from Harvard Business School.

*J. Rainer Twiford* will join our board of directors upon consummation of this offering. Since 1999, Mr. Twiford has been president of Capital Strategies Advisors, Inc., an investment advisory company. Prior to joining Capital Strategies Advisors, Mr. Twiford was partner of Trammell Crow Company from 1987 until 1991. Mr. Twiford is currently a director of Russel County Hospital and IPI, Inc., and previously served on the board of a children's behavioral health company. Mr. Twiford received a BA and a PhD from the University of Mississippi, an MA from the University of Akron and a JD from the University of Virginia.

**Board Committees**

Our board of directors has established three committees consisting solely of independent directors, the principal functions of which are briefly described below. Matters put to a vote at any one of our three committees must be approved by a majority of the directors on the committee who are present at a meeting, in person or as otherwise permitted by our bylaws, at which there is a quorum or by unanimous written consent of the directors on that committee.

*Audit Committee*

Our board of directors has established an audit committee, which will be composed of three of our independent directors: Mr. Bisbee, Ms. Lebenthal and Ms. Robards. Mr. Bisbee will chair the committee and has been determined by our board of directors to be an "audit committee financial expert" as that term is defined by the SEC. The audit committee assists the board of directors in overseeing:

- our accounting and financial reporting processes;

- the integrity and audits of our consolidated financial statements;
- our compliance with legal and regulatory requirements;
- the qualifications and independence of our independent registered public accounting firm; and
- the performance of our independent registered public accounting firm and any internal auditors.

The committee is also responsible for engaging an independent registered public accounting firm, reviewing with the independent registered public accounting firm the plans and results of the audit engagement, approving professional services provided by the independent registered public accounting firm and considering the range of audit and non-audit fees.

*Compensation Committee*

Our board of directors has established a compensation committee, which will be composed of three of our independent directors: Messrs. Bisbee and Twiford and Ms. Lebenthal. Mr. Twiford will chair the committee. The principal functions of the compensation committee are to:

- evaluate the performance of and compensation paid by us, if any, to our chief executive officer;
- evaluate the performance of our Manager;
- review the compensation and fees payable to our Manager under our management agreement;
- administer our incentive plans; and
- produce a report on executive compensation required to be included in our proxy statement for our annual meetings, including the compensation, discussion and analysis.

*Nominating, Corporate Governance and Investment Oversight Committee*

Our board of directors has established a nominating, corporate governance and investment oversight committee, which will be composed of three of our independent directors: Messrs. Gorman

96

Table of Contents

and Twiford and Ms. Robards. Mr. Gorman will chair the committee. The nominating, corporate governance and investment oversight committee is responsible for:

- identifying, recruiting and recommending to the full board of directors qualified candidates for election as directors and recommending a slate of nominees for election as directors at the annual meeting of stockholders;
- developing and recommending to the board of directors corporate governance guidelines, including the committee's selection criteria for director nominees;
- reviewing and making recommendations on matters involving general operation of the board of directors and our corporate governance;
- recommending to the board of directors nominees for each committee of the board of directors;
- annually facilitating the assessment of the board of directors' performance as a whole and of the individual directors and reports thereon to the board of directors; and
- reviewing and, if appropriate, approving any investment opportunities that our independent investment advisor asks such committee to review and approve pursuant to the investment committee charter.

**Code of Business Conduct and Ethics**

Our board of directors has established a code of business conduct and ethics that applies to our officers,

directors and employees, if any. Among other matters, our code of business conduct and ethics is designed to deter wrongdoing and to promote:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- full, fair, accurate, timely and understandable disclosure in our SEC reports and other public communications;
- compliance with applicable governmental laws, rules and regulations;
- prompt internal reporting of violations of the code to appropriate persons identified in the code; and
- accountability for adherence to the code.

Any waiver of the code of business conduct and ethics for our executive officers or directors may be made only by our audit committee or, in the case of employees of our Manager and its affiliates who are involved in our business and who are not our executive officers or directors, by our chief executive officer and will be promptly disclosed as required by law or stock exchange regulations.

**Director Compensation**

We have not paid any cash compensation or granted any equity-based awards to any of the members of our board of directors. As of March 31, 2007, none of our directors held any awards in the form of or relating to our common stock.

Each independent director will receive an annual retainer of $100,000 in quarterly payments in arrears, of which 50% will be comprised of cash and 50% will be comprised of our common stock. Upon joining our board of directors, we will also grant each of our independent directors 3,000 restricted shares of our common stock which will vest over a three-year vesting schedule. We will also reimburse our independent directors for reasonable out-of-pocket expenses incurred in connection with performance of their duties as directors, including, without limitation, travel expenses in connection with their attendance at full board and committee meetings. In addition, the chairs of our audit committee and our nominating, corporate governance and investment oversight committee each will be paid an annual retainer of $7,500 and the chair of our compensation committee will be paid an

Table of Contents

annual retainer of $5,000 in addition to the annual retainer of $100,000. The chairman of our board of directors will be paid an annual retainer of $10,000, in addition to his annual retainer of $100,000.

**Executive Compensation**

*Compensation Discussion and Analysis*

We have not paid, and we do not intend to pay, any cash compensation to our executive officers and we do not currently intend to adopt any policies with respect thereto. Our management agreement provides that our Manager will provide us with a management team, including our chief executive officer, chief financial officer and chief investment officer or similar positions. We do not have agreements with any of our executive officers or any employees of our Manager with respect to their compensation. Our Manager will determine the levels of base salary and cash incentive compensation that may be earned by our executive officers, based on the time required for the performance of the duties of our Manager under the management agreement and such other factors as our Manager may determine are appropriate. Our Manager will also determine whether and to what extent our executive officers will be provided with pension, deferred compensation and other employee benefits plans and programs. Cash compensation paid to our executive officers will be paid by our Manager from the fees

paid by us to our Manager under the management agreement. We will not control how such fees will be allocated by our Manager to its employees and have been advised by our Manager that none of our executive officers is entitled to any part of such fees, except as may be determined by our Manager in its discretion. For a description of our management agreement, see "Our Manager and Management Agreement—Our Management Agreement."

We have determined to make grants of restricted stock to certain of our executive officers and directors, effective as of the consummation of this offering, as discussed further in the table following "Equity Incentive Plans." These awards were made in recognition of such individual's efforts on our behalf in connection with our formation and this offering and to provide a retention element to their compensation. As a new company, our compensation committee has not yet adopted a policy with respect to future grants of equity awards to our executive officers. We anticipate that such determinations will be made based on factors such as the desire to retain such officer's services over the long-term. In addition, our compensation committee may determine to make awards to new executive officers in order to attract talented professionals to serve us. We have not granted any equity-based awards to any of our executive officers and none of our executive officers hold any awards based on or relating to our common stock. Our Manager may grant awards based on such shares to one or more of its employees, including our executive officers and directors, subject to terms and conditions determined in our Manager's discretion and subject to our Manager's policies. See below, under "Equity Incentive Plans—Equity Plan" and "Equity Incentive Plans—Manager Equity Plan" for descriptions of these plans.

**Equity Incentive Plans**

*Equity Plan*

We have adopted the Care Investment Trust Inc. Equity Plan, which provides for the issuance of equity-based awards, including stock options, stock appreciation rights, restricted stock, restricted stock units, unrestricted stock awards and other awards based on our common stock that may be made by us to our directors and officers and to our advisors and consultants who are providing services to the Company (which may include employees of our Manager and its affiliates) as of the date of the grant of the award. Shares of common stock to be issued to our independent directors in respect of their annual retainer fees will be issued under this plan.

The Equity Plan will be administered by our board of directors (the plan administrator), which may delegate its authority to a committee of our board of directors. The plan administrator will have the authority to make awards to eligible directors, officers, advisors and consultants, and to determine what form the awards will take and the terms and conditions of the awards. Except as provided below

98

Table of Contents

with respect to equitable adjustments, the plan administrator may not take any action that would have the effect of reducing the exercise or purchase price of any award granted under the Equity Plan without first obtaining the consent of our stockholders.

An aggregate of 700,000 shares of our common stock are reserved for issuance under the Equity Plan, subject to adjustment as provided below. Included in the 700,000 shares are 551,667 shares available for future issuances. If any shares subject to an award granted under the Equity Plan are forfeited, cancelled, exchanged or surrendered or if an award terminates or expires without a distribution of shares to the participant, the shares of common stock with respect to such award will again be available for awards under the Equity Plan. Upon the exercise of any award granted in tandem with any other award, the related award will be cancelled to the extent of the number of shares of common stock as to which the award is exercised and, notwithstanding the foregoing, that number of shares will no longer be available for awards under the Equity Plan.

No employee of our Manager shall receive one or more awards within any single calendar year greater than the lesser of (i) $1,000,000 or (ii) 75,000 shares of restricted stock.

In the event that the plan administrator determines that any dividend or other distribution (whether in the form of cash, common stock, or other property), recapitalization, stock split, reverse split, reorganization, merger or other similar corporate transaction or event, affects our common stock such that an adjustment is appropriate in order to prevent dilution or enlargement of the rights of participants under the Equity Plan, then the plan administrator will make equitable changes or adjustments to: (i) the number and kind of shares of common stock or other property (including cash) that may thereafter be issued in connection with awards; (ii) the number and kind of shares of common stock or other property (including cash) issued or issuable in respect of outstanding awards; (iii) the exercise price, grant price or purchase price relating to any award and (iv) the performance goals, if any, applicable to outstanding awards. In addition, the plan administrator may determine that any equitable adjustment may be accomplished by making a payment to the award holder in the form of cash or other property (including but not limited to shares of our common stock).

Each stock option and stock appreciation right granted under the Equity Plan will have a term of no longer than 10 years, and will have an exercise or base price that is no less than 100% of the fair market value of our common stock on the date of the grant of the award. The other terms of stock options and stock appreciation rights granted by us under the Equity Plan will be determined by the plan administrator.

The plan administrator will determine the terms and conditions of each grant of restricted stock or restricted stock units under the Equity Plan. Restricted stock units confer on the participant the right to receive cash, common stock or other property, as determined by the plan administrator, having a value equal to the number of shares of our common stock that are subject to the award. Unless otherwise determined by the plan administrator, the holders of awards of restricted stock or restricted stock units will be entitled to receive dividends or, in the case of restricted stock units, dividend equivalents, which in either case will be payable at such time that dividends are paid on outstanding shares.

The plan administrator may determine to make grants of our common stock that are not subject to any restrictions or a substantial risk of forfeiture or to grant other stock-based awards to eligible participants, the terms and conditions of which will be determined by the plan administrator at the time of grant.

Unless otherwise determined by the plan administrator, if our management agreement with our Manager is terminated or not renewed other than for cause (as defined in the management agreement), each outstanding award under the Equity Plan held by a participant who is an employee of our Manager will become immediately vested, exercisable and/or payable. Unless otherwise determined by the plan administrator, outstanding awards under the Equity Plan held by a participant who is one of our independent directors will become fully vested, exercisable and/or payable upon our termination of such independent director's service as a director, unless such termination of service is pursuant to a removal for cause.

99

Table of Contents

If we experience a change in control (as defined in the Equity Plan), the plan administrator will have full authority to determine the effect, if any, on the vesting, exercisability, settlement, payment or lapse of restrictions applicable to an award. The effect of a change in control may be specified in a participant's award agreement or determined at a subsequent time. Unless otherwise specified in an award agreement, (i) any and all options and stock appreciation rights outstanding as of the effective date of a change in control shall be immediately exercisable and will remain exercisable until the earlier of the expiration of their initial term or the second anniversary of the participant's termination of employment, (ii) any restrictions imposed on restricted stock or restricted stock units outstanding as of the effective date of the change in control will lapse, and (iii) the vesting of all awards denominated in shares of stock outstanding as of the effective date of the change in control shall be accelerated.

The Equity Plan will automatically expire on the 10th anniversary of the date on which it was adopted. Our board of directors may terminate, amend, modify or suspend the Equity Plan at any time, subject to stockholder approval as required by law or stock exchange rules. The plan administrator may amend the terms of any