# EXHIBIT 3 –
# Part 2

Table of Contents

credit risk concentrations in our loan investment portfolio by evaluating exposure to various markets, underlying property types, investment structure, term, sponsors, tenant mix and other credit metrics. The collateral securing our loan investments are real estate properties located in the United States.

## New Accounting Pronouncements

In June, 2007, the American Institute of Certified Public Accountants (AICPA) issued Statement of Position (SOP) 07-1, *Clarification of the Scope of the Audit and Accounting Guide* Investment Companies *and Accounting for Parent Companies and Equity Method Investors for Investments in Investment Companies*. This SOP provides guidance for determining whether an entity is within the scope of the AICPA Audit and Accounting Guide *Investment Companies* (the Guide). Entities that are within the scope of the Guide are required, among other things, to carry their investments at fair value, with changes in fair value included in earnings. The provisions of this SOP have been deferred indefinitely, however, the Company is currently evaluating this guidance and has not determined whether it will be required to apply the provisions of the SOP in presenting its financial statements.

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements*, which established a framework for calculating the fair value of assets and liabilities as required by numerous other accounting pronouncements, and expands disclosure requirements of the fair value of certain assets and liabilities. SFAS 157 is effective for us on January 1, 2008. The Company is currently evaluating the impact, if any, that the adoption of this statement will have on our consolidated financial statements.

In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities*. This statement was issued with the intent to provide an alternative measurement treatment for certain financial assets and liabilities. The alternative measurement would permit fair value to be used for both initial and subsequent measurement, with changes in fair value recognized in earnings as those changes occur. This "Fair Value Option" would be available on an instrument-by-instrument basis. For us, SFAS 159 is effective for January 1, 2008. The Company is currently assessing the impact, if any, that adoption of this statement will have on our consolidated financial statements.

## Note 3 — Investments in Loans

As of September 30, 2007, our investments in loans amounted to $272.1 million and consisted of $255.5 million of loans from the initial portfolio contributed by our Manager, $1.2 million funded to existing portfolio clients, and $15.4 million of new originations generated by our Manager (see Note 5). During the quarter, the Company realized an early loan payoff from one borrower of $24.1 million and a partial payoff of $2.0 million from another. In addition, the Company received approximately $1.5 million in loan amortizations and other loan-related payments.

Our investments include senior whole loans and participations secured primarily by real estate property in the form of pledges of ownership interests, direct liens or other security interests. The investments are in various geographic markets in the United States. Our investment in variable rate loans (15 loans) approximated $237.7 million and had an effective yield for the three months ended September 30, 2007 of LIBOR plus 3.20%. One-month LIBOR was 5.13% at September 30, 2007. The remaining $34.4 million of investment was fixed rate and had an effective yield for the three months ended September 30, 2007 of 8.12%. As of September 30, 2007 we held the following investments (in thousands):

11

Table of Contents

| Property Type (a) | Location | | Carrying Amount | Unamortized Prem/(Disc) | Seller's Basis (b) | Interest Rate | Maturity Date |
|---|---|---|---|---|---|---|---|
| | City | State | | | | | |
| SNF | Middle River | Maryland | $ 9,395 | $ 220 | $ 9,175 | L+3.75% | 3/31/11 |
| SNF/ALF | Various | New Jersey | 25,468 | 574 | 24,894 | L+3.48% | 12/8/08(c) |
| SNF/ALF/IL | Various | Washington, Oregon | 27,006 | 855 | 26,151 | L+2.75% | 10/4/11 |
| SNF | Various | New Jersey | 28,116 | 668 | 27,448 | L+4.00% | 1/31/11 |
| SNF | Various | Michigan | 23,939 | 115 | 23,824 | L+2.25% | 3/26/12 |
| SNF | Various | Virginia | 25,969 | 465 | 25,504 | L+2.50% | 3/1/12 |
| SNF | Various | Texas | 6,742 | 93 | 6,649 | L+3.00% | 6/30/11 |
| SNF | Austin | Texas | 5,498 | 37 | 5,461 | L+3.00% | 5/30/11 |
| SNF/ICF | Various | Illinois | 30,272 | 368 | 29,904 | L+3.00% | 10/31/11 |
| SNF | San Antonio | Texas | 8,777 | 100 | 8,677 | L+3.50% | 2/9/11 |
| SNF/ALF | Nacogdoches | Texas | 9,958 | 317 | 9,641 | L+3.15% | 10/2/11 |
| SNF/Sr. Appts/ALF | Various | Texas, Louisiana | 17,435 | 199 | 17,236 | L+4.34% | 2/1/11 |
| ALF | Daytona Beach | Florida | 3,731 | (16) | 3,747 | L+3.43% | 8/11/11 |
| SNF/ALF/IL | Various | Ohio | 34,440 | 90 | 34,350 | 8.15% | 4/30/09(d) |
| **Contributed portfolio** | | | 256,746 | $ 4,085 | $ 252,661 | | |
| SNF | Irvine | California | 6,094 | | | L+3.00% | 7/31/09(e) |
| SNF | Aurora | Colorado | 9,294 | | | L+5.74% | 8/4/10 |
| **Investments in loans gross (f)** | | | $ 272,134 | | | | |

(a)  SNF refers to skilled nursing facilities; ALZ refers to Alzheimer facilities; ALF refers to assisted living facilities; IL refers to independent living facilities; ICF refers to independent care facilities; and Sr. Appts refers to senior living apartments.

(b)  The amounts represent the amortized value of the loans acquired on June 22, 2007.

(c)  Borrower has the ability to extend the maturity date to 12/8/10 upon advanced written notice and subject to compliance with certain covenants stipulated in the loan agreement.

(d)  Loan prepaid subsequent to September 30, 2007. See Note 11.

(e)  Borrower has the ability to extend the maturity date to 7/31/12 upon advanced written notice and subject to compliance with certain covenants stipulated in the loan agreement.

(f)  Gross investment in loans excludes approximately $144 in unamortized loan fees.

The premium on the purchased portfolio is amortized on the effective yield method over the remaining term of the loans. As of September 30, 2007, one loan with a carrying value of approximately $26 million was technically past due 90 days with respect to interest payments as a result of a billing dispute. This dispute was subsequently resolved and Care received full payment for the past due interest. All other loans were performing in accordance with their terms as of September 30, 2007.

## Note 4 — Debt Obligations

The acquisition of the initial portfolio of loans from the Manager was financed from proceeds of the initial public offering of the Company's common stock and the issuance of common stock of the Company to the Manager. As of September 30, 2007, Care had no debt obligations or facilities in place to provide financing for the acquisition of future investments. On October 1, 2007, Care entered into a master repurchase agreement with Column Financial, Inc., an affiliate of Credit Suisse, one of the underwriters of Care's initial public offering in June 2007 (See Note 11).

Investor concerns surrounding sub-prime mortgage credit risk, hedge fund losses, a large volume of unsuccessful leveraged loan syndications and related impact on the overall credit markets, including widening of credit spreads, arose in the second quarter of 2007. Disruption in the credit markets persists beyond September 30, 2007. These factors have materially impacted the availability of liquidity in the debt markets, making financing terms for borrowers less attractive. Consequently, the advance rates of our warehouse facility are less than the levels expected at inception of negotiations for the facility. In addition, plans to issue collateralized debt obligations (CDO) for more stable longer-term financing are uncertain given continuing turmoil in the CDO market. We can not foresee when the CDO market may stabilize and do not believe that we will he able to successfully enter into a CDO on terms acceptable to us in the short term. Should the current market conditions continue for an extended period of time, our ability to grow may be impeded and Care may be required to further

adjust its business plan.

12

Table of Contents

## Note 5 — Related Party Transactions

### Management Agreement

In connection with our initial public offering, we entered into a Management Agreement with our Manager, which describes the services to be provided by our Manager and its compensation for those services. Under the Management Agreement, our Manager, subject to the oversight of the Board of Directors of Care, is required to manage the day-to-day activities of the Company, for which the Manager receives a base management fee and is eligible for an incentive fee. The Manager is also entitled to charge the Company for certain expenses incurred on behalf of Care.

The Management Agreement has an initial term expiring on June 30, 2010, and will be automatically renewed for one-year terms thereafter unless either we or our Manager elect not to renew the agreement. The base management fee is payable monthly in arrears in an amount equal to 1/12 of 1.75% of the Company's stockholders' equity at the end of each month, computed in accordance with GAAP, adjusted for certain items pursuant to the terms of the Management Agreement. Our Manager is also eligible to receive an incentive fee, payable quarterly in arrears based upon performance thresholds stipulated in the Management Agreement.

Our Manager may also be entitled to a termination fee, payable for non-renewal of the Management Agreement without cause, in an amount equal to three times the sum of the average annual base management fee and the average annual incentive fee, both as earned by our Manager during the two years immediately preceding the most recently completed calendar quarter prior to the date of termination. No termination fee is payable if we terminate the Management Agreement for cause.

Care is also responsible for reimbursing the Manager for its pro rata portion of certain expenses detailed in the Management Agreement, such as rent, utilities, office furniture, equipment, and overhead, among others, required for Care's operations. Transactions with our Manager during the three months ended September 30, 2007 and the period from June 22 (commencement of operations) to September 30, 2007 included:

- The acquisition of our initial assets from our Manager upon the completion of Care's initial public offering. The fair value of the acquisitions was approximately $283.1 million inclusive of approximately $4.6 million of loan premium. In exchange for these assets, we issued 5,256,250 shares of common stock to our Manager at a fair value of approximately $78.8 million and paid our Manager approximately $204.3 million in cash from the proceeds of our initial public offering.

- Our issuance of 607,690 shares of common stock to our Manager concurrently with our initial public offering at fair value of $9.1 million at date of grant. These shares vested immediately and therefore their fair value was expensed at issuance;

- Our issuance of 133,333 shares of restricted common stock to our Manager's employees, some who are also Care Investment Trust Inc. officers or directors, and 15,000 shares to our independent directors, with a total fair value of $2.2 million at the date of grant. The shares granted to our Manager's employees vest on June 22, 2010, three years from the date of grant. The shares granted to our independent directors vest ratably over the next three years on each anniversary of the date of grant. Pursuant to SFAS 123R, we recognized approximately $142,000 and $161,000 in expense for the three months ended September 30, 2007 and for the period from June 22, 2007 (commencement of operations) to September 30, 2007, respectively, related to these grants. The remainder of this compensation will be recognized over the remaining vesting period and the amount of the compensation adjusted to fair value at each measurement date pursuant to SFAS 123R;

- Our $2.2 million liability to our Manager for professional fees paid and other third party costs incurred by our Manager on behalf of Care related to the initial public offering of our common stock ($0.6 million) and business operations ($1.6 million); and

13

Table of Contents

- Our accrual of $1.3 million for the Base Management Fee as required pursuant to our agreement with our Manager from June 22, 2007 (commencement of operations) to September 30, 2007.

## Note 6 — Fair Value of Financial Instruments

The following disclosures of estimated fair value were determined by management using available market information and appropriate valuation methodologies. Considerable judgment is necessary to interpret market data and develop estimated fair value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts we could realize on disposition of the financial instruments. The use of different market assumptions and/or estimation methodologies may have a material effect on the estimated fair value amounts.

Cash equivalents, accrued interest receivable, accounts payable and accrued expenses, and other liabilities reasonably approximate their fair values due to the short maturities of these items.

Investing in healthcare-related commercial mortgage debt is transacted through an over- the-counter market with minimal pricing transparency. Loans are infrequently traded and market quotes are not widely available and disseminated. Our investments in variable rate loans bear interest at stated spreads to a floating base rate (1 Month LIBOR) and reprice monthly. Accordingly, management believes our variable rate loans, considering borrowers with similar risk profiles, are carried at amounts which reasonably approximate fair value. Our $34.4 million fixed rate mortgage investment is carried at its unpaid principal balance plus the premium paid at purchase from our Manager. The loan was repaid in full, along with a prepayment fee of $0.6 million, approximately five months prior to maturity and subsequent to September 30, 2007. As a result, management believes the carrying value of this loan at September 30, 2007 reasonably approximates fair value.

## Note 7 — Stockholders' Equity

Our authorized capital stock consists of 100,000,000 shares of preferred stock, $0.001 par value and 250,000,000 shares of common stock, $0.001 par value. As of September 30, 2007, no shares of preferred stock were issued and outstanding and 21,012,373 shares of common stock were issued and outstanding.

### Equity Plan

We have adopted the Care Investment Trust Inc. Equity Plan, which provides for the issuance of equity-based awards, including stock options, stock appreciation rights, restricted stock, restricted stock units, unrestricted stock awards and other awards based on our common stock that may be made by us to our directors and officers and to our advisors and consultants who are providing services to the Company (which may include employees of our Manager and its affiliates) as of the date of the grant of the award. Shares of common stock to be issued to our independent directors in respect of their annual retainer fees will be issued under this plan.

An aggregate of 700,000 shares of our common stock are reserved for issuance under the Equity Plan, subject to adjustment under certain circumstances. Each stock option and stock appreciation right granted under the Equity Plan will have a term of no longer than 10 years, and will have an exercise or base price that is no less than 100% of the fair market value of our common stock on the date of the grant of the award. The other terms of stock options and stock appreciation rights granted by us under the Equity Plan will be determined by Care's Board of Directors (the ''plan administrator''). Unless otherwise determined by the plan administrator, the holders of awards of restricted stock or restricted stock units will be entitled to receive dividends or, in the case of restricted stock units, dividend equivalents, which in either case will be payable at such time that dividends are paid on outstanding shares.

On June 22, 2007, 133,333 shares of common stock with a fair value of approximately $2.0 million were awarded to our Manager's employees, some of whom are officers or directors of Care. The shares granted vest on June 22, 2010, three years from the date of grant. Pursuant to SFAS 123R, we

14

Table of Contents

recognized approximately $0.1 million in expense for the period from June 22, 2007 (commencement of operations) to September 30, 2007 related to these grants. The remainder of the compensation will be recognized over the remaining vesting period and the amount of the compensation adjusted to fair value at each measurement date pursuant to SFAS 123R.

On June 22, 2007, 15,000 shares of common stock with a fair value of approximately $0.2 million were awarded to members of Care's independent Board of Directors. The shares vest ratably on the first, second and third anniversaries of the grant. Care recognized approximately $15,000 in compensation expense related to these grants for the period from June 22, 2007 (commencement of operations) to September 30, 2007. The remainder of the compensation will be recognized over the remaining vesting period and the amount of the compensation adjusted to fair value at each measurement date pursuant to SFAS 123R.

As of September 30, 2007, 148,333 shares of our common stock had been granted pursuant to the Equity Plan and 551,667 shares remain available for future issuances. The Equity Plan will automatically expire on the 10th anniversary of the date it was adopted. Care's Board of Directors may terminate, amend, modify or suspend the Equity Plan at any time, subject to stockholder approval in the case of amendments or modifications.

### Schedule of Non Vested Shares — Equity Plan

| | Grants to Directors | Grants to Manager's Employees | Total Grants |
|---|---|---|---|
| Granted during the period | 15,000 | 133,333 | 148,333 |
| Vested | — | — | — |
| Forfeited | — | — | — |
| Balance at September 30, 2007 | 15,000 | 133,333 | 148,333 |

### Vesting Schedule

| | | | |
|---|---|---|---|
| June 22, 2008 | 5,000 | — | 5,000 |
| June 22, 2009 | 5,000 | — | 5,000 |
| June 22, 2010 | 5,000 | 133,333 | 138,333 |
| | 15,000 | 133,333 | 148,333 |

### Manager Equity Plan

We have adopted the Care Investment Trust Inc. Manager Equity Plan, which provides for the issuance of equity-based awards, including stock options, stock appreciation rights, restricted stock, restricted stock units, unrestricted stock awards and other awards based on our common stock that may be made by us to our Manager. Our Manager may make awards to its employees and employees of its affiliates which are in the form of or based on the shares of our common stock acquired by our Manager under the Manager Equity Plan, in which case our Manager will make all determinations concerning the eligible employees of our Manager and its affiliates who may receive awards, which form the awards will take, and the terms and conditions of the awards.

An aggregate of 1,325,635 shares of our common stock are reserved for issuance under the Manager Equity Plan, subject to adjustment. Each stock option and stock appreciation right granted under the Manager Equity Plan will have a term of no longer than 10 years, and will have an exercise or base price that is no less than 100% of the fair market value of our common stock on the date of the grant of the award. The other terms of stock options and stock appreciation rights granted under the Manager Equity Plan will be determined by Care's Board of Directors (the "plan administrator"). Unless otherwise determined by the plan administrator, the Manager will be entitled to receive dividends or, in the case of restricted stock units, dividend equivalents, in respect of restricted stock and restricted stock unit awards, which in either case will be payable at such time that dividends

are paid on outstanding shares.

15

Table of Contents

On June 22, 2007, upon completion of Care's initial public offering of its common stock, we granted to our Manager 607,690 fully vested shares of our common stock under the Manager Equity Plan. These shares are subject to our Manager's right to register the resale of such shares pursuant to a registration rights agreement we entered into with our Manager in connection with our initial public offering. Because these shares vest immediately, their fair value of $9.1 million was expensed at issuance.

At September 30, 2007, 717,945 shares are available for future issuances under the Manager Equity Plan. The Manager Equity Plan will automatically expire on the 10th anniversary of the date it was adopted. Care's Board of Directors may terminate, amend, modify or suspend the Manager Equity Plan at any time, subject to stockholder approval in the case of amendments or modifications.

## Note 8 — Income (Loss) per Share

|  | Three Months Ended September 30, 2007 | From June 22, 2007 (Commencement of Operations) to September 30, 2007 |
|---|---|---|
| Income (loss) per share – basic and diluted | $ 0.18 | $ (0.25) |
| **Numerator** | | |
| Net income (loss) | $ 3,714 | $ (5,183) |
| **Denominator** | | |
| Common Shares | 20,864,040 | 20,864,040 |

Diluted income per share was the same as basic income per share for the three months ended September 30, 2007 and diluted loss per share was the same as basic loss per share for the period from June 22, 2007 (commencement of operations) to June 30, 2007 because all outstanding restricted stock awards were anti-dilutive.

## Note 9 — Commitments and Contingencies

Several of our investments in loans have commitment amounts in excess of the amount that we have funded to date on such loans. At September 30, 2007, Care was obligated to provide approximately $5.0 million in additional financing at the request of our borrowers, subject to the borrowers' compliance with their respective loan agreements.

On September 18, 2007, a class action complaint for violations of federal securities laws was filed in the United States District Court, Southern District of New York alleging that the registration statement relating to the initial public offering of shares of Care Investment Trust Inc.'s common stock, filed on June 21, 2007, failed to disclose that certain of the assets in the contributed portfolio were materially impaired and overvalued and that Care was experiencing increasing difficulty in securing its warehouse financing lines. Care believes the complaint and allegations are without merit and intends to defend against the complaint and allegations vigorously. However, the outcome of this matter can not currently be predicted.

Care is not presently involved in any other material litigation nor, to our knowledge, is any material litigation threatened against us or our investments, other that routine litigation arising in the ordinary course of business. Management believes the costs, if any, incurred by us related to litigation will not materially affect our financial position, operating results or liquidity.

## Note 10 — Financial Instruments: Derivatives and Hedging

At September 30, 2007, Care did not have any investments in derivatives or hedging instruments.

## Note 11 — Subsequent Events

*Secured Warehouse Facility*

On October 1, 2007, Care and two of its subsidiaries, Care ORS and Care Mezz, entered into a master repurchase agreement (the "Agreement") with Column Financial, Inc. ("Column"), an affiliate

16

Table of Contents

of Credit Suisse Securities LLC which is an affiliate of Credit Suisse, one of the underwriters of Care's June 2007 initial public offering. This type of lending arrangement is often referred to as a warehouse facility.

The Agreement provides an initial line of credit of up to $300 million which may be increased temporarily to an aggregate amount of $400 million under the terms of the Agreement. Care may receive up to 50% of the value of each loan sold based on Column's underwriting of such loan and will agree to repurchase each loan at a future date. From the time of sale until the time of repurchase, Care will pay Column a monthly price differential payment which will be set at 0.75% over LIBOR for the first eight months of the Agreement and 1% over LIBOR thereafter,

Column has the right to issue margin calls in certain situations which Care generally must satisfy in cash within one business day. The Agreement also contains certain financial covenants that require Care to maintain a minimum level of liquidity, a minimum adjusted tangible net worth (as defined in the Agreement), a maximum ratio of indebtedness to adjusted tangible net worth of 4:1, and generate a net quarterly profit each quarter, The Agreement provides for specified events of default including, among others, if Care fails to make any payment due under the Agreement, comply with certain covenants set forth in the Agreement or repurchase all of the loans purchased by Column within 120 days following a change in control in Care, as defined in the Agreement.

The term of the Agreement is for three years and may be terminated by Column at any time on not less than one year's notice.

### Early Loan Termination

On October 5, 2007 a borrower, upon prior notification to Care, prepaid its current loan obligation of $34.4 million in accordance with the terms of the underlying loan agreement. Proceeds from the repayment also included a pre-payment fee of approximately $0.6 million, which after accounting for the unamortized premium resulting from the initial contribution, will result in $0.5 million in income in the fourth quarter of 2007.

### Declaration of Dividend

On November 5, 2007, the Board of Directors declared the Company's first dividend in the amount of $0.17 per share of common stock. The dividend is payable on November 30, 2007 to common stockholders of record on November 15, 2007.

### Potential Transaction Costs

Included in Other assets at September 30, 2007, are approximately $0.6 million in deferred legal costs and professional fees incurred in connection with the possible acquisition of healthcare-related properties. Negotiations have been protracted and ongoing. Should we terminate negotiations with the counterparty or the acquisition is otherwise no longer deemed probable, Care will recognize these deferred expenses.

17

Table of Contents

**ITEM 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations**

**and**

**ITEM 3.   Quantitative and Qualitative Disclosures about Market Risk**

The following should be read in conjunction with the consolidated financial statements and notes included herein. This "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Quantitative and Qualitative Disclosures about Market Risk" contain certain non-GAAP financial measures. See "Non-GAAP Financial Measures" and supporting schedules for reconciliation of our non-GAAP financial measures to the comparable GAAP financial measures.

**Overview**

Care Investment Trust Inc. (all references to "Care", "the Company", "we", "us", and "our" means Care Investment Trust Inc. and subsidiaries) is a newly-organized, real estate investment and finance company formed principally to invest in healthcare-related commercial mortgage debt and real estate. We provide financing to companies operating a full range of healthcare-related facilities, including skilled nursing facilities, hospitals, outpatient centers, surgery centers, senior housing, assisted living facilities, independent living facilities, continuing care retirement communities, medical office buildings, laboratories and other healthcare facilities. We intend to provide mortgage financing secured by these healthcare facilities, including first lien mortgage loans, mezzanine loans, B Notes and construction loans. In addition, we intend to make investments in healthcare real estate assets that are consistent with our investment guidelines, such as acquisitions of healthcare facilities.

Care is externally managed and advised by CIT Healthcare LLC ("Manager"), a wholly-owned subsidiary of CIT Group Inc. Our Manager is a healthcare finance company that offers a full-spectrum of financing solutions and related strategic advisory services to companies across the healthcare industry throughout the United States. Our Manager was formed in 2004 and is a wholly-owned subsidiary of CIT Group Inc., a leading commercial and consumer finance company that provides clients with financing and leasing products and advisory services. We intend to qualify as a real estate investment trust, or REIT, for federal income tax purposes and will elect to be taxed as a REIT under the Internal Revenue Code of 1986, as amended, commencing with our taxable year ending December 31, 2007. We generally will not be subject to federal taxes on our taxable income to the extent that we distribute our taxable income to stockholders and maintain our qualification as a REIT.

We intend to utilize leverage in accordance with our investment guidelines in order to increase our overall returns. Our investment guidelines state that our leverage will generally not exceed 80% of the total value of our investments. Current conditions in the credit markets have resulted in significantly reduced availability of liquidity and may require Care to utilize less leverage in the near term, resulting in slower growth than planned. We cannot anticipate when credit markets will stabilize and liquidity becomes available. Our actual leverage will depend on our mix of investments and the cost and availability of leverage. Our charter and bylaws do not limit the amount of indebtedness we can incur, and our board of directors has discretion to deviate from or change our investment guidelines at any time. We will use leverage for the sole purpose of financing our portfolio and not for the purpose of speculating on changes in interest rates. Our financing strategy focuses on the use of match-funded financing structures. Accordingly, we will seek to match the maturities and/or repricing schedules of our financial obligations with those of our investments to minimize the risk that we will have to refinance our liabilities prior to the maturities of our investments and to reduce the impact of changing interest rates on earnings.

We will use short-term financing, in the form of warehouse facilities, secured bank lines and repurchase agreements. These short-term financing structures are typically in the form of collateralized loans made to borrowers who invest in securities and loans and, in turn, pledge the resulting securities and loans to the lender. We executed a warehouse facility with Column Financial Inc, an affiliate of Credit Suisse Securities, LLC on October 1, 2007. For longer-term funding, we expect that as our portfolio of assets becomes large enough and when the securitized credit markets stabilize, we will

18

Table of Contents

enter into collateralized debt obligations ("CDOs") or commercial mortgage-backed securities ("CMBS"), as well as other match-funded secured financing structures. We can not foresee when the CDO market may stabilize and do not believe we will be able to successfully enter into a CDO on terms acceptable to us in the short term. Should the current market conditions continue for an extended period of time, our ability to grow may be impeded and Care may be required to further adjust its business plan. We also intend to finance a portion of the purchase price of our investments in real estate by borrowing property-specific non-recourse debt from third parties.

We have not invested in any loans that contain assets that could be classified as sub-prime residential mortgages. We do not anticipate that losses in the sub-prime residential mortgage market will affect our portfolio of healthcare-related commercial mortgages. However, continued turmoil in the sub-prime residential market may have an effect on the commercial mortgage market in general, including reduced liquidity and general availability of credit.

As of September 30, 2007, we held investments in variable rate and fixed rate loans of approximately $237.7 million and $34.4 million, net of premiums and discounts, respectively. These loans are principally first mortgage loans or term loans secured by first mortgages. The investments are in various geographic markets within the United States. As of September 30, 2007, one loan with a carrying value of approximately $26 million was technically past due 90 days with respect to interest payments as a result of a billing dispute. This dispute was subsequently resolved and Care received full payment for the past due interest. All other loans were performing in accordance with their terms as of September 30, 2007.

## Critical Accounting Policies

### *Loans and Investments*

We have the intent and ability to hold our investments in loans to maturity in accordance with SFAS No. 65 *Accounting for Certain Mortgage Banking Activities*. Such loans are classified as held for investment and are carried at cost, net of unamortized up-front loan fees, acquisition premium and acquisition costs, unless such loan or investment is deemed to be impaired. At such time as we invest in preferred equity interests that allow us to participate in a percentage of the underlying property's cash flows from operations and proceeds from a sale or refinancing, we must determine whether such investment should be accounted for as a loan, joint venture or as real estate at the inception of the investment. Care did not own any preferred equity investments at September 30, 2007.

The expense for credit losses in connection with loan investments is a charge to earnings to increase the allowance for possible credit losses to the level that management estimates to be adequate to cover probable losses considering delinquencies, loss experience and collateral quality. Specific valuation allowances are established for impaired loans based on the fair value of collateral on an individual loan basis. The fair value of the collateral may be determined by an evaluation of operating cash flow from the property during the projected holding period, and estimated sales value computed by applying an expected capitalization rate to the stabilized net operating income of the specific property, less selling costs. Alternatively, for construction loans, the fair value of the collateral may be determined based on the estimated cost to complete and projected sales value of the property. Whichever method is used, other factors considered relate to geographic trends and project diversification, the size of the portfolio and current economic conditions. Based upon these factors, we will establish an allowance for probable credit losses. When it is probable that we will be unable to collect all amounts contractually due, the loan is considered impaired.

Where impairment is indicated, an impairment charge is recorded based upon the excess of the recorded investment amount over the net fair value of the collateral, as reduced by selling costs. As of September 30, 2007, we had no impaired loans and accordingly, no allowance for credit losses.

We rely on significant subjective judgments and assumptions of our Manager (i.e., discount rates, expected prepayments, market comparables etc.) regarding the above items. There may be a material impact to these financial statements if our Manager's judgment or assumptions are subsequently determined to be incorrect.

19