UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

BRIARWOOD INVESTMENTS, INC.,                :   Civil Action No. 1:07-cv-08159-LLS
Individually and On Behalf of All Others      :
Similarly Situated,                                    :
                                                              :
                                        Plaintiff,            :
                                                              :
        vs.                                                    :
                                                              :
                                                              :
CARE INVESTMENT TRUST INC.,               :
F. SCOTT KELLMAN, ROBERT O'NEILL        :
and FLINT D. BESECKER,                           :
                                                              :
                                        Defendants.      :
                                                              :
—————————————————————— x


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**


Joel G. Chefitz (JC5517)
227 West Monroe Street, Suite 4400
Chicago, Illinois 60606
312/372-2000
312/984-7700 (fax)

Andrew D. Kaizer (AK9730)
340 Madison Avenue
New York, NY 10173-1922
212/547-5400
212/547-5444 (fax)
*Attorneys for Care Investment Trust Inc.,
F. Scott Kellman, Robert O'Neill and
Flint D. Besecker*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 1

RULE 12(b)(6) STANDARD .................................................................................. 7

ARGUMENT .......................................................................................................... 8

I.    THE AMENDED COMPLAINT FAILS TO STATE A SECTION 11
      CLAIM. ........................................................................................................ 9

      A.    The Amended Complaint Fails To Identify Anything False or
            Misleading in the Offering Documents. ........................................... 9

            1.    Relationship to Manager .......................................................... 9

            2.    Contributed Portfolio ............................................................ 11

                  a.    Care Made No Representation of the Value of the
                        Contributed Portfolio. ................................................ 11

                  b.    Even if Care Had Represented the Value, Plaintiffs'
                        Claims Would Still Fail. ............................................ 12

            3.    Warehouse Facilities ............................................................. 15

            4.    CDOs ..................................................................................... 17

      B.    The Alleged Misstatements Could Not Have Caused Plaintiffs'
            Losses. .......................................................................................... 18

II.   THE AMENDED COMPLAINT FAILS TO STATE SECTION 12 AND
      15 CLAIMS. ............................................................................................... 20

CONCLUSION ...................................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alpern v. UtiliCorp United, Inc.,*
   84 F.3d 1525 (8th Cir. 1996).................................................................................................. 19

*Associated Gen. Contractors of Cal., Inc. v. Carpenters,*
   459 U.S. 519 (1983)................................................................................................................. 7

*ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007)...................................................................................................... 8

*Bell Atl. Corp. v. Twombly,*
   127 S. Ct. 1955 (2007) ........................................................................... 7, 8, 11, 12, 13, 20, 22

*Caiafa v. Sea Containers, Ltd.,*
   525 F. Supp. 2d 398 (S.D.N.Y. 2007)..................................................................................... 8

*Conley v. Gibson,*
   355 U.S. 41 (1957).................................................................................................................. 7

*Cortec Indust., Inc. v. Sum Holding L.P.,*
   949 F.2d 42 (2d Cir. 1991)...................................................................................................... 8

*Davidco Investors, LLC v. Anchor Glass Container Corp.,*
   2006 U.S. Dist. LEXIS 11527 (M.D. Fla. Mar. 6, 2006)...................................................... 18

*Dura Pharm., Inc. v. Broudo,*
   544 U.S. 336 (2005)............................................................................................................... 18

*Faulkner v. Verizon Commc's, Inc.,*
   156 F. Supp. 2d 384 (S.D.N.Y. 2001).................................................................................... 10

*Feit v. Leasco Data Processing Equip. Corp.,*
   332 F. Supp. 544 (E.D.N.Y. 1971) ....................................................................................... 20

*Ganino v. Citizens Utils. Co.,*
   228 F.3d 154 (2d Cir. 2000) .................................................................................................... 5

*Hinerfeld v. United Auto Group,*
   1998 U.S. Dist. LEXIS 10601 (S.D.N.Y. July 15, 1998) ......................................... 9-10, 17, 18

*In re Adelphia Commcn's Corp. Sec. & Derivative Litig.,*
   2007 U.S. Dist. LEXIS 66911 (S.D.N.Y. Sept. 10, 2007) .................................................. 7, 8

*In re AFC Enterprises, Inc. Sec. Litig.,*
  348 F. Supp. 2d 1363 (N.D. Ga. 2004) ..................................................................... 19

*In re IBM Corp. Sec. Litig.,*
  163 F.3d 102 (2d Cir. 1998) ..................................................................... 10

*In re Infonet Servs. Corp. Sec. Litig.,*
  310 F. Supp. 2d 1080 (C.D. Cal. 2003) ..................................................................... 21, 22

*In re McKesson HBOC, Inc. Sec. Litig.,*
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................................................... 18

*In re Merrill Lynch & Co., Inc. Research Reports,*
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) ..................................................................... 5, 9, 18

*In re Metro. Sec. Litig.,*
  2007 U.S. Dist. LEXIS 84392 (E.D. Wash. Nov. 5, 2007) ..................................................................... 21, 22

*In re Musicmaker.com Sec. Litig.,*
  2001 U.S. Dist. LEXIS 251118 (C.D. Cal. June 4, 2001) ..................................................................... 21

*In re Scottish Re Group Sec. Litig.,*
  524 F. Supp. 2d 370 (S.D.N.Y. 2007) ..................................................................... 8

*In re Stratosphere Corp. Sec. Litig.,*
  1 F. Supp. 2d 1096 (D. Nev. 1998) ..................................................................... 21

*In re Ultrafem Inc. Sec. Litig.,*
  91 F. Supp. 2d 678 (S.D.N.Y. 2000) ..................................................................... 22

*Kramer v. Time Warner, Inc.,*
  937 F.2d 767 (2d Cir. 1991) ..................................................................... 8

*Lasker v. N.Y. State Elec. & Gas Corp.,*
  85 F.3d 55 (2d Cir. 1996) ..................................................................... 10

*Maher v. Durango Metals, Inc.,*
  144 F.3d 1032 (10th Cir. 1998) ..................................................................... 21, 22

*Maywalt v. Parker & Parsley Petroleum Co.,*
  808 F. Supp. 1037 (S.D.N.Y. 1992) ..................................................................... 8

*Nelson v. Paramound Commc'ns, Inc.,*
  872 F. Supp. 1242 (S.D.N.Y. 1994) ..................................................................... 9, 10

*P. Stolz Family Partnership L.P. v. Daum,*
  355 F.3d 92 (2d Cir. 2004) ..................................................................... 18

*Pani v. Empire Blue Cross Blue Shield,*
   152 F.3d 67 (2d Cir. 1998) ............................................................................ 8

*Pinter v. Dahl,*
   486 U.S. 622 (1988) ............................................................................... 20, 21

*Riley v. Merrill Lynch, Pierce, Fenner & Smith,*
   292 F.3d 1334 (11th Cir. 2002) ..................................................................... 7

*Rombach v. Chang,*
   355 F.3d 164 (2d Cir. 2004) ........................................................................ 10

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,*
   75 F.3d 801 (2d Cir. 1996) .......................................................................... 10

*Shain v. Duff & Phelps,*
   915 F. Supp. 575 (S.D.N.Y. 1995) .............................................................. 21

*Shaw v. Digital Equip. Corp.,*
   82 F.3d 1194 (1st Cir. 1996) .................................................................. 21, 22

*Wilson v. Saintine Exploration & Drilling Corp.,*
   872 F.2d 1124 (2d Cir. 1989) ...................................................................... 21

## STATUTES

15 U.S.C. § 77(a) ................................................................................................. 9

15 U.S.C. § 77k ............................................................................................ 15, 18

15 U.S.C. § 77k(e) ............................................................................................. 19

15 U.S.C. § 77k(e)(1) ......................................................................................... 19

15 U.S.C. § 77l(a)(2) .......................................................................................... 20

## RULES AND REGULATIONS

Fed. R. Civ. P. 12(b)(6) .................................................................................. 7, 22

## OTHER AUTHORITIES

Thomas Hazen, 2 Treatise on the Law of Securities Regulation § 7.7 (5th ed. 2005) ..... 21

## INTRODUCTION

On June 22, 2007, Care Investment Trust Inc. (Care) commenced an IPO with full and repeated warning of the risks involved. Following the IPO, the credit crisis struck; Care's stock dropped from its IPO price; and on September 18, 2007, Care was hit with a putative class action alleging violations of Sections 11, 12 and 15 of the Securities Act. Five months later, on February 19, 2008, two institutional Plaintiffs filed an Amended Complaint alleging the same violations.

While parroting the statutory formula of material misstatements or omissions, Plaintiffs fail to point to anything wrong with any statement in the Offering Documents. Stripped of its conclusions, all that remains of the Amended Complaint is an attempt by sophisticated institutional investors to be relieved of the risk they took when they invested in this IPO. The Amended Complaint fails to state a claim and should be dismissed with prejudice.

## STATEMENT OF FACTS

**The Parties**

Defendant Care is a real estate investment trust (REIT) that provides mortgage financing secured by healthcare facilities. (Registration Statement (RS) 1.)[1] Care was formed and is externally managed by CIT Healthcare LLC ("CIT Healthcare" or the "Manager"), a healthcare finance company that offers a full spectrum of financing solutions and related strategic advisory services to companies across the healthcare industry throughout the United States. (Id. 1-2.) CIT Healthcare is a wholly-owned subsidiary of CIT Group Inc., a commercial and consumer financing company providing financing and leasing products and services to clients in a wide variety of industries around the world. (Id.) The Amended Complaint also names three

---

[1] A copy of the Registration Statement is attached to the Declaration of Joel G. Chefitz in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint (Chefitz Decl.), Exhibit A hereto, as Exhibit 1.

individuals as Defendants based solely on their signatures to the Registration Statement. (Am. Compl. ¶¶ 8-10.) CIT Healthcare and CIT Group are not Defendants.

Lead Plaintiffs Alaska Hotel & Restaurant Employees Pension Trust Fund and Norfolk County Retirement System (collectively "Plaintiffs") allege that they purchased Care common stock pursuant or traceable to Care's initial public offering. (Id. ¶ 6.) Plaintiffs filed suit against Care under the Securities Act of 1933 on behalf of a putative class of plaintiffs consisting of all those who also purchased Care common stock pursuant or traceable to Care's IPO. (Id. ¶ 12.)

**Care's Initial Public Offering**

On June 22, 2007, Care held an IPO and offered 15 million shares of its common stock at $15.00 per share. (Id. ¶ 20.) Closing on June 27, 2007, the IPO generated net proceeds of $210 million for Care. (Id.)

In connection with the IPO, Care issued a Registration Statement and Prospectus (collectively "Offering Documents") describing the company's goals, business strengths and financing strategy and detailing the risks inherent in investing in Care. In the Summary section of the Offering Documents, Care described its business and explained the intended benefits of having CIT Healthcare as its Manager. (RS 1.)

Care also explained that, upon consummation of the IPO, CIT Healthcare would contribute to the REIT a portfolio of healthcare-related mortgage loans (Contributed Portfolio) in exchange for $204.3 million in cash and shares of Care's common stock then worth $78.8 million. (Id. 2.) As mortgage assets, the contributed loans are secured by the real properties described in the Offering Documents. (Id. 71-74.) Care disclosed that CIT Healthcare had determined that the fair market value of the assets in their Contributed Portfolio was $284.9

million as of March 31, 2007, which represented approximately 101.6% of the book value of

$280.3 million.[2] (Id. 3, 68.)

In the Risk Factors section of the Offering Documents, Care repeatedly alerted potential

investors:

> ***The contribution agreement for the initial assets was not negotiated on an arms-length basis and we did not receive independent appraisals of the initial assets to be contributed upon completion of this offering. As a result, the terms of the contribution agreement, including the consideration paid by us in exchange for the initial assets, may not be as favorable to us as if it was negotiated with an unaffiliated third party.***

> The contribution agreement was negotiated between related parties. As a result, we did not have the benefit of arms-length negotiations of the type normally conducted with an unaffiliated third party and the terms, including the terms of the contribution of the initial assets, may not be as favorable to us as if we did engage in negotiations with an unaffiliated third party. We have not obtained any independent third-party appraisals of the initial assets to be contributed to us and the determination of the fair market value of the initial assets upon the closing of this offering will be made by our Manager. . . . As a result, the consideration to be paid by us in exchange for the contribution of the assets upon the completion of this offering may exceed the fair market value of these assets. In addition, we may choose not to enforce, or to enforce less vigorously, our rights under the contribution agreement because of our desire to maintain our ongoing relationship with our Manager and CIT Group.

(Id. 16 (emphasis in original).) Care reiterated the same warnings in the section describing the

conflicts of interest inherent in its relationship with its Manager:

> The terms of the contribution agreement relating to the contribution of our initial assets were also not negotiated at arms-length, and those terms, including the consideration paid for our initial assets, may not be as favorable to us as if the contribution agreement had been negotiated with an unaffiliated party. Our Manager also faced conflicts of interest in determining which assets in its portfolio would be contributed to us as part of our initial assets since there were other assets in our Manager's portfolio that met the criteria in the investment guidelines and conflicts of interest policy described below and therefore could have been selected for contribution to us.

---

[2] Accounting for a reduction in fair market value of the initial assets from March 31, 2007, due to loan amortization, CIT Healthcare determined the fair market value of the Contributed Portfolio as of the closing of the Offering to be $283.1 million. (RS 3.)

3

(Id. 10.) Care again cautioned later in the Offering Documents that "our Manager's determinations of fair market value may differ materially from the values that would have been used had a ready market for these securities existed." (Id. 34.)

Care also reported in the Offering Documents that it hoped to use short-term financing in the form of warehouse facilities and that it was then negotiating a warehouse facility with two potential lenders: Column Financial Inc. and UBS Real Estate Securities Inc. (UBS Real Estate). (Id. 10.) Although negotiations were progressing, Care warned investors: "There is no assurance, however, that we will be able to close these facilities on terms favorable to us, if at all." (Id.)

Care also reported the possibility of using collateralized debt obligations, among other securitization structures, for longer-term funding. "For longer-term funding, we may utilize, among other financings, securitization structures, such as collateralized debt obligations (CDOs) or commercial mortgage-backed securities (CMBS), as well as other match-funded secured financing structures." (Id. 10.) As with the warehouse facilities, Care explicitly warned investors that the use of CDOs was not guaranteed:

> *We may not be able to acquire eligible investments for a securitization or other long-term secured financing issuance or may not be able to issue securities on attractive terms, either of which may require us to seek more costly financing for our investments or to liquidate assets....*
>
> In addition, conditions in the capital markets may make the issuance of a securitization [such as CDOs] less attractive to us when we have accumulated a sufficient pool of collateral. If we are unable to issue a securitization to finance these assets, we may be required to seek other forms of potentially less attractive financing or otherwise to liquidate the assets.

(Id. 33 (emphasis in original).)

The IPO was followed by difficult conditions in the credit markets. By September 18, 2007, the date the original Complaint in this case was filed, the price of Care stock had fallen to

4

$11.50.[3] (Chefitz Decl., Ex. 2.) In its Form 10-Q filed with the SEC on November 14, 2007, Care reported that, as it had warned in the Offering Documents, its pursuit of short-term financing in the form of warehouse facilities and long-term funding through the issuance of CDOs had been complicated by the intervening credit crisis.   Care closed on its negotiations with Column Financial Inc., but "the advance rates of our warehouse facility were less than the levels expected at inception of negotiations for the facility." (Nov. 10-Q at 12.)[4] The Company also reported that, as a result of turmoil in the CDO market, it would not be able "to successfully enter into a CDO on terms acceptable to us in the short term." (Nov. 10-Q at 12.) On February 19, 2008, when Plaintiffs filed their Amended Complaint, Care stock was trading at $10.64.[5] (Ex. 2.)

**The Allegations of the Amended Complaint**

Rather than acknowledging the intervening credit market crisis, Plaintiffs attribute the drop in Care's stock price to four alleged misstatements of material fact in the Offering Documents:

First, Plaintiffs claim that the Registration Statement was inaccurate because it painted Care's relationship with its Manager, CIT Healthcare, in positive terms. (Am. Compl. ¶¶ 23-24.)

Second, Plaintiffs contend that the *CIT Healthcare's* valuation of the Contributed Portfolio constituted an inaccurate statement of material fact by *Care*. (Id. ¶¶ 25-27.)  Plaintiffs base this contention on three allegations: (1) CIT Healthcare allegedly secured some of its loans with accounts receivable and made other, unsecured loans, although Plaintiffs do not allege that these "questionable loan practices" had any conceivable relevance to the real-estate-backed loans

---

[3] A court may take judicial notice of "well-publicized stock prices." *In re Merrill Lynch & Co., Inc. Research Reports*, 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000)).  Plaintiffs allege that at the time of the filing of the original Complaint, Care stock traded for $11.15 per share.  (Compl. ¶ 24.)
[4] A copy of the November 14, 2007 Form 10-Q is attached as Exhibit 3 to the Chefitz Decl.
[5] Plaintiffs allege that at the time of the filing of the Amended Complaint, Care stock traded "in a range of $10.00 to $10.50 per share." (Am. Compl. ¶ 40.)

5

included in the Portfolio and reported in the Offering Documents (id. ¶ 28(a)); (2) despite disclosing twice in the Offering Documents that the fair market value assigned by CIT Healthcare was 1.6% above book value, Plaintiffs claim that Care did not disclose the 1.6% spread between book and market values of the Contributed Portfolio until its Form 10-Q filed on August 14, 2007 (id. ¶ 28(b)); and (3) as of September 30, 2007 (over three months after the IPO), one of the loans in the portfolio was in default as a result of a billing dispute that was then resolved with full repayment of the loan and past due interest as of the filing of Care's Form 10-Q on November 14, 2007 (id. ¶ 31). These are the only grounds on which Plaintiffs seek to convert *CIT Healthcare's* valuation of the Contributed Portfolio into a material misrepresentation by *Care*; Plaintiffs dismiss the disclosed Risk Factors as a "boilerplate disclosure." (Id. ¶ 29.)

Third, Plaintiffs allege that Care's representation was inaccurate that it was negotiating warehouse facilities with two entities with "no assurance . . . that we will be able to close these facilities on terms favorable to us, if at all." (Id. ¶¶ 32-33.) It was misleading, Plaintiffs claim, because negotiations were not going well and because "UBS Real Estate's commercial real estate securities group was nothing more than a shell and the group was virtually non-existent." (Id.) Plaintiffs base this claim on three post-IPO SEC filings by Care that make no mention of UBS Real Estate in summarizing the progress of the negotiations with Column Financial and the closing of a warehouse facility. (Id. ¶¶ 34-36.)

Finally, Plaintiffs claim that Care's statement that it "may" utilize CDOs for longer-term funding was materially false and misleading "because the credit markets were beginning to dry up as a result of widespread and far reaching problems in the sub-prime market." (Id. ¶ 37-38.)

## RULE 12(b)(6) STANDARD

In order to survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007). In a 7-2 decision, the Supreme Court in *Twombly* rejected the overly deferential standard from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), under which "a wholly conclusory statement of claim would survive a motion to dismiss." *Twombly*, 127 S. Ct. at 1968-96. *Twombly* requires plaintiffs to support their claims with specific factual allegations that are sufficient "to raise a right to relief above the speculative level." *Id.* at 1965. The Supreme Court's decision was guided by its concern that "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases . . . ." *Id.* at 1967. The Court emphasized that "'a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Id.* (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)).[6] "The complaint must provide 'plausible grounds' for the allegations with 'enough facts to raise a reasonable expectation that discovery will reveal evidence' to support them." *In re Adelphia Commcn's Corp. Sec. & Derivative Litig.*, 2007 U.S. Dist. LEXIS 66911, at *3 (S.D.N.Y. Sept. 10, 2007) (quoting *Twombly*, 127 S. Ct. at 1965).

Although the substantive claim in *Twombly* was based on antitrust laws, the Supreme Court's decision interpreted Fed. R. Civ. P. 12(b)(6). Accordingly, the Second Circuit has declined to limit *Twombly*'s holding to the antitrust context, *ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2. (2d Cir. 2007), and courts within the Circuit have applied *Twombly* to claims under the Securities Act of 1933. *E.g., Caiafa v. Sea Containers, Ltd.*, 525 F.

---

[6] This same policy consideration was a prime motivator for enacting the Private Securities Litigation Reform Act of 1995, which was "designed to enable securities defendants to obtain early dismissal of frivolous class actions, and thereby avoid the high expense of discovery." *Riley v. Merrill Lynch, Pierce, Fenner & Smith*, 292 F.3d 1334, 1341 (11th Cir. 2002).

Supp. 2d 398, 406-08 (S.D.N.Y. 2007); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 382, 386-87 (S.D.N.Y. 2007); *In re Adelphia Commcn's Corp.*, 2007 U.S. Dist. LEXIS 66911, at *3.

In addition to well-pleaded facts in the complaint, this Court may consider: (1) documents that are attached to the complaint or incorporated in it by reference, *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71 (2d Cir. 1998); (2) documents that are integral to the complaint and relied on by Plaintiffs in bringing suit, even if they are not attached or incorporated by reference, *Cortec Indust., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); (3) "public disclosure documents required by law to be filed, and actually filed, with the SEC," *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); and (4) facts that a court may properly take judicial notice of under Fed. R. Evid. 201, *id.* at 773. Even under the pre-*Twombly* standard, "if the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the complaint." *Maywalt v. Parker & Parsley Petroleum Co.*, 808 F. Supp. 1037, 1046 (S.D.N.Y. 1992).

## ARGUMENT

Plaintiffs recite as conclusions the elements of a Section 11 claim, but they point to no actual statement or omission in the Offering Documents that could be construed as false or misleading. And the Amended Complaint's contentions, if not patent non sequiturs, are belied by the Offering Documents themselves and even those portions selectively quoted by Plaintiffs. Accordingly, Count I fails to state a claim Under Section 11. 15 U.S.C. § 77(a) (requiring that the registration statement contain an "untrue statement of material fact" or omission of material fact); *Nelson v. Paramound Commc'ns, Inc.*, 872 F. Supp. 1242, 1246 (S.D.N.Y. 1994)

(dismissing claim for failure to identify an actual misrepresentation). Count I also fails for the independent reason that the alleged misstatements could not have caused Plaintiffs' losses as a matter of law; the documents on which Plaintiffs rely do not contain any corrective disclosure, let alone one that could have caused the drop in stock price. *In re Merrill Lynch & Co., Inc. Research Reports*, 272 F. Supp. 2d at 254-55 (dismissing claim because alleged misstatements could not have caused plaintiffs' losses). For the same reasons, Counts II and III of the Amended Complaint fail to state a Section 12(a)(2) or Section 15 claim. Count II also fails to state a Section 12(a)(2) claim for the independent reason that Plaintiffs do not provide a factual basis for their allegation that the individual Defendants were sellers under the statute.

## I.    THE AMENDED COMPLAINT FAILS TO STATE A SECTION 11 CLAIM.

### A.    The Amended Complaint Fails To Identify Anything False or Misleading in the Offering Documents.

#### 1.    Relationship to Manager

Plaintiffs allege Securities Act violations based on Care's purportedly inaccurate statements regarding its relationship with its manager, CIT Healthcare. (Am. Compl. ¶¶ 23-24.) The Registration Statement recites Care's belief that it would benefit from CIT Healthcare's "experience and reputation in the healthcare finance industry, market knowledge and relationships with companies in the healthcare industry," which would enable CIT Healthcare to "originate, manage and create value from attractive investment opportunities" for Care. (RS 1.) Plaintiffs fail to point to any misstatement of fact in this description. *See Hinerfeld v. United Auto Group*, 1998 U.S. Dist. LEXIS 10601, at *14 (S.D.N.Y. July 15, 1998) (dismissing Section 11 claim because complaint "points to no actual misrepresentations contained within the prospectus" at the time the filing became effective); *Nelson*, 872 F. Supp. at 1246 (same).

9

In any event, Plaintiffs cannot convert Care's optimistic opinion about its relationship with its Manager into a Section 11 violation. It is well settled that a complaint alleging violations of the securities laws may not rely on statements that constitute opinion, puffery or ordinary expressions of corporate optimism. *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 58-59 (2d Cir. 1996); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996). "[M]ere opinions and predictions of future performance are not actionable under the securities laws unless 'they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them.'" *Faulkner v. Verizon Commc's, Inc.*, 156 F. Supp. 2d 384, 398 (S.D.N.Y. 2001) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)). "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (citation omitted).

Nor can Plaintiffs bootstrap Care's optimism about its relationship with its Manager into a Section 11 violation by relying on their conclusory allegations that CIT Healthcare had engaged in "questionable loan practices" prior to the IPO. (Am. Compl. ¶ 24.) As explained below, those allegations are independently insufficient.

2. **Contributed Portfolio**

a. **Care Made No Representation of the Value of the Contributed Portfolio.**

Plaintiffs claim that Care misrepresented the value of the Contributed Portfolio. But Plaintiffs point to nothing misleading about Care's actual statements that (1) Care's manager would transfer a portfolio of real estate mortgage assets upon consummation of the IPO; (2) Care believed that the diversity of the portfolio would be a strength; and (3) *CIT Healthcare* ascribed a fair market value of $283.1 million to the Contributed Portfolio.  Instead, Plaintiffs assume statements that Care never made and then try to knock down their own straw men.

In "a wholly conclusory statement" proscribed by *Twombly*, Plaintiffs contend the statements are misleading because the Contributed Portfolio purportedly contained a "material number of extremely high credit risk loans which had been materially overvalued *by Care Investment*" and it was "materially misleading to describe the Contributed Portfolio as having a 'fair market value' of $283.1 million when its 'fair market value' was materially less than that amount." (Am. Compl. ¶ 27 (emphasis added).)  Plaintiffs' contention is belied by the Offering Documents and by the Amended Complaint itself.  Care concededly made no representation of the value of the Contributed Portfolio, much less overvalue it.  As Care disclosed in the Offering Documents, and as Plaintiffs acknowledge in their Amended Complaint, the valuation of the Contributed Portfolio was determined by *CIT Healthcare—not Care.* (RS 16; Am. Compl. ¶¶ 29, 31.)

Plaintiffs' only response to these and the Registration Statements' many other warnings is to label them "boilerplate disclosure." (Am. Compl. ¶ 29.)  Far from being "boilerplate," Care's bold, italicized and repeated disclosures expressly warned investors that the Manager's valuation

11

of the Contributed Portfolio was not independently verified and the consideration paid for the

Contributed Portfolio might exceed fair market value:

> *The contribution agreement for the initial assets was not negotiated on an*
> *arms-length basis and we did not receive independent appraisals of the initial*
> *assets to be contributed upon completion of this offering. As a result, the terms*
> *of the contribution agreement, including the consideration paid by us in*
> *exchange for the initial assets, may not be as favorable to us as if it was*
> *negotiated with an unaffiliated third party.*
>
> We have not obtained any independent third-party appraisals of the initial assets
> to be contributed to us and the determination of the fair market value of the initial
> assets upon the closing of this offering will be made by our Manager. . . . As a
> result, the consideration to be paid by us in exchange for the contribution of the
> assets upon the completion of this offering may exceed the fair market value of
> these assets. In addition, we may choose not to enforce, or to enforce less
> vigorously, our rights under the contribution agreement because of our desire to
> maintain our ongoing relationship with our Manager and CIT Group.

(RS 16 (emphasis in original).)

> b.    **Even if Care Had Represented the Value, Plaintiffs' Claims**
>       **Would Still Fail.**

Leaving aside Plaintiffs' attempted sleight of hand to convert CIT Healthcare's valuation

into a representation by Care and to dismiss repeated disclosures as "boilerplate," their

contention that the Contributed Portfolio was materially overvalued rests on three unsupported

allegations: (1) CIT Healthcare had poor loan underwriting and questionable loan practices for

non-mortgage financing; (2) Care failed to disclose that CIT Healthcare's fair market value for

the Contributed Portfolio included a 1.6% premium over book value; and (3) at the time of the

IPO, interest on a $26 million loan from the Contributed Portfolio was in dispute and not being

paid.    Each of Plaintiffs' allegations is belied by the Offering Documents and, contrary to

*Twombly*, implausible on its face.

**CIT Healthcare's Loan Practices:** Plaintiffs'    allegations    of    "questionable    loan

practices" are on their face irrelevant to a Contributed Portfolio of "real estate mortgage assets."

(Am. Compl. ¶ 25.) According to Plaintiffs, "CIT Healthcare would issue a loan to a healthcare company based on and collateralized by a portion of the outstanding accounts receivable balance reported by the healthcare company to CIT Healthcare" without "properly verifying the accounts receivable information." (Am. Compl. ¶ 28(a).) Plaintiffs also contend that CIT Healthcare issued "a large uncollateralized loan to a company that had previously obtained a smaller, collateralized loan[,]" without securing the second loan. (Id.)

Yet Plaintiffs do not allege that there is a single receivable-backed or unsecured loan in the Contributed Portfolio. Plaintiffs' own Amended Complaint states that the assets in the Contributed Portfolio are "real estate mortgage assets secured by several different types of healthcare facilities." (RS.2; Am. Compl. ¶ 25; *see also* RS 71-74 (describing real properties that secure mortgage assets).) Plaintiffs' allegations about receivable-backed loans are irrelevant to real estate mortgage assets and are thus insufficient "to raise a right to relief above the speculative level." *Twombly*, 127 S. Ct. at 1965.

**1.6% Spread Between Book and Market Values:** Plaintiffs are flat out wrong in claiming that "months after the IPO, Care disclosed for the first time in its Form 10-Q, dated August 14, 2007, that CIT Healthcare had received a premium of $4.6 million in connection with the sale of the Contributed Portfolio." (Am. Compl. ¶ 28(b).) The Offering Documents disclose the 1.6% premium not once, but twice. The Registration Statement expressly states:

> Our Manager determined the fair market value of the assets to be contributed was approximately $284.9 million as of March 31, 2007, which represents 101.649% of book value of $280.3 million, the principal balance of the initial assets as of March 31, 2007. As of the closing of this offering and the contribution of the initial assets to us, the fair market value of the assets to be contributed to us, as determined by our Manager, will be $283.1 million.

(RS 3.) Virtually the same statement is repeated later. (Id. 68.) Plaintiffs either missed or chose to ignore both disclosures.

13