# Memorandum – Part 2

**"Past Due" Loan:** Plaintiffs do not claim any inaccuracy in Care's statement that, as of March 31, 2007, none of the loans in the Contributed Portfolio was delinquent or in default. (Am. Compl. ¶ 30.) Instead, Plaintiffs contend that, at the time of the IPO in June 2007, there was a $26 million loan from the Contributed Portfolio that was past due. (Am. Compl. ¶ 31.) Purporting to base their claim on the November 2007 10-Q filed after the IPO, Plaintiffs state, "this loan—which represented nearly 10% of the Contributed Portfolio's assets, as valued by CIT Healthcare—was in default at least as of the end of June 2007, when the IPO was completed." (Am. Compl. ¶ 31.) This claim is wrong on its face and disingenuous. It is based on Plaintiffs' misleading quotation and their miscounting of the calendar.

First, Plaintiffs have performed a misleading surgical excision of the disclosure in the November 10-Q. Plaintiffs claim Care then "disclosed that 'one loan [in the Contributed Portfolio] with a carrying value of approximately $26 million was technically past due 90 days with respect to interest payments as a result of a billing dispute.'" (Am. Compl. ¶ 31.) But Plaintiffs' creative editing is more revealing for what they have omitted from their pleading:

> *As of September 30, 2007*, one loan with a carrying value of approximately $26 million was technically past due 90 days with respect to interest payments as a result of a billing dispute. *This dispute was subsequently resolved and Care received full payment for the past due interest.* All other loans were performing in accordance with their terms as of September 30, 2007.

(Nov. 10-Q at 12 (emphasis added).) Nothing in the full and actual disclosure suggests that the loan was in default "at the time of the IPO," as Plaintiffs contend, much less on March 31, 2007.

Second, whether inadvertently or not, Plaintiffs' have miscounted. The November 10-Q discloses that the interest payment was 90 days past due "[a]s of September 30, 2007," Plaintiffs' first deletion from their quotation. The plain language of the 10-Q means that the interest would have first been due on July 2, 2007. Conversely, that statement means that no interest payment was past due as of June 22, 2007, the date the Prospectus became effective, let alone in default.

14

Plaintiffs' attempt to cut and paste the November 10-Q to fit their contention that a loan was in default—whether on March 31, June 22, or June 27, 2007—eviscerates their credibility.[7]

### 3.  Warehouse Facilities

Plaintiffs similarly point to nothing false or misleading in Care's disclosure regarding its warehouse facility negotiations. (Am. Compl. ¶¶ 32-36.) Rather than attack Care's actual statement, Plaintiffs attack a statement of their own creation by alleging that Care "did not have two lenders lined up to provide warehouse facilities, but rather was struggling to convince a single lender to extend it a warehouse facility on favorable terms." (Id. ¶ 33.) Plaintiffs' allegation is belied by the actual disclosure in the Registration Statement:

> We are currently negotiating a warehouse facility with Column Financial Inc., . . . which we expect to be in place shortly after consummation of this offering. We are also currently negotiating a warehouse facility with UBS Real Estate Securities, Inc., . . . which we expect to be in place soon after consummation of this offering. *There is no assurance, however, that we will be able to close these facilities on terms favorable to us, if at all.*

(RS 10 (emphasis added); Am. Compl. ¶ 32.) The statement not only makes no promise about the likely success of the negotiations or whether Care expected to obtain favorable rates, but it expressly warns investors of the possible failure of the negotiations.

---

[7] Plaintiffs' attempt to base their claim on statements in the Contribution Agreement (Am. Compl. ¶ 30) also fails. The Contribution Agreement, which is attached as Exhibit 4 to the Chefitz Decl., is between Care and CIT Real Estate Holding Corporation (CIT Holding), a wholly-owned subsidiary of CIT Group. CIT Group contributed the initial assets to CIT Holding, which then immediately contributed the assets to Care. (RS 2.)

    Plaintiffs' reliance upon the Contribution Agreement fails for at least two reasons. First, as explained above, Plaintiffs allege no facts showing any inaccuracy in *CIT Holding's* representation in the Contribution Agreement that, "*[t]o the best of CIT Holding's knowledge,* there is no material default, breach, violation or event of acceleration existing under any Initial Asset . . . ." (Contribution Agreement § 7(j) (emphasis added to denote phrase omitted in Am. Compl. ¶ 30).) Second, the plain language of Section 11 limits claims brought pursuant to that section to those arising out of material omissions or misstatements in the written registration statement or prospectus itself—misstatements or omissions by *Care*. 15 U.S.C. § 77k. The representation excerpted in the Amended Complaint was made by *CIT Holding*, not Care, and for the benefit solely of Care:

> This Agreement is solely for the benefit of CIT Holding and the Company and nothing contained in this Agreement shall be deemed to confer upon anyone other than CIT Holding and the Company any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.

(Contribution Agreement § 21(c) at 10.)

Plaintiffs concede that Care successfully secured a warehouse facility from Column Financial (Am. Compl. ¶ 36), but they contend without factual support that Care was negotiating with only one lender at the time of the IPO. (Am. Compl. ¶ 33.) Plaintiffs base their contention instead on the bald assertion that, at the time of the IPO, "UBS Real Estate's commercial real estate securities group was nothing more than a shell and the group was virtually non-existent." (Id.) This claim is not only speculative, but contradicted by public disclosure documents filed with the SEC. These SEC filings demonstrate that, far from being "virtually non-existent," UBS Real Estate was involved in multi-million dollar commercial real estate transactions around the time of the IPO. (Chefitz Decl., Exs. 5-6.)[8]

Plaintiffs also point to two post-IPO SEC filings by Care as a basis for their claim that Care was "experiencing significant difficulties securing warehouse lines on acceptable terms" at the time of the IPO. (Am. Compl. ¶¶ 34-36.) In its August 14, 2007 Form 10-Q, Care stated that "our efforts to negotiate our warehouse facilities on terms favorable to us are taking longer than expected" (Aug. 10-Q at 15),[9] and in its Form 10-Q filed on November 17, 2007, it stated that "the advance rates of our warehouse facility are less than the levels expected at inception of negotiations for the facility . . . ." (Nov. 10-Q at 12.) These two filings provide no support for Plaintiffs allegation for two reasons.

---

[8] The attached SEC filings demonstrate that UBS Real Estate was involved in significant transactions before and after the IPO.
    Exhibit 5 is a Form 8-K filed by J.P. Morgan Chase Commercial Mortgage Securities Trust 2007LDP10 on April 13, 2007, which reports a Mortgage Loan Purchase Agreement entered into with UBS Real Estate on March 1, 2007. (Chefitz Decl., Ex. 5, 8-K at 3.) The terms of the Mortgage Loan Purchas Agreement state that UBS Real Estate sold a number of mortgage loans for $1,295,179,893.21. (Chefitz Decl., Ex. 5, Purchase Agreement at 2.)
    Exhibit 6 is a Form 8-K filed by J.P. Morgan Chase Commercial Mortgage Securities Trust 2007-LDP12 on September 14, 2007, which reports a Mortgage Loan Purchase Agreement entered into with UBS Real Estate on August 1, 2007. (Chefitz Decl., Ex. 6, 8-K at 3.) The terms of the Mortgage Loan Purchase Agreement state that UBS Real Estate sold a number of mortgage loans for $607,553,819.89. (Chefitz Decl., Ex. 6, Purchase Agreement at 2.)
[9] A copy of the August 14, 2007 Form 10-Q is attached as Exhibit 7 to the Chefitz Decl.

First, the disclosures in the 10-Q Forms are entirely consistent with the Registration Statement, which explicitly warned that the negotiations may not be successful. Second, the filings post-date the IPO. The August 10-Q was filed well after the IPO, and the paragraphs Plaintiffs cite expressly describe the status of warehouse negotiations since *June 30, 2007*, a week after the IPO. And the November 10-Q, rather than disclosing some misrepresentation concerning pre-IPO difficulties in securing warehouse lines, reports that Care was successful in obtaining warehouse facilities, albeit at lower levels than originally expected. "The statements in a prospectus are judged as of the effective date of the offering," *Hinerfeld*, 1998 U.S. Dist. LEXIS 10601, at *13, and the 10-Q Forms say nothing about the state of negotiations at the time of the IPO.

### 4. CDOs

Plaintiffs point to nothing false or misleading in Care's statement that it "may" utilize CDOs for longer-term funding. (Am. Compl. ¶ 37.) Plaintiffs claim that "the credit markets were beginning to dry up as a result of widespread and far reaching problems in the sub-prime market." (Am. Compl. ¶ 38.) But even if this allegation were true, it would not render Care's statement false or misleading. Care made no guarantee about the state of the CDO market or that CDOs would be used; to the contrary, Care expressly warned investors that "conditions in the capital markets may make issuance of a securitization [such as CDOs] less attractive" in the future. (RS 33.) Care made clear that CDOs were but one of a number of securitization structures it "*may* utilize, among other financings." (Id. 10.)

Plaintiffs' reliance on the November 10-Q is yet again flawed. First, the SEC filing is irrelevant because it discussed the possible use of CDOs *after* the IPO. *Hinerfeld*, 1998 U.S. Dist. LEXIS 10601, at *13. The quoted section of the November 10-Q reports that, due to recent turmoil in the CDO market, "we do not believe that we will be able to successfully enter into a

17

CDO on terms acceptable to us in the short term." (Nov. 10-Q at 12; Am. Compl. ¶ 39.) Second, this statement in no way conflicts with the Registration Statement. Rather, it describes the collapse of the CDO market in the wake of the subprime mortgage crisis, which was the type of risk Care disclosed to investors. In any event, prediction of future events may not support a Section 11 claim of misstatements of fact at the time of the IPO. *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004).

### B. The Alleged Misstatements Could Not Have Caused Plaintiffs' Losses.

Even assuming misstatements of fact in the Offering Documents, this Court should nonetheless dismiss the Section 11 claim because, as a matter of law, the assumed misstatements could not have caused Plaintiffs' losses. Under the securities laws, Plaintiffs may recover only economic losses proximately caused by a subsequent disclosure correcting the misstatements. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Although negative causation is expressly recognized as an affirmative defense, 15 U.S.C. § 77k(e), Section 11 claims may be dismissed if it is apparent from the face of the complaint that the plaintiff cannot recover his or her losses because they occurred prior to the corrective disclosure of the alleged misstatements or omissions. *In re Merrill Lynch & Co., Inc. Research Reports*, 272 F. Supp. 2d at 254-55; *Davidco Investors, LLC v. Anchor Glass Container Corp.*, 2006 U.S. Dist. LEXIS 11527, at *74-79 (M.D. Fla. Mar. 6, 2006); s*ee also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000) (citing negative causation as alternative basis for dismissing Section 11 claims).

The damages cut-off is the date the original Complaint was filed, rather than the date of the Amended Complaint as urged by Plaintiffs. (Am. Compl. ¶ 40.) Section 11 specifies that the

18

"time such suit was brought" shall be used to compute damages.[10] 15 U.S.C. § 77k(e)(1). This suit was brought on September 18, 2007, when the original Section 11 claim was filed, rather than the filing of the Amended Complaint, which simply added allegations to the same Section 11 claim. See *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525 (8th Cir. 1996); *In re AFC Enterprises, Inc. Sec. Litig.*, 348 F. Supp. 2d 1363 (N.D. Ga. 2004).

Plaintiffs fail to identify any corrective disclosures prior to September 18, 2007, that could have caused their losses. The only pre-lawsuit document, the Form 10-Q filed on August 14, 2007, does not "correct" anything. Despite Plaintiffs' characterization of certain passages in the August 10-Q as corrective disclosures (Am. Compl. ¶¶ 28(b), 34-35), the statements Plaintiffs quote are fully consistent with the Offering Documents. First, the $4.6 million spread between market and book value was not a new disclosure in the August 10-Q (Am. Compl. ¶ 28(b)); as Plaintiffs either overlooked or ignored, this spread was disclosed twice in the Prospectus. Second, even the most generous reading of Care's statement in the August 10-Q that warehouse facility negotiations "are taking longer than expected" (Am. Compl. ¶¶ 34-35) in no way "corrects" representations in the Registration Statements that Care was negotiating with "no assurance, however, that we will be able to close these facilities on terms favorable to us, if at all." (Id. ¶ 32.)

Plaintiffs also rely upon two SEC documents that were filed after the damages cut-off date and therefore could not have caused Plaintiffs' losses. But even if the Court considers these filings, the analysis does not change. Plaintiffs rely upon the October Form 8-K for what it *does not* say: Plaintiffs claim the filing is significant because Care "made no mention of UBS Real Estate" (Am. Compl. ¶ 36), which discloses nothing. And as discussed above, the statements in

---

[10] The other two measures of damages provided apply when the security has been sold, either before or after the action is filed. 15 U.S.C. § 77k(e). Plaintiffs in this case are using the filing date to compute damages.

19

the November 10-Q about the results of the warehouse negotiations and the use of CDOs are entirely consistent with the Registration Statement.

Because the documents cited by Plaintiffs contain no corrective disclosures, the Complaint on its face demonstrates that the alleged misstatements—as opposed to the market downturn—could not have caused Plaintiffs' losses.

## II. THE AMENDED COMPLAINT FAILS TO STATE SECTION 12 AND 15 CLAIMS.

Because the elements for liability under Section 11 and Section 12 are "essentially the same," Plaintiffs' Section 12(a)(2) claim must be dismissed in its entirety for the same reasons as their Section 11 claims. *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 584 (E.D.N.Y. 1971). In addition, Plaintiffs fail "to state a claim to relief that is plausible on its face." *Twombly*, 127 S. Ct. at 1974, against the individual Defendants for the independent reason that the Plaintiffs provide no factual basis for their allegation that the individual Defendants were sellers as required by Section 12(a)(2).

Section 12(a)(2) establishes liability for persons who offer or sell securities by means of communications that include untrue or misleading statements or omissions. 15 U.S.C. § 77l(a)(2). In *Pinter v. Dahl*, 486 U.S. 622, 647-48 (1988), the Supreme Court held that a person is a "seller" under the predecessor of 12(a)(1) if the person either: (1) passes title to the securities to the plaintiff, or (2) solicits the purchase, motivated in part by his own financial interests.[11] In the case of individuals who do not pass title to the securities, the plaintiff must sufficiently allege that the defendants solicited the purchase:

---

[11] *Pinter* addressed the meaning of "seller" under the predecessor of Section 12(a)(1). The Second Circuit regards the "offers or sells" language in the predecessor to 12(a)(1) to have the same meaning as in the predecessor to

(continued...)

20

> Courts should avoid taking an overly expansive approach to liability under section 12, despite the temptation to do so. In order to impose liability, the defendants must have been actively and directly involved in the sale. The defendant's activities in soliciting the sale must have been based on a self-interested financial motive.

Thomas Hazen, 2 Treatise on the Law of Securities Regulation § 7.7 (5th ed. 2005). The Amended Complaint fails this test.

"[N]either the signing of a prospectus, nor the unsupported assertion of solicitation is sufficient to qualify an individual as a 'seller' for the purposes of Section 12." *In re Metro. Sec. Litig.*, 2007 U.S. Dist. LEXIS 84392, at *81 (E.D. Wash. Nov. 5, 2007); *accord Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996) ("Under *Pinter* . . . neither involvement in preparation of a registration prospectus nor participation in 'activities' relating to the sale of securities, standing alone, demonstrates the kind of relationship between defendant and seller that could establish statutory seller status."); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1100 (C.D. Cal. 2003); *In re Musicmaker.com Sec. Litig.*, 2001 U.S. Dist. LEXIS 251118, at *45-48 (C.D. Cal. June 4, 2001); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1120 (D. Nev. 1998). Plaintiffs "must at a minimum allege facts indicating that [the defendants] solicited [their] purchase" of the stock. *Maher v. Durango Metals, Inc.*, 144 F.3d 1032, 1307 (10th Cir. 1998).

Plaintiffs' conclusion that the individual Defendants are sellers by virtue of their alleged assistance in preparing the Prospectus and soliciting purchasers is too speculative to satisfy this requirement. (Am. Compl. ¶¶ 52-53.) Plaintiffs fail to allege minimal facts showing that the individual Defendants solicited the purchase; the allegations of seller status are nothing more than the types of "labels and conclusions" that *Twombly* said "will not do." *Twombly*, 127 S. Ct.

---

12(a)(2). Thus *Pinter*'s definition of "seller" applies to 12(a)(2) as well. *Shain v. Duff & Phelps*, 915 F. Supp. 575, 581 (S.D.N.Y. 1995) (citing *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989)).

at 1964-65; *see also In re Metro. Sec. Litig.*, 2007 U.S. Dist. LEXIS 84392, at *81 (noting that *Twombly* "emphasizes the importance of alleging facts at the pleading stage" and dismissing the claim).[12]

In addition, because the underlying allegations of primary violations of Sections 11 and 12(a)(2) are insufficient, Plaintiffs' Section 15 claim also must be dismissed. *See In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 701 (S.D.N.Y. 2000).

## CONCLUSION

Plaintiffs, sophisticated institutional investors, took the market risk when they bet on Care's IPO. And they were warned explicitly and repeatedly by Care of that and every other risk of which they complain. Plaintiffs fail to point to a single misstatement or omission in the Offering Documents. Their attempt to shift the risk of their bet to Care fails to state a claim under the Securities Act against either Care or the individual Defendants. The Amended Complaint should be dismissed with prejudice.

---

[12] Even under the pre-*Twombly* standard, Plaintiffs allegations are similar to those in other cases dismissed on Rule 12(b)(6) motions. *See Maher*, 144 F.3d at 1307; *Shaw*, 82 F.3d at 1216; *In re Infonet Servs. Corp.*, 310 F. Supp. 2d at 1101-02.

| | |
|---|---|
| DATED: April 22, 2008 | McDERMOTT WILL & EMERY LLP |
| | |
| | /s/ Joel G. Chefitz |
| | Joel G. Chefitz (JC5517) |
| | 227 West Monroe Street, Suite 4400 |
| | Chicago, Illinois 60606 |
| | 312/372-2000 |
| | 312/984-7700 (fax) |
| | |
| | Andrew D. Kaizer (AK9730) |
| | 340 Madison Avenue |
| | New York, NY 10173-1922 |
| | 212/547-5400 |
| | 212/547-5444 (fax) |
| | *Attorneys for Care Investment Trust Inc., F. Scott Kellman, Robert O'Neill and Flint D. Besecker* |

CHI99 4969841-2.079947.0014