# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIARWOOD INVESTMENTS, INC., Individually and On Behalf of All Others Similarly Situated | : : : Civil Action No. 1:07-cv-08159-LLS : : CLASS ACTION |
| Plaintiff, | : : |
| CARE INVESTMENT TRUST INC., F. SCOTT KELLMAN, ROBERT O'NEILL and FLINT D. BESECKER, | : : : : : |
| Defendants. | : : |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND OF THE ACTION ................................................................... 1

III.  STATEMENT OF FACTS .................................................................................... 4

IV.   LEGAL STANDARD ............................................................................................ 7

    A.   The Complaint States a Claim Under Section 11 of the Securities Act .......................... 9

        1.   Elements of a Claim Under Section 11 .................................................... 9

        2.   The Offering Documents Were Negligently Prepared  and Contain
Untrue Statements and Omissions ........................................................... 10

            (a)   Untrue Statements About the Value of the Contributed
Portfolio ........................................................................................ 10

                (i)    Defendants Cannot Escape Liability by Relying on the
Manager's Conflict of Interest ............................................. 11

                (ii)   Defendants Failed to Address the Allegations that the
Contributed Portfolio was Overvalued and Impaired as a
Result of the Manager's Poor Loan Underwriting and
Questionable Loan Practices .................................................. 13

            (b)   Untrue Statements About Warehouse Facility Financing .............................. 15

            (c)   Untrue Statements About the Manager ........................................... 18

            (d)   Untrue Statements About the Use of Securitizations ...................................... 19

        3.   Defendants Knew or Should Have Known of the Undisclosed Risks ................... 22

            (a)   The Credit Crisis Is Not An Excuse ................................................ 22

        4.   The Misleading Statements and Omissions Caused Substantial Losses ................ 23

    B.   The Amended Complaint Adequately Pleads Section 12 and 15 Claims ..................... 25

        1.   The Amended Complaint Adequately Pleads that the Individual
Defendants were Sellers Under the Statute ........................................... 25

V.    LEAVE TO REPLEAD ......................................................................................... 27

VI.   CONCLUSION ...................................................................................................... 27

# TABLE OF AUTHORITIES

## CASES

*In re Adelphia Commc'ns Corp.*,
   No. 03 MD 1529, 2006 WL 2463355 (S.D.N.Y. Aug. 23, 2006)..........................................9

*Bell Atl. Corp. v. Twombly*,
   127 S. Ct. 1955 (2007) ....................................................................................................8

*Chesapeake Constr. Corp. v. Rodman*,
   261 A.2d 156 (Md. 1970).................................................................................................12

*Degulis v. LXR Biotechnology, Inc.*,
   928 F. Supp. 1301 (S.D.N.Y. 1996)................................................................................26

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005).............................................................................26

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   411 F. Supp. 2d 377 (S.D.N.Y. 2006).........................................................................9, 23

*Globus v. Law Research Serv., Inc.*,
   418 F.2d 1276 (2d Cir. 1969).........................................................................................23

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ...............................................................................................1, 9, 10

*In re Initial Pub. Offering Sec. Litig.*,
   358 F. Supp. 2d 189 (S.D.N.Y. 2004).............................................................................21

*In re Initial Pub. Offering Sec. Litig.*,
   544 F. Supp. 2d 277 (S.D.N.Y. 2008)...........................................................................8, 9

*In re Integrated Res. Real Estate Ltd., P'ships Sec. Litig.*,
   815 F. Supp. 620 (S.D.N.Y. 1993).................................................................................17

*Levine v. AtriCure, Inc.*,
   508 F. Supp. 2d 268 (S.D.N.Y. 2007).............................................................................23

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
   65 F.3d 1044 (2d Cir. 1995)...........................................................................................23

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y 1999)............................................................................9, 16

*In re NYSE Specialists Sec. Litig.*,
   503 F.3d 89 (2d Cir. 2007)...............................................................................................8

*P. Stolz Family Partnership L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004) ................................................................21

*Pinter v. Dahl*,
  486 U.S. 622 (1988) ...............................................................25, 26

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996) .................................................16

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) ...............................................................8, 22

*In re Scottish Re Group Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007) .........................................27

*Strougo v. Bassini*,
  282 F.3d 162 (2d Cir. 2002) ........................................................12

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) .........................................16

*In re WRT Energy Sec. Litig.*,
  No. 96 Civ. 3610, 2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005) ...............23, 24, 25

*In re Worldcom Inc. Sec. Litig.*,
  No. 02-3288, 2004 WL 1435356 (S.D.N.Y. June 28, 2004) ......................8

## STATUTES

15 U.S.C. § 77k(a) .............................................................................9

15 U.S.C. § 77k(a)(1) ........................................................................9

15 U.S.C. § 77k(a)(2) ........................................................................9

15 U.S.C. § 77k(a)(3) ........................................................................9

15 U.S.C. § 77k(a)(4) ........................................................................9

15 U.S.C. § 77k(a)(5) ........................................................................9

15 U.S.C. § 77l(a)(2) .......................................................................10

**RULES**

Fed. R. Civ. P. 8(a)(2)..................................................................................................8

Fed. R. Civ. P. 15(a)...................................................................................................27

## I.    <u>INTRODUCTION</u>

The claims in this action were brought under Sections 11, 12(a)(2) and 15 of the

Securities Act of 1933 ("Securities Act") by Lead Plaintiffs Alaska Hotel & Restaurant

Employees Pension Trust Fund and Norfolk County Retirement System ("Plaintiffs").  The

Amended Class Action Complaint ("Complaint") alleges defendants Care Investment Trust, Inc.,

("Care" or the "Trust"), and three key executives[1] (collectively "Defendants") made untrue

statements in the Registration Statement and Prospectus ("Prospectus" or "Offering Documents")

filed with the Securities and Exchange Commission ("SEC") in connection with Care's initial

public offering of stock ("IPO").

This is not a fraud claim. Accordingly, it is subject to review under Rule 8 and as such,

Plaintiffs' pleading burden is "relatively minimal." *See Herman & MacLean v. Huddleston*, 459

U.S. 375, 382 (1983).  Plaintiffs need only plead a material misstatement or omission to establish

their *prima facie* case. *Id*.  The Complaint adequately pleads that Defendants made numerous

material misstatements in the Offering Documents regarding Care's investment strategy, access

to capital and the quality of the assets Care purchased from its Manager, CIT Healthcare.

## II.    <u>BACKGROUND OF THE ACTION</u>

Care became a publicly traded company when it completed its initial public offering

("IPO") of stock on June 22, 2007.  Investors in Care's IPO thought they were buying shares in a

---

[1] The Individual Defendants are F. Scott Kellman ("Kellman"), Care's Chief Executive Officer ("CEO") and President and managing director of CIT Healthcare, Robert O'Neil ("O'Neil"), Care's Chief Financial Officer ("CFO"), Treasurer and Secretary, and Senior Vice President, Finance and Accounting at CIT, and Flint D. Besecker ("Besecker"), the Vice-Chairman of Care's Board of Directors and President of CIT Healthcare (collectively "Individual Defendants"). Each of the Individual Defendants signed the Offering Documents.

new venture with a sound growth strategy[2] formed by a proven industry veteran – the $79 billion

commercial consumer and finance company, CIT Group, Inc. ("CIT").  The Prospectus described

Care's growth strategy as being built on the purported skill, industry experience and unique

access of Care's Manager, CIT Healthcare LLC ("CIT Healthcare" or the "Manager").

According to the Prospectus, Care needed certain building blocks to execute this growth strategy.

    The first building block Care needed was access to capital.  The Prospectus described this

as a two step process; the first step being Care's purchase of a portfolio of existing real estate

mortgage assets from its Manager (the "Contributed Portfolio"), and the second step being

obtaining lines of credit secured by the Contributed Portfolio. Care would then use the borrowed

funds to make additional investments.  That is how the Prospectus represented Care would grow

its business.

    According to the Prospectus, Care was in advanced negotiations at the time of the IPO

with lending subsidiaries of two of its underwriters, Credit Suisse and UBS Investment Bank, to

secure credit lines called "Warehouse Facilities" secured by the Contributed Portfolio as

collateral.  Also according to the Prospectus, Care expected the Warehouse Facilities "***to be in***

***place"*** soon after the consummation of the IPO. (emphasis added).  An essential cog in Care's

purported growth strategy was to borrow from the Warehouse Facilities and use the funds to take

advantage of the Manager's purported unique access to deals, acquire new investments and grow

the business. That is what investors in Care were told they were buying.

    The investment strategy, however, never came to fruition.  Instead, after Care's IPO, and

after CIT Healthcare reaped over $200 million cash from the offering and the underwriters

---

[2] Investors were not buying a pool of existing assets – indeed CIT would have been fortunate to be able to sell investors their portfolio of "illiquid" investments.

reaped $15 million, Care's forward progress came to an abrupt halt.  On August 14, 2007, just *seven weeks* after the IPO, Care made the first in a series of announcements revealing that, in reality, its stated future growth plan was not viable.  On that date, Care revealed that negotiations with the two warehouse lenders (both subsidiaries of the IPO underwriters) were not as certain or advanced as Care represented in the Prospectus.  The surprise announcement caused Care's stock price to tumble as analysts recognized that the delay would push out the timing of growth.

Over the next several months Care would announce that it was completely abandoning the growth strategy it laid out in the Prospectus, and was, for the most part, living on the income generated by the Contributed Portfolio.  The unique access to investment opportunities Care promised never materialized, nor did Care's promised growth strategy.  In fact, Care was unable to close on a Warehouse Facility on terms that gave it ready access to capital.  Instead, Care was only able to enter into an agreement with one of the warehouse lenders, Column Financial Inc. ("Column") on unfavorable terms.  Rather than a line of credit, the deal was structured as an asset purchase agreement that gave Column the sole discretion whether to purchase Care's assets at a very deep discount.  The terms of the agreement reflect both on the truth of Care's representations about the likelihood of obtaining warehouse financing, and the value and quality of the assets in the Contributed Portfolio Care intended to use as collateral.

It appears that Care was primarily a vehicle to convert an illiquid pool of assets into cash for CIT, and that Care's purported forward "investment strategy" was little more than an afterthought.  While CIT and the underwriters reaped millions from the IPO, Care's stockholders did not fair as well, losing a substantial part of their investment within weeks**.**  Investor lawsuits followed Care's revelations challenging the veracity of numerous statements made in the Prospectus.

Defendants now seek dismissal of Plaintiffs' claims. Defendants' strategy in their motion to dismiss ("MTD") is to focus on only certain allegations in the Complaint (while ignoring others), and argue that these selected allegations *could* possibly be explained by events subsequent to the IPO. Defendants then argue that because the Prospectus gave general boilerplate warnings that certain events *might* occur in the future, Defendants are immune from liability.

The MTD ignores, however, the well-pleaded central allegations of the Complaint; that the statements in the Prospectus regarding (1) the value of the Contributed Portfolio, (2) the Company's ability to secure warehouse financing, (3) the skill, industry experience of CIT Healthcare and its unique access to deals competitors did not have, and (4) Care's intention to use CDOs to provide longer term funding, all of which were necessary to implement its growth strategy, *were not accurate when made*. Because Plaintiffs have identified actionable misstatements in the Prospectus negligently made by Defendants, the MTD should be denied.

## III.    STATEMENT OF FACTS

Care was formed in March 2007 by CIT, a $79 billion commercial consumer and finance company. *See* Relevant excerpts of Care's Preliminary Prospectus dated March 29, 2007, attached as Ex. A to the Declaration of Jonathan Gardner in Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint ("Gardner Decl."). CIT created Care as part of a plan to generate over $200 million in cash. Compl. ¶¶ 7, 18-21.[3] Care was to be externally managed by a subsidiary of CIT, CIT Healthcare, and organized as a real estate investment trust ("REIT") for federal income tax purposes. Compl. ¶¶ 7, 18.

---

[3]    References to the Complaint are cited herein as "Compl. ¶__".

Care was pitched to investors as a way to invest in healthcare-related commercial mortgage debt and real estate. Compl. ¶ 7.  The Prospectus touted Care's unique advantage over its competition because of CIT Healthcare's experience, reputation, market-knowledge and business relationships which would enable Care to gain direct access to attractive investment opportunities unavailable to others. Compl. ¶ 23.  Care planned to use the proceeds from the IPO to purchase the Contributed Portfolio of healthcare-related mortgage assets from CIT Healthcare. Compl. ¶¶ 20-21.  The Prospectus stated that Care would grow the Trust by using the Contributed Portfolio as collateral to borrow from two Warehouse Facilities Care said it was about to close with, both of which were lending subsidiaries of two of its underwriters.  Compl. ¶ 33. Care would then acquire new investments, and eventually turn those new investments into structured securities ("CDOs") to finance future investments. Compl. ¶¶ 32-37.

Care completed its IPO on June 22, 2007, raising over $225 million in cash -- $210 million went to Care and over $15 million went to the underwriters. Compl.¶ 20; *see* Final Prospectus, 424B1 dated June 22, 2007, attached as Ex. B to Gardner Decl.  Care then paid almost all the cash -- $204 million plus 5,256,250 shares of stock valued at $78.8 million -- to CIT in exchange for the Contributed Portfolio.  Compl. ¶ 21.

On August 14, 2007, just ***seven weeks*** after the IPO, Care filed its quarterly report for the period ending June 30, 3007 with the Securities and Exchange Commission ("SEC") indicating that negotiations with the two warehouse lenders (both subsidiaries of Care underwriters) were not nearly as certain or advanced as Care represented in the Prospectus and were "taking longer than expected." Compl. ¶¶ 33-35.  Analysts recognized that "the delay will push out the timing of growth as Care does not have the ability to leverage the capital raised during the IPO." *See* Credit Suisse Analyst Report dated August 15, 2007, attached as Ex. C to Gardner Decl.  The

surprise announcement caused Care's stock price to tumble.  *See* Stock Price Listing for Care stock on August 14, 2007, attached as Ex. D to Gardner Decl.

On October 2, 2007, Care issued a press release announcing it secured a line of credit from Column. Compl. ¶ 36. Care also filed a Form 8-K with the SEC on that date describing the agreement in more detail. See Care's SEC Form 8-K, dated October 2, 2007, attached as Ex. E to the Gardner Decl.  According to the Form 8-K, the agreement was a "line of credit" whereby Column may purchase certain loans held by Care "subject to the satisfaction of customary conditions in the Agreement."  *Id*.  It further stated that the agreement "will enable the Company, through its subsidiaries, to leverage its loan portfolio by effectively entering into a series of sales to Column of the underlying loans . . . In exchange for selling loans to Column, the Company's subsidiaries may receive up to 50% of the value of each loan sold based upon Column's underwriting of such loans and will agree to repurchase each loan from Column at a future date."  *Id*.  The Form 8-K thus represented that Care had obtained access to $300 million in capital, albeit at a deep discount to the value of each loan sold.

On November 12, 2007, Care issued a press release announcing its financial results for the third quarter of 2007. *See* Ex. 99.1 as part of Care's 8-K dated 11/13/07, attached as Ex. F to Gardner Decl.  Care conducted an investor conference call on the same day in which Defendants Kellman and Besecker participated.  Defendant Besecker revealed on the call that Care was abandoning the investment strategy it laid out in the Prospectus, focusing instead on a strategy of owning real estate and other direct equity investments. *See* Ex. 99.2 as part of Care 8-K dated 11/13/07, attached as Ex. F to Gardner Decl.

On November 14, 2007, Care filed its quarterly report on Form 10-Q with the SEC for the quarter ending September 30, 3007. *See* Form 10-Q, attached as Ex. 3 to Chefitz Decl. The

Form 10-Q revealed that the advance rates under the Column agreement were less that levels

Care expected. Compl. ¶ 36.  The Form 10-Q also attached the actual asset-purchase agreement

("Master Repurchase Agreement") described in the October 2, 2007 Form 8-K.  *See* Master

Repurchase Agreement, attached as Ex. G to Gardner Decl.  The Master Repurchase Agreement

revealed additional material facts not disclosed in the October 2, 2007 Form 8-K.  Specifically,

Column had the sole discretion whether to purchase assets from Care, and was under no

obligation to do so. *See id.* at 26.  In addition, Care could not incur any other indebtedness

without the prior written consent of Column.  *See id.* at 53.  Thus, Care's ability to obtain funds

from this Warehouse Facility was solely at the discretion of Column, Care was effectively

precluded from pursuing other credit facilities, and Care did not have a true line of credit or

access to capital without Column's advance consent.

The unique access to investment opportunities the Prospectus promised never

materialized, nor did Care's promised growth strategy.[4]  It appears that Care was primarily a

vehicle to convert an illiquid pool of assets into cash for CIT, and that Care's purported

"investment strategy" was little more than an afterthought.  While CIT and the underwriters

reaped millions from the IPO, Care's stockholders did not fair as well, loosing a substantial part

of their investment within weeks.

## IV.  <u>LEGAL STANDARD</u>

In reviewing motions to dismiss, courts must presume that the allegations of the

complaint are true, read the complaint as a whole, and give the plaintiff the benefit of every

---

[4] As referenced above, Care eventually announced the closing of only one of the warehouse
facilities on terms far less favorable than Care initially expected. Compl. ¶ 36. The terms were
such that Care was still *unable* to execute its investment strategy. It was only very recently, on

*(continued . . . )*

favorable inference that can be drawn from its allegations. *Scheuer v. Rhodes*, 416 U.S. 232, 236

(1974); *see also In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). A complaint

"attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" but

rather must simply provide the grounds of entitlement to relief and raise a right to relief above

the speculative level. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1959 (2007) (citations

omitted) ("Twombly").

A complaint need only contain a "short and plain statement of the claim[s] showing that

the pleader is entitled to relief."[5] Fed. R. Civ. P. 8(a)(2). "[A] short and plain statement of the

claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds on

which it rests" is all that is required. *Twombly*, 127 S. Ct. at 1959. In deciding Defendants'

Motion, the Court may consider "any written instrument attached to the complaint, statements or

documents incorporated into the complaint by reference, legally required public disclosure

documents filed with the SEC, and documents possessed by or known to the plaintiff and upon

which it relied in bringing the suit" but only to the extent that "no dispute exists regarding the

authenticity or accuracy of the document." *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp.

2d 277, 284-85 (S.D.N.Y. 2008)(quotation marks and citations omitted).

In light of these well-established principles, and for the reasons set forth below,

Defendant's Rule 12(b)(6) Motion should be denied.

---

*( . . . continued)*
July 2, 2008, Care announced that Column relaxed the terms of the Agreement only slightly and
the amended agreement now permits Care to incur other debt without Column's consent.

[5] The Amended Complaint expressly states that its Section 11 and 12(a) claims are for
negligent acts and therefore, the claims (not sounding in fraud) are subject to Rule 8(a). Compl.
¶¶ 17, 22, 43; *see In re Worldcom Inc. Sec. Litig.*, No. 02-3288, 2004 WL 1435356, at *3
(S.D.N.Y. June 28, 2004).

### A.    The Complaint States a Claim Under Section 11 of the Securities Act

### 1.    Elements of a Claim Under Section 11

Section 11 of the Securities Act addresses liability for untrue statements contained in registration statements filed with the SEC. *See* 15 U.S.C. § 77k(a); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 227-28 (S.D.N.Y 1999).  Specifically, Section 11 provides a private remedy for any purchaser of a security in which the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading…"  15 U.S.C. § 77k(a).

Plaintiff's burden in connection with a Section 11 claim is "relatively minimal" as a plaintiff need only show a material misstatement or omission. *Herman*, 459 U.S. at 382  (holding that the pleading burden for such claims is "relatively minimal" and that "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case"); *see also In re Adelphia Commc'ns Corp.*, No. 03 MD 1529 (LMM), 2006 WL 2463355, at *8 (S.D.N.Y. Aug. 23, 2006) ("Section 11 places a relatively minimal burden on a plaintiff"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*,  411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006) ("A plaintiff need only plead a material misstatement or omission in the registration statement to establish a prima facie fraud claim under § 11 of the Securities Act").  A misstatement under Section 11 is established when "'material facts have been omitted or presented in such a way as to obscure or distort their significance.'" *Initial Pub. Offering*, 544 F. Supp. 2d at 290.  Among those liable for these misstatements under Section 11 are those who signed the registration statement, directors of the issuer, anyone who participated in the preparation of the registration statement, and any underwriters of the security.  *See* 15 U.S.C. § 77k(a)(1)-(5); *Milman*, 72 F. Supp. 2d at 227-28. Scienter is not an element of Section 11. *See Herman*, 459 U.S. at 382.

Section 12(a)(2) of the Securities Act imposes liability upon any person who offers or sells a security by means of a prospectus that contains a material misstatement or omission. *See* 15 U.S.C. § 77l(a)(2).  Similar to Section 11 claims, scienter is not an element of Section 12(a)(2) claims. *See Herman*, 459 U.S. at 382.

The Complaint names the following as having violated Section 11 with respect to the Offerings: Care as the issuer and the Individual Defendants who each were Care senior officers or directors and who each signed the Registration Statement (Count I) and Defendants as sellers, offerors and/or solicitors of purchasers of the common stock offered pursuant to the Prospectus (Count II).

### 2. The Offering Documents Were Negligently Prepared and Contain Untrue Statements and Omissions

As detailed in the Complaint, the Offering Documents were negligently prepared and contain numerous untrue statements of material fact regarding the value of the Contributed Portfolio, the Company's ability to secure warehouse financing, the skill, industry experience of CIT Healthcare and its unique access to deals competitors did not have, and Care's intention to use CDOs to provide longer term funding, all of which were necessary to implement Care's growth strategy.  *See, e.g.*, Compl. ¶ 22.

### (a) Untrue Statements About the Value of the Contributed Portfolio

The Complaint clearly alleges that the Contributed Portfolio was materially overvalued and impaired as a result of CIT Healthcare's poor loan underwriting and questionable loan practices. Compl. ¶¶ 25-31 ("the Contributed Portfolio contained a material number of extremely high credit risk loans which had been materially overvalued by Care Investment . . . given the true credit risk of the investments in the Contributed Portfolio, it was materially misleading to describe the Contributed Portfolio as having a 'fair market value' of $283.2 million when its 'fair

market value' was materially less than that amount.") Compl. ¶ 27.  In other words, Care

overpaid for the assets its senior officers selected for the Trust and its Manager sold to it.

**(i)    Defendants Cannot Escape Liability by
Relying on the Manager's Conflict of Interest**

Defendants' first response to the allegation that the Contributed Portfolio was overvalued

is an attempt to distance the Manager from the situation and claim that Care never made

representations to investors about the Contributed Portfolio's value.  Instead, Defendants contend

that the representations were made by CIT Healthcare.  To further that argument, Defendants

point to the "Risk Factors" section of the Prospectus where they note that the value of the

Contributed Portfolio was determined by CIT Healthcare and thus was not determined on an

arms-length basis. MTD at 3-4. Later, Defendants argue:

> Care concededly made no representation of the value of the
> Contributed Portfolio, much less overvalue it. As Care disclosed in
> the Offering Documents, and as Plaintiffs acknowledge in their
> Amended Complaint, the valuation of the Contributed Portfolio
> was determined by *CIT Healthcare…*

MTD at 11 (emphasis in original).  Defendants next emphasize language in the Prospectus that

because the value of the Contributed Portfolio was not determined on an arms-length basis and

was not independently verified, the terms might not be as favorable as if they were negotiated

with an unaffiliated third-party. MTD at 12.

Defendants seem to conveniently ignore that CIT Healthcare *is **Care's Manager,*** and that

Defendant Besecker was both the Vice Chairman of Care's board and the President of CIT

Healthcare. Compl. ¶ 10.   It is almost inconceivable that Defendants would assert that the

Manager did not have to deal fairly with Care or its shareholders.  While the Manager had an

admittedly disclosed conflict of interest, and presumably divided loyalties when it sold its assets

to the Trust, ***it does not lessen the Manager's duty to deal fairly with Care and its shareholders***

11

*in connection with the valuation of the Contributed Portfolio*. (Emphasis added).

*See Strougo v. Bassini*, 282 F.3d 162, 173 (2d Cir. 2002)[6] ("Maryland courts have clearly established the proposition that directors and officers owe fiduciary duties to both the corporation and the shareholders.); *Chesapeake Constr. Corp. v. Rodman*, 261 A.2d 156 (Md. 1970) (Directors must demonstrate fairness of transaction between themselves and the corporation.).

There is no dispute that the value of the Contributed Portfolio was determined by the Manager. Compl. ¶ 26. However, according to the Prospectus, Care's executives (the Individual Defendants) *selected* the investments and determined their suitability for Care's shareholders:

> The initial assets consist of a representative cross-section of the types of investments in our Manager's real estate portfolio in terms of yield and asset type and were selected from among the portfolio because *we believe they are appropriate investments within our investment guidelines that reflect our needs as a dividend paying company.*

Prospectus, attached as Exhibit 1 to Chefitz Decl. at 68. (Emphasis added).[7]

Care cannot escape liability for making untrue statements about the value of the Contributed Portfolio by claiming it disclosed its Manager's conflict of interest. Such disclosure does not lessen the fact that as Care's Manager, CIT Healthcare had a duty to deal fairly with Care and its shareholders when it valued the investments it sold to Care and unilaterally determined the purchase price, and that Care and its executives had a duty to deal fairly with Care's shareholders when they *selected* the investments and determined their suitability. *See Strougo v. Bassini, supra.*

---

[6] Care is incorporated in Maryland.

[7] It is a fair inference that the "*we*" in the quoted passage refers to Care and the Individual Defendants.

**(ii)    Defendants Failed to Address the Allegations
that the Contributed Portfolio was Overvalued
and Impaired as a Result of the Manager's Poor
Loan Underwriting and Questionable Loan Practices**

Without support, Defendants simply dismiss as "irrelevant," the Complaint's allegations that the Contributed Portfolio was overvalued and impaired, in part as a result of CIT Healthcare's failure to verify receivables or to secure sufficient collateral for the underlying assets. MTD at 12-13.  Indeed, it is hard to fathom how Care's overpaying for assets overvalued as a result of the Manager's shoddy underwriting practices and failure to ensure adequate collateral would be "irrelevant."  Defendants' half-hearted challenge is a sufficient basis for the denial of their attack on this allegation.

If a question remains whether the Contributed Portfolio was overvalued or secured by adequate collateral, the terms of the purported Warehouse facility Care entered into after the IPO suggest the answer.  In an October 2, 2007 press release, Care announced, under the headline "Care Investment Trust Inc. Secures Line of Credit," that it "secured a line of credit with Column Financial, Inc., ("Column") an affiliate of Credit Suisse Securities LLC."  Exhibit 99.1 as part of Care's 8-K, attached as Ex. E to Gardner Decl.  The press release caused Care's stock price to rise.  However, a closer inspection of the terms reveals that the agreement was far different than the announced "line of credit."  Instead, it was an asset-purchase agreement whereby Column had an opportunity to purchase assets from Care in its sole discretion at an enormous discount.

The "material terms" of the agreement between Care and Column were purportedly set forth in a Form 8-K filed with the SEC on October 2, 2007.  *See id*.  Additional material terms were revealed on November 14, 2007 when Care attached the actual Master Repurchase Agreement to it September 30, 2007 Form 10-Q filed with the SEC.  The agreement provides that Column may, in its sole discretion, purchase up to $300 million in loans from Care through a

series of sales *at up to 50% of the value of each loan sold*[8] based on Column's underwriting and *subject to Care's agreement to repurchase* each loan from Column at a future date.[9]  *See* Care's 8-K, attached as Exhibit E to Gardner Decl.   Care is also required to pay Column interest set at 0.75% over LIBOR for the first eight months of the agreement and 1% over LIBOR thereafter. *See id*.  In addition, Column has the right to issue margin calls under the agreement and to require Care to maintain certain minimum liquidity levels. *See id.*  Care was also precluded from incurring any additional debt without Column's prior written approval. *See* Master Repurchase Agreement at 53, attached as Ex. G to Gardner Decl.

The above-described agreement is far different from the "line of credit" Care announced. Instead, Care had no control over how much money, if any, it could access.[10]  And, if Column did decide to purchase Care's assets, it could do so at a very deep discount (the actual discount was *65%* as Defendant Kellman later admitted).  The terms of the agreement and the size of the discount are a strong indication of the asset quality of the Contributed Portfolio and are strong

---

[8] Defendant Kellman later admitted in Care's third quarter earnings conference call in response to an analyst's question that "[t]he effective advance rate currently given our current documentation on loans and what not is about 35%." Thus, Column was discounting the assets of the Contributed Portfolio by *65%*.  *See* Ex. 99.2 as part of Care's 8-K, attached as Ex. F to Gardner Decl.

[9] The Master Repurchase Agreement provides that the amount can be increased up to $400 million under certain conditions.

[10] The Master Repurchase Agreement clearly states that Column is under no obligation to purchase assets from Care:

> This Agreement is not a commitment by Buyer [Column] to enter into Transactions with Seller [Care] but rather sets forth the procedures to be used in connection with periodic requests for Buyer to enter into Transactions with Seller. Seller hereby acknowledges that Buyer is under no obligation to agree to enter into, or to enter into, any Transaction pursuant to this Agreement.

Master Repurchase Agreement at 26, attached as Ex. G to Gardner Decl.

evidence that the value of the assets was overstated, the asset quality was weak, and the

underlying collateral was inadequate.

### (b)    Untrue Statements About Warehouse Facility Financing

The Complaint alleges that Defendants made untrue statements in the Prospectus about

Care's ability to secure its critical Warehouse Facilities. Compl. ¶¶ 32-36. The Prospectus

represented, in relevant part:

> We will use short-term financing, in the form of warehouse
> facilities. Warehouse lines are typically collateralized loans made
> to borrowers who invest in securities and loans and, in turn, pledge
> the resulting securities and loans to the warehouse lender. *We are
> currently negotiating a warehouse facility with Column
> Financial Inc., an affiliate of Credit Suisse Securities, LLC, an
> affiliate of one of our underwriters, which we expect to be in
> place shortly after consummation of this offering. We are also
> currently negotiating a warehouse facility with UBS Real Estate
> Securities Inc., an affiliate of one of our underwriters, which we
> expect to be in place soon after consummation of this offering*.
> There is no assurance, however, that we will be able to close these
> facilities on terms favorable to us, if at all. [Emphasis added.]

Compl. ¶ 32.

Plaintiffs had no reason to doubt these statements, as both Column and UBS Real Estate

Securities Inc. ("UBS Real Estate") were affiliated with the IPO's underwriter. Compl. ¶ 33.

This warehouse financing was especially important as it was to serve as the basis on which Care

was to implement its growth strategy, as it did not have any independent ability to leverage the

capital it raised during the IPO. Compl. ¶¶ 32-33.

The above-statements were not true, and were negligently made by Defendants. First, the

statement "[w]e will use short-term financing, in the form of warehouse facilities" proved not to

be true, as Care's agreement with Column closer resembles an asset purchase agreement than a

collateralized loan. Moreover, it was misleading for Care to state that it expected to have the

warehouse facilities in place shortly after the IPO without disclosing that Care was already

having difficulty securing warehouse lines on acceptable terms, and at the time of the IPO was really only negotiating with one lender because UBS Real Estate was little more than a shell company.  Compl. ¶¶ 32-33.

In response, Defendants raise four arguments. First, Defendants assert that the Prospectus "expressly warn[ed] investors of the possible failure of the negotiations." MTD at 15. That is not, however, what Defendants said.  Rather, the Prospectus states an affirmative belief that "we expect [these Warehouse Facilities] to be in place soon after the consummation of this offering" with the attached general, boilerplate warning "[t]here is no assurance, however, that we will be able to close these facilities on terms favorable to us, if at all."  Compl. ¶ 9. Defendants cannot hide behind the boilerplate cautionary language tacked on to their affirmative statements. *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 183 (S.D.N.Y. 2003) ("boilerplate warnings will not suffice....The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements.").

Moreover, Plaintiffs allege that at the time the above-statement was made, Defendants *knew* Care was already having trouble obtaining credit and moreover, UBS Real Estate was little more than a shell company.  Compl. ¶¶ 32-33.  It was misleading to state the specific expectation that an event will occur while in possession of specific facts that show it is unlikely to occur. "Warnings of possible detriment are insufficient if they are simply a smoke screen to cover a company's internal reasonably informed certainty of detriment." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 74 (S.D.N.Y. 1996); *see also Milman*, 72 F. Supp. 2d at 231 ("No degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made."). "[A]ll the cautionary language in the

world will not replace a true material omission or misstatement of fact which would matter to a reasonable investor." *In re Integrated Res. Real Estate Ltd., P'ships Sec. Litig.,* 815 F. Supp. 620, 674 (S.D.N.Y. 1993).

Defendants' next argument is that Care eventually did get Warehouse Financing with one of the lenders: Column.  However, as Plaintiffs demonstrated above, Care's agreement with Column was in the form of an asset purchase agreement whereby Column, in its sole discretion and subject to its underwriting, has the option to purchase assets from Care at a very deep discount.  As Plaintiffs explained, such terms are a far cry from the "line of credit" Care announced where typically the lender has already accepted the borrower's collateral and based on that collateral agrees to make a sum certain available for the borrower to draw and use in *the borrower's* discretion subject to agreed repayment terms.

Defendants next challenge Plaintiffs' allegations that UBS Real Estate was nothing more that a shell company at the time of the IPO. Compl. ¶ 33.  Defendants have not offered anything that contradicts Plaintiffs' allegations.  Instead, Defendants attempt to support their argument by citing two SEC filings that mention UBS Real Estate in relation to collateralized mortgage transactions by J.P. Morgan Chase. MTD at 16.  All that the first-referenced transaction shows is that on March 1, 2007 – *almost four months before the IPO* – UBS Real Estate was an underlying *seller* of mortgage assets in connection with a mortgage securitization transaction put together by J.P. Morgan Chase. *See* Ex. 5, Chefitz Decl.  The second-referenced transaction shows that in September 2007, UBS Real Estate was also a *seller* of mortgage assets in connection with another mortgage securitization deal put together by J.P. Morgan Chase. *See* Ex. 6, Chefitz Decl.

17

The date of the first transaction shows it is completely irrelevant to whether or not UBS Real Estate was extending credit to borrowers at all, let alone four months later at the time of the IPO. Moreover, the substance of both referenced-transactions do not in any way show that UBS Real Estate was engaged in any type of lending activity either before or after the IPO. Instead, UBS Real Estate was a *seller* of mortgage assets. *Id.* The transactions Defendants highlight -- the disposition of assets -- are arguably more consistent with a company winding-down operations. They do not support Defendants' argument at all, and do not in any way reflect that UBS Real Estate was an active, ongoing lender.

Finally, Defendants argue that Care's disclosures in its post-IPO filings do not establish the falsity of the statements in the Prospectus because events could have changed between the IPO and the later filed documents. MTD at 17. Defendants' argument -- that things could have changed -- does nothing to undercut the well-pleaded allegations of the Complaint that Defendants' statements were untrue when made. Moreover, it is disingenuous to argue that circumstances changed so drastically between June 22 and June 30 that would suggest that a disclosure made as to the state of the negotiations does not apply to the time of the IPO. Absent support by the Defendants that some material change occurred prior to June 30th and following the IPO on June 22nd, this argument should fail.[11]

**(c)    Untrue Statements About the Manager**

The Prospectus touted the abilities of the Manager and its unique access to deals. For example, it states:

---

[11] Even if some material change did occur in the status of the negotiations as to the warehouse financing after the IPO but before June 30th, if it was a material change, Defendants presumably would have filed a Form 8-K with the SEC to inform investors of the same. No such Form 8-K was ever filed.

> We believe that our Manager's experience and reputation in the healthcare finance industry, market knowledge and relationships with companies in the healthcare industry will benefit us by enabling our Manager to originate, manage and create value from attractive investment opportunities for us. While many of our competitors rely on financial institutions or other third party originators to provide them with investment opportunities, we believe that one of our business strengths will be our access to investment opportunities directly originated by our Manager. Our Manager also has business relationships with many financial institutions and may originate investment opportunities for us through these firms as well.

Compl. ¶ 23. This "key business strength," Defendants touted, access to investment opportunities not available to competitors, never materialized. The Complaint adequately alleges that the representations regarding the Manager were not true. Compl. ¶ 24.

Defendants' sole attack on these allegations is that the statements made in the Complaint are "opinion, puffery or ordinary statements of corporate optimism" and thus are not actionable. MTD at 10. Rather than simple puffery or statements of optimism, the statements in the Prospectus about the Manager related directly to Care's core business strategy – access to investment opportunities others did not have. That unique access -- something Defendants called a "key business strength" in the Prospectus -- is how Defendants pitched Care to investors. The statements were clearly material and important to Care's investors, and the Complaint adequately alleges they were not true.

### (d)    Untrue Statements About the Use of Securitizations

Plaintiffs also allege that Defendants' statements that Care would grow its business through the use of CDOs for longer term funding were also untrue. The Prospectus stated:

> For longer-term funding, we may utilize, among other financings, securitization structures, such as collateralized debt obligations (CDOs) or commercial mortgage-backed securities (CMBS), as well as other match-funded secured financing structures. We believe match-funded secured financing structures are an appropriate financing vehicle for our investments because they will

19

> enable us to obtain long-term, cost of funds and minimize the risk that we have to refinance our liabilities prior to the maturities of our investments while giving us the flexibility to manage credit risk and, subject to certain limitations, to take advantage of profit opportunities.

Compl. ¶ 37.

The Complaint alleges that the above-statements were negligently made and were false and misleading because Defendants knew, or should have known,[12] that at the time of the IPO, credit markets were already beginning to dry up as a result of widespread and far reaching problems in the sub-prime mortgage market, and these problems necessarily impaired the Company's ability to use CDOs as a viable means of providing longer term funding. Compl. ¶ 38.

Defendants challenge Plaintiffs' allegations by claiming that the Prospectus expressly warned about the risk that conditions in the capital markets "*may*" make issuance of CDOs less attractive. MTD at 17 (italics added). Although Defendants try and distort this so-called disclosure by only citing one portion of it in their Motion, in context, the disclosure that Defendants reference is as follows:

> ***We intend to acquire debt instruments and finance them on a non-recourse long-term basis, such as through the issuance of securitizations (CDOS or CMBS).*** During the period that we are acquiring these assets, we intend to finance our purchases through relatively short-term credit facilities. ***We intend to use short-term warehouse lines of credit to finance the acquisition of instruments until a sufficient quantity is accumulated, at which time we may refinance these lines through a securitization, such as a CDO or CMBS issuance, or other long-term financing.*** As a result, we are subject to the risk that we will not be able to acquire, during the period that our warehouse facility is available, a sufficient amount of eligible assets to maximize the efficiency of a

---

[12] Indeed, CIT, a $79 billion world-wide consumer and finance company, would have had the "inside track" on any news relating to the credit markets.

> securitization issuance. In addition, conditions in the capital markets **may** make the issuance of a securitization less attractive to us when we have accumulated a sufficient pool of collateral.

Prospectus at 33, attached as Ex. 1 to Chefitz Decl. (Bold and italics added).

The above quoted "risk disclosure" does not adequately warn of the problems in the credit markets known to Defendants at the time of the IPO and the corresponding negative impact on Care's ability to use CDOs to implement its growth strategy. *See In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 212 (S.D.N.Y. 2004)("[c]autionary language in securities offerings is just about universal."). "[I]f a party is aware of a particular problem worthy of disclaimers, the party may not rely on general disclosures to avoid liability." *Id.* (court held that the bespeaks doctrine did not insulate misstatements where plaintiffs were not complaining that there were not advised that company could face possible loss of revenues from non-renewing contracts, but that 75% of contracts were due to expire in one month).

Here, Defendants knew, or should have known, of the storm warnings in the credit markets as a result of the sub-prime mortgage problems, and the corresponding effect on the debt markets. Compl. ¶¶ 38-39. The known impact of these problems on Care's business model and ability to implement its growth strategy should have been adequately disclosed in the Prospectus. Nonetheless, as articulated above, Defendants failed in including proper or sufficient cautionary language to warn investors of this material risk. *See* Prospectus at 33, attached as Ex. 1 to Chefitz Decl.[13]

---

[13] As the only case in support of their position here, Defendants cite *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) (finding bespeaks caution doctrine to be available to defendants). This case is clearly distinguishable from the facts here, given the substantial and pervasive cautionary language pointed to by the court in its opinion. *See id.* at *98.

### 3.    Defendants Knew or Should Have Known of the Undisclosed Risks

### (a)    The Credit Crisis Is Not An Excuse

Defendants should not be permitted to escape liability by claiming that unforeseen problems in the credit markets caused them to completely abandon Care's business model within months of the IPO. The growing problems in the credit market were already known to market participants prior to the IPO. Compl. ¶ 39 (Problems were developing as of the second quarter of 2007).[14]

For example, the Wall Street Journal recently reported in an article entitled "*Bear Stearns Hedge Fund Managers May Face Indictments*" (June 16, 2008; Page A1) that there was serious concern as early as February, March and April of 2007 as to the credit markets. According to the article, one such signal of the impending market crunch occurred "[o]n Feb. 27, 2007" when "a closely watched slice of the ABX, an index that tracks subprime-mortgage securities…slid to a low of 63 from well north of 90 at the beginning of the year…" *Id*. The article goes on to detail how it was the insiders who were able to assess and benefit from this information and who attempted to, and did, hide the impending meltdown in the subprime sector from investors. *Id*.

Given the importance of access to borrowed funds as a central pillar of Care's business model and growth strategy, and Defendants' unique insider position (particularly with CIT being a world-wide consumer and finance company, and CIT Healthcare as a participant in the healthcare related mortgage markets), Defendants were in a unique position to know, or were negligent in not knowing, the state of the credit markets and the impact those markets would have on Care's ability to carry out its growth strategy. Compl. ¶ 38. Instead, Defendants were

---

[14] At this stage of the litigation, the plaintiff the benefit of every favorable inference that can be drawn from its allegations. *Scheuer v. Rhodes*, *supra*.

more concerned with ensuring the success of the IPO in order to raise a substantial amount of cash for CIT and the underwriters.

### 4. The Misleading Statements and Omissions Caused Substantial Losses

Under Section 11, plaintiff has no burden to prove loss causation or a causal connection between the misstatement and the drop in stock price. *See Levine v. AtriCure, Inc*., 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007). Instead, "[a]s an affirmative defense, the burden of disproving loss causation falls on defendants. *Id*.; *Flag Telecom Holdings*, 411 F. Supp. 2d at 382 (defendants did not establish affirmative defense of "negative causation"). The imposition of the burden falling on defendant, reflects "Congress's desire to allocate the risk of uncertainty to the defendants." *Levine*, 508 F. Supp. 2d at 272 (quotation marks and citation omitted); *see also Globus v. Law Research Serv., Inc*., 418 F.2d 1276, 1288 (2d Cir. 1969) ( "Civil liability under section 11 and similar provisions was designed not so much to compensate the defrauded purchaser as to promote enforcement of the Act and to deter negligence by providing a penalty for those who fail in their duties."). Thus, Section 11 can be said to create a factual presumption that "any decline in value is ... caused by the misrepresentation in the registration statement." *McMahan & Co. v. Wherehouse Entm't, Inc*., 65 F.3d 1044, 1048 (2d Cir. 1995) (citation omitted). This affirmative burden on Defendants in disproving causation is called "negative causation".

Because this inquiry into negative causation is often fact-intensive, courts have found that it is generally established by a defendant only at later stage in the litigation - on a motion for summary judgment or at trial. *See Levine*, 508 F. Supp. 2d at 272-73. The difficult nature of the burden is evidenced in the matter of *In re WRT Energy Sec. Litig*., No. 96 Civ. 3610, 2005 WL 2088406, at *1 (S.D.N.Y. Aug. 30, 2005). In *WRT Energy*, Judge Keenan vacated his earlier decision on a Rule 12(b)(6) motion and allowed plaintiffs to assert a Section 11 claim for

damages for declines in share value *prior to* the first alleged disclosure. *See id.* (emphasis added). The court found that "[t]o conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies." *Id.*, 2005 WL 2088406, at *2.

Here, Plaintiffs' losses were clearly the result of untrue statements of material fact identified in the Complaint. On August 14, 2007, when Care filed its Form 10-Q with the SEC revealing that its ability to obtain warehouse financing -- "the purpose for which Care Investment was formed"[15] --"is taking longer than expected," Care's stock price tumbled over 13% from $11.67 on the prior day to $10.13 on the news. *See* Stock Price Listing for August 14, 2007, attached as Ex. D to Gardner Decl. Analysts recognized that the "delay in achieving financing [] push[ed] out the timing of growth as Care [did] not have the ability to leverage capital raised during the IPO." *See* Credit Suisse Analyst Report dated August 15, 2007, attached as Ex. C to Gardner Decl. The market realized on that date that not only was the warehouse financing delayed, but because it was such an essential cog, Care's overall growth strategy was delayed as well. Accordingly, as referenced in the Complaint, the August 14, 2007 disclosure caused Plaintiffs' losses.

Defendants have failed to meet this "fact-intensive" burden of proving negative causation. Defendants have not attributed the drop in stock price to anything other than the August 14, 2007 disclosure. On this basis alone, Defendants fail to meet their burden. *See, e.g., In re WRT Energy*, 2005 WL 2088406, at *2. Specifically, the court in *WRT Energy* stated:

> Defendants …cite nothing in the pleadings establishing some reason other than the alleged misstatements in the WRT registration statements for the drop in the value of the WRT

---

[15] Compl. ¶ 32.

> securities. Reading the Complaint most favorably to Plaintiffs, the Court must draw the inference that Plaintiffs' losses *could have* been the result of the alleged misstatements. To conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies.

*Id*.

Based on the above, Defendants have not, and cannot prove that this corrective disclosure did not cause Plaintiffs' losses and accordingly, Defendants have failed to satisfy their burden of establishing negative causation.[16]

### B.    The Amended Complaint Adequately Pleads Section 12 and 15 Claims

#### 1.    The Amended Complaint Adequately Pleads that the Individual Defendants were Sellers Under the Statute

Plaintiffs have adequately pled that each of the Individual Defendants were "sellers" of securities under § 12(a)(2) of the Securities Act by alleging that each of the Individual Defendants was an officer or director of Care, and each signed the offering prospectus containing untrue statements of material fact.[17]

The Supreme Court interpreted the elements of § 12(a)(2) liability in *Pinter v. Dahl,* 486 U.S. 622 (1988). A person can be a "seller" of securities under this section in two circumstances: (1) when the plaintiff is in privity with the defendant, *i.e.*, a party who "passed title, or other interest in the security to the buyer for value," *id*. at 642, or, if a party is not in privity with the plaintiff, they may also be held liable under § 12(a)(2) if they (2) solicited the

---

[16] Defendants' argument that the August 14, 2007 Form 10-Q does not "correct" anything is simply wrong. *See* MTD at 19.

[17] Defendants only challenge to Plaintiffs' Section 15 is that *if* Plaintiffs' Section 11 and 12 claims fail, so to must Plaintiffs' Section 15 claim. Since Plaintiffs have adequately pled claims under Sections 11 and 12 claims, Plaintiffs' Section 15 claim should be sustained as well.

plaintiff's purchase and were motivated in some way by their own financial interest. *See id*. at 647.

Courts in this Circuit hold that a plaintiff satisfies the "solicitation" requirement and adequately pleads a §12(a)(2) claim by alleging that an officer or director of the defendant signed the offering prospectus containing untrue statements of material fact. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 454 (S.D.N.Y. 2005) ("[a]n officer or director who signs a Registration Statement containing materially false or misleading statements or omissions is deemed, for pleading purposes, to have solicited a purchase within the meaning of [§12(a)(2)])"; *Degulis v. LXR Biotechnology, Inc*., 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996) ("[I]t is, at this stage of the proceedings [the motion to dismiss], a sufficient allegation to permit plaintiffs to present evidence that, alone or in tandem with other acts, the signatures constituted active solicitation . . .").

Plaintiffs have alleged that the Individual Defendants each signed the registration statement. *See* Compl. ¶¶ 8-10.  Moreover, each of them was a senior officer or director of Care. For example, Kellman was Care's CEO and President and managing director of Care's manager, CIT Healthcare, Compl. ¶ 8, O'Neil was Care's CFO, Treasurer and Secretary, and Senior Vice President, Finance and Accounting at CIT, Compl. ¶ 9, and Besecker was the Vice-Chairman of Care's Board of Directors and President of CIT Healthcare. Compl. ¶ 10.

Because Plaintiffs have pled that each of the Individual Defendants was an officer or director who signed the registration statement containing untrue statements of material fact,

plaintiffs have adequately alleged that the Individual Defendants "solicited plaintiffs' purchase" of Care securities under § 12(a)(2).[18]

## V.    <u>LEAVE TO REPLEAD</u>

Plaintiffs respectfully request leave to amend in the event that the Court is inclined to grant Defendants' motion in any respect.[19]   Fed. R. Civ. P. 15(a) provides that "leave [to amend] shall be freely given when justice so requires" and is within the discretion of the Court. *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 388 (S.D.N.Y. 2007).  "Moreover, '[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead,'" particularly when deciding a motion to dismiss brought under Rule 12(b)(6) and Rule 9(b).  *Id.* at 387-88 (quoting *Cordec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).

## VI.    <u>CONCLUSION</u>

For the reasons set forth herein, the Defendants' Motion to Dismiss should be denied in its entirety.

---

[18] Defendants' only challenge to plaintiffs' §12(a)(2) claim is the citation to cases outside this Circuit for the general proposition that simply signing a prospectus is insufficient to qualify an individual as a seller. Defendants' argument is at odds with the allegations of the Complaint and the settled law of this Circuit.

[19] Plaintiffs acknowledge that they referenced certain limited materials not in the Complaint in response to Defendants' arguments. While Plaintiffs believe that the Complaint is sufficient on its own, we respectfully request leave to re-plead should the Court believe otherwise.

DATED: July 9, 2008                    LABATON SUCHAROW LLP


                                       _____
                                        /s/Christopher J. Keller
                                       Christopher J. Keller

                                       CHRISTOPHER J. KELLER
                                       JONATHAN GARDNER
                                       SERENA RICHARDSON
                                       140 Broadway
                                       New York, New York 10005
                                       Telephone: (212) 907-0700
                                       (212) 818-0477 (fax)
                                       *Lead Counsel for Plaintiffs*
                                       COUGHLIN STOIA GELLER
                                       RUDMAN & ROBBINS LLP

                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD
                                       JOSEPH RUSSELLO
                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)