UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
BRIARWOOD INVESTMENTS, INC., : Civil Action No. 1:07-cv-08159-LLS
Individually and On Behalf of All Others :
Similarly Situated, : **ORAL ARGUMENT REQUESTED**
:
                        Plaintiff, :
:
    vs. :
:
:
CARE INVESTMENT TRUST INC., :
F. SCOTT KELLMAN, ROBERT O'NEILL :
and FLINT D. BESECKER, :
:
                      Defendants. :
:
------------------------------------------------------x

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS'
AMENDED CLASS ACTION COMPLAINT**

Joel G. Chefitz (XXXXXX)
Amanda J. Metts (XXXXXX)
Jeffrey Hammer (XXXXXX)
227 West Monroe Street, Suite 4400
Chicago, Illinois 60606
312/372-2000
312/984-7700 (fax)

Andrew D. Kaizer (AK9730)
340 Madison Avenue
New York, NY 10173-1922
212/547-5400
212/547-5444 (fax)
*Attorneys for Care Investment Trust Inc.,
F. Scott Kellman, Robert O'Neill and
    Flint D. Besecker*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................... ii

I. PLAINTIFFS AGAIN FAIL TO POINT TO ANY FALSE OR MISLEADING STATEMENT BY CARE IN ITS REGISTRATION STATEMENT. ........................................................................................................... 1

    A. Care Made No Misstatement About the Value of the Contributed Portfolio. ................................................................................................ 2

        1. Plaintiffs Concede that Care Did Not Value the Contributed Portfolio. ......................................................................................... 2

        2. Plaintiffs Have Not Alleged Facts To Support Their Conclusory Allegation that the Contributed Portfolio was Overvalued. ..................................................................................... 3

    B. Care Made No Misstatement About Its Intended Use of Warehouse Financing. ............................................................................................... 4

    C. Care Made No Misrepresentations About Its Manager. ................................. 9

    D. Care Made No Misrepresentation About Its Possible Use of CDOs. ............. 10

II. THE ALLEGED MISSTATEMENTS COULD NOT HAVE CAUSED PLAINTIFFS' LOSS. .................................................................................... 12

III. THE AMENDED COMPLAINT FAILS TO STATE SECTION 12 AND 15 CLAIMS. ................................................................................................ 14

IV. PLAINTIFFS' REQUESTED AMENDMENT WOULD BE FUTILE. .................... 15

CONCLUSION ............................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**                                                                                                                 **Page(s)**

*Bell Atlantic Corp. v. Twombly*,
   127 S. Ct. 1955 (2007) .................................................................................... 1, 3, 9, 14, 16

*Brown v. Lippard*,
   472 F.3d 384 (5th Cir. 2006) ............................................................................................ 12

*Chesapeake Constr. Corp. v. Rodman*,
   261 A.2d 156 (Md. 1970) .................................................................................................... 2

*Coppola v. Bear Stearns & Co., Inc.*,
   499 F.3d 144 (2d Cir. 2007) ................................................................................................ 5

*Coppola v. Bear Stearns & Co., Inc.*, No. 1:02-CV-1581,
   2005 U.S. Dist. LEXIS 45551 (N.D.N.Y. Oct. 17, 2005) .................................................. 5

*Degulis v. LXR Biotechnology, Inc.*,
   928 F. Supp. 1301 (S.D.N.Y. 1996) ................................................................................. 14

*Detwiler v. Bristol-Myers Squibb Co.*,
   884 F. Supp. 117 (S.D.N.Y. 1995) ................................................................................... 15

*Fisher v. Ross*, No. 93 Civ. 0725,
   1996 U.S. Dist. LEXIS 15091 (S.D.N.Y. Oct. 11, 1996) ................................................. 11

*Hinerfeld v. United Auto Group*, No. 97 Civ. 3533,
   1998 U.S. Dist. LEXIS 10601 (S.D.N.Y. July 15, 1998) ............................................. 4, 11

*In re Alamosa Holdings, Inc. Secs. Litig.*,
   382 F. Supp. 2d 832 (N.D. Tex. 2005) ............................................................................. 13

*In re Apollo Group, Inc. Secs. Litig.*, No. CV 04-2147-PHX-JAT,
   2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) .................................................... 13

*In re Flag Telecom Holdings*,
   411 F. Supp. 2d 377 (S.D.N.Y. 2006) .............................................................................. 13

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005) .............................................................................. 14

*In re Merrill Lynch & Co., Inc. Research Reports*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) .............................................................................. 12

*In re Metro. Sec. Litig.*, No. CV-04-0025,
   2007 U.S. Dist. LEXIS 84392 (E.D. Wash. Nov. 5, 2007) ................................................... 14

*In re Scor Holding (Switz.) AG Litig.*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008) ................................................................................... 15

*In re Vivendi Universal, S.A. Secs. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003) ............................................................................. 7, 11

*In re WRT Energy Secs. Litig.*, No. 96 Civ. 3610,
   2005 U.S. Dist. LEXIS 18701 (S.D.N.Y. Aug. 30, 2005) ...................................................... 13

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*,
   32 F.3d 697 (2d Cir. 1994) ....................................................................................................... 7

*Levine v. AtriCure, Inc.*,
   508 F. Supp. 2d 268 (S.D.N.Y. 2007) ................................................................................... 13

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
   98 F.3d 2 (2d Cir. 1996) .................................................................................................... 6, 11

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) .................................................................................................. 10

*Saslaw v. Al Askari*, No. 95 Civ. 7641,
   1997 U.S. Dist. LEXIS 5621 (S.D.N.Y. Apr. 25, 1997) .......................................................... 6

*Scholastic, Inc. v. Stouffer*,
   124 F. Supp. 2d 836 (S.D.N.Y. 2000) ..................................................................................... 5

*Sheppard v. TCW/DW Term Trust 2000*,
   938 F. Supp. 171 (S.D.N.Y. 1996) .......................................................................................... 5

*Strougo v. Bassini*,
   282 F.3d 162 (2d Cir. 2002) .................................................................................................... 2

*Viacom Int'l, Inc. v. Youtube, Inc.*,
   540 F. Supp. 2d 461 (S.D.N.Y. 2008) ................................................................................... 15

**Statutes**

15 U.S.C. § 77(a) .............................................................................................................................. 8

15 U.S.C. § 77k(a) ....................................................................................................................... 1, 3

Plaintiffs still fail to point to a single false statement by Care in its Registration Statement. Instead, in their Opposition to Care's Motion to Dismiss, Plaintiffs brief a state law fiduciary duty case they did not bring, argue about statements Care did not make and attack post-IPO statements Section 11 does not cover. Seemingly aware that their Amended Complaint as written cannot stand, Plaintiffs also assume new allegations throughout their Opposition, sometimes in direct contradiction to the actual allegations in the Amended Complaint. Plaintiffs' roving allegations, rather than salvaging their Amended Complaint, reveal that Plaintiffs are making it up as they go along. Plaintiffs cannot disguise their continued failure to point to a single alleged misstatement made by Care in its Registration Statement that passes muster under *Twombly*.

I. **PLAINTIFFS AGAIN FAIL TO POINT TO ANY FALSE OR MISLEADING STATEMENT BY CARE IN ITS REGISTRATION STATEMENT.**

There is no dispute that, to survive a motion to dismiss, Plaintiffs must allege specific factual allegations sufficient to state a claim that is plausible on its face under *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007). (Plaintiffs' Opposition (Opp.) 8 (citing *Twombly*).) Plaintiffs also recognize their burden under Section 11 to "show a material misstatement or omission." (Opp. 9.) But Plaintiffs gloss over the more specific requirement of a material misstatement or omission *in the Registration Statement*. 15 U.S.C. § 77k(a). And though Plaintiffs pay lip service to the requirement that any alleged misstatements meeting these criteria must have been inaccurate *when made* (Opp. 4), they continue to rely on post-IPO statements about post-IPO events that cast no doubt on statements as of the IPO. Plaintiffs conclude throughout their Opposition that they have stated a Section 11 claim, but they still fail to allege any statement by Care, in its Registration Statement, that was inaccurate when made.

### A. Care Made No Misstatement About the Value of the Contributed Portfolio.

#### 1. Plaintiffs Concede that Care Did Not Value the Contributed Portfolio.

Plaintiffs concede "there is no dispute that the value of the Contributed Portfolio was determined by [Care's] Manager." (Opp. 12.) And, while pointing to no representation by Care of the assets' value, Plaintiffs concede the truth of the more limited statements Care did make. Plaintiffs do not dispute the truth of the report in the Registration Statement that *CIT*, Care's manager, had valued the Contributed Portfolio at $283.1 million. (Amended Complaint (Am. Compl.) ¶ 26 ("the Prospectus represented that CIT Healthcare had purportedly ascribed a 'fair market value' of $283.1 million to the Contributed Portfolio").) Nor do Plaintiffs dispute the truth of the Prospectus' statement that the assets "are appropriate investments within our investment guidelines that reflect our needs as a dividend paying company," although quoting and emphasizing it. (Opp. 12.) Instead, Plaintiffs engage in sleight of hand in an attempt to conflate CIT's valuation with Care's statement.

Plaintiffs then compound their failure to identify a single false statement on Care's part by briefing a state law fiduciary duty claim against both Care and CIT, which is not a defendant to this case:

> Such disclosure does not lessen the fact that as Care's Manager, CIT Healthcare had a duty to deal fairly with Care and its shareholders when it valued the investments it sold to Care and unilaterally determined the purchase price, and that Care and its executives had a duty to deal fairly with Care's shareholders when they selected the investments and determined their suitability.

(Opp. 12 (emphasis omitted).) In support of their argument, Plaintiffs rely on breach of fiduciary duty cases decided under Maryland state law. *Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002); *Chesapeake Constr. Corp. v. Rodman*, 261 A.2d 156 (Md. 1970). While neither Care nor its manager breached any fiduciary duty, it would be inappropriate in this case to argue the

merits of a state law fiduciary duty claim that Plaintiffs have not brought and that is entirely irrelevant to Plaintiffs' Section 11 claim. Plaintiffs have not pointed to any misstatement by Care in its Registration Statement about the value of the Contributed Portfolio, as they must to state a claim under Section 11. 15 U.S.C. § 77k(a).

### 2. Plaintiffs Have Not Alleged Facts To Support Their Conclusory Allegation that the Contributed Portfolio was Overvalued.

Care's concededly accurate statement that its manager had valued the Contributed Portfolio at $283.1 million cannot constitute a Section 11 violation. Even if Care had made its own representation of value, Plaintiffs have not alleged facts in support of their conclusory allegation that the Contributed Portfolio was overvalued, as they must to survive a Motion to Dismiss. *See* Twombly, 127 S. Ct. at 1964-65.

Plaintiffs acknowledge by the silence in their Opposition that the only factual allegations in their Amended Complaint are on their face flat out wrong. Plaintiffs no longer rely on their allegation that Care failed to disclose a 1.6% premium over book value for the Contributed Portfolio (Am. Compl. ¶ 28(b)), after Care pointed out in its Motion to Dismiss that it disclosed the 1.6% spread between book value and the purchase price twice in the Offering Documents. (Motion to Dismiss (Motion) 13.) Plaintiffs also have abandoned their allegation that a $26 million loan in the Contributed Portfolio was technically past due at the time of the IPO (Am. Compl. ¶ 31), after Care uncovered Plaintiffs' misleading cut and paste job from Care's November 2007 10-Q and corresponding miscalculation of the date the interest payment was due. (Motion 14.) Finally, although they refer to them generally, Plaintiffs attempt to gloss over their allegations in the Amended Complaint that CIT engaged in poor loan practices (Am. Compl. ¶ 28(a)), stating that Care's only response was to "simply dismiss [them] as 'irrelevant'." (Opp. 13.) Far from simply dismissing the allegations as irrelevant, Care demonstrated that

Plaintiffs not only failed to allege that a single receivable-backed or unsecured loan was included in the Contributed Portfolio, but affirmatively alleged that the entire Contributed Portfolio consisted of "real estate mortgage assets secured by several different types of healthcare facilities." (Am. Compl. ¶ 25; Motion 13.)

Plaintiffs instead contend for the first time that the terms of Care's warehouse facility with Column Financial--entered into after the IPO--demonstrate that the Contributed Portfolio was overvalued at the time of the IPO. Plaintiffs acknowledge that the relevant issue is whether the alleged misstatements were accurate when made (Opp. 4), but then disregard their own standard. Care entered into the warehouse facility with Column on October 1, 2007. (Am. Compl. ¶ 36.) Care's agreement with Column, on which Plaintiffs rely (Opp. 13-14, Ex. G thereto), does not purport to value the Contributed Portfolio at all, let alone at the time of the IPO months earlier on June 22, 2007, which is the time at which Care's statements must be judged.[1] *See Hinerfeld v. United Auto Group*, No. 97 Civ. 3533, 1998 U.S. Dist. LEXIS 10601, at *13-14 (S.D.N.Y. July 15, 1998) (dismissing Section 11 claim because complaint "points to no actual misrepresentations contained within the prospectus" at the time the filing became effective).

> **B.   Care Made No Misstatement About Its Intended Use of Warehouse Financing.**

Plaintiffs also argue in their Opposition for the first time that Care's statement that it will "use short-term financing, in the form of warehouse facilities" was false because the agreement that it reached with Column Financial "closer resembles an asset purchase agreement than a collateralized loan." (Opp. 15.) Plaintiffs made no such allegation in the Amended Complaint,

---

[1] Plaintiffs' leap of logic to equate a warehouse facility in October 2007 with a valuation of the Contributed Portfolio months earlier is further contradicted by Plaintiffs' own allegations that the credit markets were in turmoil in the intervening months. (Am. Compl. ¶ 38.)

and in fact affirmatively alleged that Care secured a warehouse facility with Column. (Am. Compl. ¶ 36 ("When the Company eventually secured a warehouse facility on October 1, 2007"; "even after the Company had finally secured a warehouse facility").) Plaintiffs' attempt to contradict their own factual allegations with argument is improper.[2]

Even ignoring the contradiction with their own pleading, Plaintiffs' new argument that the Column warehouse facility really was "an asset purchase agreement" insults the Court. Whether deliberately or recklessly, Plaintiffs misrepresent the nature of warehouse financing. As the Second Circuit has recognized, a warehouse facility involves the sale of loans to a lender, with the obligation to repurchase them later at an agreed-upon price:

> NFC would sell the loan to Bear and "sweep" it into the warehouse line, with the right and obligation to repurchase it from Bear in the event of resale or default on the part of NFC. When NFC sold a loan on the Bear warehouse line, it would pay Bear an agreed-on price to repurchase the loan from Bear and retain any profit earned from the sale.

*Coppola v. Bear Stearns & Co., Inc.*, 499 F.3d 144, 146 (2d Cir. 2007). A warehouse facility is also termed a repurchase agreement, and often governed by a Master Repurchase Agreement like the one Care entered with Column. *See Coppola v. Bear Stearns & Co., Inc.*, No. 1:02-CV-1581, 2005 U.S. Dist. LEXIS 45551, at *3 (N.D.N.Y. Oct. 17, 2005) ("A Master Repurchase Agreement ("MRA"), dated June 16, 1997, governed the repurchase warehouse line."). *See also* Joseph Cioffi & Joseph Falcone, *When is a Repurchase Agreement not a Repurchase Agreement?*, Metro. Corp. Counsel, Mar. 2008, at 29 ("[W]arehouse financing arrangements are typically documented as 'master repurchase agreements' under which an originator, as seller,

---

[2] The sufficiency of Plaintiffs' allegations must be decided solely on the allegations contained in the Amended Complaint. *See Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 178 (S.D.N.Y. 1996) (holding in securities case that "[a]llegations made outside of the complaint are not properly before the court on a motion to dismiss") (citation omitted); *Scholastic, Inc. v. Stouffer*, 124 F. Supp. 2d 836, 851 n.16 (S.D.N.Y. 2000) ("parties are not entitled to assert new facts in submissions on a motion to dismiss").

transfers newly-originated mortgage loans against payment by the warehouse provider, as purchaser, with a simultaneous agreement by the originator to repurchase from the warehouse provider the same mortgage loans, by not later than a date certain, at a designated repurchase price.").[3]

Plaintiffs also continue to disregard the language of the Registration Statement, in which Care expressly warned that it may not succeed in closing the warehouse facilities on favorable terms, if at all:

> We are currently negotiating a warehouse facility with Column Financial Inc., an affiliate of Credit Suisse Securities, LLC, an affiliate of one of our underwriters, which we expect to be in place shortly after consummation of this offering. We are also currently negotiating a warehouse facility with UBS Real Estate Securities, Inc., an affiliate of one of our underwriters, which we expect to be in place soon after consummation of this offering. *There is no assurance, however, that we will be able to close these facilities on terms favorable to us, if at all*.

(Am. Compl. ¶ 32; RS 10 (emphasis added).)

"The bespeaks caution doctrine prevents a plaintiff from basing an action for fraudulent misrepresentation upon a statement that bespeaks caution of the very risks about which plaintiffs complain." *Saslaw v. Al Askari*, No. 95 Civ. 7641, 1997 U.S. Dist. LEXIS 5621, *19-20 (S.D.N.Y. Apr. 25, 1997) (finding that warnings about expected ability to enter new license agreements adequately disclosed risks). Far from being boilerplate, as Plaintiffs would wish, Care's warning that it may not succeed in securing a warehouse facility--the very outcome that Plaintiffs now argue occurred, in the very statement that Plaintiffs challenge as inaccurate-- defeats Section 11 liability. *See id.* at *30; *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (upholding dismissal of Section 11 claim pursuant to 12(b)(6) because of "prominent and specific" language that warned investors of "exactly the risk the plaintiffs claim

---

[3] A copy of this article is attached as Exhibit 1 to the Declaration of Joel G. Chefitz in Further Support of Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint (Chefitz Decl.), Exhibit A hereto.

was not disclosed."). *Accord Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 702 (2d Cir. 1994) (holding plaintiff on notice of potential insolvency where opinion in prospectus was "contingent on future events" and followed immediately by the caveat that "no assurance can be given, however, that a court would confirm the Company's positions with respect to these [solvency] issues" (brackets in original)). *Compare In re Vivendi Universal, S.A. Secs. Litig.*, 381 F. Supp. 2d 158, 183 (S.D.N.Y. 2003) (holding insufficient the generic statement, "actual results may differ").

In addition to inconsistent argument, Plaintiffs try to recast the allegations that they did make in the Amended Complaint. In the face of public filings showing that UBS was not a shell, as Plaintiffs alleged (Am. Compl. ¶ 33), Plaintiffs now argue that UBS was not "engaged in any type of lending activity . . . but was a *seller* of mortgage assets." (Opp. 18 (emphasis in original).) Once again, a simple search of public filings reveals that Plaintiffs are simply making it up. As with the allegations of their Amended Complaint, Plaintiffs' new argument is contradicted by public disclosure documents demonstrating that UBS Real Estate was providing loans of hundreds of millions of dollars in the weeks both before and after Care's IPO. (Chefitz Decl., Exs. 2-3). (*See also* Chefitz Decl., Ex. 4 (describing UBS Real Estate's amendment and restatement of a $200 million revolving warehouse credit facility).)

While paying lip service to the statutory element that any alleged misstatements be inaccurate at the time they were made, Plaintiffs still try to bootstrap their claims with Care's post-IPO statements about post-IPO events. (Opp. 18.) Plaintiffs make no mention in their Opposition of their previous reliance in the Amended Complaint on Care's November 2007 Form 10-Q, nor attempt to explain how any disclosure about Care's negotiations as of November 2007 could reflect the state of warehouse negotiations in June 2007. Yet Plaintiffs continue to rely on Care's August 2007 Form 10-Q, which similarly described the state of negotiations *after*

the IPO.[4]  But the language on which Plaintiffs rely from the August 2007 Form 10-Q confirms, rather than contradicts, Care's expectations in June 2007 as reported in the Registration Statement:

> Due to continuing disruption in the credit markets along with a material reduction in liquidity, efforts to finalize negotiations on these debt facilities are taking longer than originally anticipated.

(Am. Compl. ¶ 34 (emphasis removed).)  Care's statement in the August 2007 Form 10-Q *confirms* that it originally expected that its warehouse facility negotiations would be complete by August 2007.  (Am. Compl. ¶ 32 (stating that Care expected warehouse facilities to be in place "shortly after consummation of this offering").)  Both the August and November 2007 statements are also consistent with the Registration Statement in that they reveal that the warehouse negotiations were precisely "as certain or advanced as Care represented in the Prospectus" (Opp. 3), which expressly warned that negotiations may not be successful *at all*.  (RS 10; Am. Compl. ¶ 32.)

Finally, Plaintiffs' argument that Care's warehouse facility arrangement is a "far cry from the 'line of credit' Care announced" in an October 7, 2007, press release (Opp. 13, 17) is also beside the point.  Statements made in a press release issued months after the IPO are not subject to Section 11 liability.  15 U.S.C. § 77(a).  Plaintiffs' real argument seems to be that the terms of Care's warehouse facility with Column were not favorable enough in the abstract.  But Care never promised that they would be, instead warning that Care might not be able to close a

---

[4] Plaintiffs' speculation that circumstances had not changed so drastically between the June 22 IPO and June 30 is "disingenuous." (Opp. 18.)  As Plaintiffs' own allegations make clear, Care's August Form 10-Q described the status of warehouse negotiations not *as of* June 30, 2007, but *since* June 30, 2007.  (Am. Compl. ¶ 35 (quoting paragraph from August 2007 Form 10-Q that begins, "Since June 30, 2007").)

- 8 -

warehouse facility on favorable terms. (RS 10; Am. Compl. ¶ 32.) Plaintiffs' reliance on post-IPO events and attack of post-IPO statements are irrelevant to their Section 11 claims.[5]

### C.   Care Made No Misrepresentations About Its Manager.

Plaintiffs once again assume new allegations in their Opposition. In the Amended Complaint, Plaintiffs allege that Care's description of its relationship with its manager was inaccurate "because it portrayed Care Investment and its relationship with CIT Healthcare in a positive fashion but failed to disclose that prior to the IPO, CIT Healthcare had engaged in questionable loan practices which exposed the Company to a heightened risk of default in the Contributed Portfolio." (Am. Compl. ¶ 24.) In their Opposition, Plaintiffs move away from the allegations in their Complaint and again improperly substitute argument for allegations. Plaintiffs now argue that Care's statement about its manager was inaccurate not because of the alleged "questionable loan practices"--an allegation rendered irrelevant by the Amended Complaint's affirmative allegations and the Offering Documents' quoted statements describing the different loans included in the Contributed Portfolio (RS 2, 71-74; Am. Compl. ¶ 25)--but because Care's manager's access to investment opportunities "never materialized." (Opp. 19.)

Plaintiffs have alleged no facts in the Amended Complaint in support of their new argument. *See Twombly*, 127 S. Ct. at 1965. Plaintiffs cite instead the same allegations of questionable loan practices, which make no mention of investment opportunities available through Care's manager. (Opp. 19 (citing Am. Compl. ¶ 24).) In fact, Plaintiffs cannot make any supporting allegations, because the opportunities that Care said its manager "may" originate

---

[5] Plaintiffs' argument about Care's October 7, 2007, press release is not only irrelevant to their Section 11 claim, but once again flat out wrong. The same warehouse facility with Column that Plaintiffs contend was a "far cry from" a line of credit enabled Care to close on more than $250 million in real estate acquisitions within two months of closing the warehouse facility. (Chefitz Decl., Ex. 5 at 1 (describing $263 million transaction with Cambridge Holdings Incorporated) and 2 ("the Company borrowed $25 million under its warehouse facility with Column Financial, Inc. to finance a portion of the purchase price payable to Cambridge").) And Care achieved that success before the subsequent improvement in the terms of the warehouse facility, which Plaintiffs acknowledge. (Opp. 7-8, n.4.)

did materialize. Plaintiffs' fabricated argument is directly contradicted by SEC filings showing that Care's relationship with its manager was so beneficial that Care more than doubled its asset base from $283.1 million to $646.9 million one year after its IPO. (Chefitz Decl., Exs. 5-6 (describing $263 and $100.8 million real estate acquisitions).)

Even if Care's relationship with its manager had not been so successful, Plaintiffs point to nothing false in Care's stated "belief" that one of its business strengths would be access to investment opportunities originated by its Manager, or that its manager "may" originate investment opportunities through business relationships with financial institutions. (Am. Compl. ¶ 23.) And Plaintiffs' sole attempt to characterize Care's optimistic (and accurate) statement about its manager as actionable is to contend the statement "related directly to Care's core business strategy." (Opp. 19.) But that adds nothing. *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (confirming ability to "be confident about their stewardship and the prospects of the business that they manage" without giving rise to securities violations). Plaintiffs also once again ignore direct warning statements in the Registration Statement about Care's business strategy and its manager. In a section titled, "Risks Related to Our Business: We are dependent on our Manager, who has no experience operating a REIT," Care warned:

> Our Manager's lack of experience in managing a portfolio of assets . . . may hinder its ability to achieve our investment objective. In addition, maintaining our REIT qualification and complying with the Investment Company Act exemptions limit the types of investments, particularly with respect to healthcare businesses, that we are able to make. We can offer no assurance that our Manager will be successful at all or as successful as in its previous endeavors . . . .

(RS 18.)

**D.    Care Made No Misrepresentation About Its Possible Use of CDOs.**

In response to Care's motion to dismiss, Plaintiffs simply quote more extensively from Care's statements in its Prospectus about the possible use of CDOs. (Opp. 19-21.) The

additional language cited by Plaintiffs simply confirms that Care represented nothing more than that it "may" use CDOs. (Opp. 19-20.) Plaintiffs can point to nothing false in that statement. And the excerpts Plaintiffs quote show on their face that Care included specific warning language in its very statement about CDOs:

> [W]e are subject to the risk that we will not be able to acquire, during the period that our warehouse facility is available, a sufficient amount of eligible assets to maximize the efficiency of a securitization issuance. In addition, conditions in the capital markets may make the issuance of a securitization less attractive to us when we have accumulated a sufficient pool of collateral.

(Opp. 20-21 (quoting RS 33).) This specific warning renders Care's statement inactionable under Section 11, because it immediately followed the very statement that Plaintiffs challenge and it listed "substantive information about factors that realistically could cause results to differ materially from those projected." *See Vivendi*, 381 F. Supp. at 183 (citations omitted) (cited by Plaintiffs in Opposition). *Accord Olkey*, 98 F.3d at 5.

Nor have Plaintiffs pled an actionable omission under Section 11. Plaintiffs contend that problems in the credit market were "already known to market participants prior to the IPO." (Opp. 22.) Plaintiffs again improperly rely solely on facts that post-date the IPO--here, a Wall Street Journal article published a full year after the IPO. First, external sources reporting a year after the IPO, with the benefit of perfect hindsight, do not cast any doubt on Care's statements at the time of its Registration Statement. *See Hinerfeld*, 1998 U.S. Dist. LEXIS 10601, at *14. *Accord Fisher v. Ross*, No. 93 Civ. 0725, 1996 U.S. Dist. LEXIS 15091, at *11 (S.D.N.Y. Oct. 11, 1996) ("impressions made misleading only with the benefit of hindsight" are not actionable under Section 11). Second, the article on which Plaintiffs purport to rely relates solely to the sub-prime mortgage market, which is admittedly irrelevant to the assets included in the IPO. Plaintiffs do not allege that any of the assets in the Contributed Portfolio was sub-prime; to the contrary, they affirmatively allege that the assets are "secured by several different types of

healthcare facilities with diverse operations and tenants in a variety of geographic locations." (Am. Compl. ¶ 25.) Nor can Plaintiffs equate knowledge of the sub-prime credit crisis to knowledge of a slowdown in other sectors of the economy. Public sources demonstrate that Federal Reserve System Chairman Ben S. Bernanke predicted in June 2007--only two weeks before the IPO--that "troubles in the subprime sector seem unlikely to seriously spill over to the broader economy . . . ." *See* Speech of Chairman Ben S. Bernanke to the 2007 International Monetary Conference, Cape Town, South Africa, June 5, 2007.[6]  *See also Brown v. Lippard*, 472 F.3d 384, 387 (5th Cir. 2006) (taking judicial notice of the existence of a statement without noticing it for its truth).

## II. THE ALLEGED MISSTATEMENTS COULD NOT HAVE CAUSED PLAINTIFFS' LOSS.

Plaintiffs cannot dispute that dismissal of a Section 11 claim is proper if negative causation is apparent on the face of the Complaint. *In re Merrill Lynch & Co., Inc. Research Reports*, 272 F. Supp. 2d 243, 253-54 (S.D.N.Y. 2003) . *See also* (Opp. 23 ("courts have found that [negative causation] is *generally* established by defendants only at a later stage in the litigation") (emphasis added).) They argue instead that their claims should not be dismissed here because their losses were "clearly the result of untrue statements of material fact identified in the Complaint." (Opp. 24.) Plaintiffs base their argument entirely on Care's August 14, 2007, Form 10-Q, after which they argue that Care's stock "tumbled." But the alleged misstatements could not have caused Plaintiffs' losses because, as is clear from the face of the Amended Complaint,

---

[6] A copy of Bernanke's speech is attached to the Chefitz Decl. as Exhibit 7. Only months later, with the benefit of hindsight, did even Chairman Bernanke determine that the subprime crisis had affected the broader economy starting in August 2007--*after* Care's IPO. *See* Speech of Chairman Ben S. Bernanke at the Federal Reserve Bank of Atlanta Financial Markets Conference, May 13, 2008, attached to Chefitz Decl. as Exhibit 8 ("*[S]ince August*, severe financial strains have shaken this foundation [of well-functioning financial markets]. A sharp housing contraction has generated substantial losses on many mortgage-related assets and a broad-based tightening in credit availability." (emphasis added)).

the August 2007 Form 10-Q does not correct any statement made in the Registration Statement. *See In re Alamosa Holdings, Inc. Secs. Litig.*, 382 F. Supp. 2d 832, 866 (N.D. Tex. 2005) (dismissing Section 11 claim where plaintiffs alleged that the stock dropped in response to a press release that did not correct the Registration Statement); *In re Apollo Group, Inc. Secs. Litig.*, No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995, at *9 (D. Ariz. Aug. 4, 2008) ("A disclosure that does not reveal anything new to the market is, by definition, not corrective.") (citations omitted)).

Care's statement in its August 2007 10-Q that the warehouse facility negotiations "are taking longer than expected" (Am. Compl. ¶¶ 34-35) is fully consistent with the representation in the Registration Statement that Care was negotiating with "no assurance, however, that we will be able to close these facilities on terms favorable to us, if at all." (*Id.* ¶ 32.) Because the only disclosure on which Plaintiffs rely does not correct the Registration Statement, any loss experienced by Plaintiffs cannot be attributed to any alleged misrepresentation in the Registration Statement, and Plaintiffs' Section 11 claim must be dismissed. *See In re Alamosa*, 382 F. Supp. 2d at 866. *Accord In re Apollo*, 2008 U.S. Dist. LEXIS 61995, at *5-6 (granting judgment as a matter of law in defendants' favor where disclosure was not corrective). Plaintiffs have no argument in response, and do not even attempt to explain how the August 2007 10-Q corrects the Registration Statement. (Opp. 25 n.16 (dismissing Care's argument as "simply wrong").)[7]

---

[7] The cases Plaintiffs cite for their general assertion that negative causation is more appropriately decided at a later stage in a litigation are inapposite. They consider arguments that defendants' corrective disclosures could not have caused plaintiffs' damages because the price declines took place *before* the issuance of undisputedly corrective disclosures. *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 271 (S.D.N.Y. 2007); *In re Flag Telecom Holdings*, 411 F. Supp. 2d 377, 383-84 (S.D.N.Y. 2006); *In re WRT Energy Secs. Litig.*, No. 96 Civ. 3610, 2005 U.S. Dist. LEXIS 18701, *5 (S.D.N.Y. Aug. 30, 2005). Care does not assert that the timing of the August 2007 Form 10-Q precludes causation; rather, Plaintiffs' supposed corrective disclosure does not correct anything in the Registration Statement.

**III.   THE AMENDED COMPLAINT FAILS TO STATE SECTION 12 AND 15 CLAIMS.**

Plaintiffs' allegations that the individual Defendants were officers and directors who signed the Registration Statement is insufficient to establish "seller" status under Section 12(a)(2) after *Twombly*. (Am. Compl. ¶¶ 8-10 (alleging that the individual Defendants signed the Registration Statement and amendments).) Plaintiffs rely on pre-*Twombly* case law for the proposition that their allegations are sufficient to show that the individual Defendants solicited purchase of the securities, as Section 12 requires. *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 352 F. Supp. 2d 429, 454 (S.D.N.Y. 2005); *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996). But after *Twombly*, a plaintiff must go beyond "labels and conclusions" and allege sufficient facts to move a claim "above the speculative level." *Twombly*, 127 S. Ct. at 1964-65.

Accordingly, after *Twombly*, "neither the signing of the prospectus, nor the unsupported assertion of solicitation is sufficient to qualify an individual as a 'seller' for purposes of Section 12." *In re Metro. Sec. Litig.*, No. CV-04-0025, 2007 U.S. Dist. LEXIS 84392, at *81 (E.D. Wash. Nov. 5, 2007) (noting that "*Twombly* emphasizes the importance of alleging facts at the pleading stage" and dismissing Section 12 claim). Plaintiffs have provided no factual allegations to support their contention that the individual Defendants solicited the sale, beyond their bare allegation that they signed the Registration Statement, and their Section 12 claim must be dismissed. *Id.*

Because Plaintiffs' Section 11 and 12 claims cannot stand, their Section 15 claims must also be dismissed.

- 14 -

## IV. PLAINTIFFS' REQUESTED AMENDMENT WOULD BE FUTILE.

Plaintiffs seek leave to amend their Amended Complaint for the apparent purpose of incorporating the "certain limited materials" mentioned in their Opposition but not in the Amended Complaint. (Opp. 27 n.19.) These materials include: documents related to Care's August 14, 2007, Form 10-Q; documents related to several filings and press releases made by Care in October and November 2007; and the Master Repurchase Agreement that governs Care's warehouse facility with Column. Although Fed. R. Civ. P. 15(a) provides that leave to amend should be freely given when justice so requires, "it is well established that leave to amend a complaint need not be granted when amendment would be futile." *See Viacom Int'l, Inc. v. Youtube, Inc.*, 540 F. Supp. 2d 461, 462 (S.D.N.Y. 2008) (J. Stanton) (denying leave to amend) (citing *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003)).

Plaintiffs' suggested amendment would be futile because the additional, post-IPO materials Plaintiffs rely on provide no support for their conclusion that Care violated Section 11. *In re Scor Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 573-74 & n.23 (S.D.N.Y. 2008) (denying request for leave to amend complaint to append additional facts contained in motion papers in case involving alleged violations of federal securities laws). Care has addressed in this Reply each of the additional materials Plaintiffs rely on and has demonstrated that, even if Plaintiffs' Amended Complaint were amended further, it still could not survive a motion to dismiss. Plaintiffs' request to amend should be denied, and their Amended Complaint dismissed with prejudice. *Detwiler v. Bristol-Myers Squibb Co.*, 884 F. Supp. 117, 119 (S.D.N.Y. 1995) (J. Stanton) ("A district court is justified in denying an amendment if the proposed amendment could not withstand a motion to dismiss.") (internal quotations and citations omitted).

**CONCLUSION**

Plaintiffs still fail to point to a single false statement by Care in its Registration Statement.  Plaintiffs' newly hatched contentions inconsistent with their Amended Complaint, their repeated reliance on post-IPO statements and events and even their misrepresentations of publicly available facts do not render the factual allegations of their Amended Complaint actionable under *Twombly*'s heightened pleading standard.  The Amended Complaint should be dismissed with prejudice.

DATED: September 10, 2008                                        McDERMOTT WILL & EMERY LLP

  /s/  Joel G. Chefitz
Joel G. Chefitz (XXXXXX)
227 West Monroe Street, Suite 4400
Chicago, Illinois 60606
312/372-2000
312/984-7700 (fax)

Andrew D. Kaizer (AK9730)
340 Madison Avenue
New York, NY 10173-1922
212/547-5400
212/547-5444 (fax)
*Attorneys for Care Investment Trust Inc.,
F. Scott Kellman, Robert O'Neill and
Flint D. Besecker*