## Subprime – Law Firms & Corporate Counsel

# When Is A Repurchase Agreement Not A Repurchase Agreement?
### *Testing The Limits Of Bankrupcy Protections Afforded Mortgage Loan Warehouse Providers*

**Joseph Cioffi**
DAVIS & GILBERT LLP

**Joseph Falcone**
NATIXIS CAPITAL MARKETS INC.


**Joseph Cioffi**


**Joseph Falcone**

The title of this article may sound like a trick question, but American Home Mortgage Corp. ("American Home"), a residential mortgage loan originator and Chapter 11 debtor in Delaware Bankruptcy Court, became the first originator to seriously pose this question and challenge the safe harbor provisions of the Bankruptcy Code (the "Code") that were specifically broadened in recent years to include mortgage loan repurchase agreements (otherwise known as "mortgage loan repos"). American Home's opposition to certain financial institutions which helped finance its mortgage loan originations to consumers serves as both a cautionary tale for mortgage loan repo participants and an affirmation by the Bankruptcy Court of the broad protections intended by Congress to be granted to such participants.

As evidenced throughout the Code, subsequent amendments and legislative history, Congress has long recognized the importance of protecting financial markets from the disastrous effect that may occur if the insolvency of one participant is allowed to spread to other players. In particular, the viability and stability of the repo market was a key concern addressed in the 1984 amendments to the Code and, then again, as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). In 1984, section 559 was added in order to protect the exercise by repo participants of contractual rights to liquidate repurchase agreements from stays, avoidance and other limitations that would otherwise be imposed by the Code. Without such protection, a party to a repo with a debtor in bankruptcy would be vulnerable to loss of, or interference with, its rights and remedies under the repo by reason of the commencement of the bankruptcy proceeding. BAPCPA specifically expanded the protections of section 559 to participants in repo agreements involving "mortgage related securities" (as defined in section 3 of the Securities Exchange Act of 1934), "mortgage loans," or "interests in mortgage related securities or mortgage loans" by expanding the definition of "repurchase agreements" contained in section 101(47). In addition, among other things, BAPCPA broadened repo participants' safe-harbored activities to include the exercise of contractual rights to accelerate or terminate repurchase agreements.

Mortgage loan originators typically finance their origination activities through short-term financing facilities known as "warehouse facilities," which, in many cases, are provided by banks and other capital markets participants. Prior to the enactment of BAPCPA, many warehouse providers, and particularly Wall Street firms, eschewed secured lending facilities and instead entered into mortgage loan repos with originators on the theory that their contracts could, at a minimum, be covered under the safe harbor provisions of section 555 as "securities contracts."

In the post-BAPCPA world today, warehouse financing arrangements are typically documented as "master repurchase agreements" under which an originator, as seller, transfers newly-originated mortgage loans against payment by the warehouse provider, as purchaser, with a simultaneous agreement by the originator to repurchase from the warehouse provider the same mortgage loans, by no later than a date certain, at a designated repurchase price. During the interim period, the originator tries to arrange for the sale of the mortgage loans to a take-out purchaser. Simultaneously with the sale to the take-out purchaser, the repurchase is consummated by the originator under the repurchase agreement, as the purchase price is transferred, on the originator's behalf, directly from the take-out purchaser to the warehouse provider in exchange for the mortgage loans.

By 2007, the procession of bankruptcies of mortgage loan originators that flowed from declining housing prices, rising interest rates and collapse of the subprime mortgage industry created for the first time an opportunity to test the protections afforded by the BAPCPA amendments. Generally, however, warehouse providers had been able to exercise their contractual rights under mortgage loan repos without interference from the Bankruptcy Court. American Home changed that at the end of 2007 when it challenged the rights of certain of its warehouse providers, Credit Suisse First Boston ("CSFB") and Calyon, New York Branch ("Calyon"), arguing that its mortgage loan repos with CSFB and Calyon (the "Warehouse Providers") were not truly "repurchase agreements," but instead were secured financings cloaked in repurchase agreement parlance extracted from the Bankruptcy Code. American Home further argued that even if the Court concluded that the agreements were "repurchase agreements" as defined under section 101(47), the servicing rights were severable and had been retained by American Home and therefore, were not subject to control by the Warehouse Providers.

According to American Home, in order for the safe harbor provisions of the Code to apply to a repurchase agreement (including a mortgage loan repo) the contract must evidence (i) alienability or fluidity (i.e., the warehouse provider can dispose of the loans to a third party) and (ii) substitutability (i.e., the warehouse provider can return different assets to the seller as part of the repurchase transaction). Because the agreements in question did not expressly authorize the Warehouse Providers to "sell" the mortgage loans absent an event of default, or permit different assets to be returned as part of the repurchase transaction, American Home contended that the agreements lacked the hallmarks of "true" repurchase agreements.

Notably, the criteria set forth by American Home are not found in the definition of "repurchase agreement" under section 101(47). As the Warehouse Providers pointed out, in order for a repurchase agreement to allow for the substitution of different property, the property sold in the first stage of the repurchase transaction must be fungible. Mortgage loans are not fungible because every loan is unique: each is secured by a different parcel of real property and each has a different borrower with a different payment and credit history. Therefore, given the realities of the market, if American Home was correct, then there would be no mortgage loan repo currently existing that would be covered by the safe harbor provisions. Accordingly then, American Home essentially posited that the BAPCPA amendments, which expressly broadened the protections of section 559 to mortgage loan repos, could, in fact, be a nullity.

American Home also relied on the Warehouse Providers' failure to use the form of repurchase agreement developed by the Bond Market Association and typically used to document securities repurchase transactions, and showed evidence that terms used in sections 101(47) and 559 were merely inserted into a form of secured loan agreement previously negotiated with Calyon in an attempt to create a mortgage loan repo. American Home maintained that the CSFB and Calyon agreements had features more characteristic of a secured loan, including: (i) calculation of the price differential (which operates like an interest rate on advances under the facility) without regard to income generated by the underlying assets; (ii) extensive affirmative and negative covenants similar to those found in secured loan agreements; (iii) "conditions precedent" to funding; and (iv) "commitments" to fund. As demonstrated by the Warehouse Providers, however, a survey of more than twenty publicly available mortgage loan repos showed none of them followed the global form promulgated by the Bond Market Association, with all providing for the repurchase of the exact same mortgage loans initially sold under the repo, and most containing the same terms that American Home claimed undermined the classification of the CSFB and Calyon agreements as "repurchase agreements" under the Code.

American Home further argued that even if the Court established that a true "repurchase agreement" existed, the servicing rights to the underlying mortgage loans were severable from the remainder of the agreement. It contended that servicing rights cannot constitute an "interest in mortgage loans" for purposes of section 101(47) or elsewhere in the Code. Further, American Home maintained that servicing rights are not related to an underlying mortgage loan repo transaction because separate agreements often govern servicing exclusively.

The Warehouse Providers argued to the contrary that the servicing component of a mortgage loan repo is a "related term" under section 101(47) and, thus, should be covered under the safe harbor provisions. Generally under mortgage loan repos, the originator/seller services the loans only for the brief interim period between the initial sale and repurchase stage of the transaction. During this interim period, which is usually no longer than 30 to 60 days, servicing is not shuffled around but remains with the originator (as the temporary servicer) to avoid confusion among borrowers with respect to where to send their mortgage payments. Misdirected or untimely mortgage payments often lead to impaired loan values. Accordingly, they argued, because the servicing performed by the originator/seller under a mortgage loan repo makes the transaction workable and avoids disruption, it is an integral part of the repo and cannot be severed from the rest of the agreement.

Ultimately, the Court did not decide the repurchase agreement and servicing issues with respect to CSFB due to a settlement between the parties. However, by applying the plain meaning of section 101(47), the Court concluded that Calyon's agreement did constitute a "repurchase agreement" and that the safe harbor provisions of sections 555 and 559 were applicable. The Court found that there was no need to consider extrinsic evidence because there was no uncertainty regarding Congress's intent in drafting the definition of "repurchase agreement." Based on several unique provisions of Calyon's agreement relative to more typical mortgage loan repos, the Court also concluded that the servicing rights were severable from the remainder of the Calyon agreement and had been retained by American Home, and hence were not subject to termination or control by Calyon under the safe harbor provisions of the Code. In determining that the loans were sold to Calyon on a "servicing retained basis," the Court cited the existence of a separate monthly servicing fee paid by Calyon under the agreement and various other provisions of the agreement which indicated that American Home retained the right to designate the servicer of the loans. The Court also pointed to the express right of the servicer initially appointed, AHM Servicing, Inc., to subcontract servicing responsibilities to third parties. To the Court, all signs pointed to American Home, and not Calyon, as being the true owner of the servicing rights to the subject mortgage loans.

The arguments fashioned by American Home, and the Court's decision regarding Calyon's mortgage loan repo, provide an opportunity for warehouse providers and their counsel to revisit and fortify their structuring and documentation practices with respect to these transactions to ensure that warehouse providers are adequately protected against arguments similar to those made by American Home. American Home may have been the first repo seller to significantly challenge the BAPCPA amendments expressly intended by Congress to protect mortgage loan repo participants, but it will most likely not be the last to pose novel arguments in an attempt to prevent warehouse providers from availing themselves of the safe harbors under the Code.

*Joseph Cioffi is a Partner at Davis & Gilbert LLP and heads the firm's mortgage banking practice. Joseph Falcone is Director, Counsel at Natixis Capital Markets Inc. Craig Gold, an Associate at Davis & Gilbert LLP, contributed to this article.*

**Please email the authors at jcioffi@dglaw.com or joseph.falcone@cm.natixis.com with any questions regarding this article.**