"Other Funding Group Limit" means the maximum outstanding principal amount of Advances that may be extended by an Other Funding Group. As of the date of this Agreement, each Other Funding Group Limit is $0.

"Other Improvement Effective Date" means, in respect of an Approved Aircraft Improvement other than a Freighter Conversion, the date by which each of the following has occurred: (a) the completion of such Approved Aircraft Improvement, (b) the delivery of appropriate completion and/or airworthiness certificates associated therewith to the Administrative Agent, in form and substance reasonably acceptable thereto, and (c) the placing of such Aircraft back into service following such improvement.

"Other Non-Conduit Lender" means a bank or other financial institution which, under an Assignment and Assumption, an amendment to, or an amendment and restatement of this Agreement, as applicable, hereafter agrees to become a party hereto as a Non-Conduit Lender hereunder and/or any of its successors and assigns thereof permitted under the terms hereof.

"Other Non-Conduit Lender Percentage" of any Other Non-Conduit Lender means, (i) with respect to an Other Non-Conduit Lender, the percentage set forth on the signature page to an amendment to or an amendment and restatement of this Agreement, as such amount is reduced or increased by any Assignment and Assumption entered into with an Eligible Assignee (or other assignee consented to by the Borrower) or, after the occurrence of an Event of Default, any other Person or (ii) with respect to an Other Non-Conduit Lender that has entered into an Assignment and Assumption, the amount set forth therein as such Non-Conduit Lender's Other Non-Conduit Lender Percentage, as such amount is reduced or increased by an Assignment and Assumption entered into between such Other Non-Conduit Lender and an Eligible Assignee (or other assignee consented to by the Borrower) or, after the occurrence of an Event of Default, any other Person.

"Outstanding Class A Principal Amount" means, as of any date of determination, the sum of all outstanding Class A Advances.

"Outstanding Class B Principal Amount" means, as of any date of determination, the sum of all outstanding Class B Advances.

"Outstanding Principal Amount" means, as of any date of determination, the sum of all outstanding Advances.

"Own" means, with respect to an Aircraft, to hold legal, direct and sole ownership of such Aircraft, or, in the case of the ANA Aircraft, to hold beneficial ownership pursuant to the ANA Beneficial Ownership Structure. The terms "Ownership" and "Owned by" have a correlative meaning.

"Owner Participant" means a Borrower Subsidiary which is the sole beneficial owner of one or more Aircraft by means of owning, pursuant to an Owner Trust Agreement, all of the beneficial interest in the Owner Trust which Owns such Aircraft.

45

"Owner Trust" means an owner trust, reasonably satisfactory to the Administrative Agent, (i) that is the legal owner of an Aircraft and (ii) all of the beneficial interest in which is owned by an Owner Participant pursuant to an Owner Trust Agreement.

"Owner Trust Agreement" means a trust agreement, reasonably satisfactory to the Administrative Agent, between an Owner Participant and an Owner Trustee.

"Owner Trustee" means a Person, not in its individual capacity, but solely in its capacity as the owner trustee of an Owner Trust under an Owner Trust Agreement, which such Person shall be (i) a bank or trust company having a combined capital and surplus of at least One Hundred Million Dollars ($100,000,000) and that is reasonably satisfactory to the Administrative Agent, or (ii) any other Person that is reasonably satisfactory to the Administrative Agent, it being understood that as of the Closing Date any of Wells Fargo Bank National Association, Wells Fargo Bank Northwest, National Association, Wilmington Trust Company, or U.S. Bank, National Association each are satisfactory to the Administrative Agent.

"Participant" means the party to a Participation Agreement identified as the "Participant" thereunder, which party if becoming a Participant prior to the occurrence and during the continuance of an Event of Default, (A) shall not be an entity which, at the time of becoming a Participant, competes with AerCap in a material manner in the leasing of commercial aircraft unless the Borrower has otherwise consented to such specific competitor entity becoming a Participant, and (B) if becoming a Participant prior to the Amortization Period, either (1) has a long term debt rating of at least "A" from Standard & Poor's and/or "A2" from Moody's, or a short term debt rating of at least "A-1" from Standard & Poor's and/or "P-1" from Moody's, or (2) has otherwise been consented to by the Borrower (with such consent not to be unreasonably withheld or delayed).

"Participation Agreement" means a written agreement between UBSRESI and the applicable Participant, substantially in the form attached hereto as Exhibit J.

"Patriot Act" has the meaning set forth in Section 9.21.

"Payment Date" means the 10th day of each calendar month, or if such 10th day is not a Business Day, the next succeeding Business Day.

"Pension Plan" means, with respect to any Person, any employee pension benefit plan within the meaning of Section 3(2) of ERISA, other than a Multiemployer Plan, which is subject to the provisions of Title IV of ERISA or Section 412 of the Code and which (i) is maintained for employees of such Person or any of its ERISA Affiliates or is assumed by such Person or any of its ERISA Affiliates in connection with any acquisition or (ii) has at any time been maintained for the employees of such Person or any current or former ERISA Affiliate.

"Permitted Lien" means:

    (i)    any Lien for Taxes if (a) such Taxes shall not be due and payable, or (b) the obligation to pay such Taxes is being contested in good faith by appropriate proceedings and as to which reserves have been established and, in accordance with

46

GAAP, are reflected in the relevant financial statements, <u>provided</u>, that any proceedings related thereto, or the continued existence of such Lien, does not give rise to any reasonable likelihood of the sale, forfeiture or other loss of the affected asset or of criminal liability on the part of any Borrower Group Member;

(ii)    in respect of any Aircraft, any repairer's, carrier's or hangar keeper's, warehousemen's, mechanic's or materialmen's Lien or employee and other like Liens arising in the ordinary course of business by operation of law or any engine or parts-pooling arrangements or other similar Lien if such Liens (a) have not been due and payable for more than sixty (60) days, or (b) have been due and payable for more than sixty (60) days, but are being contested in good faith and as to which reserves, reasonably satisfactory to the Administrative Agent, have been established and in accordance with GAAP are reflected in the relevant financial statements, <u>provided</u>, that any proceedings related thereto, or the continued existence of the Lien, do not give rise to any reasonable likelihood of the sale, forfeiture or other loss of the affected assets or of criminal liability on the part of any Borrower Group Member;

(iii)    any Lien for any air navigation authority, airport tending, gate or handling (or similar) charges or levies arising in the ordinary course of business unless such Lien gives rise to a reasonable likelihood of the sale, forfeiture or other loss of the affected assets or of criminal liability on the part of any Borrower Group Member;

(iv)    any Lien created by a Lessee, a sublessee of a Lessee or any Person claiming by or through a Lessee or such a sublessee, provided that the Dollar equivalent amount of claims, charges or obligations asserted to be secured by such Lien, does not exceed 10% of the Adjusted Borrowing Value of the Aircraft as to which such Lien purports to attach, unless Effectively Bonded;

(v)    any Lien created in favor of the Collateral Agent, the Administrative Agent, the Funding Agents or the Lenders pursuant to the Transaction Documents;

(vi)    any permitted lien or encumbrance, as defined under any Lease, on any Aircraft or the engines or parts thereof (other than liens or encumbrances created by the relevant lessor);

(vii)    the respective rights of the Aircraft Owning Entity, any Applicable Intermediary and the lessee under any applicable Lease (and the rights of any sublessee under any permitted sublease relating to such Lease) and the documents related thereto; and

(viii)    Liens arising out of any judgment or amount with respect to which an appeal or proceeding for review is being prosecuted in good faith by appropriate proceedings diligently conducted and with respect to which a stay of execution is in effect, and such stay is Effectively Bonded.

47

"Person" means an individual, partnership, corporation, business trust, limited liability company, joint stock company, trust, unincorporated association, joint venture, government or any agency or political subdivision thereof or any other entity.

"Platform" has the meaning set forth in Section 17.3(c).

"Pledge of Borrower Equity" means a pledge, assignment, grant, charge, security agreement or other similar instrument, to be entered into by Codan Trust Company Limited as holder of 95% of the entire Equity Interest in the Borrower, encumbering in favor of the Collateral Agent such 95% Equity Interest in the Borrower.

"Political Risk/Repossession Insurance" means coverage under (i) the insurance policy MJ 51225 provided by Willis Limited for the benefit of the Borrower as in effect on the Original Closing Date, in the form provided and certified as a true and correct copy by the Borrower to the Administrative Agent for review prior to the Original Closing Date, but subject to supplement and indorsement as necessary to procure coverage levels up to at least the Required Coverage Amount and/or to effect such other additional coverages or increases in coverage as the Borrower or the Insurance Servicer may determine to obtain, and with such amendments, addendums, endorsements, extensions or replacements as may have been entered into consistent with the provisions of Section 10.34 hereof, or (ii) such other comparable insurance policy or policies in replacement of the foregoing as the Administrative Agent shall have reasonably approved.

"Precedent Lease" means (i) the lease under which an Aircraft is leased at the time such Aircraft becomes subject to the financing provided herein; or (ii) in connection with the leasing of an Aircraft to a Person that is or has been a lessee of aircraft from any Borrower Subsidiary, a form of lease substantially similar to the prior or pre-existing lease to such lessee from such lessor.

"Prohibited Countries" means those countries, as reasonably determined by the Administrative Agent from time to time (based upon applicable Rating Agency guidelines then in effect), in which Aircraft may not be registered in, or operated by lessees domiciled in or organized under the laws of, such countries without procuring insurance consistent with industry standards, which countries presently include Afghanistan, Albania, Bosnia, Burma, Burundi, Cambodia, Congo, Cote d'Ivoire, Cuba, Haiti, Herzegovina, Iran, Iraq, North Korea, Laos, Lebanon, Liberia, Libya, Montenegro, Rwanda, Serbia, any former Soviet Republic (other than Russia, Ukraine, Kazakhstan and Azerbaijan), Sudan, Syria, Yemen, Yugoslavia, Zaire and Zimbabwe.

"Purchase Agreement Guaranty" means the Guaranty Agreement of AerCap Holdings N.V., dated as of November 6, 2006, securing the obligations of AerCap under the AerCap-Borrower Purchase Agreement, or any successor or replacement to such agreement contemplated by Section 12.1(f) hereof and the terms thereof.

"Qualifying Lender" means a Lender, beneficially entitled to the interest payable to such Lender under this Agreement (a) which is an entity qualifying as a body corporate; (b) which, by virtue of the law of a relevant territory, is resident for the purposes of tax in that relevant

48

territory (a relevant territory for this purpose means (i) a Member State of the European Community (other than Ireland) or (ii) a territory which has concluded a double-tax treaty with Ireland which has force of law in Ireland and such relevant territory); and (c) to which the interest payments under this Agreement are not made in connection with a trade or business carried on by such Lender through a branch or agency in Ireland.

"Qualifying Purchase Option" means, with respect to a Lease that has a purchase option exercisable by the Lessee in respect of the Aircraft leased thereunder, that the expected purchase price of such option (as determined as of the Advance Date with respect to such Aircraft) will not be less than 95% of the Adjusted Borrowing Value of such Aircraft on the date of purchase pursuant to the option.

"Quarterly Report" means a report in substantially the form of Exhibit D hereto.

"Rating Agency" means Standard & Poor's and Moody's, or any of them.

"Records" means all Leases and other documents, books, records and other information (including, without limitation, computer programs, tapes, disks, data processing software (to the extent permitted by any applicable licenses) and related property and rights) directly related to the Leases and the other Aircraft Assets related to the Aircraft, and the servicing thereof, whether maintained by the Servicer or any other Person, and including without limitation with respect to each Lease: records including the lease number; Obligor name; Obligor address; Obligor business phone number; original term; rent; stated termination date; origination date; date of most recent payment; days (if any) currently delinquent; number of contract extensions (months) to date; expiration date of any current insurance policies; and past due late charges (if any).

"Related Expenses" means amounts due by any Borrower Group Member to an Obligor under a Lease or related document that are not funded out of the Maintenance Reserve Account or the Security Deposit Account.

"Related Security" means with respect to any Lease:

    (a)    any and all security interests or Liens and property subject thereto from time to time purporting to secure payment of such Lease;

    (b)    all guarantees, indemnities, warranties, letters of credit, escrow accounts, insurance policies and proceeds and premium refunds thereof and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Lease whether pursuant to such Lease or otherwise;

    (c)    the Records relating to such Lease; and

    (d)    all proceeds of the foregoing.

"Replaced Lender" has the meaning set forth in Section 6.6(b).

"Replacement Lender" has the meaning set forth in Section 6.6(b).

49

"Required Coverage Amount" means, with respect to any country described in clause (b)(2) of the definition of Approved Country List, an amount of available coverage under Political Risk/Repossession Insurance with respect to covered events affecting the related Funded Aircraft, which amount results in net proceeds available under such coverage at least equal to 105% of the aggregate Allocable Advance Amounts of Funded Aircraft registered in such country or leased by a Lessee organized or domiciled in such country (with such Allocable Advance Amount measured as of the date the Aircraft became a Funded Aircraft hereunder).

"Required Liquidity Reserve Amount" means, for any date of determination, an amount equal to (i) for so long as Critical Mass exists, 4%, and (ii) otherwise, 6%, in each case of the Adjusted Borrowing Value of the Funded Aircraft in the Borrower's Portfolio as of such date.

"Requirement of Law" means, as to any Person, any law, treaty, rule, order or regulation or determination of a regulatory authority or arbitrator or a court or other Government Entity, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, including, without limitation, each Applicable Foreign Aviation Law applicable to such Person or the Aircraft Owned or operated by it or as to which it has a contractual responsibility.

"Section 6.3 Indemnitee" has the meaning set forth in Section 6.3(a).

"Security Deposit" means any security deposits, commitment fees, consultant fees and any other supplemental rent payments in respect thereof payable by any Lessee under a Lease.

"Security Deposit Account" means an account (number 51946) in the name of the Borrower and maintained with the Account Bank.

"Security Trust Agreement" means the Security Trust Agreement, dated as of April 26, 2006 and substantially in the form of Exhibit I hereto, among the Collateral Agent, the Borrower and each of the Borrower Subsidiaries from time to time, as such agreement may be amended, modified and/or restated from time to time pursuant to the terms thereof.

"Seller" means any seller or transferor of an Aircraft or Aircraft Owning Entity under a related Aircraft Acquisition Document.

"Service Provider Agreements" means, collectively, the Servicing Agreement, the Service Provider Administrative Agency Agreement, and the Cash Management Agreement.

"Service Provider Administrative Agency Agreement" means the Administrative Agency Agreement, dated as of April 26, 2006, among the Service Provider Administrative Agent, the Financial Administrative Agent, the Borrower, the Aircraft Owning Entities, the Owner Participants, the Applicable Intermediaries and the Administrative Agent, substantially in the form of Exhibit E hereto, as the same may be amended, modified and/or restated from time to time pursuant to the terms thereof.

"Service Provider Administrative Agent" has the meaning set forth in the Preamble.

50

"Service Provider Fees" means, with respect to any Payment Date, (a) a fee for the services of the Servicer under the Servicing Agreement, equal to 3.00%, (b) a fee for the services of the Administrative Agent under the Service Provider Administrative Agency Agreement, equal to 0.40%, (c) a fee for the services of the Cash Manager under the Cash Management Agreement, equal to 0.40%, (d) a fee for the services of the Insurance Servicer under the Servicing Agreement, equal to 0.10%, and (e) a fee for the services of the Financial Administrative Agent under the Service Provider Administrative Agency Agreement, equal to 0.10%, in each case of the total amount of lease rental payments (excluding any Maintenance Reserves or Security Deposits, unless and until applied to Lease obligations, and/or any payments reimbursable to any Obligor) paid by Obligors and deposited into the Collection Account during the monthly period commencing with a Determination Date through the day preceding the next Determination Date.

"Service Providers" means, collectively, the Servicer, Service Provider Administrative Agent, Insurance Servicer, Cash Manager and Financial Administrative Agent.

"Servicer" has the meaning set forth in the Preamble.

"Servicer Advance" has the meaning assigned such term in Section 8.1(g).

"Servicer Advance Reimbursement" means the amount of a Servicer Advance, to which the Servicer shall be entitled to reimbursement under the Flow of Funds.

"Servicer Standard of Performance" means, collectively, the Standard of Care and the Conflicts Standard, in each case as such terms are defined in the Servicing Agreement.

"Servicer Termination Event" has the meaning set forth in Section 12.1.

"Servicing Agreement" means the Servicing Agreement, dated as of April 26, 2006, among the Servicer, the Insurance Servicer, the Service Provider Administrative Agent, the Financial Administrative Agent, the Borrower, the Aircraft Owning Entities, the Owner Participants, the Applicable Intermediaries and the Administrative Agent, substantially in the form of Exhibit G hereto, as the same may be amended, modified and/or restated from time to time pursuant to the terms thereof.

"Settlement Date" means, with respect to any Advance, (x) each Payment Date, or (y) the date on which the Borrower shall repay or prepay Advances pursuant to Section 4.1 or Section 4.2.

"Solvent" means, when used with respect to any Person, that at the time of determination:

    (i)    the fair value of its assets (both at fair valuation and at present fair saleable value on an orderly basis) is in excess of the total amount of its liabilities, including Contingent Liabilities; and

    (ii)    it is then able and expects to be able to pay its debts as they mature;

51

    (iii)    with respect to any Person formed, organized or incorporated under the laws of Ireland, it is neither unable nor deemed to be unable to pay its debts within the meaning of Section 214 of the Companies Act, 1963 (as amended) or Section 2(3) of the Companies (Amendment) Act 1990; and

    (iv)    it has capital sufficient to carry on its business as conducted and as proposed to be conducted.

"Standard & Poor's" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"State" means a State in the United States of America.

"Stated Maturity Date" means the third anniversary of the Conversion Date or, if such third anniversary is not a Business Day, the first Business Day following such fourth anniversary.

"Subsidiary" means, with respect to any Person (for purposes of this definition only, the "Parent") at any date, (i) any person the accounts of which would be consolidated with those of the Parent in the Parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, (ii) any other corporation,

limited liability company, association, trust or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board of Directors thereof are, as of such date, owned, controlled or held by the Parent and/or one or more subsidiaries of the Parent, (iii) any partnership (a) the sole general partner or the managing general partner of which is the Parent and/or one or more subsidiaries of the Parent or (b) the only general partners of which are the Parent and/or one or more subsidiaries of the Parent and (iv) any other person that is otherwise Controlled by the Parent and/or one or more subsidiaries of the Parent.

"Supporting Party" means AerCap Holdings N.V., in its capacity as signatory to the Purchase Agreement Guaranty and the Indemnity Agreement, or any successor or replacement thereto in such capacity as contemplated by Section 12.1(f) hereof and the terms thereof.

"Syndication Cooperation Agreement" means an agreement substantially in the form of Exhibit N hereto, dated on or before the Original Closing Date, among the Servicer, the Borrower and the Administrative Agent.

"Tateha" means Tateha Aircraft Holding Corporation, a company organized under the law of Japan.

"Tateha Aircraft Mortgage" means the First Priority Aircraft Mortgage Agreement dated March 17, 2006, between Tateha, as mortgagor, and Opal, as mortgagee, covering the ANA Aircraft, as such mortgage may be amended, modified or supplemented from time to time pursuant to the terms thereof.

"Tateha Sale and Conditional Repurchase Agreement" means the Sale and Conditional Repurchase Agreement dated March 17, 2006, among Opal, as Seller, Tateha, as Titleholder, and Mitsui, as Parent, covering the ANA Aircraft, as such agreement may be amended, modified or supplemented from time to time pursuant to the terms thereof.

"Taxes" means all taxes, levies, imposts, duties, charges, fees, deductions or withholdings imposed, levied, collected, withheld or assessed by any Governmental Entity.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination" has the meaning set forth in Section 17.19.

"Termination Payment" has the meaning set forth in Section 17.19.

"Third Party Event" has the meaning set forth in Section 10.14.

"Tombo" means Tombo Capital Corporation, a company organized under the law of Japan.

"Tombo Assignment" means the Security Assignment dated March 17, 2006 between Tombo, as assignor, and Lyon, as assignee, which includes as collateral the rights of Tombo under the ANA Sublease, as such assignment may be amended, modified or supplemented from time to time pursuant to the terms thereof.

"Tombo Sublease" means the Aircraft Sublease Agreement dated March 17, 2006 between Lyon, as lessor, and Tombo, as lessee, covering the leasing of the ANA Aircraft, as such sublease may be amended, modified or supplemented from time to time pursuant to the terms thereof.

"Transaction Documents" means the Credit Documents, any Aircraft Acquisition Document, and any other documents executed or to be executed and delivered by the Borrower, AerCap, any Service Provider or any Borrower Subsidiary in connection therewith.

"Type" means with respect to an Aircraft, the designation of Aircraft type or model which designation is set forth on Table 1 and Table 2 in Appendix I hereto.

"UBS Funding Agent" has the meaning set forth in the Preamble.

"UBS Funding Group" means, collectively, each UBS Non-Conduit Lender.

"UBS Funding Group Limit" means the maximum outstanding principal amount of Advances that may be extended by the UBS Funding Group. As of the date of this Agreement, the UBS Funding Group Limit is $1,000,000,000.

53

"UBS Non-Conduit Lender" means UBSRESI, each financial institutions identified as a UBS Non-Conduit Lender on the signature pages hereof, and/or any of their respective successors and assigns permitted under the terms hereof.

"UBS Non-Conduit Lender Percentage" of any UBS Non-Conduit Lender means, (i) with respect to UBSRESI, 100%, as such percentage is reduced or increased by any Assignment and Assumption entered into with an Eligible Assignee (or other assignee consented to by the Borrower) or, after the occurrence of an Event of Default, any other Person or (ii) with respect to another UBS Non-Conduit Lender that has entered into an Assignment and Assumption, the amount set forth therein as such UBS Non-Conduit Lender's UBS Non-Conduit Lender Percentage, as such amount is reduced or increased by any Assignment and Assumption entered into between such UBS Non-Conduit Lender and an Eligible Assignee (or other assignee consented to by the Borrower) or, after the occurrence of an Event of Default, any other Person.

"UBSRESI" has the meaning set forth in the Preamble.

"UBSS" has the meaning set forth in the Preamble.

"UCC" means the Uniform Commercial Code as from time to time in effect in the applicable jurisdiction or jurisdictions.

"Weighted Average Portfolio Age" means, as of any Payment Date for which the same is determined, the weighted (by Adjusted Borrowing Value) average Aircraft Age of the Borrower's Portfolio as of such date.

"Weighted Average Portfolio Age Limit" means 8.5 years.

"Weighted Average Portfolio Age Advance Rate Adjustment" means an adjustment to the Base Advance Rates based on the Weighted Average Portfolio Age as follows:

(a) for any date of determination as of which the Weighted Average Portfolio Age is above 8.0 years, the applicable Base Advance Rate is reduced by 1.50 percentage points so long as Critical Mass does not exist, and by 1.00 percentage points while Critical Mass exists;

(b) for any date of determination as of which the Weighted Average Portfolio Age is above 7.5 years, but at or below 8.0 years, the applicable Base Advance Rate is reduced by 1 percentage point so long as Critical Mass does not exist, and by 5/10ths of a percentage point while Critical Mass exists; and

(c) for any date of determination as of which the Weighted Average Portfolio Age is at or below 7.5 years, the applicable Base Advance Rates will have no adjustment.

"Wet Lease" means any arrangement whereby a lessee under a Lease (or the sublessee under any permitted sublease) agrees to furnish an Aircraft to a lessee pursuant to which (i) such lessee's (or permitted sublessee's) crew shall maintain full operational control of the Aircraft, (ii) such Aircraft shall be operated solely by regular employees of such lessee (or permitted

54

sublessee) or independent contractors under the direction and supervision of such lessee (or permitted sublessee) possessing all current appropriate FAA or other Applicable Foreign Government Entity certificates and licenses (it is understood that cabin attendants need not be regular employees of such lessee), (iii) the insurance required under such Lease shall remain in full force and effect, (iv) such Aircraft shall be maintained and used by such lessee (or permitted sublessee) and any maintenance provider in accordance with its normal maintenance practices and as required by the terms of the applicable Lease (or any relevant permitted sublessee), and (v) the term of any such arrangement does not extend beyond the remaining term of the applicable Lease.

"Widebody Aircraft" means Aircraft of the following Types (from the list of Types shown on Table 1 of Appendix I hereto): any Type with a designation using "747", "767", "777", "A330" or "MD-11".

"Widebody Maximum Percentage" means 30%.

"Widebody Percentage" means, as of any date of determination, the Facility Limit Percentage of Funded Aircraft constituting Widebody Aircraft.

"Yield" means, with respect to any period and any Advance, the sum of the daily interest accrued on such Advances on each day during such period equal, for any such day, to the product of (x) the outstanding principal amount of such Advances on such day, (y) the applicable Lender Rate and (z) the applicable computation period determined in accordance with Section 3.5 of this Agreement,

provided that (1) after the occurrence of an Event of Default, Yield shall accrue at the Default Rate with respect to all Advances and (2) after the date any principal amount of any Advance is due and payable (whether on the Stated Maturity Date, upon acceleration or otherwise) or after any other monetary Obligation of the Borrower arising under this Agreement shall become due and payable, the Borrower shall pay (to the extent permitted by law, if in respect of any unpaid amounts representing Yield) Yield (after as well as before judgment) on such amounts at a rate per annum equal to (A) with respect to Advances, the greater of (i) the applicable Yield on such Advance as in effect on the date that such Advance became due and payable, and (ii) the Federal Funds Rate most recently determined by the Administrative Agent plus 0.50% per annum, and (B) with respect to other Obligations, the Federal Funds Rate most recently determined by the Administrative Agent plus 0.50% per annum.

SECTION 1.2 Other Definitional Provisions.

(a)      Unless otherwise specified therein, all terms defined in this Agreement have the meanings as so defined herein when used in any Note or any other Transaction Document, certificate, report or other document made or delivered pursuant hereto.

(b)      Each term defined in the singular form in Section 1.1 or elsewhere in this Agreement shall mean the plural thereof when the plural form of such term is used in this Agreement, any Note or any other Transaction Document, certificate, report or other document

55

made or delivered pursuant hereto, and each term defined in the plural form in Section 1.1 shall mean the singular thereof when the singular form of such term is used herein or therein.

(c)     The words "hereof," "herein," "hereunder" and similar terms when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, subsection, schedule and exhibit references herein are references to articles, sections, subsections, schedules and exhibits to this Agreement unless otherwise specified.

(d)     All accounting terms not specifically defined herein shall be construed in accordance with GAAP. All terms used in Article 9 of the UCC in the State of New York, and not specifically defined herein, are used herein as defined in such Article 9 or any other article of the UCC in the State of New York.

## ARTICLE II

## THE FACILITY, ADVANCE PROCEDURES AND NOTES

SECTION 2.1 Facility.

(a)     Initial Class A Advances. Subject to the terms and conditions of this Agreement, each of the Conduit Lenders, if any, in each Class A Funding Group may, on or after the Closing Date, in its sole discretion, and if the Conduit Lenders in such Class A Funding Group do not (or, if there are no Conduit Lenders in such Class A Funding Group), each Non-Conduit Lender in such Class A Funding Group shall, ratably, make an initial Class A Advance to the Borrower in such amounts as may be requested by the Borrower pursuant to Section 2.2 (the "Initial Class A Advances"). Notwithstanding the foregoing, if UBSRESI has entered into a Participation Agreement relating to all or any portion of its Non-Conduit Lender Commitment with respect to Initial Class A Advances, it shall not be obligated to the Borrower to fund against such related amount of its commitment under this subsection if it does not receive funding in respect of such related amount from the applicable Participant.

(b)     Initial Class B Advances. Subject to the terms and conditions of this Agreement, each of the Conduit Lenders, if any, in each Class B Funding Group may, on or after the Closing Date, in its sole discretion, and if the Conduit Lenders in such Class B Funding Group do not (or, if there are no Conduit Lenders in such Class B Funding Group), each Non-Conduit Lender in such Class B Funding Group shall, ratably, make an initial Class B Advance to the Borrower in such amounts as may be requested by the Borrower pursuant to Section 2.2 (the "Initial Class B Advances" and, together with the Initial Class A Advances, the "Initial Advances"). Notwithstanding the foregoing, if UBSRESI has entered into a Participation Agreement relating to all or any portion of its Non-Conduit Lender Commitment with respect to Initial Class B Advances, it shall not be obligated to the Borrower to fund against such related amount of its commitment under this subsection if it does not receive funding in respect of such related amount from the applicable Participant.

(c)     [Intentionally omitted.]

56

(d) <u>Additional Class A</u> Advances. Subject to the terms and conditions of this Agreement, each of the Conduit Lenders, if any, in each Class A Funding Group may, in its sole discretion, and if the Conduit Lenders in such Class A Funding Group do not (or, if there are no Conduit Lenders in such Class A Funding Group), each Non-Conduit Lender in such Class A Funding Group shall, during the Additional Advance Commitment Period, ratably make Class A Advances to the Borrower in such amounts as may be requested by the Borrower pursuant to <u>Section 2.2</u> (the "<u>Additional Class A Advances</u>", and, together with the Initial Class A Advances, the "<u>Class A Advances</u>"). Notwithstanding the foregoing, if UBSRESI has entered into a Participation Agreement relating to all or any portion of its Non-Conduit Lender Commitment with respect to Additional Class A Advances, it shall not be obligated to the Borrower to fund against such related amount of its commitment under this subsection if it does not receive funding in respect of such related amount from the Participant.

(e) <u>Additional Class B Advances</u>. Subject to the terms and conditions of this Agreement, each of the Conduit Lenders, if any, in each Class B Funding Group may, in its sole discretion, and if the Conduit Lender in such Class B Funding Group do not (or, if there are no Conduit Lenders in such Class B Funding Group), each Non-Conduit Lender in such Class B Funding Group shall, during the Additional Advance Commitment Period, ratably make Class B Advances to the Borrower in such amounts as may be requested by the Borrower pursuant to <u>Section 2.2</u> (the "<u>Additional Class B Advances</u>," and, together with the Initial Class B Advances, the "<u>Class B Advances</u>"; the Additional Class B Advances together with the Additional Class A Advances, the "<u>Additional Advances</u>"). Notwithstanding the foregoing, if UBSRESI has entered into a Participation Agreement relating to all or any portion of its Non-Conduit Lender Commitment with respect to Additional Class B Advances, it shall not be obligated to the Borrower to fund against such related amount of its commitment under this subsection if it does not receive funding in respect of such related amount from the Participant.

(f) [Intentionally omitted.]

(g) <u>Class A Advance Limits, etc</u>. Advances pursuant to clauses (a) and (d) above are subject to the following requirements:

    (i) Initial Class A Advances and Initial Class B Advances, and Additional Class A Advances and Additional Class B Advances, relating to the same Aircraft (or the same Original Agreement Refinancing Advance, Critical Mass Event Advance or Increased Availability Advance or Improvement Advance, as the case may be), in each case shall be made on the same date (the "<u>Initial Advance Date</u>" or an "<u>Additional Advance Date</u>", as applicable);

    (ii) After giving effect to such Advances, the Outstanding Class A Principal Amount outstanding hereunder shall not exceed the Maximum Class A Principal Amount and the Outstanding Class A Principal Amount advanced by any Non-Conduit Lender shall not exceed the Non-Conduit Lender Commitment of such Non-Conduit Lender;

    (iii) the Outstanding Principal Amount outstanding hereunder shall not exceed the Maximum Aggregate Principal Amount; and

57

(iv)     the aggregate principal amount of all Class A Advances made by any Class A Funding Group shall not exceed the related Funding Group Limit.

Each Class A Advance by a Class A Funding Group shall be made on a <u>pro rata</u> basis based on the Class A Funding Group Limit of such Class A Funding Group as a percentage of the aggregate Class A Funding Group Limits of all Class A Funding Groups and each Class A Advance by a Non-Conduit Lender in a Class A Funding Group shall be made on a <u>pro rata</u> basis based on the Non-Conduit Lender Commitment of such Non-Conduit Lender as a percentage of the aggregate Non-Conduit Lender Commitments of all Non-Conduit Lenders in such Class A Funding Group (except as otherwise provided in the proviso to the last sentence of this <u>Section 2.1(g)</u>). Payments or prepayments of the Class A Advances may be reborrowed from time to time prior to the Conversion Date as Additional Class A Advances, but only to finance a portion of the acquisition cost for acquiring an Additionally Financed Aircraft into the Borrower's Portfolio, or to finance the reimbursement of Approved Asset Improvement Costs with an Improvement Advance, or in a single drawdown on a Payment Date as a Critical Mass Event Advance, or in a drawdown on a Payment Date as an Increased Availability Advance, and in each case otherwise subject to the terms and conditions applicable to such Advances herein.

The obligations of the Class A Funding Groups to fund Advances hereunder are several and not joint; <u>provided, however</u>, that if a Class A Funding Group shall fail to fund a Class A Advance pursuant to the terms hereof, any other Class A Funding Group may, in its sole discretion, fund all or any portion of such Class A Advance without regard to the <u>pro rata</u> provisions of this Agreement and without regard to the Class A Funding Group Limit of such Class A Funding Group or the Non-Conduit Lender Commitment of any Non-Conduit Lender included in such Class A Funding Group which shall be deemed adjusted to reflect any such funding without any other act by any Person being necessary.

(h)     <u>Class B Advance Limits, etc.</u> Advances pursuant to clauses (b) and (e) above are subject to the following requirements:

(i)     Initial Class B Advances and Initial Class A Advances, and Additional Class B Advances and Additional Class A Advances, relating to the same Aircraft (or the same Original Agreement Refinancing Advance, Critical Mass Event Advance or Increased Availability Advance or Improvement Advance, as the case may be), in each case shall be made on the same Initial Advance Date or Additional Advance date, as applicable;

(ii)     After giving effect to such Advances, the Outstanding Class B Principal Amount shall not exceed the Maximum Class B Principal Amount and the Outstanding Class B Principal Amount advanced by any Non-Conduit Lender shall not exceed the Non-Conduit Lender Commitment of such Non-Conduit Lender;

(iii)     the Outstanding Principal Amount shall not exceed the Maximum Aggregate Principal Amount; and

(iv)     the aggregate principal amount of all Class B Advances made by any Class B Funding Group shall not exceed the related Funding Group Limit.

58

Page 60 of 221

Each Class B Advance by a Class B Funding Group shall be made on a pro rata basis based on the Class B Funding Group Limit of such Class B Funding Group as a percentage of the aggregate Class B Funding Group Limits of all Class B Funding Groups and each Class B Advance by a Non-Conduit Lender in a Class B Funding Group shall be made on a pro rata basis based on the Non-Conduit Lender Commitment of such Non-Conduit Lender as a percentage of the aggregate Non-Conduit Lender Commitments of all Non-Conduit Lenders in such Class B Funding Group (except as otherwise provided in the proviso to the last sentence of this Section 2.1(h)). Payments or prepayments of the Class B Advances may be reborrowed from time to time prior to the Conversion Date as Additional Class B Advances, but only to finance a portion of the acquisition cost for acquiring an Additionally Financed Aircraft into the Borrower's Portfolio, or to finance the reimbursement of Approved Asset Improvement Costs with an Improvement Advance, or in a single drawdown on a Payment Date as a Critical Mass Event Advance, or in a drawdown on a Payment Date as an Increased Availability Advance, and in each case otherwise subject to the terms and conditions applicable to such Advances herein.

The obligations of the Class B Funding Groups to fund Advances hereunder are several and not joint; provided, however, that if a Class B Funding Group shall fail to fund a Class B Advance pursuant to the terms hereof, any other Class B Funding Group may, in its sole discretion, fund all or any portion of such Class B Advance without regard to the pro rata provisions of this Agreement and without regard to the Class B Funding Group Limit of such Class B Funding Group or the Non-Conduit Lender Commitment of any Non-Conduit Lender included in such Class B Funding Group which shall be deemed adjusted to reflect any such funding without any other act by any Person being necessary.

(i)    [Intentionally omitted.]

(j)    UBSRESI Agreements re Participant Rights. With respect to the references to UBSRESI's funding obligations in the relevant provisions in Section 2.1 above in the event of a failure of a Participant to honor its funding agreement to UBSRESI under a Participation Agreement, UBSRESI agrees with the Borrower that UBSRESI will use commercially reasonable efforts to enforce its rights to receive funds from the Participant (and agrees to consult with the Borrower in good faith as to the progress of its efforts in such enforcement) (the "Enforcement Efforts"); provided, that at the sole option of the Borrower, and upon the Borrower's written request, UBSRESI, in lieu of complying any further with the Enforcement Efforts, will promptly assign to AMS AerCap all of its rights to enforce against the Participant such dishonored funding obligation (and will execute any necessary powers of attorney, and give other commercially reasonable further assurances to or cooperation with the assignee, in order for the assignee to receive the full benefit of the assignment of such rights against the Participant under the Participation Agreement).

SECTION 2.2    Advance Procedures.

(a)    Initial Advances. By at least 11:00 a.m., New York time, two (2) Business Days prior to the Initial Advance Date (or at such later time, on or prior to the Initial Advance Date, as the Borrower and the Administrative Agent may agree), the Borrower may request Initial Advances hereunder, by giving notice (herein called an "Initial Advance Request") to the Administrative Agent and each Funding Agent. The Initial Advance Request shall be

59