Party's right to demand such compensation; provided, that the Borrower shall not be required to compensate an Affected Party pursuant to such clauses of this Section 6.2 for any increased costs incurred or reductions suffered more than 120 days prior to the date that such Affected Party notifies the Borrower of the event or events giving rise to such increased costs or reductions and of such Affected Party's intention to claim compensation therefor (except that, if such event or events have a retroactive effect, then the 120 day period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     The Borrower shall pay to any Lender, so long as such Lender shall be required under regulations of the Board of Governors of the Federal Reserve System to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency Liabilities, additional Yield on the unpaid Eurodollar Rate Advances of such Lender during each Interest Period, for such Interest Period, at a rate per annum equal, at all times during such Interest Period, to the remainder obtained by subtracting (i) the Eurodollar Rate for such Interest Period from (ii) the rate obtained by dividing such Eurodollar Rate referred to in clause (i) above by that percentage equal to 100% minus the Eurodollar Rate Reserve Percentage of such Lender for such Interest Period, payable on each date on which Yield is payable on such Advances. Such additional Yield shall be determined by such Lender and notice thereof (accompanied by a statement setting forth the basis for the amount being claimed) given to the Borrower through the applicable Funding Agent within thirty (30) days after any Yield payment is made with respect to which such additional Yield is requested. Such written statement shall, in the absence of manifest error, be conclusive and binding for all purposes.

SECTION 6.3  Taxes.

(a)     All payments made by the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future Taxes now or hereafter imposed, levied, collected, withheld or assessed by any Government Entity, excluding income, gross receipts, franchise, net worth, doing business and similar Taxes imposed on, respectively, the Administrative Agent, the Collateral Agent, any Funding Agent or any Lender as a result of a present or former connection between, respectively, the Administrative Agent, the Collateral Agent, such Funding Agent or such Lender and the jurisdiction of the Government Entity imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the respective Administrative Agent, Collateral Agent, Funding Agent or Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement). If any such non-excluded Taxes ("Non-Excluded Taxes") are required to be withheld from any amounts payable to the Administrative Agent, the Collateral Agent, any Funding Agent or any Lender hereunder, respectively (each a "Section 6.3 Indemnitee"), the amounts so payable to such Section 6.3 Indemnitee shall be increased to the extent necessary to yield to such respective Section 6.3 Indemnitee (after payment of all Non-Excluded Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in or pursuant to this Agreement; provided, however, that the Borrower shall not be required to increase any such amounts payable to any Section 6.3 Indemnitee to the extent imposed as a result of the failure of any such Section 6.3 Indemnitee, or in the case of any amounts payable by any Funding Agent, any related Lender, to comply with the requirements of paragraph (b) of this Section 6.3 or as a

75

result of such Lender failing to be a Qualifying Lender; <u>provided further</u>, that the immediately preceding proviso shall not apply, and the Borrower's obligations to make increased payments to any Section 6.3 Indemnitee pursuant to this Section 6.3(a) shall continue to apply, to the extent that any such noncompliance or the failure to be a Qualifying Lender is attributable to (x) a change in applicable law or regulation or in the interpretation thereof, or the introduction of any law or regulation, in either case that occurs after the Original Closing Date or later date on which a respective Section 6.3 Indemnitee becomes a party hereto, or (y) the existence or exercise of the rights of the Borrower or AMS AerCap described in <u>Section 2.1(j)</u>. Whenever any Non-Excluded Taxes are payable by the Borrower, as promptly as possible thereafter, the Borrower shall send to the Administrative Agent, the Collateral Agent and each applicable Funding Agent for their respective accounts or for the account of the applicable Lender, as the case may be, a certified copy of an original official receipt (or other evidence reasonably satisfactory to such Person) received by the Borrower showing payment thereof. If the Borrower fails to pay any Non-Excluded Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent, the Collateral Agent or the applicable Funding Agent, as the case may be, the required receipts or other required documentary evidence, the Borrower shall indemnify the Administrative Agent, the Collateral Agent and the Lenders for any incremental Taxes, interest or penalties (and related costs) that may become payable, respectively, by the Administrative Agent, the Collateral Agent or any Lender as a result of any such failure. The agreements in this <u>Section 6.3</u> shall survive the termination of this Agreement and the payment of all other amounts payable hereunder.

(b)   Each Section 6.3 Indemnitee shall, to the extent it may lawfully do so, deliver to the Borrower, or to the Funding Agent for each Funding Group in the case of any Lender (in such number of copies as shall be requested by the recipient), on or prior to the date on which such Person becomes a Lender, Administrative Agent, Collateral Agent or Funding Agent under this Agreement (and from time to time thereafter upon the request of Borrower and each such Funding Agent), but only if such Person is legally entitled to do so, any form or information prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in withholding tax duly completed together with such supplementary documentation as may be prescribed by any applicable Requirement of Law to permit the Borrower or any applicable Funding Agent to determine the withholding or deduction required to be made. Each Section 6.3 Indemnitee agrees to take such actions as the Borrower shall reasonably request and as are consistent with applicable Requirements of Law to claim any available reductions or exemptions from Non-Excluded Taxes and to otherwise cooperate with the Borrower to minimize any amounts payable by the Borrower under this Section 6.3, provided that any material costs incurred in taking such actions (including attorneys' fees) shall be for the account of the Borrower. Each Lender further represents that it is a Qualifying Lender as of the Closing Date or other date as of which it becomes a Lender hereunder, and agrees to advise the Borrower reasonably promptly following its becoming aware that it is no longer a Qualifying Lender.

Without limiting the foregoing, each Person that is an assignee pursuant to <u>Article XV</u> shall, upon the effectiveness of the related transfer, be required to provide all of the forms and statements required pursuant to this <u>Section 6.3</u>.

(c)     The Borrower agrees to pay any present or future stamp, sales, documentary, filing, registration, excise or property Taxes or any other Taxes, fees, charges or other levies payable, or determined to be payable, in connection with the execution, delivery, filing recording or registration of this Agreement and any other Transaction Documents and agrees to indemnify any Section 6.3 Indemnitee against any liabilities (including related costs) with respect to or resulting from any delay in paying or the omission to pay such Taxes.

(d)     The Borrower shall indemnify any Section 6.3 Indemnitee, within ten (10) Business Days after written demand therefor, for the full amount of any Non-Excluded Taxes (including Non-Excluded Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by any such Section 6.3 Indemnitee, and any penalties, interest and reasonable expenses (including costs of contesting such Non-Excluded Taxes) arising therefrom or with respect thereto. A certificate as to the amount of such payment or liability delivered to the Borrower by any Lender (with a copy to the Administrative Agent), by the Collateral Agent or by the Administrative Agent on its own behalf or on behalf of any Lender, setting forth in reasonable detail the manner in which such amount was determined, shall be conclusive absent manifest error.

(e)     If any Section 6.3 Indemnitee receives a refund of any Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 6.3, such Section 6.3 Indemnitee shall pay over such refund (net of all out-of-pocket expenses of such Section 6.3 Indemnitee and without interest, other than any interest paid to it with respect to such refund) to the Borrower (but only to the extent of the amounts paid by the Borrower under this Section 6.3 with respect to the Taxes giving rise to such refund, plus any interest received with respect to such refund); provided, that the Borrower, upon the request of any such Section 6.3 Indemnitee, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed) to the Section 6.3 Indemnitee in the event such Section 6.3 Indemnitee is required to repay such refund to any Government Entity. This subsection (e) shall not be construed to require any Section 6.3 Indemnitee to make available its Tax Returns (or any other information relating to its Taxes which it deems confidential) to the Borrower or any other Person.

SECTION 6.4  **Indemnity Regarding Breakage Costs**. The Borrower hereby agrees to indemnify each Lender and to hold each Lender harmless from any loss (other than loss of Applicable Margin) or reasonable expense which such Lender may sustain or incur as a consequence of (a) default or rescission, as applicable, by the Borrower in making a borrowing of, conversion into or continuation of any Advance hereunder on the date requested after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment on the date requested after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Advances on a day which is not the last day of an Interest Period with respect thereto. Such indemnification shall be in an amount equal to the excess, if any, of (i) the amount of interest which would have accrued on the amount so prepaid, or not so borrowed, for the period from the date of such prepayment or of such failure to borrow to the last day of such Interest Period (or, in the case of a failure to borrow, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for

http://sec.gov/Archives/edgar/data/1378789/000104746907005525/a2178262zex-10_2.htm          9/9/2008

such Advances provided for herein (minus the Applicable Margin) over (ii) the amount of interest (as determined by such Lender) which would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. This covenant shall survive the termination of this Agreement and the payment of all other amounts payable hereunder.

SECTION 6.5 <u>Notice of Amounts Payable</u>. In the event that any Lender becomes aware that any amounts are or will be owed to it pursuant to <u>Section 6.1</u>, <u>6.2</u> or <u>6.3(a)</u>, then it shall promptly notify the Borrower thereof; <u>provided</u> that any failure to provide such notice shall not affect the Borrower's obligations hereunder or under the other Transaction Documents or result in any liability of or on the part of such Lender. The amounts set forth in such notice shall be conclusive and binding for all purposes absent manifest error.

SECTION 6.6 <u>Mitigation Obligations; Replacement</u>.

(a) If any Lender or any of its Affiliates requests compensation under <u>Section 6.2</u>, or requires the Borrower to pay any additional amount to such Lender, any of its Affiliates or any Governmental Entity for the account of such Lender or any of its Affiliates pursuant to <u>Section 6.3</u>, then such Lender (an "<u>Affected Lender</u>") shall use reasonable efforts to designate a different lending office for funding or booking its Advances hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Affected Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 6.2</u> or <u>6.3</u>, as the case may be, in the future and (ii) would not subject such Affected Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Affected Lender (other than in a *de minimus* manner). The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Affected Lender in connection with any such designation or assignment. A certificate setting forth such costs and expenses submitted by such Affected Lender to the Borrower shall be conclusive absent manifest error.

(b) Notwithstanding anything to the contrary contained herein, prior to the occurrence of any Event of Default or Early Amortization Event hereunder, the Borrower shall have the right to replace an Affected Lender which has not completed one of the mitigating actions described in subsection (a) of this Section 6.6 resulting in the elimination of any amounts payable pursuant to <u>Section 6.2</u> or <u>6.3</u> within 60 days of becoming an Affected Lender hereunder (each such Affected Lender being so replaced, a "<u>Replaced Lender</u>") with one or more other lending institutions (which may, but need not be, existing Lenders hereunder) reasonably acceptable to the Administrative Agent (any, a "<u>Replacement Lender</u>") that have agreed to purchase the outstanding Advances held by and (as applicable) Non-Conduit Lender Commitments maintained by such Affected Lender, pursuant to Article XV and one or more Assignment and Assumptions; <u>provided</u> that:

    (i) each such assignment shall be arranged by the Borrower in coordination with the Administrative Agent; and

    (ii) no Replaced Lender shall be obligated to make any such assignment pursuant to this subsection (b) unless and until such Replaced Lender shall

78

have received one or more payments from the Replacement Lender in an aggregate amount equal to the aggregate outstanding principal amount of the Advances owing to such Replaced Lender, and from the Borrower an aggregate amount equal to all accrued and unpaid interest and fees thereon (including, in any event, any breakage indemnities of the type described in Section 6.4) to the date of such payment and all other amounts payable to such Replaced Lender under this Agreement, including without limitation all amounts which, by virtue of its making claims against the Borrower therefor, caused the Lender to become an Affected Lender hereunder.

Upon the effectiveness of such assignment, the Replacement Lender shall become a Lender hereunder and (except with respect to any indemnities or other amounts payable under this Agreement with respect to events or circumstances arising prior to the replacement of such Replaced Lender, which shall survive as to such Replaced Lender) the Replaced Lender shall cease to constitute a Lender hereunder.

### ARTICLE VII

### CONDITIONS PRECEDENT

SECTION 7.1A  <u>Conditions to Effectiveness</u>. The effectiveness of this Agreement on the Closing Date is subject to the fulfillment of the following conditions precedent:

(a)  <u>Deliveries</u>. The Administrative Agent shall have received all of the following, each duly executed, dated the Closing Date (or such later date as specified below, or such earlier date as shall be reasonably satisfactory to the Administrative Agent) and otherwise satisfactory to the Administrative Agent:

(i)  <u>Documents</u>. Executed originals of each of this Agreement, a Note with respect to the Class A Advances, a Note with respect to the Class B Advances, and the Fee Letter (collectively, the "<u>New Transaction Documents</u>");

(ii)  <u>Resolutions</u>. Certified resolutions of the Boards of Directors of the Borrower and each Service Provider, approving and adopting the New Transaction Documents and the Amendments to be executed by such Person, and authorizing the execution and delivery thereof;

(iii)  <u>Opinions</u>. Favorable opinions of (A) special New York counsel to the Borrower and the Service Providers with respect to (1) the New Transaction Documents being the legal, valid, binding obligations of the Borrower and the Service Providers, enforceable in accordance with their terms, (2) non-contravention and (3) no consents, approvals, authorizations or filings needed, (B) special Irish counsel to the Service Providers with respect to dues incorporation, corporate capacity and due authorization and execution of New Transaction Documents and the Amendments and (C) special Bermuda counsel to the Borrower with respect to general corporate matters, the due authorization, execution and delivery of New Transaction Documents and the Amendments by the Borrower and such other matters with respect to Bermuda law as the Agent may reasonably request;

79

    (iv) <u>Consents</u>. Written consents from Participants with respect to this Agreement and the transactions contemplated hereunder;

    (v) <u>Amendments</u>. Amendments (the "<u>Amendments</u>") to the Service Provider Agreements and the Security Trust Agreement addressing (i) the release of the Borrower Subsidiaries that were sold by the Borrower in connection with the Closing Date ABS Transaction shall have been entered into and (ii) changes to evidence the transactions hereunder; and

    (vi) <u>Amendment of AerCap Sub Note</u>. An amendment and restatement of the AerCap Sub Note executed on the Original Closing Date which shall increase the purposes for which borrowings thereunder can be made and which postpones the maturity date thereof.

  (b) <u>Closing Date ABS Transaction</u>. (i) The ABS Asset Purchase Agreement with respect to the Closing Date ABS Transaction shall have been executed and become effective and shall provide for the sale of at least the greater of (1) 75% of the number of Funded Aircraft as of the Closing Date and (2) Funded Aircraft with an aggregate Adjusted Borrowing Value equal to at least 75% of the aggregate Adjusted Borrowing Value of all Funded Aircraft as of the Closing Date (whether directly or through the sale of beneficial interests in the related Borrower Subsidiaries and whether on the Closing Date or thereafter), (ii) a final executed copy of such ABS Asset Purchase Agreement shall have been delivered to the Administrative Agent and (iii) the first transfer of Aircraft Assets and/or beneficial interests in Borrower Subsidiaries under such ABS Asset Purchase Agreement shall have occurred and the proceeds from such transfer shall have been deposited into the Collection Account.

  (c) <u>No Event of Default</u>. No Default, Event of Default, Early Amortization Event (including a Servicer Termination Event), or event that would constitute a Servicer Termination Event or Early Amortization Event but for the passage of time or the giving of notice or both, has occurred and is continuing under the Original Agreement or will result from the effectiveness of this Agreement.

  (d) <u>Representations and Warranties.</u> As of the Closing Date, and after giving effect to the transactions contemplated under this Agreement on the Closing Date, the representations and warranties of the Borrower contained in <u>Article IX</u> and of the Service Providers contained in <u>Section 8.3</u> are true and correct.

  (f) <u>Payment of Costs and Expenses</u>. Payment of all costs and expenses (including legal fees) accrued prior to the Closing Date in accordance with <u>Section 17.4</u> hereof to the extent invoiced or otherwise notified to the Borrower in writing and in a manner and at such time as the Administrative Agent and the Borrower may have agreed.

SECTION 7.1B  Conditions to Release of Initial Advances. The availability of the Initial Advance hereunder is subject to the fulfillment of the following conditions precedent (in addition to the conditions precedent specified in Section 7.5):

(a) Original Agreement Refinancing Advance. If the Initial Advance is an Original Agreement Refinancing Advance, after giving effect to the Initial Advance (and for the avoidance of doubt, determining each Borrowing Base for this purpose giving effect to the inclusion of each ABS Subject Aircraft within the Borrower's Portfolio), no Borrowing Base Deficiency will exist (and the Administrative Agent shall have received an Initial Advance Request and borrowing base certification demonstrating the foregoing).

(b) Non-Original Agreement Refinancing Advance. If the Initial Advance is not an Original Agreement Refinancing Advance, each of the conditions precedent specified in Section 7.2 shall have been fulfilled; provided, that for purposes of this Section 7.1B, each reference in Section 7.2 shall to "Additional Advance," "Additional Advance Date," "Additional Advance Request," and "Additionally Financed Aircraft" shall be deemed to be references to "Initial Advance," "Initial Advance Date," "Initial Advance Request," and "Initial Financed Aircraft," as applicable.

SECTION 7.2  Additional Advances. The release of funds to the Borrower from the making of any Additional Advance under this Agreement in connection with the acquisition of an Additionally Financed Aircraft (i.e., not an Improvement Advance, a Critical Mass Event Advance or an Increased Availability Advance) is, in addition to the conditions precedent specified in Section 7.1B and Section 7.5, and subject to the funding and release procedures described in Section 2.3(c), subject to the fulfillment of the following conditions precedent:

(a) No Borrowing Base Deficiency. After giving effect to the Additional Advance and to the related release of funds (and for the avoidance of doubt, determining each Borrowing Base for this purpose giving effect to the inclusion of the incipient Additionally Financed Aircraft within the Borrower's Portfolio and to the application of all applicable Advance Rate Adjustments), no Borrowing Base Deficiency will exist (and the Administrative Agent shall have received an Additional Advance Request and a Holding Period Release Request, as applicable, containing a borrowing base certification demonstrating the foregoing).

(b) Aircraft and Lessee Limitations. If Critical Mass will exist after giving effect to the Additional Advances or has previously been achieved, the acquisition of the related Additionally Financed Aircraft into the Borrower's Portfolio does not constitute either an Aircraft Limitation Event or a Lessee Limitation Event.

(c) Aircraft Age. Each Additionally Financed Aircraft has an Aircraft Age of less than the Aircraft Age Limit for Aircraft of its Type.

(d) Off-Lease Aircraft. No such Additionally Financed Aircraft to be acquired will be Off-Lease, unless immediately after giving effect to such acquisition, not more than 10% (measured by Adjusted Borrowing Value) of all Aircraft in the Borrower's Portfolio are Off-Lease.

81

(e)     Deliveries. The Administrative Agent shall have received all of the following, each duly executed and dated the related Additional Advance Date or, if later, the date of release of related funds to the Borrower (or such earlier date as shall be satisfactory to the Administrative Agent), and otherwise as indicated below:

(i)     Incumbency. Certified specimen signatures of officers of each Borrower Subsidiary that is becoming a Borrower Group Member in connection with such Additional Advance;

(ii)    Good Standing. Certificates issued as of a recent date by the Secretaries of State or comparable officials of the respective jurisdiction of formation of each Borrower Subsidiary that is becoming a Borrower Group Member in connection with such Additional Advance, as to the due existence and good standing (to the extent such concept is applicable) of such Person;

(iii)   Aircraft Acquisition Documents. Copies of the Aircraft Acquisition Documents in respect of the Additionally Financed Aircraft (which shall have been delivered in final, if available, or in draft form to the Administrative Agent at least five (5) Business Days prior to the applicable Additional Advance Date, except that delivery of a related Lessee insurance certificate shall be governed by the covenant of the Borrower at Section 10.34 hereof;

(iv)    Organizational Documents. The Organizational Documents of each Borrower Subsidiary that is becoming a Borrower Group Member in connection with such Additional Advance, certified as of a recent date, and which shall, if permitted under applicable law, contain limitations on purpose and other bankruptcy remoteness provisions reasonably satisfactory to the Administrative Agent;

(v)     Operating Documents. Operating Documents of each Borrower Subsidiary that is becoming a Borrower Group Member in connection with such Additional Advance, certified as of the related Additional Advance Date as true and correct, and which shall contain limitations on purpose and other bankruptcy remoteness provisions reasonably satisfactory to the Administrative Agent;

(vi)    FAA Counsel Opinions. With respect to each Additionally Financed Aircraft registered in the United States, the favorable written opinion of FAA Counsel that the applicable Aircraft Owning Entity is the registered owner of such Aircraft, that such Aircraft is free and clear of recorded liens, and as to such other matters as the Administrative Agent may reasonably request;

(vii)   Local Counsel Opinions. With respect to each Additionally Financed Aircraft that is registered in, or which is under Lease to a Lessee organized under the laws of or domiciled in, a country other than the United States, the favorable written opinion of Local Aircraft Counsel with respect to each Applicable Foreign Aviation Law applicable to such Additionally Financed Aircraft as to (A) the due registration of such Aircraft, and (B) that such Aircraft is free and clear of recorded liens to the extent that liens may be recorded under Applicable Foreign Aviation Law, and

(C) as to such other matters as the Administrative Agent may reasonably request (which request may include, with respect to jurisdictions of concern to the Lenders, an opinion satisfactory to the Administrative Agent advising as to creditor's rights, including rights of recovery and repossession of aircraft), provided, that the Administrative Agent may not exercise such clause (C) right with respect to Applicable Foreign Aviation Law of the countries listed on the current version of the Approved Country List;

(viii) Cape Town Registration Opinions. With respect to each Additionally Financed Aircraft or related Aircraft Asset as to which any of the transactions contemplated in the release of the Additional Advance are creating or assigning international interests that may be registered in the International Registry, a legal opinion addressing the effectiveness and effect of such registrations under the Cape Town Convention, in form and substance satisfactory to the Administrative Agent, provided, that (A) if delivery of such opinion concurrently upon or prior to the release to the Borrower of funds under an Additional Advance is not feasible after the Borrower's using commercially reasonable efforts to comply with this condition, such delivery shall not be a condition precedent and instead shall be the subject of the Borrower's covenant obligation set forth at Section 10.2, and (B) if the provisions of clause (A) apply to the delivery condition, it shall nonetheless be a condition precedent to the release of funds that the Borrower deliver to the Administrative Agent a draft form of such opinion, substantially in the form to be eventually delivered pursuant to Section 10.2, which draft is in form and substance reasonably satisfactory to the Administrative Agent;

(ix) Security Interest Granted by Non-Irish or Non-U.S. Lessor. With respect to each Additionally Financed Aircraft the Lessor of which is domiciled or otherwise connected with a country other than the United States or Ireland, such that the laws of such country would or could, in the reasonable judgment of the Administrative Agent, govern or establish the perfection and effect of perfection and/or priority of the Collateral Agent's security interest in such Lease granted by the Lessor under the Security Trust Agreement, a legal opinion, in form and substance reasonably satisfactory to the Administrative Agent, addressing and confirming the taking of such actions or making of such filings in such country as would or could govern or establish the perfection and effect of perfection and/or priority of the Collateral Agent's security interest (or confirming that such actions will be taken or filings will be made, to the extent that such actions or filings cannot under applicable law be taken or made prior to the release of funds associated with the related Additional Advance to the Borrower), or the Borrower shall have otherwise confirmed or established, in a manner reasonably satisfactory to the Administrative Agent, that the taking of such actions or making of such filings as are specified in the legal opinion shall have occurred or will occur;

(x) Notice and Acknowledgment. A Notice and Acknowledgment, executed by the applicable Borrower Subsidiary for each Additionally Financed Aircraft and the applicable Lessee, with respect to each of the related Additional Leases;

(xi) Aircraft Insurance. (A) With respect to each of the Additionally Financed Aircraft, and if available as of the Additional Advance Date (and if not then

available the related covenant of the Borrower set forth at Section 10.34 hereof shall apply), certificates of insurance from qualified brokers of aircraft insurance or other evidence reasonably satisfactory to the Administrative Agent, evidencing all insurance required to be maintained by the applicable Obligor under the Lease and/or the applicable Notice and Acknowledgment, in each case, together with all endorsements required under the Transaction Documents and/or the applicable Notice and Acknowledgment, and (B) certificates of insurance from qualified brokers of aircraft insurance or other evidence satisfactory to the Administrative Agent with respect to the Contingent Insurance Policy, together with all endorsements required under the Transaction Documents;

    (xii)    Lien/Registration Searches. To the extent available under the applicable law, the Administrative Agent shall have received searches of the applicable title and/or lien registration records, in the jurisdiction(s) of registration of the applicable Aircraft;

    (xiii)    Appraisals. The Administrative Agent shall have received Initial Base Value Appraisals and Initial Current Market Value Appraisal in respect of the Additionally Financed Aircraft; and

    (xiv)    NY Counsel Opinion. With respect to each Borrower Group Member entering into or becoming party to a Credit Document in respect of or relating to an Additionally Financed Aircraft, a legal opinion of special New York counsel to such Borrower Group Member (which may be the same special New York counsel as delivered the legal opinion referred to in Section 7.1(g)(vi) of the Original Agreement on the Initial Advance Date), addressing substantially the same matters, as to the relevant additional Borrower Group Member(s), as were addressed in respect of Borrower Group Members in the opinion of special New York counsel delivered on the Initial Advance Date.

(f)    Financing Statements, Other Registrations, etc.

    (i)    The Administrative Agent shall have received Uniform Commercial Code financing statements appropriate for filing in all places required by applicable law to perfect the Liens of the Collateral Agent for the benefit of the Lenders under the Transaction Documents as first priority Liens as to the interests in any Borrower Subsidiary that is becoming a Borrower Group Member in connection with such Additional Advance, in which a security interest may be perfected by the filing of financing statements, and such other documents and/or evidence of other actions or registrations as may be necessary under applicable law (including Irish law and the Cape Town Convention) to perfect, within the time period provided for in the Security Trust Agreement, or otherwise ensure the effectiveness of the related Liens of the Collateral Agent for the benefit of the Lenders under the Transaction Documents as first priority Liens (and, in the case of the pledge of equity interests in Borrower Group Members that are organized under the laws of Ireland, the entry into an Irish Pledge with respect to such interests);

    (ii) The Borrower shall have delivered to the Collateral Agent all stock certificates and other certificates, if any, evidencing ownership of any Equity Interests in any Borrower Subsidiary that is becoming a Borrower Group Member in connection with such Additional Advance, accompanied in each case by duly executed stock or transfer powers (or other appropriate transfer documents) in blank affixed thereto, in each case if customary under the law of the jurisdiction governing the pledges;

    (iii) The Borrower shall have delivered to the Collateral Agent fully executed "control agreements" that have been executed by the respective issuers (and consented to by the Borrower) with respect to any uncertificated Equity Interests of any Borrower Subsidiary that is becoming a Borrower Group Member in connection with such Additional Advance;

    (iv) Each of the Aircraft Owning Entities and Owner Participants shall have delivered to the Collateral Agent fully executed "control agreements" with respect to any uncertificated Equity Interests in any Owner Trust, Applicable Intermediary or other Subsidiary, that is becoming a Borrower Group Member in connection with such Additional Advance;

    (v) Subject to the provisos below, there shall have been delivered evidence satisfactory to the Administrative Agent of the taking of such actions (including without limitation becoming a "transacting user entity" with the International Registry) and the making of such registrations (including prospective registrations) in the International Registry pursuant to the Cape Town Convention and the International Registry Procedures to obtain the benefits and protections of the Cape Town Convention as may be applicable and available to the transactions contemplated by the Credit Documents as the same relate to the Borrower Acquisition Documents that are the subject of an Advance (which transactions include, without limitation, any sale of the applicable Aircraft on or prior to the Additional Advance Date to AerCap or an Aircraft Owning Entity (any such sale, an "<u>Aircraft Sale</u>")), <u>provided</u>, it is understood that (A) no mortgages are being taken directly on the Aircraft, (B) if a related Lease is not, at the time of the release of proceeds of the Advance to the Borrower, an "international interest" then (without limiting the terms of the second proviso of this clause (v)) it is not a condition precedent to such release of proceeds to undertake the search or any of the registrations described in clause (D) below, (C) except to the extent provided in the second proviso of this clause (v), it shall not be a condition precedent to any funding that any Aircraft Sale be registered as a sale or prospective sale with respect to the applicable Aircraft on the International Registry and (D) where the related Lease is or has become, at the time of the release of such proceeds, an "international interest", it is a condition to the release of such proceeds to the Borrower in respect of the related Advance that (i) a search of the registry with respect to the relevant Aircraft reveals no prior registration of an international interest or sale or prospective international interest or prospective sale with respect to such Aircraft other than the Aircraft Sale to AerCap or the applicable Aircraft Owning Entity (or a sale of the applicable Aircraft to the Person selling such Aircraft to AerCap or the applicable Aircraft Owning Entity or to such Person or to a prior owner of such Aircraft), (ii) the Lessor's interest in the Lease be registered

85

(including as a prospective interest) as and to the extent necessary to permit timely compliance with the condition in the immediately succeeding clause (iii), and (iii) the Lessor's security assignment of the Lease to the Collateral Agent shall have been registered (including as a prospective interest); and; provided, further, that if an Aircraft Sale constitutes a sale or prospective sale under the Cape Town Convention, it is a condition to the release of such proceeds to the Borrower in respect of the related Advance that (i) a search of the International Registry with respect to the relevant Aircraft reveals no prior registration of an international interest or sale or prospective interest or prospective sale with respect to such Aircraft (other than (i) the Lease if an international interest with respect thereto is registrable under the Cape Town Convention or (ii) the Aircraft Sale to AerCap or the applicable Aircraft Owning Entity (or a sale of the applicable Aircraft to the Person selling such Aircraft to AerCap or the applicable Aircraft Owning Entity or to such Person or to a prior owner of such Aircraft)) and (ii) AerCap shall have used commercially reasonable efforts to cause such Aircraft Sale to be registered as a sale or prospective sale with respect to the Aircraft on the International Registry.

(vi) For each Additional Lease with a Lessor that is organized under the laws of a State (or the District of Columbia) within the United States (within the meaning of Article 9 of the UCC), (A) if such Lease was originated by the Lessor prior to the Original Closing Date, the Borrower shall have delivered to the Collateral Agent, if available, a Chattel Paper Original of the applicable Lease and any related lease amendment or supplement, in each case signed by the Lessee (and complied with the other requirements set forth in the definition of Chattel Paper Original herein), and in any case, if available, a duplicate "hard copy" original thereof signed by the Lessee if available, and (B) if such Lease was originated by the Lessor after the Original Closing Date, the Borrower shall have delivered to the Collateral Agent a Chattel Paper Original of the applicable Lease (together with any related lease amendment or supplement constituting an extension or renewal thereof), in each case signed by the Lessee (and complied with the other requirements set forth in the definition of Chattel Paper Original herein).

(vii) The applicable Borrower Subsidiary owning or to become the owner of the related Funded Aircraft, shall have duly authorized, executed and delivered a "Grantor Supplement" as defined in and as contemplated under the Security Trust Agreement, and the Borrower shall have duly authorized, executed and delivered a related "Collateral Supplement" as defined in and contemplated under the Security Trust Agreement, and such Collateral Supplement shall have been registered in the "Register of Charges" of Bermuda (with a search of such Register of Charges revealing no prior registration with respect to the Collateral that is the subject matter of such Collateral Supplement).

(g) No Proceedings. There exist no proceedings or investigations pending or, to the Borrower's knowledge, threatened, before any court, regulatory body, administrative agency or other tribunal or governmental instrumentality having jurisdiction over the Borrower or any Borrower Subsidiaries or any of their respective properties (A) asserting the invalidity of this

86

Agreement or any of the other Credit Documents, as the same relate to the Aircraft Acquisition Documents associated with the relevant Additionally Financed Aircraft, (B) seeking to prevent the consummation or performance of any of the transactions contemplated by this Agreement or any of the other Credit Documents, as the same specifically relate to the rights of the Collateral Agent in the Aircraft Acquisition Documents associated with the relevant Additionally Financed Aircraft, or (C) seeking any determination or ruling that might materially and adversely affect the performance by the Borrower or any Borrower Subsidiaries of its obligations under any of the Credit Documents, as the same specifically relate to the rights of the Collateral Agent in the Aircraft Acquisition Documents associated with the relevant Additionally Financed Aircraft.

(h)     Waivers and Consents. All necessary waivers, consents, approvals and authorizations required in connection with the Transaction Documents dated as of the Additional Advance Date and the transactions contemplated therein shall have been delivered.

(i)     Reserve Accounts. The Administrative Agent shall have received evidence that the Liquidity Reserve Account shall have been funded so as to equal the Required Liquidity Reserve Amount (after giving effect to the addition of the related Additionally Financed Aircraft to the Borrower's Portfolio), which funding may be derived from the proceeds of Class B Advances.

(j)     Certain Events. None of the following events has occurred: (i) any information submitted to the Administrative Agent or any Lender by or on behalf of the Borrower, any Borrower Subsidiary, AerCap or any Service Provider in connection with such Additional Advance or related proposed Additionally Financed Aircraft proves to have been inaccurate or incomplete in any material respect; and (ii) there shall be any pending or threatened litigation or other proceeding (private or governmental) with respect to the Borrower Acquisition Documents relating to the proposed Additionally Financed Aircraft.

(k)     Description of Additionally Financed Aircraft, etc. The Administrative Agent shall have received amended and restated copies of Schedule I, Schedule II and Schedule III incorporating all information required thereunder regarding (i) the Additionally Financed Aircraft or interests therein acquired with such Additional Advances, (ii) each Aircraft Owning Entity and, if applicable, Owner Participant and Owner Trustee related to any such Additionally Financed Aircraft, and (iii) the Lease with respect to each Additionally Financed Aircraft.

(l)     No Event of Loss. No Event of Loss has occurred with respect to any such Additionally Financed Aircraft as of the Additional Advance Date.

(m)     Security Deposits. The Administrative Agent shall have received evidence reasonably satisfactory to it that the Borrower is complying with the covenants applicable to funding of amounts in respect of Security Deposits set forth at Section 8.1(c)(i), to the extent applicable.

(n)     No Violation of Law. The consummation of the transactions contemplated by this Agreement and the other Credit Documents and the Borrower Acquisition Documents, as the same relate to the relevant Additionally Financed Aircraft, do not (A) violate in any material respect any law (including, without limitation, any Environmental Law), rule or regulation

87

applicable to the Borrower or any Borrower Subsidiaries or to such Borrower Acquisition Documents or relevant Additionally Financed Aircraft, or (B) violate any writ, order, judgment or decree binding on or affecting the Borrower or any Borrower Subsidiaries of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Borrower or any Borrower Subsidiaries and relating to such Borrower Acquisition Documents or relevant Additionally Financed Aircraft.

SECTION 7.3 <u>Improvement Advances</u>. The making of any Additional Advance under this Agreement constituting an Improvement Advance is, in addition to the conditions precedent specified in Section 7.1B and Section 7.5, subject to the fulfillment of the following conditions precedent:

(a) <u>No Borrowing Base Deficiency</u>. After giving effect to any Improvement Advance (and for the avoidance of doubt, determining each Borrowing Base for this purpose giving effect to the inclusion of the Aircraft as so improved within the Borrower's Portfolio), no Borrowing Base Deficiency will exist (and the Administrative Agent shall have received an Additional Advance Request containing a borrowing base certification demonstrating the foregoing).

(b) <u>Occurrence of Effective Date</u>. The Freighter Conversion Effective Date or Other Improvement Effective Date, as applicable, shall have occurred.

(c) <u>Insurance</u>. Evidence that applicable insurance coverages have been increased to account for the increase in value attributable to the improved Aircraft.

(d) <u>No Mechanics Liens, etc</u>. Evidence reasonably satisfactory to the Administrative Agent that all mechanics, materialmen and other providers of services in connection with the improvement, shall have been paid in full and that no Liens relating to or attributable to such services exist (or any such Liens have been discharged by payment in full).

(e) <u>Reserves</u>. The Liquidity Reserve Account is (or will be, after giving effect to the Improvement Advance) fully funded to the level of the Required Liquidity Reserve Amount.

(f) <u>Update Lien Filings, etc</u>. Evidence that any necessary amendments of filings in any public or aviation Lien records have been made.

(g) <u>Payment Date</u>. The Improvement Advance shall be funded only on a Payment Date.

(g) <u>Deliveries</u>. The Administrative Agent shall have received all of the following, in form and substance satisfactory to the Administrative Agent and such Funding Agent:

(i) <u>Effective Date Deliveries</u>. The documentation contemplated in the definitions of Freighter Conversion Effective Date or Other Improvement Effective Date, as applicable.

(ii) <u>Appraisals</u>. A related Improvement Base Value Appraisal and Improvement Current Market Value Appraisal.

88

SECTION 7.4 <u>Critical Mass Event Advance; Increased Availability Advance</u>. The making of any Additional Advance under this Agreement constituting a Critical Mass Event Advance or an Increased Availability Advance is, in addition to the conditions precedent specified in Section 7.1B and Section 7.5, subject to the fulfillment of the following conditions precedent:

(a) <u>No Borrowing Base Deficiency</u>. After giving effect to any Critical Mass Event Advance or Increased Availability Advance, no Borrowing Base Deficiency will exist (and the Administrative Agent shall have received an Additional Advance Request and a Monthly Report demonstrating the foregoing).

(b) <u>Number</u>. In the case of a Critical Mass Event Advance, no Critical Mass Event Advance has previously been requested and funded.

(c) <u>Timing</u>. The related Advances are to be funded on a Payment Date.

(d) <u>Critical Mass</u>. Critical Mass or other conditions shall exist, with the result that availability of the Borrowing Base has increased due to a Critical Mass Advance Rate Adjustment or other change in an Advance Rate Adjustment.

(e) <u>Reserves</u>. The Liquidity Reserve Account is (or will be, after giving effect to the Critical Mass Event Advance) fully funded to the level of the Required Liquidity Reserve Amount.

SECTION 7.5 <u>All Advances</u>. The making of the Initial Advance and any Additional Advance under this Agreement is, in addition to the conditions precedent specified in <u>Section 7.1B</u>, <u>Section 7.2</u>, <u>Section 7.3</u> and <u>Section 7.4</u> (in each case as applicable), subject to the conditions precedent that:

(a) <u>No Event of Default</u>. No Default, Event of Default, Early Amortization Event (including a Servicer Termination Event), or event that would constitute a Servicer Termination Event or Early Amortization Event but for the passage of time or the giving of notice or both, has occurred and is continuing or will result from the effectiveness of this Agreement or the making of the applicable Advance; and

(b) <u>Representations and Warranties</u>. As of the date of such Advance, and after giving effect to such Advance and the consummation of the transactions contemplated in the making of such Advance, the representations and warranties of the Borrower contained in <u>Article IX</u> and of the Service Providers contained in <u>Section 8.3</u> are true and correct as of the date of such requested Advance, with the same effect as though made on the date of such Advance (except, that any such representations or warranties expressly stated by their terms to be made only at or as of one or more particular dates or times, shall be made only at or as of such specified dates or times and are not so deemed to be a condition to Advance).