substantial portion of the Funded Aircraft, and (B) after giving effect to the sale, no Borrowing Base Deficiency will then exist;

    (d)    no Event of Default or Early Amortization Event shall have occurred at or prior to the time of, or shall occur as a result of, such sale, transfer or other disposition;

    (e)    after giving effect to such sale, transfer or other disposition, and if the date of such sale, transfer or other disposition is a Payment Date, after giving effect to the distribution of funds under the Flow of Funds on such Payment Date, or if not, then after giving effect to the distribution of funds under the Flow of Funds on the next Payment Date, no Borrowing Base Deficiency will exist; and

    (f)    the board of directors of the Borrower shall have authorized the sale, transfer or other disposition.

The Borrower shall deposit, and shall cause the Borrower Subsidiaries to immediately deposit, in each case with written notice to the Collateral Agent, the proceeds of any such sale, transfer or other disposition, including, without limitation any such sale, transfer or other disposition of any Aircraft or any Equity Interests in any Borrower Subsidiary in connection with any ABS Transaction, into the Collection Account for application thereof (i) on the date of such deposit (in the case of the proceeds of an ABS Transaction or any significant sale, transfer or other disposition designated as such by the Administrative Agent) in the order of priority set forth in the Flow of Funds hereof with such holdbacks with respect to applications of funds (other than applications to the repayment of Advances) as the Administrative Agent deems desirable and (ii) on the next succeeding Payment Date (in any case other than the case of the proceeds of an ABS Transaction or any significant sale, transfer or other disposition designated as such by the Administrative Agent) in accordance with the Flow of Funds. On the date of any such sale, transfer or other disposition, the Borrower shall deliver to the Administrative Agent, amended and restated copies of Schedule I, Schedule II, and Schedule III hereto containing information that is correct after giving effect to such sale, transfer or other disposition.

In addition, and notwithstanding any provision of the Servicing Agreement, the Borrower agrees that it shall (1) cause each Borrower Subsidiary to only sell, transfer or otherwise dispose of, directly or indirectly, (a) any engine or part relating to an Aircraft (i) on the date that such Aircraft is sold, transferred or otherwise disposed of, or (ii) in connection with the replacement of such engine or part, and (b) an Aircraft to the extent permitted under the related Lease or any other Transaction Document, and (2) provide prior written notification of the sale, transfer or disposition of any Aircraft to the Administrative Agent.

Notwithstanding the foregoing, an Aircraft that has suffered an Event of Loss may be disposed of at the direction of an insurer that provided insurance covering such Event of Loss and has paid into the Collection Account all insurance proceeds to which the Collateral Agent, the Borrower and/or the applicable Borrower Subsidiary are entitled to receive in connection with such Event of Loss.

The provisions of this Section 10.8 shall not apply to or prohibit any repurchase or purchase in accordance with the remedial provisions of the AerCap-Borrower Purchase Agreement.

SECTION 10.9 Extension, Amendment or Replacement of Leases.

(a) Except as provided by this Section 10.9 (and in any case subject to the limitations of Section 10.7), the Borrower shall not allow any Borrower Subsidiary to transfer, assign, extend, amend, replace, or waive any term of, or otherwise modify any Lease, in any way that may cause such Lease to no longer constitute an Eligible Lease, or that would have a material adverse effect on the validity, perfection or priority of the security interest of the Collateral Agent therein.

(b) Upon the termination of any Lease with respect to any Aircraft, the Borrower shall cause the applicable Borrower Subsidiary to use its reasonable commercial efforts to renew such Lease or lease such Aircraft to another Eligible Carrier pursuant to an Eligible Lease and otherwise in compliance with the terms of the Servicing Agreement. No such renewal or additional Lease shall be permitted if it would constitute a Lessee Limitation Event.

(c) Upon execution of any renewal or replacement Lease, the Borrower or the applicable Borrower Subsidiary shall deliver:

(i) to the Collateral Agent, and only if the Lease is with a Lessor organized under the laws of a State (or the District of Columbia) within the United States within the meaning of Article 9 of the UCC, the Chattel Paper Original of such renewal or replacement Lease;

(ii) to the Collateral Agent, a Notice and Acknowledgment with respect to such Lease;

(iii) to the Collateral Agent and the Administrative Agent, certificates of insurance from qualified brokers of aircraft insurance or other evidence satisfactory to the Administrative Agent, evidencing all insurance required to be maintained by the applicable Obligor together with endorsements naming (i) the Collateral Agent, for the benefit of the Administrative Agent and the Lenders, as a "contract party" and listing the relevant Transaction Documents as "contracts" for purposes of certificates incorporating Lloyd's AVN67B endorsements or similar language or as "loss payee" or as an "additional insured", if applicable and (ii) each of the Borrower, the Borrower Subsidiary that is the owner, or lessor, of such Aircraft, the Collateral Agent and the Administrative Agent, on behalf of the Lenders, as an additional insured;

(iv) to the Administrative Agent, promptly and in any case within 15 days, a copy of such Lease, and an amended and restated Schedule III hereto incorporating all information required under such schedule with respect to such renewed or replacement Lease; and

(v) to the Collateral Agent, with respect to any renewal or replacement Lease, copies of such legal opinions with regard to compliance with the registration requirements of the relevant jurisdiction, enforceability of such Lease and such other matters customary for such transactions to the extent that receiving such legal opinions is consistent with Leasing Company Practice.

121

(d) The Borrower shall, and shall cause each applicable Borrower Subsidiary to, in each case, whether directly or through the Servicer, commence the negotiation of any commitment for an Eligible Lease or Leases in a manner consistent with the practices employed by the Servicer with respect to its aircraft operating leasing services business generally and in accordance with the terms of the Servicing Agreement.

SECTION 10.10 Acquisitions of Aircraft. The Borrower shall not acquire, and shall not cause or permit any Borrower Subsidiary to acquire any aircraft other than (i) an Aircraft, or (ii) from another Borrower Subsidiary in connection with an ABS Transaction.

SECTION 10.11 Servicing Agreement.

(a) No Modifications. The Borrower shall not amend, terminate, restate, supplement or otherwise modify any Service Provider Agreement in any respect without the consent of the Administrative Agent, provided, that with respect to any amendment, supplement or modification to be entered into for the purposes of adding additional terms and conditions to any Service Provider Agreement or in order to comply with applicable law, such consent may not be unreasonably withheld or delayed.

(b) Service Provider Agreements. The Borrower shall take all actions as are necessary to be in compliance

with the Service Provider Agreements and to cause the applicable Service Provider to be in compliance with the applicable Service Provider Agreement to which it is party.

(c) <u>Fees</u>. The Borrower shall not, and shall not cause or permit any Borrower Subsidiary to, pay any management or other fee to AerCap or any Affiliate thereof other than payment of Service Provider Fees to the extent contemplated by this Agreement and the Service Provider Agreements.

(d) <u>Breaches</u>. The Borrower shall not commit or permit any material breach of any Service Provider Agreement.

SECTION 10.12 <u>Representations Regarding Operation</u>. The Borrower shall not, and shall not cause or permit any Borrower Subsidiary to represent or hold out, or permit any Applicable Carrier or Owner Trustee to represent or hold out, the Collateral Agent, the Administrative Agent, any Funding Agent or any Lender as (i) the owner or lessor of any Aircraft, (ii) carrying goods or passengers on any Aircraft, or (iii) being in any way responsible for any operation of carriage (whether for hire or reward or gratuitously) with respect to any Aircraft.

SECTION 10.13 <u>Costs and Expenses</u>. The Borrower shall pay all of its and its Subsidiaries' reasonable costs and disbursements in connection with the performance of its obligations hereunder and under the Transaction Documents.

SECTION 10.14 <u>Compliance with Laws, Etc</u>. The Borrower will, and the Borrower will cause each Borrower Subsidiary to, comply in all material respects with all Requirements of Law (including, without limitation, any Environmental Law), rules, regulations and orders and

preserve and maintain its corporate existence, rights, franchises, qualifications, and privileges except to the extent that the failure so to comply with such laws, rules and regulations or the failure so to preserve and maintain such existence, rights, franchises, qualifications, and privileges would not materially adversely affect the Borrower Collateral, the collectibility of the Leases or the ability of the Borrower, any Service Provider or such Borrower Subsidiary to perform its obligations under the Transaction Documents.

Without limiting the foregoing, the Borrower shall, and shall cause the Aircraft Owning Entities and Owner Participants to, obtain all material governmental (including regulatory) registrations, certificates, licenses, permits and authorizations required for the use and operation of the Aircraft Owned by it, including, without limitation, a current certificate of airworthiness for each Aircraft (issued by the applicable aviation authority and in the appropriate category for the nature of operations of such Aircraft), except that (A) no certificate of airworthiness will be required for any Aircraft (x) during any period when such Aircraft is undergoing maintenance, modification or repair, or (y) following the withdrawal or suspension by such applicable aviation authority of certificates of airworthiness in respect of all aircraft of the same model or period of manufacture as such Aircraft (in which case the Borrower and any applicable Borrower Subsidiary will comply, and cause each of its subsidiaries to comply, with all directions of such applicable aviation authority in connection with such withdrawal or suspension), or (z) with respect to a Lessee in any individual case, so long as the Servicer is enforcing, in accordance with the Servicer Standard of Performance, the applicable provisions of the Lease requiring the Lessee to cure such lapse and obtain a reinstatement of the applicable lapsed certificate of airworthiness, (B) no registrations, certificates, licenses, permits or authorizations required for the use or operation of any Aircraft need be obtained with respect to any period when such Aircraft is not being operated and (C) no such registrations, certificates, licenses, permits or authorizations will be required to be maintained for any Aircraft that is not the subject of a Lease, except to the extent required under Requirements of Law.

Notwithstanding the foregoing, no breach of this Section 10.14 shall be deemed to have occurred by virtue of any act or omission of a lessee or sub-lessee, or of any Person which has possession of the Aircraft or any engine for the purpose of repairs, maintenance, modification or storage, or by virtue of any requisition, seizure, or confiscation of the Aircraft (other than seizure or confiscation arising from a breach by the Borrower or a Borrower Subsidiary of this Section 10.14) (each, a "Third Party Event"); provided, that (i) neither the Borrower nor any Borrower Subsidiary consents or has consented to such Third Party Event; and (ii) the Borrower or Borrower Subsidiary which is the lessor or owner (or beneficial owner) of such Aircraft promptly and diligently takes such commercially reasonable actions as a leading international aircraft operating lessor would reasonably take in respect of such Third Party Event, including, as deemed appropriate (taking into account, inter alia, the laws of the jurisdictions in which the Aircraft are located), seeking to compel any applicable Obligor or any other relevant Person to remedy such Third Party Event or seeking to repossess the relevant Aircraft or engine.

SECTION 10.15 Environmental Compliance. If the Borrower or any of the Borrower Subsidiaries shall receive any letter, notice, complaint, order, directive, claim or citation alleging that the Borrower, any Service Provider or any of the Borrower Subsidiaries has violated any Environmental Law, has released any Hazardous Material, or is liable for the costs of cleaning

up, removing, remediating or responding to a release of Hazardous Materials, the Borrower shall, and shall cause any such Borrower Subsidiary to, within the time period permitted and to the extent required by the applicable Environmental Law or the Government Entity responsible for enforcing such Environmental Law, remove or remedy such violation or release or satisfy such liability.

SECTION 10.16 <u>Employee Benefit Plans; Employees</u>. None of the Borrower or any Borrower Subsidiary shall have (i) any Employee Benefit Plan, any Multiemployer Plan or any Pension Plan, or any obligation to fund any such plan, or (ii) any employees other than as required by any provisions of local law, <u>provided</u> that trustees and directors shall not be deemed to be employees for purposes of this covenant.

SECTION 10.17 <u>Change in Business</u>. The Borrower will not, nor will it permit or cause any of the Borrower Subsidiaries to, alter its policies and procedures relating to the operation of its aircraft leasing business in a manner which would materially adversely affect the collectibility of a substantial portion of the Leases or the ability of the Borrower to perform its obligations under this Agreement or any Transaction Document, without the prior written consent of the Administrative Agent.

SECTION 10.18 <u>Notice of Adverse Claim or Loss</u>. The Borrower shall notify the Lenders, the Collateral Agent, the Administrative Agent and each Funding Agent promptly, in writing and in reasonable detail, (i) of any Adverse Claim known to it made or asserted against any of the Borrower Collateral (other than Permitted Liens), (ii) of the occurrence of any event (other than a change in general market conditions) which would have a material adverse effect on the assignments and security interests granted by the Borrower or AerCap under any Transaction Document, and (iii) as soon as the Borrower or any Borrower Subsidiary becomes aware, of any loss, theft, damage, or destruction to any Aircraft if the potential cost of repair or replacement of such asset (without regard to any insurance claim related thereto) may exceed $5,000,000.

SECTION 10.19 <u>Reporting Requirements</u>.

(a) The Borrower (through itself or any applicable Service Provider) shall furnish, or cause to be furnished, to the Administrative Agent and each Funding Agent (in multiple copies, if requested by the Administrative Agent or any Funding Agent), and, in the case of clauses (i) and (vi) below, to the Collateral Agent:

(i) on each Determination Date, a certificate in substantially the form of <u>Exhibit H</u> to the Administrative Agent (the "<u>Monthly Report</u>");

(ii) as soon as available and in any event within 120 days after the end of each Fiscal Year, a copy of the audited consolidated financial statements, prepared in accordance with GAAP, for such year of each of the AerCap Group and the Borrower and their respective consolidated Subsidiaries, certified by any firm of nationally recognized independent certified public accountants acceptable to the Administrative Agent, accompanied by a certificate of the officer in charge of financial matters of

124

AerCap Group, confirming that AerCap Group is in compliance with the net worth requirement in Section 12.1(f) hereof;

(iii)     as soon as available and in any event within 75 days after the end of each of the first three quarters of each Fiscal Year, with respect to (x) the AerCap Group and (y) the Borrower and its consolidated Subsidiaries, unaudited consolidated balance sheets as of the end of such quarter and as at the end of the previous Fiscal Year, and consolidated statements of income for such quarter and for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter prepared in accordance with GAAP, certified by the officer in charge of financial matters of the AerCap Group or the Borrower, as applicable, identifying such balance sheets or statements as being the balance sheets or statements of such Person described in this paragraph (iii) and stating that the information set forth therein fairly presents the financial condition of the AerCap Group or the Borrower, as applicable, and its consolidated Subsidiaries as of and for the periods then ended, subject to year-end adjustments consisting only of normal, recurring accruals and omissions of footnotes and subject to the auditors' year end report, and accompanied by a certificate of the officer in charge of financial matters of AerCap Group confirming that AerCap Group is in compliance with the net worth requirements in Section 12.1(f) hereof;

(iv)     promptly after receipt thereof, a copy of any "management letter" received by the Borrower from its certified public accountants and the management's response thereto;

(v)     on every third Determination Date following the Original Closing Date, the Borrower shall deliver or cause to be delivered a Quarterly Report to the Administrative Agent and each Funding Agent;

(vi)     as soon as possible and in any event within five (5) days after the occurrence of a Default, an Event of Default, a Servicer Termination Event, an Early Amortization Event, an event that would constitute a Servicer Termination Event or Early Amortization Event but for the passage of time or the giving of notice or both, a written statement of an officer in charge of financial matters of the Borrower setting forth complete details of such Default, Event of Default, Servicer Termination Event, Early Amortization Event or any such other event, and the action, if any, which the Borrower has taken, is taking and proposes to take with respect thereto;

(vii)     promptly after the Borrower obtains knowledge thereof, notice of any default under the AerCap-Borrower Purchase Agreement or any Borrower Acquisition Document;

(viii)     promptly after receipt thereof, copies of all formal notices (other than an inconsequential notices) received by the Borrower or the Servicer from the seller under the AerCap-Borrower Purchase Agreement;

(ix)     promptly, from time to time, such other information, documents, Records or reports respecting the Aircraft, the Leases, the Equity Interests of the

125

Borrower Subsidiaries, the Related Security or the condition or operations, financial or otherwise, of the Borrower, the Borrower Subsidiaries or any of their respective Subsidiaries which the Collateral Agent, the Administrative Agent or any Funding Agent may, from time to time, reasonably request; and

(x)   prompt written notice of the issuance by any court or governmental agency or authority of any injunction, order, decision or other restraint prohibiting, or having the effect of prohibiting, the making of the Advances hereunder, or invalidating, or having the effect of invalidating, any provision of this Agreement, or any other Transaction Document, or the initiation of any litigation or similar proceeding seeking any such injunction, order, decision or other restraint, in each case, of which it has knowledge.

(b)   The Borrower shall provide each Service Provider with any and all information reasonably necessary or appropriate for such Service Provider in connection with its duties hereunder and under the applicable Service Provider Agreements.

(c)   The Administrative Agent, the Funding Agents and the Lenders are hereby authorized to deliver a copy of any such financial or other information delivered hereunder to the Lenders (or any affiliate of any Lender) or to the Administrative Agent or any Funding Agent, to any Government Entity having jurisdiction over any such Person pursuant to any written request therefor or in the ordinary course of examination of loan files, to any rating agency in connection with their respective ratings of commercial paper issued by any Lender or to any other Person who shall acquire or consider the assignment of, or acquisition of any participation interest in, any Obligation permitted by this Agreement; provided, that such Person agrees in writing to the confidentiality provisions set forth in Section 17.15.

SECTION 10.20  Corporate Separateness.

(a)   The Borrower shall at all times maintain independent directors (which must constitute a majority of all directors), each of which (i) does not have any direct financial interest or any material indirect financial interest in AerCap, the Borrower, or in any Affiliate of the Borrower, (ii) is not, and has not been, connected with AerCap, the Borrower, or any Affiliate of the Borrower as an officer, employee, promoter, underwriter, trustee, partner or Person performing similar functions and is not a member of the immediate family of any such person and (iii) is not, and has not been, a director, member or a trustee (other than as an independent director, member or trustee for an Affiliate which is a special purpose entity) or stockholder of AerCap, the Borrower, or any Affiliate of the Borrower and is not a member of the immediate family of any such person. The Borrower shall cause each Borrower Subsidiary (other than an Owner Trust) to at all times maintain independent directors, members or trustees (which must constitute a majority of all such positions), as applicable, each of which (i) does not have any direct financial interest or any material indirect financial interest in AerCap, the Borrower, or any Affiliate of the Borrower, (ii) is not, and has not been, connected with AerCap, the Borrower, or any Affiliate of the Borrower as an officer, employee, promoter, underwriter, trustee, partner or Person performing similar functions and is not a member of the immediate family of any such person and (iii) is not, and has not been, a director, member or a trustee (other than as an independent director, member or trustee for an Affiliate which is a special purpose

126

entity) or stockholder of AerCap, the Borrower, or any Affiliate of the Borrower and is not a member of the immediate family of any such person.

(b)     The Borrower shall not direct or participate in the management of any other Person's operations other than in its capacity as owner of Equity Interests in the Borrower Subsidiaries, and (except to the extent permitted under the Service Provider Agreements) no other Person, other than the officers, trustees and owner of the Borrower, shall be permitted to direct or participate in the management of the Borrower. The Borrower shall cause each Borrower Subsidiary to (i) not direct or participate in the management of any other Person's operations other than in its capacity as owner of Equity Interests in any other Borrower Subsidiaries and (ii) (except to the extent permitted under the Service Provider Agreements) prevent any other Person, other than the officers, trustees and owners of such Borrower Subsidiary, from directing or participating in the management of such Borrower.

(c)     [Reserved]

(d)     The Borrower shall limit its business and activities to (i) the acquisition and ownership of the Borrower Subsidiaries and/or Aircraft, (ii) effectuating any Approved Restructuring, (iii) the sale of the Borrower Subsidiaries and/or Aircraft as and when permitted hereunder, (iv) entering into and performing under the Transaction Documents, (v) entering into and performing under the documents relating to, and taking other actions related to, any ABS Transaction or Lease, and (vi) business incidental to such activities. The Borrower will be permitted to guarantee the obligations under Leases of the Aircraft Owning Entities and the Applicable Intermediaries. The Borrower shall cause each Borrower Subsidiary to limit its business and activities to (i) the acquisition and ownership (or beneficial ownership) and lease of the Aircraft and/or the ownership of other Borrower Subsidiaries, (ii) the sale of the Aircraft as and when permitted hereunder, (iii) entering into and performing under the Transaction Documents, (iv) entering into and performing under the documents relating to, and taking other actions related to, any ABS Transaction (including any Approved Restructuring) or Lease, and (v) business incidental to such activities.

(e)     The Borrower shall have stationery and other business forms separate from that of any other Person. The Borrower shall cause each Borrower Subsidiary to have stationery and other business forms separate from that of any other Person.

(f)     The Borrower shall ensure that, to the extent that it, or any Borrower Subsidiary, jointly contracts with any of its equity holders or Affiliates to do business with vendors or service providers or to share overhead expenses, the costs incurred in so doing shall be allocated fairly among such entities and that each such entity shall bear its fair share of such costs and shall ensure that, to the extent that the Borrower, or any Borrower Subsidiary, contracts or does business with vendors or service providers where the goods and services provided are partially for the benefit of any other Person, the costs incurred in so doing shall be fairly allocated to or among such entities for whose benefit the goods and services are provided and that each such entity shall bear its fair share of such costs.

(g)     The Borrower shall at all times provide for its own operating expenses and liabilities from its own funds, shall not allow its funds to be diverted to any other Person or for

127

any use other than the use of the Borrower and any Borrower Subsidiary, and shall not, except as may be expressly permitted by the Transaction Documents, allow its funds to be commingled with those of any other Person other than any Borrower Subsidiary. The Borrower shall cause each Borrower Subsidiary to at all times provide for its own operating expenses and liabilities from its own funds, not allow its funds to be diverted to any other Person or for other than the corporate use of such Borrower Subsidiary, and shall not, except as may be expressly permitted by the Transaction Documents, allow its funds to be commingled with those of any other Person, other than with the Borrower and any other Borrower Subsidiary.

(h) Except as otherwise required to effectuate an Approved Restructuring, the Borrower shall maintain its assets and transactions separately from those of any other Person, and evidence such assets and transactions by appropriate entries in books and records separate and distinct from those of any other Person. Except as otherwise required to effectuate an Approved Restructuring, the Borrower shall cause each Borrower Subsidiary to maintain its assets and transactions separately from those of any other Person and evidence such assets and transactions by appropriate entries in books and records separate and distinct from those of any other Person.

(i) The Borrower shall ensure that all transactions between the Borrower and any of its Affiliates shall be only on an arm's-length basis (it being understood and agreed that the foregoing shall not prohibit transfers by the Borrower of Equity Interest in Aircraft Owning Entities to one or more newly formed Borrower Subsidiaries, or any related transactions, in connection with any Approved Restructuring). The Borrower shall cause each Borrower Subsidiary to ensure that all transactions between such Borrower Subsidiary and any of its Affiliates shall be only on an arm's-length basis (it being understood and agreed that the foregoing shall not prohibit transfers by the Borrower of Equity Interest in Aircraft Owning Entities to one or more newly formed Borrower Subsidiaries, or any related transactions, in connection with any Approved Restructuring).

(j) The Borrower shall hold itself out to the public under its own name as a legal entity separate and distinct from any other Person, shall act solely in its own name and through its own authorized officers and agents, and no Affiliate of the Borrower shall be appointed to act as agent by the Borrower, except as may be expressly permitted by any agreements of the Borrower.

(k) The Borrower shall not hold itself out as having agreed to pay, or as being liable, primarily or secondarily, for any obligations of any other Person other than it may guaranty the obligations of a Borrower Subsidiary. The Borrower shall cause each Borrower Subsidiary to not hold itself out as having agreed to pay, or as being liable, primarily or secondarily, for any obligations of any other Person, except as contemplated by the Transaction Documents.

(l) Except as provided herein, the Borrower shall not maintain, or allow any Borrower Subsidiary to maintain, any joint account with any other Person.

(m) The Borrower shall not make any payment or distribution of assets with respect to any obligation of any other Person, except the Borrower Subsidiaries, or grant any Lien on any of its assets to secure any obligation of any other Person. The Borrower shall not allow any

128

Borrower Subsidiary to make any payment or distribution of assets with respect to any obligation of any other Person or grant any Lien on any of its assets to secure any obligation of any other Person other than the Obligations of the Borrower.

(n) The Borrower shall not make loans, advances or otherwise extend credit to any other Person (provided that the Borrower may guaranty obligations of its Subsidiaries), except on an arm's-length basis, and shall not permit any Affiliate of the Borrower to advance funds to the Borrower or otherwise supply funds to, or guaranty debts of, the Borrower (except Servicer Advances and advances under the AerCap Liquidity Facility to fund Approved Asset Improvements, and advances under the AerCap Sub Notes), it being understood and agreed that the foregoing shall not prohibit any loans or advances made in connection with any Approved Restructuring or the repayment of such loans and advances in connection with an ABS Transaction. The Borrower shall not allow any Borrower Subsidiary to make loans, advances or otherwise extend credit to any other Person, except on an arm's-length basis, and shall not permit any Affiliate of such Borrower Subsidiary, other than the Borrower, to advance funds to such Borrower Subsidiary or otherwise supply funds to, or guaranty debts of, such Borrower Subsidiary, it being understood and agreed that the foregoing shall not prohibit any loans or advances made in connection with any Approved Restructuring or the repayment of such loans and advances in connection with an ABS Transaction.

(o) The Borrower shall hold regular duly noticed meetings of the holders of its Equity Interests, no less than once annually, and make and retain minutes of such meetings. The Borrower shall cause each Borrower Subsidiary to hold regular duly noticed meetings of the holders of its Equity Interests, no less than once annually, and make and retain minutes of such meetings.

(p) The Borrower shall file its own tax returns or, if it is a member of a consolidated group, will join in the consolidated return of such group as a separate member thereof and shall ensure that any financial reports required of the Borrower shall comply with GAAP and shall be issued separately from, but may be consolidated with, any reports prepared for any of its Affiliates. The Borrower shall cause each Borrower Subsidiary to file its own tax returns or, if such Borrower Subsidiary is a member of a consolidated group, will join in the consolidated return of such group as a separate member thereof and shall ensure that any financial reports required of such Borrower Subsidiary shall comply with GAAP and shall be issued separately from, but may be consolidated with, any reports prepared for any of its Affiliates.

(q) The Borrower shall maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person. The Borrower shall cause each Borrower Subsidiary to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person.

(r) The Borrower shall comply with and exercise its rights under all provisions of the Operating Documents and Organizational Documents. The Borrower shall cause each Borrower Subsidiary to comply with all provisions of its Operating Documents and Organizational Documents.

129

SECTION 10.21 Purchase Agreement. The Borrower will not amend, waive or modify any provision of the AerCap-Borrower Purchase Agreement (other than any such amendment, waiver or modification which shall not affect, directly or indirectly, the rights, benefits and privileges of the Borrower or any Lender thereunder or the obligations and duties of AerCap thereunder) or waive the occurrence of any default under the AerCap-Borrower Purchase Agreement, without in each case the prior written consent of the Administrative Agent. The Borrower will perform all of its obligations under the AerCap-Borrower Purchase Agreement in all respects and will enforce all of its rights under the AerCap-Borrower Purchase Agreement (including without limitation, its rights to require a repurchase thereunder pursuant to Article 4.5 thereof), in accordance with its terms in all respects.

SECTION 10.22 Limitation on Certain Restrictions on Borrower Subsidiaries. The Borrower shall not, and shall not cause or permit any Borrower Subsidiary to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Borrower Subsidiary to (i) pay dividends or make any other distributions on its Equity Interests owned by the Borrower or any other Borrower Subsidiary or pay any Indebtedness owed to the Borrower or any other Borrower Subsidiary, (ii) make loans or advances to the Borrower or any other Borrower Subsidiary or (iii) transfer any of its properties to the Borrower or any other Borrower Subsidiary, except for such encumbrances or restrictions existing under or by reason of (x) a Requirement of Law, (y) this Agreement or any other Transaction Documents or (z) any Lease or any agreement regarding the sale of an Aircraft or a Borrower Subsidiary to be made in compliance with Section 10.8 hereof.

SECTION 10.23 Mergers, Etc.

Other than to the extent permitted by Section 10.8 hereof, the Borrower will not, and shall not cause or permit any Borrower Subsidiary to, merge with or into or consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions), all or substantially all of its assets (whether now owned or hereafter acquired) to, or acquire all or substantially all of the assets or capital stock or other ownership interest of, or enter into any joint venture or partnership agreement with, any Person.

SECTION 10.24 Distributions, Etc. The Borrower will not declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Equity Interests of the Borrower, or return any capital to its equity holders as such, or purchase, retire, defease, redeem or otherwise acquire for value or make any payment in respect of any of the Equity Interests of the Borrower or any warrants, rights or options to acquire any such Equity Interests, now or hereafter outstanding; provided, however, that the Borrower may declare and pay cash or other dividends on its Equity Interests to its equity holders from funds distributed to the Borrower pursuant to the Flow of Funds so long as (a) no Event of Default shall then exist or would occur as a result thereof, (b) such dividends are in compliance with all applicable law, and (c) such dividends have been approved by all necessary and appropriate entity action of the Borrower.

SECTION 10.25 Subsidiaries; Investments. The Borrower shall not, and shall not cause or permit any Borrower Subsidiary to, own, create or permit to exist any Subsidiary (except for Borrower Subsidiaries in existence as of the Initial Advance Date or Applicable Intermediaries

130

created after the Initial Advance Date provided that (i) such Applicable Intermediaries comply with all representations, warranties and covenants hereunder regarding Borrower Subsidiaries and (ii) the beneficial interests in such Applicable Intermediaries have been pledged under the Security Trust Agreement), or otherwise purchase, own, invest in or otherwise acquire, directly or indirectly, any stock or other securities, or make or permit to exist any interest whatsoever in any other Person or permit to exist any loans or advances to any Person (other than Permitted Investments), other than loans to the Borrower or any Borrower Subsidiary.

SECTION 10.26 <u>Guarantees</u>. The Borrower shall not, and shall cause each Borrower Subsidiary not to, make, issue, or become liable on any Contingent Liabilities, except (a) the Security Trust Agreement and the other Transaction Documents, (b) guarantees of the Indebtedness allowed under <u>Section 10.27</u>, (c) endorsement in the ordinary course of business of negotiable instruments for deposit or collection and (d) in the case of the Borrower, guarantees of the obligations of Aircraft Owning Entities and Applicable Intermediaries.

SECTION 10.27 <u>Indebtedness</u>. The Borrower shall not, and shall cause each Borrower Subsidiary not to, incur or maintain any Indebtedness, other than the (a) the Obligations, (b) Indebtedness permitted under <u>Section 10.25</u>, (c) Indebtedness among Borrower Group Members, (d) accounts payable in the ordinary course of business so long as the payment therefor is due within one year, and (e) Indebtedness to any member of the AerCap Group for the purpose of funding the acquisition of Aircraft or Aircraft Owning Entities or Approved Asset Improvements or for other purposes approved by the Administrative Agent; <u>provided</u>, that such Indebtedness is evidenced by an AerCap Sub Note.

SECTION 10.28 <u>Organizational Documents</u>. Except as otherwise required to effectuate an Approved Restructuring, the Borrower shall not, and shall not cause or permit any Borrower Subsidiary to, modify, amend, or alter any of its Organizational Documents or its Operating Documents without the prior written consent of the Administrative Agent.

SECTION 10.29 <u>Audits; Inspections</u>. Until the date on which all Obligations are paid in full, and in any case not more frequently than four (4) times per calendar year (unless an Event of Default shall have occurred), each of the Borrower and the Servicer will, and the Borrower will cause the Borrower Subsidiaries to, at their respective expense from time to time during regular business hours as requested by the Administrative Agent, permit such Person or its agents or representatives (which shall not include independent public accountants) (i) subject to any limitations in a Lease, to conduct periodic inspections of the Aircraft, the Leases, the Related Security, the other Aircraft Assets and the related books and records and collections systems of the Borrower, the Servicer and any Borrower Subsidiary, as the case may be, (ii) to examine and make copies of and abstracts from all books, records and documents (including, without limitation, computer tapes and disks) in the possession or under the control of the Borrower, the Servicer and any Borrower Subsidiary, as the case may be, relating to the Aircraft, the Leases, the Related Security and the other Aircraft Assets, and (iii) to visit the offices and properties of the Borrower, the Servicer and any Borrower Subsidiary, as the case may be, for the purpose of examining such materials described in clause (ii) above, and to discuss matters relating to Aircraft, the Leases, the Related Security, the other Aircraft Assets or the Borrower's, the Servicer's or any Borrower Subsidiary's performance under the Transaction Documents or

under the Leases with any of the officers or employees of the Borrower, the Servicer or any Borrower Subsidiary, as the case may be, having knowledge of such matters. In addition, upon the request of the Administrative Agent, no more than once per year (with such limitation applicable only prior to the occurrence of an Event of Default), the Borrower will, at its expense (not to exceed $50,000 in any calendar year prior to the occurrence of an Event of Default, after which such expense limitation shall no longer apply), appoint an agent or representative of the Administrative Agent, including a consulting arm of an accounting firm of independent public accountants (but otherwise not an independent public accountant), or utilize the representatives or auditors of the Administrative Agent, to prepare and deliver to the Administrative Agent, a written report with respect to the Aircraft and the Leases (including, in each case, the systems, procedures and records relating thereto) on a scope and in a form reasonably requested by the Administrative Agent.

SECTION 10.30  Use of Proceeds; Margin Regulations.

(a)  Use of Proceeds. The proceeds of the Advances are to be used solely: (i) to repay the Original Agreement Repayment Amount, (ii) to finance the purchase by the Borrower from AerCap, on a "true sale" basis, of Equity Interests in Aircraft Owning Entities and Owner Participants, pursuant to the AerCap-Borrower Purchase Agreement, which interests AerCap has acquired from the applicable Sellers pursuant to the related Aircraft Acquisition Documents (collectively, the "Borrower Acquisition"), (iii) in the case of Improvement Advances, to finance a reimbursement or otherwise in respect of Approved Asset Improvement Costs, (iv) in the case of Critical Mass Event Advances and Increased Availability Advances, to utilize availability arising under this Agreement due to Critical Mass Advance Rate Adjustments or other changes in Advance Rate Adjustments, (v) in the case of Initial Advances, to pay certain expenses and (vi) in the case of Class B Advances, and in addition to the foregoing, to fund the Liquidity Reserve Account to the Required Liquidity Reserve Amount in connection with a related Borrower Acquisition.

(b)  Margin Regulations. The Borrower shall not permit the proceeds of any Advance to be used for any purpose which entails a violation of, or is inconsistent with, Regulation T, U or X of the Board of Governors of the Federal Reserve System of the United States.

SECTION 10.31  Accounting; Irish Tax Residency. The Borrower shall not, and shall not cause or permit any Borrower Subsidiary, to (i) change its Fiscal Year, or have any fiscal year other than the Fiscal Year or (ii) make or permit any change in accounting policies or reporting practices, without the consent of the Administrative Agent, except changes that are required by or in accordance with GAAP. In addition, the Borrower shall not take any affirmative action which would cause it to no longer be tax resident in Ireland.

SECTION 10.32  Hedging Policy; Currency Risks.

(a)  The Borrower shall maintain, as of and after the Closing Date, a hedging policy ("Hedging Policy") consistent with the criteria and provisions set forth on Exhibit O hereto, and with any changes in such Hedging Policy to be made subject to the provisions set forth on Exhibit O.

132

(b)     The Borrower further covenants and agrees to implement and comply with its Hedging Policy as in effect from time to time, by entering into Eligible Hedge Agreements with Eligible Counterparties as necessary to so comply.

(c)     The Borrower agrees that it will not maintain Leases payable in Euros, with respect to Leases on Aircraft that in the aggregate have an Allocable Advance Amount exceeding $50,000,000.

SECTION 10.33   [Reserved].

SECTION 10.34   Insurance.

(a)     The Borrower shall maintain in full force and effect the Contingent Policy and shall maintain, and shall cause the Insurance Servicer and each Borrower Subsidiary to, maintain or cause to be maintained with respect to each Aircraft and all other Borrower Collateral all other insurance required pursuant to the Servicing Agreement.

(b)     Neither the Contingent Policy, nor any policy implementing the Required Coverage Amount as described in subsection (d) below, shall be amended without the prior written consent of the Administrative Agent, which consent with respect to any amendment that does not adversely affect the coverages or other terms or protections provided by the Contingent Policy or such other policy, will not be unreasonably withheld or delayed.

(c)     The Borrower shall deliver to the Administrative Agent copies of Lessee insurance certificates evidencing the insurance coverages required under the applicable Lease, to the extent not delivered at or prior to the related Additional Advance Date, as soon as available (provided that the Servicer is undertaking efforts to obtain the same from the Lessee, consistent with the Servicer Standard of Performance).

(d)     The Borrower agrees that, to the extent that it shall have obtained the Required Coverage Amount in respect of a country to be included (or treated as if included) on the Approved Country List, that it will maintain such Required Coverage Amount in effect for so long as the Borrower's Portfolio has exposure to such country.

SECTION 10.35   Anti-Terrorism Law; Anti-Money Laundering. The Borrower shall not, nor shall it permit or cause any Borrower Subsidiary to:

(a)     Anti-Terrorism Law. Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in Section 9.22, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law (and the Borrower, the Aircraft Owning Entities and the Owner Participants shall, and shall cause any Borrower Subsidiary to, deliver to the Lenders any certification or other evidence requested from

133

time to time by any Lender in its reasonable discretion, confirming their compliance with this Section 10.35).

(b)    Money Laundering. Cause or permit any of the funds of any of them that are used to repay the Advances to be derived from any unlawful activity with the result that the making of the Advances would be in violation of any Requirement of Law.

SECTION 10.36  Embargoed Person. The Borrower shall not, nor shall it permit or cause any Borrower Subsidiary to, cause or permit (a) any of the funds or properties of any of them that are used to repay the Advances to constitute property of, or be beneficially owned directly or indirectly by, any person subject to sanctions or trade restrictions under United States law ("Embargoed Person" or "Embargoed Persons") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or Requirement of Law promulgated thereunder, with the result that such investment (whether directly or indirectly) is prohibited by a Requirement of Law, or the Advances made by the Lenders would be in violation of a Requirement of Law, or (2) the Executive Order, any related enabling legislation or any other similar Executive Orders or (b) any Embargoed Person to have any direct or indirect interest of any nature whatsoever in any of the Borrower or any Borrower Subsidiary, with the result that such investment (whether directly or indirectly) is prohibited by a Requirement of Law or the Advances are in violation of a Requirement of Law.

SECTION 10.37  ANA Additional Covenants. (i) The Borrower and the Servicer shall cause Opal to cause Tateha to convey title to the ANA Aircraft to Opal under the terms of the Tateha Sale and Conditional Repurchase Agreement on the Original Scheduled Expiry Date (as defined in the Tombo Sublease, and not giving effect to any extension thereof), and (ii) the Borrower shall not permit the term of either the Tombo Sublease or the ANA Sublease to be extended beyond such date, except that in the case of clause (i) or clause (ii) the Borrower and the Servicer shall not be so obligated if they shall have obtained the prior written consent of the Administrative Agent, which consent shall not be unreasonably withheld, except that no such consent shall be required if on the Original Scheduled Expiry Date (not giving effect to any extension thereof) Tateha holds no assets other than title to the ANA Aircraft. Neither the Borrower nor any Service Provider shall, nor shall the Borrower allow any Borrower Subsidiary to, convey title to any aircraft or any other asset to Tateha on or after the date hereof.

SECTION 10.38  ABS Asset Purchase Agreement. The Servicer shall take all actions necessary under any ABS Asset Purchase Agreement in order to cause each related ABS Subject Aircraft to be transferred to the related ABS Issuer as promptly as possible on or after the closing date with respect to such ABS Asset Purchase Agreement.