```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X
BRIARWOOD INVESTMENTS, INC.,
Individually and on Behalf of All
Others Similarly Situated

                Plaintiff,                OPINION AND ORDER

     - against -                           07 Civ. 8159 (LLS)

CARE INVESTMENT TRUST INC., F. SCOTT
KELLMAN, ROBERT O'NEILL, and FLINT D.
BESECKER,

                Defendants.
- - - - - - - - - - - - - - - - - - -X
```

Defendant Care Investment Trust Inc. filed a registration statement and prospectus with the Securities and Exchange Commission ("SEC") in connection with its initial public offering (the "Care IPO"). Defendants Kellman, O'Neill, and Besecker each signed the registration statement.

The issue on the defendants' motion for summary judgment is whether Care's registration statement and prospectus contained materially false or misleading statements, in violation of sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l* (a)(2), 77o, regarding Care's expectation of securing warehouse financing.

## BACKGROUND

The following facts are not disputed, except where noted.

Care Investment Trust is a real estate investment trust, managed by CIT Healthcare LLC, a wholly owned subsidiary of CIT

Group Inc. ("CIT").  Care provides mortgage financing to healthcare-related facilities and invests in healthcare-related real estate assets.  The individual defendants are former Managing Director and Head of Real Estate for CIT Healthcare and former Care CEO F. Scott Kellman; former CFO, Treasurer, and Secretary of Care Robert O'Neill; and former President of CIT Healthcare and current director on Care's board Flint Besecker. The lead plaintiffs are UNITE HERE National Retirement Fund and Norfolk County Retirement System, who are pursuing this claim on behalf of a putative class consisting of purchasers of stock in reliance on Care's IPO documents.

CIT decided to fund Care by warehouse financing (also known as a "warehouse facility" or "warehouse line"), which "is typically a form of short-term financing that is provided by one or more banks."  Ashraf Dep. 21:25-22:3, Feb. 5, 2010, Rosenfeld Decl. Ex. 1.  Besecker worked with Usama Ashraf, a Senior Vice President and Assistant Treasurer of CIT, to formulate a financing strategy for Care.  Cathleen Crowley-Piscitell, Chief Risk Officer of CIT Healthcare, and William Harris, an Assistant Vice President in Strategic Finance for CIT, were also part of the team implementing Care's debt strategy.

In January and February 2007, representatives of CIT met with several banks, including Credit Suisse Securities (USA), LLC, also an underwriter for Care's IPO, to discuss warehouse

- 2 -

financing for Care.  On February 15, 2007, Credit Suisse Real Estate Capital provided CIT with an initial term sheet for Care's warehouse facility.  On March 29, 2007, Care filed with the SEC its initial registration statement, which stated in relevant part, "We will use short-term financing, in the form of warehouse facilities.  Warehouse lines are typically collateralized loans made to borrowers who invest in securities and loans and, in turn, pledge the resulting securities and loans to the warehouse lenders."  Joint Statement of Facts ¶ 26.  CIT and Credit Suisse continued to negotiate, and on April 26, 2007, Credit Suisse provided Care with a final term sheet.  After comparing Credit Suisse's terms to those of other potential lenders, CIT selected Credit Suisse as a warehouse lender for Care because "we thought that Credit Suisse had one of the better proposals."  Ashraf Dep. 90:16-17, Kratenstein Decl. Ex. 2.

While in negotiations with Credit Suisse, CIT also sought an additional warehouse lender who would match Credit Suisse's terms for Care.  UBS Real Estate Securities Inc., an affiliate of Care IPO underwriter UBS Securities LLC, sent CIT an initial term sheet on May 7, 2007.  On May 11, 2007, Care filed with the SEC its first amended registration statement, which contained the same language regarding warehouse financing as the initial registration statement.  UBS sent CIT a revised term sheet on

May 18, 2007.  By May 23, 2007, CIT selected UBS as Care's second warehouse lender, believing that UBS's terms most closely matched those of Credit Suisse.

Before internally approving credit for the warehouse facilities, both potential lenders conducted "due diligence" investigations of Care.  On May 25, 2007, representatives from Credit Suisse met with CIT Healthcare employees and prospective Care officers,[1] and requested a follow-up meeting to discuss, among other things, warehouse financing.  On June 4, 2007, members of CIT gave a presentation for Care's prospective directors,[2] at which they identified Credit Suisse and UBS as Care's potential warehouse lenders.  On June 6, 2007, UBS representatives held an in-person session similar to that earlier conducted by Credit Suisse.

Recognizing that the warehouse financing might not close by the date of the Care IPO, CIT circulated a draft registration statement on June 6, 2007, which stated in relevant part:

> We are currently negotiating a warehouse facility with Column Financial, Inc., an affiliate of Credit Suisse Securities, LLC, an affiliate of one of our underwriters, which we expect to be in place shortly after the consummation of this offering.  We are also currently negotiating a warehouse facility with UBS Real Estate Securities Inc., an affiliate of one of our underwriters.  There is no assurance, however, that we will be able to close these facilities on

---

[1] Because Care was not yet formally in being (since it was formed only to participate in this transaction), its officers and directors were not yet in office.
[2] Care's officers and directors were not yet in office.  See note 1 supra.

terms favorable to us, if at all.

Kratenstein Decl. Ex. 53.  Shortly thereafter, each of Care's underwriters, including Credit Suisse and UBS, consented to the use of that language.  Certain minor changes were made to the draft registration statement, including the addition of a clause stating that Care expected to close its warehouse facility with UBS "soon after the consummation" of the IPO. These changes were included in Care's second amended registration statement, filed with the SEC on June 7, 2007.  The second amended registration statement contained the following disclosure, the one in issue in this case (the "Disclosure"):

> We will use short-term financing, in the form of warehouse facilities.  Warehouse lines are typically collateralized loans made to borrowers who invest in securities and loans and, in turn, pledge the resulting securities and loans to the warehouse lender.  We are currently negotiating a warehouse facility with Column Financial Inc., an affiliate of Credit Suisse Securities, LLC, an affiliate of one of our underwriters, which we expect to be in place shortly after the consummation of this offering.  We are also currently negotiating a warehouse facility with UBS Real Estate Securities Inc., an affiliate of one of our underwriters, which we expect to be in place soon after the consummation of this offering.  There is no assurance, however, that we will be able to close these facilities on terms favorable to us, if at all.

Kratenstein Decl. Ex. 57.

CIT employees continued to work toward securing the warehouse lines.  Ashraf e-mailed Crowley-Piscitell and Harris on June 8, 2007, discussing the "due diligence" session with

UBS, and mentioned that a UBS representative suggested June 30, 2007, as the date by which UBS would provide internal credit approval for the warehouse facility.  Ashraf also said that the final documentation process would last several weeks after receiving internal credit approval.  See Kratenstein Decl. Ex. 41.  Also on June 8, 2007, Crowley-Piscitell e-mailed Besecker to say that her meeting with Credit Suisse "went very well," and that Credit Suisse "hedged on meeting end of month timeline, but will be likely done with approvals by end on [sic] next week or beg of the following week."  Kratenstein Decl. Ex. 44.

During the week leading up to the Care IPO CIT continued to cooperate with Credit Suisse and UBS on closing the warehouse financing.  Credit Suisse was awaiting approval from its outside counsel before completing its internal approval process.  UBS was conducting further "due diligence," and on June 18, 2007, Crowley-Piscitell stated to Besecker that she anticipated UBS's approval that week.

Care filed with the SEC its final prospectus and registration statement on June 21, 2007, each of which contained the Disclosure, as quoted above.  Each of Credit Suisse and UBS, in its capacity as underwriter, approved Care's final prospectus.  The registration statement was declared effective by the SEC on June 22, 2007.

Discussions with both Credit Suisse and UBS continued

throughout the summer of 2007, and Credit Suisse's internal credit committee gave its approval on June 29.  However, by August 14, 2007, when Care filed its Form 10-Q with the SEC, market conditions had deteriorated and Care had not closed either warehouse facility.  In its Form 10-Q, Care explained:

> Since June 30, 2007, investor concerns surrounding sub-prime mortgage credit risk, hedge fund losses, a large volume of unsuccessful leveraged loan syndications and related impact on the overall credit markets, including widening of credit spreads, have materially impacted liquidity in the debt markets, making financing terms for borrowers less attractive.  Consequently, our efforts to negotiate our warehouse facilities on terms favorable to us are taking longer than expected.  Should the current market conditions continue, our ability to grow may be impeded.  We are in discussions with several financial institutions relating to other short-term financings.

Kratenstein Decl. Ex. 89.

On October 1, 2007, Care closed its warehouse facility with Credit Suisse, albeit on terms less favorable than those in Credit Suisse's final term sheet.  UBS declined the warehouse financing deal in late 2007.

When this action was brought, Care's stock traded for a third less than its IPO price.

The defendants move for summary judgment that the lead plaintiffs have presented no evidence sufficient to raise an issue whether the Disclosure contained an untrue statement of material fact, or omitted to state a material fact required to make the disclosure not misleading.

## **DISCUSSION**

Under Federal Rule of Civil Procedure 56(a), "the court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "This standard requires that courts resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  <u>Spinelli v. City of New York</u>, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotation marks omitted).

The Disclosure was an expression of opinion; however, in the securities law context, an opinion may be treated as false or misleading "if the speaker does not genuinely and reasonably believe it or if it is without a basis in fact."  <u>Kowal v. Int'l Bus. Machs. Corp. (In re Int'l Bus. Machs. Corp. Sec. Litig.)</u>, 163 F.3d 102, 109 (2d Cir. 1998).  The defendants argue that they are entitled to summary judgment because the lead plaintiffs "can point to no evidence that Care's warehouse financing disclosure was false on the date it was published, let alone sufficient evidence to create an issue of material fact." Defs.' Mem. Law in Supp. of Their Mot. Summ. J. 3.  The lead plaintiffs counter that the "Defendants cannot legitimately argue that the issues of (i) whether they believed Care would secure warehouse financing shortly after the IPO; and (ii)

whether such belief was reasonable, pose anything other than material factual questions that are incapable of resolution on this motion." Lead Pls.' Mem. Law in Opp'n to Defs.' Mot. Summ. J. 1.

**I.**

Care's Disclosure provided in part, "We are currently negotiating a warehouse facility with Column Financial Inc., an affiliate of Credit Suisse Securities, LLC, an affiliate of one of our underwriters, which we expect to be in place shortly after the consummation of this offering." Kratenstein Decl. Ex. 57. Two of the individual defendants testified that the phrase "shortly after" referred to a time period measured by weeks, as opposed to months. See Besecker Dep., Feb. 24, 2010, 161:13-16, Rosenfeld Decl. Ex. 2; Kellman Dep., Feb. 17, 2010, 92:8-14, Rosenfeld Decl. Ex. 4.

There is no genuine factual question that the defendants reasonably believed the statement that the Credit Suisse warehouse facility was expected to close shortly after the consummation of the Care IPO. In an e-mail on June 22, 2007, Michael McDugall, CIT Healthcare's Chief Credit Officer, informed defendants Besecker, O'Neill, and Kellman that the warehouse lines would close "Best case -- week after next." Kratenstein Decl. Ex. 70. On that same day, a Friday, McDugall informed Crowley-Piscitell and defendant O'Neill that Credit

Suisse was "still waiting for last legal docs before they start approval. They will have all docs by Monday." Kratenstein Decl. Ex. 71. Each individual defendant testified why he believed that the warehouse facility would close shortly after the Care IPO. See Besecker Dep. 272:1-6, Kratenstein Decl. Ex. 3 ("I had been given updates by both the treasury CIT team in addition to the CIT Healthcare team and those updates indicated that they were making substantial progress with Credit Suisse towards the consummation and closing of a warehouse line of credit."); id. at 272:10-13("I spoke directly with multiple Credit Suisse individuals who led me to believe that the credit facility would close soon or shortly thereafter."); Kellman Dep. 208:2-6, Kratenstein Decl. Ex. 6 ("Everyone in our team was working to move forward and close those facilities. And so it was my understanding from the facts and circumstances at the time that those facilities would be closed shortly after the IPO."); O'Neill Dep. 188:2-10, Feb. 19, 2010, Kratenstein Decl. Ex. 7 (his expectation that Care would close its warehouse facility with Column soon after the IPO was "based on my interaction with the internal players with Care and CIT, as well as with the investment bankers").

There is no dispute that representatives of Credit Suisse consented to the language in the Disclosure. See Counterstatement of Material Facts Opp'n Defs.' Mot. Summ. J. ¶

68; see also Besecker Dep. 274:7-11, Kratenstein Decl. Ex. 3 ("CS' sign-off" "gave me a lot of confidence" in the Disclosure). Furthermore, those at Credit Suisse working on the Care warehouse line told Credit Suisse's internal credit committee they believed that the facility would close shortly after the Care IPO: in the memorandum seeking approval of the loan, dated June 28, 2007, they stated, "If approved, CS would anticipate closing the Facility in July 2007, with initial funding occurring at that time." Kratenstein Decl. Ex. 73 at 8. The authors of the memorandum include Ken Rivkin, Andrew Winer, and Damon Pitler, each of whom was involved in negotiating the Care warehouse facility with CIT. The contemporaneous statements and actions of Credit Suisse, an ultimate source of the proposed financing, gave the authors of the IPO documents a sound basis for their Disclosure statements, whose specific language was approved by Credit Suisse as an underwriter.

## II.

With regard to UBS, the Disclosure stated, "We are also currently negotiating a warehouse facility with UBS Real Estate Securities Inc., an affiliate of one of our underwriters, which we expect to be in place soon after the consummation of this offering." Kratenstein Decl. Ex. 57. The phrase "soon after," as used in the Disclosure, had the same meaning as "shortly after." Besecker Dep. 179:1-5, Rosenfeld Decl. Ex. 2.

Although UBS became involved in the warehouse financing process later than Credit Suisse, its representatives undertook efforts to accelerate the process. In a June 6, 2007, e-mail, Scott Liebman, Managing Director in UBS's Real Estate Finance division, reported to other UBS employees that "CIT wants to close by month-end," and that "The gameplan is to simultaneously underwrite CIT (and their portfolio) and work on the legal documentation." Kratenstein Decl. Ex. 42. The next day, Harris e-mailed Crowley-Piscitell and Ashraf, informing them that UBS had retained the same outside counsel as Credit Suisse (Cadwalder, Wickersham & Taft LLP), and that "it is likely that both the CS and UBS facilities will close at the same time." Kratenstein Decl. Ex. 41. Ashraf explained to Crowley-Piscitell and Harris that "The 6/30 date UBS had mentioned at the diligence was to get their internal credit approvals and not to close the facility." Id. He added that obtaining internal approval from UBS was important, "so we can focus on the documentation process which will take several weeks post credit approvals." Id. Taken together, this evidence reflects an understanding by members of both UBS and CIT that internal approval from UBS was expected around the end of June, with the facility to close several weeks later. There is no conflicting factual evidence that the defendants did not believe that the UBS warehouse facility would close soon after the Care IPO.

On June 18, 2007, Harris e-mailed a fellow CIT employee saying that he had "not heard much from UBS other than a couple of requests." Rosenfeld Decl. Ex. 87. The lead plaintiffs characterize the lack of communication from UBS to Harris as UBS's "withdrawing from the process." Lead Pls.' Opp'n at 22-23. The Harris e-mail does not support that supposition. Crowley-Piscitell e-mailed Besecker on June 18, 2007, to say that she "Chatted with both CS and UBS today directly. UBS is finishing up some of their internal work, no issues noted. Anticipate approval this week." Kratenstein Decl. Ex. 59. The next day, Scott Liebman e-mailed Harris to ask, "Who at Cadwalder is CS using? If they haven't started yet, should we start the process?" Kratenstein Decl. Ex. 64. That same day, Aaron Niedermayer, from UBS's Real Estate Finance division, e-mailed Michael Schuman of CIT Healthcare for assistance completing "due diligence" on the Care warehouse facility. Kratenstein Decl. Ex. 65. Finally, on June 22, 2007, the day of the Care IPO, Harris e-mailed Gail Schragel of UBS, stating, "We appreciate your commitment to closing the facility as quickly as possible." Kratenstein Decl. Ex. 69. Thus, there was a basis in fact for the defendants' expectations with regard to UBS.

Not surprisingly, the defendants relied on the prospective lenders' communications with them, in their belief that the UBS warehouse facility would close soon after the Care IPO.

Besecker Dep. 272:25-273:5, Kratenstein Decl. Ex. 3 ("I did expect that Care would close on the warehouse line of credit soon or shortly thereafter based on conversations directly with UBS folks that CIT had had, that I had had, as well as other monitoring activities by the debt team that occurred throughout the IPO process."); Kellman Dep. 207:17-208:6, Kratenstein Decl. Ex. 6; O'Neill Dep. 189:13-24, Kratenstein Decl. Ex. 7. UBS consented to a modified version of the Disclosure, which did not state when Care would close the facility, but affirmed that Care expected to close a warehouse facility with UBS. See Kratenstein Decl. Ex. 55; Statement of Undisputed Material Facts Supp. Mot. Summ. J. ¶¶ 64, 67. UBS, in its capacity as an underwriter, also approved Care's registration statement and final prospectus, which contained the Disclosure in its final form. See Joint Statement ¶ 35.

The lead plaintiffs point to no evidence that either the lenders or the borrowers doubted that their statements were true.

### III.

The lead plaintiffs say that neither the Disclosure nor belief in it was reasonable, as challenged by a financial expert, who concludes the Disclosure "did not accurately portray Care Investment Trust's ("Care") status in securing warehouse financing." Decl. of Richard W. Payne, III, at 6, Rosenfeld

Decl. Ex. 123. Mr. Payne asserts that Care's management was too inexperienced to conclude they could expect to secure warehouse financing and that the approval process was not yet at a stage "where one could reasonably state they expected the facility to be in place within any time frame." Id. at 8-9.

But those "expert" conclusions disregard the fact that the defendants were consistently assured by Credit Suisse that the warehouse facility would close soon after the Care IPO. Not only did Credit Suisse approve the Disclosure: its credit committee approved the facility and the preparation of documentation on June 29, 2007. Kratenstein Decl. Ex. 74. This confirms, rather than undercuts, the reasonableness of stating in the Disclosure (seven days earlier) an expectation that it would close (accompanied by a disavowal of any assurance). Credit Suisse's approval of the deal, after it had completed its initial "due diligence" inquiries, overcomes the expert's opinion that that was not reasonably to be expected.[3]  See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("[A]n expert's report is not a talisman against summary judgment.").

In the month following the credit approval, Credit Suisse examined every loan designated for inclusion in the warehouse facility. Kratenstein Decl. Ex. 80. Ultimately, due in part to "turmoil in the credit markets," id., Credit Suisse extended the

---

[3] Cf. the old trial lawyers' aphorism, "One fact is worth a shipload of argument."

Care warehouse line on terms less favorable than were stated in its final term sheet. Joint Statement ¶ 42. However, those future events do not bear upon the defendants' beliefs regarding the Credit Suisse warehouse financing as of June 22, 2007.

The expert report similarly fails to raise an issue of material fact with regard to the UBS warehouse facility. On June 6, 2007, the Managing Director of UBS acknowledged to his co-workers that "CIT wants to close by month-end," and detailed steps for expediting the process. See Kratenstein Decl. Ex. 42. Crowley-Piscitell and Ashraf, who worked closely with the defendants in attempting to obtain warehouse financing, were informed by their colleague at CIT that "it is likely that both the CS and UBS facilities will close at the same time." Kratenstein Decl. Ex. 41. On June 18, 2007, Crowley-Piscitell informed defendant Besecker "UBS is finishing up some of their internal work, no issues noted. Anticipate approval this week." Kratenstein Decl. Ex. 59. CIT's Chief Credit Officer informed Besecker on June 22, 2007, the day of the Care IPO, that both the UBS and Credit Suisse lines would be closed "Best case -- week after next." Kratenstein Decl. Ex. 70.

As in Int'l Bus. Machs., 163 F.3d at 109, summary judgment in the defendants' favor is appropriate where "there is no evidence in the record to support a finding that these statements were made in bad faith or that the speakers did not

genuinely and reasonably believe that they were accurate." See also Fecht v. N. Telecom Ltd. (In re N. Telecom Ltd. Sec. Litig.), 116 F. Supp. 2d 446, 466 (S.D.N.Y. 2000) (summary judgment appropriate because "forward-looking statements of opinion or belief . . . are not actionable if they have a basis in fact and are genuinely and reasonably believed by the speaker" (internal quotation marks omitted)).

## CONCLUSION

The defendants' motion for summary judgment (Docket No. 78) is granted. The Clerk is directed to enter judgment accordingly.

By January 15, 2010, the lead plaintiffs shall submit to this Court a letter addressing which of the redacted documents submitted in opposition to the motion should remain redacted, and the reason (if any) for each document's continued redaction.

So ordered.

Dated:   New York, New York
         December 22, 2010

                                    _____
                                         LOUIS L. STANTON
                                            U. S. D. J.